Matthew I. Knepper, Esq.
Nevada Bar No. 12796
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Suite 170-109
Las Vegas, NV 89129
Phone: (702) 825-6060
FAX: (702) 447-8048
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Sean N. Payne
Nevada Bar No. 13216
PAYNE LAW FIRM LLC
9550 S. Eastern Ave. Suite 253-A213
Las Vegas, NV 89123
702-952-2733
Fax: 702-462-7227
Email: seanpayne@spaynelaw.com

David H. Krieger, Esq.
Nevada Bar No. 9086
HAINES & KRIEGER, LLC
8985 S. Eastern Ave., Suite 350
Henderson, NV 89123
Phone: (702) 880-5554
FAX: (702) 385-5518
Email: dkrieger@hainesandkrieger.com

Mohammed Omar Badwan
Sulaiman Law Group, Ltd.
2500 S Highland Ave Ste 200
Lombard, IL 60148
630-575-8180
Fax: 630-575-8181
Email: mbadwan@sulaimanlaw.com

Thomas A. Zimmerman , Jr.
77 W. Washington St., Ste 1220
Chicago, IL 60602
312-440-0020
Email: tom@attorneyzim.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LOUIS A. CARDINALI, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendant. | :<br>:<br>:<br>:<br>Case No. 2:16-cv-2046-JAD-NJK<br>:<br>:<br>: **PLAINTIFF'S MOTION FOR SUMMARY**<br>: **JUDGMENT**<br>:<br>:<br>:<br>:<br>: |

**INTRODUCTION**

The Fair Credit Reporting Act was enacted to ensure insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.[1]  Thereunder, consumer reporting agencies ("CRAs") like Experian Information Solutions, Inc. ("Experian") must exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.  These responsibilities require Experian reinvestigate consumer disputes as to the accuracy of information,[2] and to ensure the maximum accuracy of the information which they use to prepare consumer reports.[3]

Section 1681i(a)(2) of the Fair Credit Reporting Act requires Experian, upon notice of a consumer's dispute, to notify the source of information within five days, and include all relevant information.[4]  The rationale behind notification is simple: data Furnishers ("Furnishers") have specific knowledge about the relationship with consumers, and soliciting their input into the dispute process is an essential – though not sufficient – step in reinvestigating Section 1681i consumer disputes, and ensuring the maximum accuracy of its reported data under Section 1681e(b).[5]

But the Court doesn't have to take Plaintiff Louis Cardinali's ("Plaintiff") word for it.  To fully appreciate the importance of Furnisher input, the Court can look to the testimony of Experian's corporate witnesses, who repeatedly testify that Experian depends on Furnisher information to update consumer tradelines. Experian repeatedly claims that the Furnisher whose information is subject to dispute is far-better positioned to respond to disputes with their reporting in the first instance.  Just several weeks ago, in another class case pending before this Court, Experian argued that "*a CRA's 'reasonable reinvestigation' consists largely of triggering the investigation by the [F]urnisher . . . .*"[6]  Even in this case, Experian's expert claims that the same "account-level information" regarding charge-off accounts is information that Furnishers better understand for

---

[1] 15 U.S.C. § 1681 *et seq.* ("FCRA").

[2] *Id.* at § 1681i.

[3] *Id.* at § 1681e(b).

[4] *Id.* at § 1681i(a)(2).

[5] Obviously, Experian must do more than simply transmit an ACDV and regurgitate the response, or establish faulty procedures for investigating consumer disputes.  *See Ashcraft v. Experian*, No. 16-cv-2978-JAD-NJK, ECF Dkt. 130 (D. Nev. Dec. 12, 2018).

[6] *See Ashcraft*, ECF Dkt. 134, at 16 (D. Nev. Dec. 12, 2018) (citation omitted) (emphasis added).

1

purposes of accurate reporting. But how can Experian possibly comply with its own claimed FCRA requirements, or even its own expert's suggestions, when it fails to "trigger" any Furnisher investigation at all?

Notwithstanding this, Experian failed to notify Webbank and thus providing it with an opportunity to respond before Experian unilaterally concluded its reinvestigation. Instead, Experian chose to conduct in "internal" reinvestigation Plaintiff's dispute, and upon completion, represented to Plaintiff (and anyone who might procure his consumer report) that it had "updated" his tradeline. Worse, Experian never told Plaintiff that it had sidestepped its statutory obligation to notify Webbank and provide it the opportunity to respond. This created the impression that Experian had forwarded his tradeline on to Webbank pursuant to its statutory obligation under Section 1681i(a)(2), and Webbank had agreed with Experian's reporting. Thus, Experian willfully failed to conduct a proper reinvestigation under Section 1681i, and willfully failed to establish procedures designed to ensure the maximum accuracy of its reported credit information, as Section 1681e(b) requires.

To explain away this defect in its reinvestigation procedures, Experian will likely argue that it sent a communication known as a "Dispute Response Notice," or "DRN," to Furnishers like Webbank nanoseconds before its unilateral update was completed. This is "notification" in name only, because Furnishers are provided zero opportunity to respond to a DRN. In fact, Furnishers – including Webbank – do not consider receipt of a DRN to be notification of a dispute at all. Experian has no evidence of any of the information it sent on the DRN to Webbank, although it is undisputed that Plaintiff's dispute correspondence was not attached even though this relevant information had to be attached to any proper notification under Section 1681i(a)(2).

Experian's defective reinvestigation resulted in inaccurate reporting. Specifically, Experian reported Plaintiff's post-bankruptcy-petition charge-offs, as well as a balance of $0 "as of" August 2015, when Plaintiff's bankruptcy occurred in 2012. Further, Experian's suggestion that the Webbank tradeline had been "updated" was also inaccurate, because Webbank never verified the reporting. Experian repeated this flawed internal "update" process hundreds of thousands of times in a two-year period. Moreover, Experian is one of the architects of e-Oscar – the electronic platform through which meaningless dispute "notices," like DRNs, and legitimate dispute notices, like Automated Consumer Dispute Verifications ("ACDVs"), are transmitted. Accordingly, Experian's intimate knowledge of the e-Oscar platform easily establishes that Experian knew its internal-update

1  process would not reasonably notify its Furnishers of a consumer dispute.

2  By unilaterally cutting out the Furnisher from Plaintiff's dispute process, Experian willingly

3  abandoned its oft-asserted claim that it operates like the "library."[7]   Consequently, Experian's

4  conduct was at minimum reckless, and thus willful.  And even if Experian's conduct was merely

5  negligent, Plaintiff suffered cognizable actual damages.  Either way, Plaintiff is entitled to summary

6  judgment on both his Section 1681i and 1681e(b) claims.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

**Plaintiff obtains a bankruptcy discharge, and disputes his credit information with Experian.**

8  1.  Plaintiff filed for Chapter 7 bankruptcy on January 26, 2012, including an unsecured

9  interest from Webbank/Dell Financial Services ("Webbank") on Schedule F of his petition.[8]  On April

10  30, 2012, Plaintiff earned his discharge, which included his Webbank interest.[9]

11  2.  On August 25, 2015, Plaintiff procured a consumer disclosure, or "CDI," from

12  Experian.[10]  This CDI inaccurately stated that Plaintiff's "recent balance" on the Webbank tradeline

13  was "$0 as of Jul 2015," when the balance reached $0 via Plaintiff's 2012 bankruptcy.[11]  The disclosure

14  also inaccurately reported that Webbank had charged the account off twice after he filed his bankruptcy

15  petition, in February and March of 2012, and charged off the account on multiple months generally.[12]

16  3.  Plaintiff, with the assistance of his prior bankruptcy counsel, drafted a letter and

17  ---

18  [7] May 17, 2018 Expert Report of Kimberly Cave, *Ashcraft*, ECF Dkt. 134-2, at 4 (D. Nev. Dec. 14, 2018) ("Cave *Ashcraft* Expert Report"), **Ex. 34**; Excerpts of July 13, 2018 Deposition of Kimberly Cave, *Ashcraft*, ECF Dkt. 130-17, at 64:5-65:8 (D. Nev. Dec. 14, 2018) ("Cave *Ashcraft* Depo"), **Ex. 43**.

19  [8] Excerpts of Petition, Case No. 12-10854-bam, BK Doc. 1, at 6 (Bankr.D. Nev. Jan. 26, 2012) ("Petition"), **Ex. 1**.  Plaintiff requests this Court take judicial notice of any cited documents noted in court filings as matters of public record, pursuant to Fed. R. Civ. P. 201(b).  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.11 (9th Cir. 2006) (citing *Burbank–Glendale–Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir.1998)).

22  [9] Order of Discharge, Case No. 12-01854-bam, BK Doc. 22, at 1 (Bakr.D. Nev. Apr. 30, 2012) ("Discharge"), **Ex. 2**.

23  [10] Oct. 6, 2015 Dispute from Louis Cardinali attaching (1) dispute letter (pages 1-4), Aug. 25, 2015 Experian CDI ("Aug. 2015 CDI") (pages 4-20), excerpts of voluntary petition (pages 21-24), and identifying information (page 25) (collectively, "Dispute"), **Ex. 3**.  *See also* July 19, 2018 Deposition of Mary Methvin as Experian's 30(b)(6) witness, at 65:2-15 ("Experian Depo"), **Ex. 26**; May 10, 2018 Deposition of Plaintiff, at 55:16-56:5; 72:4-12 ("Plaintiff Depo"), **Ex. 27**.

26  [11] Aug. 2015 CDI, at 6 of 14.

27  [12] *Id.* Experian generated the August 2015 CDI from File One, a database which contains "primarily consumer information."  Experian Depo, at 90:2-9.  Experian's 30(b)(6) witness indicated that File One was a "system," and that Experian probably had more than two "systems."  *Id.* at 93:18-25.

submitted to Experian, which was sent to Experian on or about October 6, 2015.[13]  Thereon, he stated that the Webbank account had been discharged in his bankruptcy, and that it was inaccurate for Experian to report any post-bankruptcy activity on the account.[14]  He also requested that Experian "ensure that any and all attachments are forwarded to" Webbank.[15]  Attached to Plaintiff's letter was his August 2015 CDI, several pages of his Chapter 7 petition, and identifying information.[16]

**Experian receives Plaintiff's dispute, but fails to properly notify Webbank.**

4.      Experian received Plaintiff's dispute,[17] which it had a duty to reinvestigate.[18]  To Experian, a consumer's payment history (such as the charge-off notations disputed here) is not an element of a consumer's file which it can independently verify.[19]  If, as here, a Furnisher was reporting multiple charge-off notations, Experian would not know the circumstances of those charge-offs; only the consumer and the Furnisher would.[20]

5.      Experian has an obligation to notify a Furnisher who a consumer identifies as having an item of information in dispute.[21]  However, Experian did not forward on Plaintiff's dispute and attachments to Webbank as Plaintiff requested.[22]  Instead, Experian ostensibly conducted an "internal" update of Plaintiff's information.[23]  Experian completed its review of Plaintiff's dispute without

---

[13] *See* Dispute, at 1-4.

[14] *See id.* at 4.

[15] *See id.* at 1.

[16] *See id.* at 4-25.

[17] *See* Dec. 12, 2016 Experian DR Log, at 1, 3 ("DR Log") **Ex. 8**; Experian Depo, at 121:16-122:1; 124:7-10.

[18] *See* Cave *Ashcraft* Expert Report, at 6 ("Upon notification directly from a consumer (including notification from their legal representative) . . . Experian will initiate its reinvestigation process."). Experian received 3,000 to 12,000 pieces of mail it receives each day.  Experian Depo, at 133:9-25.

[19] *Id.* at 111:20-113:25.

[20] *Id.* at 115:11-16.  Experian's policies also require it to forward notice of a dispute to the Furnisher when there is a dispute regarding charge-offs, which Experian did not do because Plaintiff had not used the magic words that the account was paid in connection with his dispute.  *Id.* at 222:13-224:13; 227:17-228:14; *See* May 20, 2015 Experian Participant Guide, Dispute: Trades, at 53 ("Trades Manual"), **Ex. 11**.  Experian has an entire manual devoted to ACDV processing.  *See* Excerpts of June 1, 2016 Experian Participant Guide: ACDV Procedures ("ACDV Manual"), **Ex. 12**; *cf.* Experian Depo, at 229:25-230:24.

[21] *Id.* at 184:16-19.

[22] *See id.* at 184:16-19; *see also* Oct. 31, 2018 Declaration of Kimberly Cave, at ¶¶ 6, 14 ("Cave Decl."), **Ex. 19** (indicating that the image request on the DR Log meant no attachments were provided with the DRN); DR Log, at 1, 3.

[23] Experian Depo, at 189:24-190:13.  At the time of Mr. Cardinali's dispute, Experian's policy was to report interim reporting through the discharge date, including entries for payment history.  *Id.* at

4

notifying Webbank before its agents had entered their updates.[24] Then, nanoseconds before it finalized its reinvestigation, Experian sent Webbank a DRN.[25]

**ACDVs are two-way communications which Furnishers consider notification of a dispute; DRNs are one-way communications which Furnishers do not believe provide such notice.**

6.  A DRN is a one-way communication which does not provide the recipient Furnisher with a means to respond.[26] A DRN also does not request that a Furnisher conduct an investigation,[27] and Experian does not provide its Furnishers with a reasonable opportunity to respond to a DRN before it completes its reinvestigation.[28] Experian does not consider transmission of a DRN to constitute disputing the consumer's information with that Furnisher.[29] In fact, even if a Furnisher tried to contact Experian about the accuracy of its update and changes were made, Experian would not reopen its reinvestigation or otherwise notify the consumer that an update had been made.[30] The DRN is intended simply to inform a Furnisher of an update or deletion.[31] When Experian sends a DRN, it indicates that it has all of the information it needs to make the update.[32]

7.  In contrast to the DRN, Experian can also notify Furnishers of the pendency of a consumer dispute via ACDV.[33] An ACDV is a two-way communication in which Experian requests an investigation, and in which it can describe the nature of the consumer's dispute, outline most of the information presently reported about the tradeline, and attach all relevant information it received from the consumer.[34] Furnishers must respond to an ACDV by a date certain;[35] if they fail to do so, Experian must delete the information or modify it in accordance with the consumer's original request.[36]

---

149:13-151:18. Experian changed its policy several months after Plaintiff's dispute to suppress reporting for Chapter 7 bankruptcies as of the petition date. *See id.*

[24] *See* DR Log, at 1, 3; Cave Decl., at ¶¶ 25-26.

[25] *See* Experian Depo, at 73:3-15; DR Log at 1, 3.

[26] *See* Undated Equifax, Experian, Innovis, TransUnion, and Olde, E-Oscar Guide, Disputes and Updates: Participant Guide v8, at 8 ("E-Oscar Guide"), **Ex. 13**; Experian Depo, at 56:13-20; 86:5-9; 239:10-240:1.

[27] *Id.* at 56:13-20; 86:5-9.

[28] *Id.* at 100:21-101:21.

[29] *Id.* at 110:5-23.

[30] *Id.* at 100:21-101:21.

[31] *Id.* at 53:20-54:12; 58:23-3.

[32] *Id.* at 111:15-19.

[33] *See id.* at 47:13-49:16.

[34] *See* E-Oscar Guide, at 6; Feb. 18, 2019 Declaration of Dean Binder, at ¶ 3, attaching Sept. 10, 2018 Expert Report, at ¶ 25 ("Binder Expert Report"), **Ex. 22**.

[35] E-Oscar Guide, at 52; Experian Depo, at 70:12-17; 99:23-100:10.

[36] 15 U.S.C. § 1681i(a)(5)(A).

5

8.     ACDVs and DRNs are transmitted through a system known as e-Oscar, which Experian helped to design and which it has a statutory obligation to maintain.[37] The managing entity of e-Oscar, Online Data Exchange LLC ("OLDE"), is an Experian subsidiary not wholly owned.[38] E-Oscar diverts ACDVs and DRNs into separate "queues" of information, but only ACDVs contain a response deadline.[39] E-Oscar's own guidelines indicate that ACDVs' functionality complies with the requirement that Furnishers have an automated system to report the results of any reinvestigation; "[t]his is why Data Furnishers use e-Oscar to receive and respond to disputes from Consumer Reporting Agencies."[40] E-Oscar's guidelines are silent as to whether DRNs meet this standard.[41]

9.     Consequently, Furnishers routinely testify that they only receive notice of a dispute from a CRA via ACDV, not a DRN.[42] Furnishers have testified that they are unaware of any way to communicate with the CRA other than through an ACDV response.[43] Many Furnishers have declared that if they have no records of receiving an ACDV, they had no notice of the consumer's dispute.[44]

**Experian's representatives routinely testify that Experian cannot properly resolve consumer disputes without Furnisher input.**

10.     Experian's representatives repeatedly testify that Experian may be unable to properly

---

[37] Experian Depo, at 49:7-22 (ACDVs); *id.* at 49:23-51:1 (e-Oscar); *id.* at 52:22-53:19 (DRNs); 15 U.S.C. § 1681a(5)(D).

[38] *See* ECF Dkt. 17, at 1 (listing Online Data Exchange LLC as a "subsidiary not wholly owned.").

[39] *See* Excerpts of Mar. 6, 2017 Deposition of Tracy Meyer as Silver State Schools Credit Union's 30(b)(6) witness, *Travers v. State Collection Service, Inc.*, No. 16-cv-1848-RFB-PAL, ECF Dkt. 93-26, at 42:4-43:19; 89:1-15 (D. Nev. July 3, 2017) ("Meyer *Travers* Depo"), **Ex. 31**; Experian Depo, at 89:4-7.

[40] E-Oscar Guide, at 5.

[41] *See generally* E-Oscar Guide.

[42] *See* Excerpts of Mar. 5, 2018 Deposition of Michael Ward as Specialized Loan Servicing, LLC's 30(b)(6) witness, *Garcia v. Specialized Loan Servicing, LLC*, No. 17-cv-1721-RFB-VCF, ECF Dkt. 37-20, at 22:20-24:2 (D. Nev. May 14, 2018) ("Ward *Garcia* Depo"), **Ex. 32**; Excerpts of Dec. 2, 2018 Deposition of Christy Christensen as Ditech Financial, LLC's 30(b)(6) witness, *Dey v. Experian*, No. 18-cv-502-JAD-NJK, *consolidated with* No. 18-cv-503-RFB-CWH, at 38:3-13; 39:1-14 (D. Nev. Feb. 8, 2019) ("Christensen *Dey* Depo"), **Ex. 33**.

[43] *See* Ward *Garcia* Depo, at 31:24-32:3.

[44] *See* Mar. 31, 2017 Declaration of Megan Bartlett, *Thayn v. Select Portfolio Servicing, Inc.*, No. 17-cv-406-RFB-GWF (D. Nev.), at ¶¶ 3-4; Jan. 12, 2018 Declaration of Tonya Osborne, *Conley v. Nissan Motor Acceptance Corp.*, No. 17-cv-2785-JCM-VCF, at ¶ 5 (D. Nev.); Dec. 16, 2015 Declaration of James Scott, *Pappas v. U.S. Bank Home Mortgage*, No. 15-cv-8115, at ¶ 6 (N.D. Ill.); Jan. 4, 2017 Declaration of J. Tann Pence, *Word v. Wells Fargo Dealer Services*, No. 16-cv-1836-APG-NJK, at ¶¶ 4-14 (D. Nev.); Jan. 19, 2017 Declaration of Brian Drummond, *Johnson v. Cenlar Federal Savings Bank*, No. 16-cv-1833-RFB-PAL, at ¶¶ 5-13 (D. Nev.), collectively referred to as "Additional Declarations of No Notice" and attached at **Ex. 30**.

update accounts without Furnisher input. As Kimberly Hughes (now Kimberly Cave) declared in *Shaw v. Experian*, "the [F]urnisher of credit information stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on a reinvestigation," and "Experian . . . does not have access to detailed account records regarding a consumer's payment history, underlying contracts or other agreements and particulars of any contracts or agreements that the consumer and creditor may have entered."[45] Here, Experian's expert concedes that information regarding charge-off notations is information within the Furnisher's cognizance, as "Plaintiff would have been able to make additional payments on the account at any time prior to the account being discharged in bankruptcy."[46]

11.    In *Shaw*, Ms. Hughes suggests that a "reinvestigation" requires sending an ACDV: "[a]fter selecting an item for *reinvestigation* . . . . Experian prepares a notice of the dispute for dissemination to the data provider or providers," and "[u]pon receipt of *the* response from the Furnisher, Experian will review the response according to its policies and procedures and make any appropriate updates or deletions."[47] If the Furnisher fails to respond, Experian "either update[s] the item as the consumer requested or delete it."[48] Other Experian representatives suggest that Experian does not use a DRN when reinvestigating: "When a consumer disputes an item of information on the consumer's file disclosure or credit report, Experian sends (either manually or electronically) to the creditor a "Consumer Dispute Verification" form or an "Automated Consumer Dispute Verification" (collectively referred to as 'A/CDV'). The A/CDV identifies the consumer, identifies the basis for the consumer's dispute, and asks the creditor to verify or amend the information reported."[49] Experian declarants have also stated that Experian's assumptions about how a tradeline should report would be arbitrary, and would jeopardize the integrity of Experian's reported information.[50]

---

[45] July 13, 2016 Declaration of Kimberly Hughes, *Shaw v. Experian*, No. 13-cv-1295-JLS-BLM, ECF Dkt. 162-9, at ¶ 33 (S.D. Cal. July 14, 2016) ("Hughes *Shaw* Decl."), **Ex. 36**.

[46] *See* Sept. 10, 2018 Expert Report of Marsha J. Courchane, Pd.D., at ¶ 21 ("Courchane Expert Report"), **Ex. 25**; Jan. 29, 2018 Deposition of Marsha J. Courchane, Ph.D, at 21:18-22:17 ("Courchane Expert Depo"), **Ex. 29**.

[47] Hughes *Shaw* Decl., at ¶¶ 36-37.

[48] *Id.* at ¶ 38.

[49] July 2, 2013 Declaration of Kathy Centanni, *Banga v. Experian*, No. 08-cv-4147-SBA, ECF Dkt. 91-4, at ¶ 15 (N.D. Cal. July 2, 2013) (Centanni *Banga* Decl."), **Ex. 37**; June 13, 2013 Declaration of Teresa Iwanski, *Toliver v. Experian*, No. 12-cv-2436, at ¶ 9 (S.D. Tex. June 14, 2013) ("Iwanski *Toliver* Decl."), **Ex. 38** (using the phrase "ACDV" instead of "A/CDV" but otherwise identical).

[50] *See* Centanni *Banga* Decl., at ¶ 16; Iwanski *Toliver* Decl., at ¶ 10; July 3, 2017 Declaration of Anna Simmons, *Travers*, ECF Dkt. 89, at ¶ 18 (D. Nev. July 3, 2017) ("Simmons *Travers* Decl."), **Ex.**

12.     Other Experian witnesses have claimed that they can handle an internal dispute if "the dispute does not require Experian to make assumptions about the account".[51]  Experian concedes that it obtains information from consumers to update its internal systems.[52]  If the "proof" documents a consumer submits are not sufficient to make an update, then Experian must contact the Furnisher.[53]

**Experian's internal update did not even conform to its own written policies, and thus even by Experian's own terms did not ensure the maximum accuracy of its credit reporting data.**

13.     Per Experian's own policies, Plaintiff's dispute correspondence was not sufficient to make an internal update, because it did not include any portions of Schedules A, D, or F of his Chapter 7 bankruptcy petition.[54]  There is also no evidence that Experian checked the results of its inquiry into the accuracy of Plaintiff's information against the publicly available bankruptcy records to determine whether Plaintiff's debt had been reaffirmed or otherwise taken out of his Chapter 7 bankruptcy; in fact, doing so was against Experian's policies.[55]  Instead, Experian claimed to have made the update to Plaintiff's Webbank tradeline solely from his dispute letter.[56]

14.     Experian's declarants have testified that even when sending a DRN, Experian only internally updates when it can do so either by recourse to "Experian's own policies or to proof documents provided by the consumer."[57]  Anna Simmons, an Experian employee, recently declared that "[w]hen a consumer communicates a dispute to Experian, it is important that Experian follow" its procedures, because if Experian were to accept consumers' representations without question, "credit reports would no longer reflect the actual creditworthiness of would-be borrowers."[58]  Following its procedures "allow[s] Experian to fulfill its duty to ensure that the information it disseminates is of *maximum possible accuracy*."[59]  Plaintiff's expert agrees with Ms. Simmons that Experian's decision

---

**39**.

[51] *Id.* at ¶ 15.

[52] *E.g.*, *id.* at ¶ 15.

[53] *Id.* at ¶ 15.

[54] *See* Dispute Manual, at 27; *see* Experian Depo, at 218:2-219:19.

[55] *See* Cave *Ashcraft* Depo, at 222:23-232:14.

[56] Experian Depo, at 189:24-190:13.

[57] Sept. 30, 2016 Declaration of Mary Methvin, *Pappas v. U.S. Bank Home Mortgage*, No. 15-cv-8115, ECF Dkt. 103-1, at ¶ 14 (N.D. Ill. Oct. 3, 2016) ("Methvin *Pappas* Decl."), **Ex. 40**; *see also* Cave *Ashcraft* Expert Report, at 6 ("[A]bsent documentation received from the consumer that enables Experian to update the item, Experian prepares a notice of the dispute for dissemination to the data provider or providers.").

[58] Simmons *Travers* Decl., at ¶ 21.

[59] *Id.* (emphasis added).

to withhold an ACDV to Webbank in this case did not ensure the greatest degree of accuracy.[60]

15.     In this case, Webbank has no record of receiving any notice of a dispute from Experian.[61]   Experian has no copies of the DRN it actually sent to Webbank, or the information it contained.[62]   Although Experian claims that it sends all relevant information to the Furnisher used to make an internal update via DRN,[63] and testified that Plaintiff's letter should have been sent with the DRN because it was used to make the internal change,[64]   Experian's internal "DR Log" shows that images were not attached to the DRN at all, and thus none of Plaintiff's dispute correspondence, bankruptcy information, or CDI were provided to Webbank in connection with the DRN.[65]

**Experian's "reinvestigation" conceals from Plaintiff that Experian failed to notify Webbank of his dispute by providing Webbank any opportunity to respond.**

16.     On October 19, 2015, Experian sent its "reinvestigations" to Plaintiff.[66]   Experian provided two separate reinvestigations: first, a document known as a "CDF Full," or "CDF-F," which purportedly contained a full disclosure of the information in his consumer file pursuant to Section 1681g.[67]   Next, Experian provided a document several pages long called a "CDF Abbreviated," or "CDF-A," which contained the revisions to his Webbank tradeline.[68]     Under Section 1681i(a)(6)(B)(ii), both the CDF-A and CDF-F were required to take the form of consumer reports.[69]

---

[60] Binder Expert Report, at ¶ 27.

[61] *See* Dec. 8, 2016 Declaration of Megan Bartlett, ECF Dkt. 34-6, at ¶¶ 3-4 (D. Nev. Jan. 3, 2017) (Bartlett *Cardinali* Decl."), **Ex. 4**.

[62] *See* Dec. 11, 2017 Experian Responses to Plaintiff's First Set of Requests for Admission, at No. 28, 29 ("RFA Responses"), **Ex. 20**; Experian Depo, at 56:5-19; 74:1-16.

[63] *Id.* at 99:23-100:15.

[64] *Id.* at 189:16-23.

[65] Cave Decl., at ¶¶ 6, 14; DR Log, at 1, 3; Experian Depo, at 74:25-75:20.  Furnishers have also testified that in fact there are no documents attached to DRNs, other than the DRN form itself.  *See* Meyer *Travers* Depo, at 89:16-91:21.

[66] Oct. 19, 2015 Experian Reinvestigation, Report No. 0405-5428-19 ("CDF-F"); Oct. 19, 2015 Experian Reinvestigation, No. 1210-8791-66 ("CDF-A"), collectively attached at **Ex. 5**; Experian Depo, at 175:5-18; Plaintiff Depo, at 92:13-93:5.  *See also* Experian CIS Compliance Standards: FCRA Core, at 2 ("CIS Core Standards"), **Ex. 17** (noting that a product under the FCRA is one which utilizes data, in whole to in part, from File One, or a product which is comprised of non-File One information that is expected to be used in accordance with the statutory definition of consumer report at 15 U.S.C. § 1681a(d)); Feb. 18, 2019 Declaration of Miles N. Clark, at ¶ 6 ("Clark Decl."), **Ex. A**.

[67] *See* Disclosure Log; Experian Depo, at 65:23-66:6.

[68] *See* Undated Experian Disclosure Log for Plaintiff, at 1 ("Disclosure Log"), **Ex. 7**; Experian Depo, at 65:23-66:6.

[69] 15 U.S.C. § 1681i(a)(6)(B)(ii).

17.     On both documents, Experian explained to Plaintiff how to "read" his results.[70] Experian's actions fell into four categories.  "Deleted" indicated an item's removal from the credit report.[71]  "Remains" meant that no changes had been made.[72]  "Processed" meant that an item "was either updated or deleted".[73]  Finally, "Updated" meant "A change was made to this item; review this to view the change."[74]  Experian marked Plaintiff's Webbank dispute as "Updated," and added a notation in his Webbank tradeline that it had been "updated based on the processing of your dispute."[75] Nowhere on Experian's CDFs did Experian indicate that it had *not* sent on his dispute or attachments to Webbank before it completed its reinvestigation, or whether it had made its update internally.[76]

18.     Experian's CDFs also contained the statement that Plaintiff could "request that [Experian] send these results to organizations that you specifically designate who have requested your credit report, which contained the deleted or disputed information within the past two years for employment purposes, or within six months for any other purpose."[77]  To Experian, "results" meant the entire CDF-F and/or CDF-A, including tradelines, list of hard and soft inquiries, addresses, etc.[78]

**Experian's "reinvestigation" results in the reporting of inaccurate information.**

19.     Experian's CDFs still contained inaccuracies.  Specifically, Experian continued reporting the February and March 2012 post-bankruptcy "charge off" notations, which was inaccurate because Experian should not have reported any negative or balance reporting after the bankruptcy petition.[79]  Reporting such multiple charge-offs was also inaccurate, as it "could be perceived by Plaintiff or any consumer as an attempt to collect a debt," or mislead to future creditors.[80]

20.     Experian's reporting of the multiple post-bankruptcy-petition charge-offs also did not conform to the guidelines of the Consumer Reporting Resource Guide, or "CRRG."[81]  The CRRG is

---

[70] *See* CDF-F, at 2 of 14.
[71] *See id.*
[72] *See id.*
[73] *See id.*
[74] *See id.*
[75] *See id.* at 2, 8 of 14.
[76] *See generally* CDF-F; Experian Depo, at 183:3-184:15.
[77] *See* CDF-F, at 2 of 14; CDF-A, at 2 of 6.
[78] *See* Experian Depo, at 186:1-187:24.
[79] *See* Binder Expert Report, at para. ¶¶ 18.
[80] *See* Reinvestigation, at 8 of 14; *see also* Binder Expert Report, at ¶¶ 18, 21.
[81] *See id.* at para. ¶ 19; Excerpts of 2015 Consumer Reporting Resource Guide, at 6-17, FAQ 27(a) ("CRRG"), **Ex. 15**; Experian Depo, at 273:21-274:12; Clark Decl., at ¶ 4.

the industry reporting guideline that Experian takes part in developing,[82] and which Experian's representatives have stated that Experian follows with respect to reporting bankruptcies.[83]  Under the CRRG guidelines, for accounts included in and discharged pursuant to  a Chapter 7 bankruptcy, a creditor should report a value "D" (for "no data") in between the date of a bankruptcy petition and the date of discharge.[84]  Experian's own policies contradict the CRRG, in that they permit Experian to report derogatory entries after a bankruptcy petition date and before discharge.[85]  Under the CRRG, regardless of where the dispute originates, the Furnisher must respond.[86]

21.    Experian also changed the reporting of Plaintiff's recent balance from "$0 as of Jul 2015" to "$0 as of Aug 2015," without further explanation[87] – though in discovery, Plaintiff learned that Webbank continued to make regular updates to the tradeline on a monthly basis.[88]  Experian's reporting of "$0 as of Aug 2015" was also inaccurate, as Plaintiff's account should have reflected a $0 balance as of the date of his bankruptcy petition;[89] even Experian's expert conceded that it did not reflect the month that the account became a $0 balance, which was April of 2012.[90]  This reporting also held open the possibility that the balance on Plaintiff's account had been something *other* than $0 between the date of his bankruptcy discharge and August of 2015, which was inaccurate.[91]

22.    Experian also noted in the Webbank tradeline been "updated" based on the processing of his dispute in the tradeline itself.[92]  This was inaccurate, as it suggested that a reasonable reinvestigation involving Furnisher input had been completed, when in fact Webbank had only

---

[82] *See* CRRG, at 1-2; Binder Expert Report, at ¶¶ 19-20; *see also* Experian Depo, at 274:8-23.

[83] Apr. 28, 2014 Declaration of Kimberly Hughes, *Dixon v. Experian*, No. 13-cv-227-PPS, ECF Dkt. 42-2, at ¶ 17 ("Hughes *Dixon* Decl."), **Ex. 41**; Oct. 15, 2018 Declaration of Kimberly Cave, *Farmer v. Experian*, No. 17-cv-1531-RFB-PAL, ECF Dkt. 30-1, at ¶ 17 (D. Nev. Oct. 15, 2018) ("Cave *Farmer* Decl."), **Ex. 42**.

[84] CRRG, at 6-17, FAQ 27(a); Binder Expert Report, at ¶ 21.

[85] *Id.* at ¶ 22 (citing Dispute Manual, at 35).

[86] CRRG, at 14-1; Experian Depo, at 275:4-276:1.

[87] *See* CDF-F, at 2 of 14.  Later on the same day, Experian added a statement of dispute to his account. *See* CDF-A, at 3 of 6.  *See also* Experian Depo, at 212:18-214:5.

[88] *See* Excerpts of Jan. 12, 2018 Experian Long Admin for Plaintiff, at 11 of 22 ("Long Admin"), **Ex. 10**; Excerpts of Mar. 2017 Experian Admin Handbook, at 14-24 ("Admin Handbook"), **Ex. 14** (describing how to interpret trade band); Experian Depo, at 195:5-17.

[89] *See* Binder Expert Report, at ¶ 18.

[90] Courchane Expert Depo, at 106:14:20.

[91] *See* Courchane Expert Report, at ¶ 21.

[92] *See* CDF-F, at 2 of 14.

received a DRN which effectively prevented it from having any input into the dispute process.[93]

**Plaintiff incurred damage to his creditworthiness from Experian's reporting, as well as emotional distress and out-of-pocket expenses.**

23.     Experian's policies require that Experian send the consumer a consumer *report* upon reinvestigation.[94]  Experian also informed Plaintiff that he could have his results sent on to certain third parties, with "these results" being the entire CDF.[95]  Both his October 19, 2015 CDF-F and Experian's internal "Admin" report showed that numerous third parties had received information from Experian within the period in which Plaintiff could have requested the reinvestigation to be sent.[96]  Additionally, a December 2016 Experian disclosure listed numerous hard and soft inquiries for third parties shortly after Experian completed its reinvestigation.[97]  For example, Experian testified that a November 20, 2015 inquiry from Caliber Home Loans would have very likely contained the multiple post-bankruptcy-petition charge-offs which Experian had left on his October 19, 2015 reinvestigation.[98]

24.     Plaintiff suffered out-of-pocket expenses and lost time in the form of transportation to and from his counsel's office, and lost time in considering issues related to his credit reporting.[99]  Finally, he has suffered emotional distress because he did not know if he would be able to make new consumer purchases or not, and had to put a substantial down payment on his wife's car purchase.[100]  By failing to properly reinvestigate Plaintiff's dispute, Plaintiff lost the full value of his bankruptcy,

---

[93] *Cf. Binder Expert Report, at ¶¶ 23-29; CIS Compliance Standards, at 11-12.*

[94] *See* Sept. 21, 2018 Experian's Fair Credit Reporting Act (FCRA) Policy, at 6 ("FCRA Policy"), **Ex. 16**; Clark Decl., at ¶ 5.

[95] *See* Reinvestigation, at 2 of 14; *see also* Experian Depo, at 186:1-187:24.

[96] *See* CDF-F, at 13-14 of 14 (listing hard inquiries from WF Crd Svc, DirecTV, AXD/Pinnace Capital Mtg., Credit One Bank, Capital One, and Capital One Auto Finance); Dec. 12, 2016 Experian Admin Report for Plaintiff at 8-10 of 11 ("Admin"), **Ex. 9** (same); Admin Handbook, at 36-38 (describing inquiry types).

[97] Dec. 12, 2016 Experian Disclosure, at 9-10 of 12 ("2016 CDI"), **Ex. 6** (Listing had inquiries from THD/CBMN, Appfolio, Caliber Home Loans, Inc., and Cap One NA, and soft inquiries from WF Crd Svc, Clarity Services, Inc., Comenity Servicing LLC, Republic Bank and Trust, Capital One, LexisNexis, and fourteen additional third parties); *see* Admin, at 1-10 of 11 (same); Experian Depo, at 175:16-23; 191:24-192:3.

[98] *Id.* at 276:6-278:6.  Experian does not indicate to consumers on its disclosures that inquiries can be made for non-permissible reasons.  *See id.* at 210:8-211:21.

[99] *See* Plaintiff Depo, at 108:15-20; *see* Sept. 10, 2018 Expert Report of Stan V. Smith, Ph.D, at 4-5 ("Smith Expert Report"), **Ex. 24**; Dec. 3, 2018 Deposition of Stan V. Smith, Ph.D., at 14:1-12 ("Smith Expert Depo"), **Ex. 28**.  Additionally, Plaintiff suffered a loss of his quality of life, which can be used to ascertain a model of damages for both himself and members of a class of similarly situated individuals.  *See id.* at 5-6.

[100] *See* Plaintiff Depo, at 111:4-112:18.

and misleadingly suggested that it had properly reinvestigated his tradeline.[101]

**Both publicly available scoring methodologies, and Experian's own risk factors for its credit scoring products, show that the inaccuracies in question could lower Plaintiff's credit score.**

25.   Experian's experts have claimed that a consumer's payment history makes up 35% of the FICO score.[102]  A consumer receiving a credit score also receives factors, or adverse action codes, that were particularly important factors in the score, which "will relate to the information that was contained within the consumer's credit report when it was scored."[103]  Experian's witnesses note that a score factor stating "Time Since Delinquency is Too Recent or Unknown" speaks for itself.[104]

26.   Experian's own list of "score factors" indicate numerous items suggesting that the timing of information on a payment history grid can serve as a factor in establishing a credit score.[105] For example, its risk factors include "Too many accounts not paid on time in the last two years,"[106] that the time since the most recently reported delinquency or derogatory notation on a trade or account is too short,[107] or the time since a delinquency is "too recent or unknown,"[108] the "recency of [a] delinquent or derogatory account,"[109] the length of time since an account was not paid as agreed,[110] the worst delinquency occurring on any account within the last three years,[111] and the length of time since the most recent delinquency.[112]   Several other models consider the "frequency of delinquency."[113]   Others consider the trade activity for the last 36 months.[114]   And Experian's

---

[101] *See* Oct. 9, 2018 Rebuttal Report of Stan V. Smith, Ph.D., at 1-2 ("Smith Rebuttal Report"), **Ex. 24**; Smith Expert Depo, at 102:23-103:8.

[102] May 24, 2013 Rebuttal Report of Kimberly Hughes, *Toliver*, ECF Dkt 42-8, at 7 ("Hughes *Toliver* Rebuttal Report"), **Ex. 35**.

[103] *Id.* at 9.

[104] *Id.* at 13.

[105] *See generally* Nov. 20, 2014 Experian File One Appendix, *Shaw v. Experian*, No. 16-56587, Dkt. 40-1, (C.A.9 Sept. 1, 2017) ("File One Appendix"), **Ex. 18**; Clark Decl., at ¶ 7; *see also* CIS Compliance Standards, at 11-12 (noting that the omission of an element of data from a consumer report that nonetheless influences the transmitted information is considered to be communicated).

[106] File One Appendix, at 4 (Bankruptcy Plus Model).

[107] *Id.* at 5 (Bankruptcy Plus Model); *id.* at 18 (Extended View Score)

[108] *Id.* at 11 (Experian/Fair Isaac Advanced Risk Models).

[109] *Id.* at 30 (Experian's Scorex Plus).  *See also id.* at 33 (Telecommunications, Energy & Cable Risk Model, considering recency of account delinquencies).

[110] *Id.* at 15 (Experian's Fair Isaac Insurance Risk Models).

[111] *Id.* at 31 (Scorex Plus 2).

[112] *Id.* at 33 (Telecommunications, Energy & Cable Risk Model).

[113] *Id.* at 10 (Experian/Fair Isaac Advanced Risk Models); *id.* at 15 (Experian's Fair Isaac Insurance Risk Models); *id.* at 17 (Experian/FICO Mortgage).

[114] *Id.* at 21 (Fraud Shield Score Plus); *id.* at 25 (Never Pay Score).

VantageScore model considers whether the worst status in *recent months* on revolving accounts was delinquent or derogatory, whether there are too many accounts with a delinquent or derogatory status in recent months, and whether there is the presence of a delinquency or derogatory status *since the bankruptcy filing*.[115]  In fact, Experian's "emerging credit score" considers the presence of a "dispute" to be an adverse reason.[116]  Plaintiff personally believes he has suffered damage to his credit score.[117]

**Experian's conduct was willful.**

27.     Experian utilizes its unlawful, unilateral DRN process routinely in the course of its business, having identified over 200,000 instances of providing such internal updates to tradelines during a two-year period.[118]  As noted above, Experian routinely declares that it cannot update data without Furnisher input,[119] and has assisted in creation of an e-Oscar system which does not provide any opportunity for Furnishers to respond to DRNs like the one it purportedly sent to Webbank.[120]

28.     Experian's policies require it to provide the Furnisher with all information relevant to the dispute within five days of receipt;[121] they also provide that Experian may modify or delete information if it is found to be incomplete, inaccurate, or incapable of verification and then notify the Furnisher of its decision – *but not* if the information has merely been updated.[122]

29.     The language in Experian's policies and that its witnesses use also require this result. Experian's personnel have repeatedly stated that Experian only *reinvestigates* information, and does

---

[115] *Id.* at 37-38.

[116] *Id.* at 9.

[117] *See* Plaintiff Depo, at 110:14-19.  In fact, Experian's expert has authored reports indicating that "non-traditional" data is often used, which notes that "there may be a distinct difference in default risk between a consumer with multiple recent delinquencies on a single credit account . . . compared to a consumer who is otherwise the same but has delinquencies across several accounts."  *See* Marsha J. Courchane, Ph.D, and David M. Skanderson, Ph.D., *Fair Lending in the Brave New World of Big Data*, at 4, ABA Bank Compliance, May-June 2017 ("Big Data"), **Ex. 44**; Courchane Expert Depo, at 171:10-25.

[118] *See* June 28, 2018 Experian Corrected Third Amended Responses to Plaintiff's First Set of Interrogatories, at Nos. 2-7 ("ROG Responses"), **Ex. 21**; *see generally* Email Exchange from Chris Hall to Miles Clark, and Spreadsheets of Experian Internal Dispute Codes ("Experian Spreadsheet"), **Ex. 46**; Experian Depo, at 248:23-251:1; Clark Decl., at ¶ 8.

[119] *See* Hughes *Shaw* Decl., at ¶¶ 33, 36-38; Centanni *Banga* Decl., at ¶¶ 15-16; Iwanski *Toliver* Decl., at ¶¶ 9-10; Simmons *Travers* Decl., at ¶¶ 15, 18.

[120] *See* E-Oscar Guide, at 1; Binder Expert Report, at ¶¶ 24-28.

[121] FCRA Policy, at 5.

[122] *Id.* at 6.

not *investigate* information.[123]  Experian's FCRA policies require it to conduct an *investigation* which is reasonable, and has 30 days to complete any such *investigation*.[124]  Since Experian's experts insist that Experian merely *reinvestigates* accounts, Experian's own policies must presuppose that it will send on a dispute to a Furnisher so that the Furnisher can *investigate* the information.[125]

### STANDARD OF REVIEW

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[126]  A dispute as to a material fact is genuine if there's sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.[127]  "Summary judgment is inappropriate if reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor."[128]  If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.[129]  If the movant satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact exists.[130]  As with sister circuits, the Ninth Circuit requires trial courts to liberally construe the FCRA's consumer-oriented objectives.[131]

### ARGUMENT

**A.  Plaintiff is entitled to summary judgment on his 1681e(b) claim.**

Section 1681e(b) requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."[132]  Liability "is predicated on the

---

[123] *See* Hughes *Shaw* Decl., at ¶ 33; Cave *Ashcraft* Expert Report, at 5.
[124] *See* CIS Core Standards, at 5.
[125] *Compare* FCRA Policy, at 5, *with* Cave *Ashcraft* Expert Report, at 5.
[126] Fed. R. Civ. P. 56(a).
[127] *Id.*
[128] *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999)).
[129] *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).
[130] *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[131] *Shaw v. Experian*, 981 F.3d 749, 755 (9th Cir. 2018); *Guimond v. Trans Union Credit Co.*, 45 F.3d 1329, 1334 (9th Cir. 1995); *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010); *see also, e.g.*, *Jones v. Federated Financial Reserve Corp.*, 144 F.3d 961, 964 (6th Cir. 1998).
[132] *Id.* at § 1681e(b).

reasonableness of the credit reporting agency's procedures in obtaining credit information."[133]  This "maximum possible accuracy" standard imposes a higher burden on reporting agencies than mere "technical" accuracy.[134]  While a consumer bringing a Section 1681e(b) claim "must present evidence tending to show that a [CRA] prepared a report containing inaccurate information,"[135] the Ninth Circuit has never required that a consumer demonstrate that a report was actually *published*, as opposed to simply *prepared*.[136]  "[T]he reasonableness of a [CRA's] procedures is 'normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question.'"[137]

> **1.  Experian "prepared" and provided a consumer report in this case when it sent Plaintiff's reinvestigation to him.**

There is no question that Experian actually prepared and provided consumer reports containing inaccurate information in this case.  Under Section 1681a(d), "consumer report" means:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—
> **(A)** credit or insurance to be used primarily for personal, family, or household purposes;
> **(B)** employment purposes; or
> **(C)** any other purpose authorized under section 1681b of this title.[138]

Section 1681b identifies the exclusive purposes for which a consumer report may be "furnished."[139]  Such circumstances include: "in accordance with the written instructions of the consumer to whom it relates."[140]  In responding to a Section 1681i consumer dispute, a CRA is required to send the consumer "a *consumer report* that is based upon the consumer's file as that file is revised as a result of the reinvestigation."[141]  A consumer can dispute any item of information in their file.[142]

Plaintiff's CDF-A and CDF-F were both consumer reports, because pursuant to Section 1681i(a)(6)(ii) plain language, as well as Experian's own policies, Experian was required to provide

---

[133] *Guimond*, 45 F.3d at 1333.
[134] *Shaw*, 891 F.3d at 757.
[135] *Guimond*, 45 F.3d at 1333.
[136] *Robins v. Spokeo*, 867 F.3d 1108, 1116 & n.3 (9th Cir. 2017).
[137] *Shaw*, 891 F.3d at 755 (quotations omitted).
[138] 15 U.S.C. § 1681a(d).
[139] *Id.* at § 1681b(a).
[140] *Id.* at § 1681b(a)(2).
[141] *Id.* at § 1681i(a)(6)(ii) (emphasis added).
[142] 15 U.S.C. § 1681i(a)(1).

him with one.[143]   Experian was also authorized to "furnish" Plaintiff with the consumer report because he disputed information to Experian in writing, thereby also effectively requesting a Section 1681i(a)(6)(ii) consumer report for himself.[144]   Thus, Experian *furnished* a consumer report to Plaintiff.

Experian also informed Plaintiff that it *might furnish his* results of reinvestigation as a Section 1681b(a)(2) consumer report, when it told him that he could "request that we send these results to organizations that you specifically designate who have requested your credit report, which contained the deleted or disputed infromation within the past two years for employment purposes, or within six months for any other purpose," with the "results" meaning the *entire* CDF-F or CDF-A.[145]   In *Shaw v. Experian*, the Ninth Circuit recognized that information which either *had been* or *might be* placed on a consumer report must be disclosed to a consumer.[146]   The commonsense reason for insisting on a prospective rule is that a prudent consumer may wish to dispute and correct inaccuracies appearing on their files *prior* to applying for credit, or review their information for evidence of fraud if and when they believe they have become a victim of the same.[147]

Third parties also received Plaintiff's consumer report with the derogatory information included.   Plaintiff's Admin Report and December 2016 consumer disclosure reveal that numerous third parties accessed Plaintiff's consumer report both before and after reinvestigation;[148]   Experian's witness testified that a November 20, 2015 pull from Caliber Home Loans would have contained the post-petition charge-off notations in question, as well as the notation that the account had been updated as a result of Plaintiff's dispute.[149]

Finally, the plain language of Experian "risk factors" associated with credit scoring products suggests that both the presence of a dispute, the recency of a delinquency, and a derogatory status on an account *after* a bankruptcy could all factor into Experian scoring products; in fact, even the presence

---

[143]   Further, by submitting a dispute and triggering Experian's Section 1681 reinvestigation machinery, Plaintiff authorized Experian to send a consumer report to Welk in the form of an ACDV. *See* 15 U.S.C. § 1681b(a)(2).

[144]   *See* Statement of Undisputed Material Facts ("SUMF"), at ¶ 3.

[145]   *Id.* at ¶ 18.

[146]   *Shaw*, 891 F.3d at 759 (emphasis added) (formatting in original) (quoting *Cortez*, 617 F.3d at 711-12 (quoting at *Gillespie v. Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007)).

[147]   *See* 15 U.S.C. §§ 1681i(a)(6)(B)(2)(ii); 1681c-1.

[148]   SUMF, at ¶ 23.

[149]   *Id.* at ¶ 23.

of a dispute could do so.[150]  It is beyond question that a credit score is a consumer report for FCRA purposes.[151]  In fact, Experian's own policies indicate that even if an item is omitted but factors into a credit score, it is deemed communicated for FCRA purposes.[152]  Post-bankruptcy-petition charge-offs, and multiple charge-offs generally, could confuse future credit decision-makers.[153]

In sum, Experian could have prepared, actually prepared, and – although not required under the statute or controlling case law – actually published a multitude of different consumer reports containing the inaccurate and materially misleading information in question here.

### 2.   The Experian CDFs Were Patently Incorrect and Materially Misleading.

"[A]n item in a consumer's file can be "'incomplete or inaccurate' . . . 'because it is patently incorrect. . . .'"[154]  "[I]nformation that is inaccurate 'on its face,' is 'patently incorrect.'"[155]  A plaintiff establishes that a CRA reports patently incorrect information when that information does not correctly report according to the binding repayment terms between the plaintiff and Furnisher.[156]  Thus, "representations that Plaintiff still owed a debt and its implication that the debt might still be collectible following the bankruptcy discharge [are] inaccurate."[157]

Under the FCRA, a "materially misleading" statement is concerned with omissions to credit entries that in context create misperceptions about otherwise factually accurate data.[158]  "Materially misleading" means that information is misleading "in such a way and to such an extent that it can be expected to adversely affect credit decisions."[159]  "[I]nformation that is open to an interpretation that

---

[150] *Id.* at ¶ 26.

[151] *See, e.g.*, *Reynolds v. Hartford Fin. Servs., Grp., Inc.*, 435 F.3d 1081, 1094 (9th Cir. 2006) (finding that CRA communication that it did not have enough information on a consumer to compose a credit score constituted a consumer report), *overruled on other grounds*, 551 U.S. 47 (2007).

[152] SUMF, at ¶ 26.

[153] *See id.* at ¶ 19.

[154] *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010) (quoting *Gorman*, 584 F.3d at 1163).

[155] *Drew v. Equifax*, 690 F.3d 1100, 1108 (9th Cir. 2012) (quoting *Carvalho*, 629 F.3d at 891).

[156] *See, e.g.*, *Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1061 (C.D. Cal. 2014); *Bradshaw v. BAC Home Loans Servicing*, 816 F. Supp. 2d 1066, 1071 (D. Or. 2011).

[157] *Riekki v. Bank of America, et al.,* 2:15-cv-02312-GMN-VCF, Doc. 57 at 4 (D. Nev. June 10, 2016) (denying Furnisher's motion to dismiss); *Polvorosa v. Allied Collection Serv.*, No. 2:16-cv-1508-JCM-CWH, 2017 WL 29331, at *4 (D. Nev. Jan. 3, 2017) (denying Furnisher's motion to dismiss).

[158] *See, e.g., Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009) (citation omitted).

[159] *Id.* at 1163 (quoting *Sepulvado v. CSC Credit Servs.*, 158 F.3d 890, 895 (5th Cir.1998)).

is directly contradictory to the true information is sufficiently misleading to qualify as inaccurate."[160]

### 3. Plaintiff's Experian CDFs Contained Materially Misleading Information.

#### a. Experian's representation that the Webbank tradeline had been "updated" as a result of Plaintiff's dispute was patently incorrect and materially misleading.

Experian's representation on Plaintiffs' CDFs that his account had been "updated" and that his tradeline had been "updated based on the processing of your dispute" was patently incorrect and materially misleading.  Under Section 1681i(a)(5), if a CRA's reinvestigation leads it to conclude that the information is inaccurate or cannot be verified, it must either delete the information, or modify it as the consumer requests.[161]  Here, Experian did neither – but indicated that it had updated the account as a result of processing Plaintiff's dispute.[162]  This statement presupposed that Experian had completed a fulsome reinvestigation process which involved Furnisher input and response.[163]  Experian's statements appeared on the face of the dispute results, as well as the Webbank tradeline itself.[164]  Naturally, such notations would not be present on the face of the consumer disclosure which served as the basis of the dispute, because they were a byproduct of the dispute itself.

#### b. Experian's Reporting of Multiple Charge-Offs and Post-Bankruptcy Charge-Offs, Was Also Patently Incorrect and Materially Misleading.

Experian's reporting of the post-petition "charge off" notations was patently incorrect.  Plaintiff's Webbank tradeline was subject to the terms of his Chapter 7 bankruptcy after he filed his January 2012 bankruptcy petition.  The filing of Plaintiff's Chapter 7 bankruptcy initiates an order for relief.[165]  This Order triggers an automatic stay of debt collection,[166] and permits the debtor the opportunity for discharge order that must be granted unless an exception is met.[167]  Once granted, an order of discharge replaces the temporary stay, and relates back to the bankruptcy filing date.[168]  Because it is undisputed that Plaintiff's Welk account was an unsecured interest included in his

---

[160] *Toliver*, 973 F. Supp. 2d at 707, 715 (S.D. Tex. 2013) (citations and quotations omitted).
[161] 15 U.S.C. § 1681i(a)(5)(A).
[162] SUMF, at ¶ 17.
[163] *See id.* at ¶ 24.
[164] *Id.* at ¶ 17.
[165] 11 U.S.C. § 301(b)
[166] *Id.* at § 362(a).
[167] *In re Way*, 2 B.R. 372, 373 (Bankr.N.D. Ohio 1982).
[168] 11 U.S.C. § 727(b); *In re Am. Hardwoods, Inc.,* 885 F.2d 621, 626 (9th Cir.1989); *Boeing. N. Am., Inc. v. Ybarra,* 424 F.3d 1018, 1022 (9th Cir. 2005).

Chapter 7 bankruptcy and discharged thereunder,[169] Experian's post-petition late payments were inaccurate because the discharge created the impression that Plaintiff's debts were still owed.[170]

       If the Court does not find the post-petition charge-offs to be patently incorrect, it must find them to be materially misleading, as they suggest that Plaintiff had not fully completed his bankruptcy plan.  Further, the multiple charge-offs in general suggested that Plaintiff's tradeline had been charged off more than once, when in fact it had not been.

          *c.*  *Experian's reporting of a recent balance of $0 as of August 2015 was materially misleading.*

       Experian's reporting of the fact that the account balance read $0 as of August 2015 (a departure from the July 2015 notation in its original credit report) was materially misleading because it suggested that Plaintiff's account had gone to $0 sometime *after* his bankruptcy discharge in 2012, which was not true.[171]   Discovery showed that Experian reported the new balance information because Webbank had sent it a series of monthly updates on the tradeline.[172]   It is highly likely that Webbank would have ceased making such updates if it had been provided the opportunity to review Plaintiff's dispute, because after Plaintiff brought suit, the updates stopped.[173]   Even Experian's expert conceded that this notation left open the prospect that the balance was something *other* than $0 between the date of Plaintiff's bankruptcy discharge and August 2015.[174]   Again, Experian's credit-scoring products suggest that the time that an account went to a $0 balance could be factor in determining several credit scores.[175]

          *d.*  *Experian's Failure to Conform Its Reporting to the CRRG Guidelines Was Materially Misleading.*

       Additionally, the information is materially misleading because Experian's reporting – which it never asked Welk to verify – violated the CRRG's Metro 2 reporting standards.  A Plaintiff may establish that a CRA's failure to follow industry reporting guidelines are materially misleading where (1) the CRA adopts the standard, (2) the CRA deviated from the standard, and (2) this "deviation might adversely affect credit decisions – in other words, that entit[ies] would have expected [the

---

[169] SUMF, at ¶ 1.
[170] *Torres v. Chase Bank USA, N.A.,* 367 B.R. 478, 486 (Bankr.E.D.N.Y. 2007); *Montgomery v. PNC Bank, N.A.*, No. C-12-2453 SC, 2012 WL 3670650, at *3 (N.D. Cal. Aug. 24, 2012)).
[171] SUMF, at ¶ 21.
[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.* at ¶ 26.

defendant CRA] to report in compliance with the [Metro 2] guidelines."[176]  "The Metro 2 format is the industry standard for Furnishers to transmit data to the CRAs and to investigate consumer disputes they receive from CRAs."[177]

Experian has testified that it follows the CRRG, including reporting for accounts included in bankruptcy.[178]  The CRRG requires that after filing of a Chapter 7 bankruptcy, Experian is to report the value "D," for "no data," for all subsequent months in the payment history.[179]  By continuing to report the post-petition charge-off notations, Experian deviated from the CRRG reporting guidelines, and its failure was likely to influence future credit decision-makers.[180]

### 4. Experian's Procedures Were Not Designed to Ensure the Maximum Accuracy of Its Reported Information.

#### a. Experian's Failure to Verify Its Reporting with Furnisher Input While Representing to the Consumer that It Had Done So Demonstrates that Experian's Procedures Were Not Designed to Ensure Maximum Accuracy.

Experian routinely criticizes consumers for failing to follow up with Furnishers of information after a reinvestigation and prior to the time a lawsuit is filed.[181]  In so arguing, Experian hopes to suggest that consumers should take ownership of their disputes, and that disputing material improves the accuracy of information in Experian's systems of record.  However, in a circumstance where Experian suggests to consumers that their tradelines were "updated" as a result of a consumer dispute *without* also telling them that the update had been internal in nature dissuades a consumer from contacting a Furnisher; it suggests that such a process would be futile because *it has already verified the reporting with the Furnisher in question*.

Experian has complete control over the look and feel of its consumer disclosures, and could

---

[176] *Nissou-Rabban v. Capital One Bank (USA)*, No. 15-cv-1675-JLS-DHB, 2016 WL 4508241, at *5 (S.D. Cal. June 6, 2016) (citations and quotations omitted).

[177] *Noori v. Bank of Am.*, No. CV 15-1467-AB-AFM, 2016 WL 3124628, at *2 (C.D. Cal. May 26, 2016), *rev'd on other grounds*, 710 F. App'x 757 (9th Cir. 2018) (finding that defendant Furnisher's compliance with the CRRG establishes reasonable procedures for compliance with state law analogue to the FCRA); *Horton v. Trans Union*, No. 12-2072, 2015 WL 1055776, at *3 (E.D. Pa. Mar. 10, 2015) (considering the CRRG).

[178] SUMF, at ¶ 20.

[179] *Id.* at ¶ 20.

[180] *Id.*

[181] *See, e.g.*, *Ashcraft*, ECF Dkt. 134, at 9 (D. Nev. Dec. 12, 2018) ("Plaintiff, however, took no action in response to the reinvestigation results, and never contacted Experian or Welk before filing this lawsuit . . .").

surely note in its reinvestigations whether or not the Furnisher had been contacted; however, it does not. Therefore, Experian's representations to consumers are not reasonably designed to ensure the maximum accuracy of the information Experian reports, because it conceals a critical item of information that, if disclosed, might induce consumers to contact the Furnishers of information directly, or at least try the dispute process once more.

Experian's internal updating policies are also not reasonably designed to ensure maximum accuracy because they totally deprive the Furnishers of any input into the dispute process. Under the plain language of the FCRA, Experian was required to provide all relevant information to a Furnisher upon being notified of the dispute.[182] As noted above, Furnishers, Experian's own expert, and even Experian itself have all testified that Furnisher input into the dispute process is an essential element of any consumer dispute because Experian purportedly lacks information sufficient to update accounts on its own.[183] Just several months ago, in another class case pending before this Court, Experian argued that "*a CRA's 'reasonable reinvestigation' consists largely of triggering the investigation by the Furnisher . . . .*"[184]

Experian's DRN process does not meet its own self-chosen conception of liability for failing to conduct a reasonable reinvestigation. A DRN triggers no Furnisher response deadline, and it is transmitted nanoseconds before the dispute is finalized and the reinvestigation results were sent to the consumer.[185] No response to a DRN can be provided because e-Oscar fails to provide a means for doing so.[186] The DRN process does not provide all relevant information to a Furnisher, because here, as elsewhere, Experian's DR Log indicated that no documents were received even though at minimum Plaintiff's dispute letter was relevant information.[187] Unsurprisingly, numerous Furnishers have testified that a DRN is not a dispute at all.[188]

In fact, Experian did not even follow its own dispute policies here, because Experian did not

---

[182] 15 U.S.C. § 1681i(a)(2)(B).

[183] *See* SUMF, ¶¶ 10-13. Experian could, of course, research the bankruptcy docket itself to double-check the assertions a consumer makes and the response a Furnisher provides, but refuses to do so. *See id.* at ¶ 13.

[184] *See Ashcraft*, ECF Dkt. 134, at 16 (citation omitted) (emphasis added).

[185] SUMF, at ¶ 6.

[186] *Id.* at ¶ 6.

[187] *Id.* at ¶¶ 5, 15.

[188] *Id.* at ¶ 9.

receive adequate proof documents from Plaintiff to allow it to make the internal update in question.[189] Specifically, Experian could internally update an account when it received certain bankruptcy schedules, which Plaintiff did not provide.[190]  Therefore, Experian's reinvestigation deviated from its even its own self-designed procedures.  And as Experian's own declarants have stated, deviation from its own procedures does not ensure maximum accuracy of its reported credit data.[191]

### b. Experian's Procedures Were Unreasonable Because Experian Failed to Provide Webbank with All Relevant Information Concerning Plaintiff's Dispute.

Additionally, Experian's procedures in obtaining information were not reasonable because Experian violated Section 1681i(a)(2) of the FCRA, which required it to send on all relevant information to Webbank after receipt of the dispute.  Even if Experian somehow complied with the FCRA in submitting the dispute to Webbank through the DRN, it is undisputed that Experian failed to attach *any* of the documents to the DRN itself.[192]  In fact, there is no evidence of *any* of the information Experian would have sent on in connection with the DRN.[193]

Tellingly, Experian routinely uses its proffering of information to Furnishers through the ACDV process as a panacea to excuse its failures to properly reconcile the same information later. Just several months ago, in *Ashcraft v. Experian* (another case pending before this Court), Experian argued that it could not be held liable even for its own systemwide reconciliation failures, so long as it provided all information concerning a consumer's dispute to the Furnisher.[194]

By Experian's own admission, its failure to attach the dispute results to its DRN was not reasonable nor relevant – as this deprived Webbank of the opportunity to even conduct a hypothetical post-dispute review of the information and notify Experian if any changes were to be made.  In failing to comply with Section 1681i(a)(2), Experian's reinvestigation was unreasonable.

### c. Experian Failed to Review the Publicly Available Bankruptcy Records.

A growing number of courts recognize that review of publicly available records is part of a reasonable FCRA dispute-resolution process.  In *Myrick v. Equifax Information Services, LLC*, the

---

[189] *Id.* at ¶ 13.

[190] *Id.*

[191] *Id.* at ¶ 14.

[192] *Id.* at ¶ 15.

[193] *Id.*

[194] *See Ashcraft*, ECF Dkt. 134, at 16 ("Indeed, the Ninth Circuit has recognized that a CRA's 'reasonable reinvestigation' consists largely of triggering the investigation by the [F]urnisher . . . ." (citation omitted); *Leoni*, at ECF Dkt. 98, at 9 (same).

23

Court found that a reasonable reinvestigation by a CRA could include review of a bankruptcy docket.[195]   In the District of Nevada, one court found that a Furnisher's failure to review publicly available bankruptcy records to determine whether a consumer's bankruptcy was discharged would violate the analogous Furnisher dispute-resolution provision, Section 1681s-2(b).[196]   Indeed, another court in this District explicitly told Experian that "A reasonable investigation by Experian would have included reviewing the bankruptcy records to check if the JHP accounts had been discharged."[197]

These trial court cases echo the Ninth Circuit's longstanding position that Experian, as an entity who trades in publicly available information, must exercise reasonable diligence in examining a public record to ascertain inaccuracies, even where a Furnisher confirmed the disputed information as accurate.[198]   In *Dennis v. BEH-1, LLC*, the Ninth Circuit emphasized that the "case *illustrates how important it is for Experian, a company that traffics in the reputations of ordinary people, to train its employees to understand the legal significance of the documents they rely on*."[199]

Here, and given the fact that Experian did *not* contact the Furnisher of information, Experian should have at least checked the publicly available bankruptcy records to determine whether Plaintiff's Webbank tradeline had been treated differently than any other unsecured asset in his bankruptcy – especially given the fact that Plaintiff did not submit the type of records which Experian's own policies would have deemed sufficient to update the tradeline unilaterally.   Experian was clearly on notice that the tradeline reported as discharged in bankruptcy at the time it received Plaintiff's dispute.[200]   Plaintiff's dispute letter stated that the post-petition late payments on his Webbank tradeline were inaccurate because they occurred after the filing of his bankruptcy.[201]   A copy of Plaintiff's credit report showing the bankruptcy, as well as sections of Plaintiff's Chapter 7 bankruptcy petition, were included with his dispute.[202]

---

[195] No. 15-cv-562-BR, 2017 WL 4798154, at *2-3 (E.D.N.C. Oct, 24, 2017) (citing *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246 (4th Cir. 2017)).

[196] *Whitlock-Allouche v. Plusfour, Inc.*, No. 17-cv-1656-RFB-VCF, 2018 WL 4258506, at *4 (D. Nev. Sept. 6, 2018).

[197] *Hannon v. Northeast Credit & Collections*, No. 16-cv-1814-APG-VCF, 2018 WL 577216, at *4 (D. Nev. Jan. 26, 2018).

[198] 520 F.3d 1066, 1068-71 (9th Cir. 2008).

[199] *Id.* at 1071 (emphases added).

[200] SUMF, at ¶¶ 2-3.

[201] *Id.* at ¶ 3.

[202] *Id.*

24

But despite being provided facts that plainly placed it on notice of the fact of bankruptcy and the type of inaccuracy at issue, Experian failed to even double-check its internal records against Plaintiff's actual bankruptcy. Experian apparently had no procedures in place to cross-reference its *own* bankruptcy data against Plaintiff's dispute – let alone review the publicly available records on PACER.[203] Experian's failure to perform the straightforward task of reviewing the public records on PACER underscored the unreasonableness of its procedures in updating its account-level information.

### d.   Experian Did Not Follow the CRRG's Reporting Standards.

As Plaintiff's expert pointed out, Experian's dispute-resolution procedures did not conform to the CRRG reporting guidelines because they permitted Experian to report accounts based on delinquencies which occurred during the pendency of the consumer's bankruptcy.[204] In so doing, Experian failed to design its updating process to ensure the maximum accuracy of its reported data.

## B.   Plaintiff is entitled to summary judgment on his 1681i claim.

When a CRA receives notice of a consumer dispute, the CRA has the duty to conduct a reasonable reinvestigation to determine whether the disputed information contained in the consumer's file is inaccurate. Although the FCRA "does not on its face require that an actual inaccuracy exist for a plaintiff to state a claim, [the Ninth Circuit] impose[s] such a requirement."[205] The FCRA provides the procedural framework for a reasonable reinvestigation at 15 U.S.C. § 1681i. This section of the FCRA also requires a CRA to review and consider all relevant information submitted by the consumer, and promptly provide the credit grantor of the disputed item with all relevant information regarding the dispute.[206] The CRA must promptly delete or modify the item based on the results of the reinvestigation.[207] The CRA is then obligated to provide the consumer with, among other things, "(i) a statement that the reinvestigation is completed; [and] (ii) a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation."[208]

A reinvestigation is insufficient where the CRA "could have uncovered the inaccuracies 'if it had reasonably reinvestigated the matter.'"[209] Exclusive reliance on ACDV procedures does not

---

[203] *Id.* at ¶ 13.

[204] *Id.* at ¶ 20.

[205] *Carvalho*, 629 F.3d at 890.

[206] 15 U.S.C. §§ 1681i(a)(2)(B), (a)(4).

[207] *Id.* at § 1681i(a)(5)(A).

[208] *Id.* at § 1681i(a)(6)(B)(i), (ii).

[209] *Bradshaw*, 816 F. Supp. 2d at 1073 (quotation omitted); *see also Cushman v. Trans Union Corp.*,

suffice as a matter of law to establish the reasonableness of a reinvestigation.[210]  As noted above, growing number of courts recognized that review of publicly available records are part of a reasonable FCRA dispute-resolution process.[211]

"[A]n item on a credit report can be 'incomplete or inaccurate' . . . because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."[212]

A CRA negligently violates section 1681i when the following elements are met: (1) plaintiff's credit file contains inaccurate or incomplete information; (2) plaintiff notified the credit reporting agency directly of the inaccurate or incomplete information; (3) plaintiff's dispute is not frivolous or irrelevant; (4) the credit reporting agency failed to respond to plaintiff's dispute; (5) the failure to reinvestigate caused plaintiff to suffer damages; (6) actual damages, such as damages caused by humiliation, mental distress, or injury to reputation or creditworthiness, resulted to plaintiff.[213]

In the case of a willful violation, because the FCRA provides for money damages *in lieu* of actual damages in case of willful violations, a plaintiff doesn't need to prove damages and causation to maintain a Section 1681i cause of action.  Thus, Plaintiff can prove either (i) damages and causation to get to negligence, or simply (ii) that the CRA's failure to reinvestigate reasonably was willful.[214]

Substantive issues related to inaccuracy are the same for Section 1681e(b) as for Section 1681i, with the exception that under Section 1681i, there is no requirement to show that a consumer

---

115 F.3d 220, 226 (3d Cir. 1997).

[210] *Grigoryan*, 84 F. Supp. 3d at 1075.

[211] *See, e.g.*, *Myrick*, 2017 WL 4798154, at *2-3; *Hannon*, 2018 WL 577216, at *4; *Whitlock-Allouche*, 2018 WL 4258506, at *4.

[212] *Grigoryan* 84 F. Supp. 3d at 1075 (quoting *Gorman*, 584 F.3d at 1163.  *Gorman* involved a claim under a different provision of the FCRA (15 U.S.C. § 1681s–2(b)).  *Gorman*, 584 F.3d at 1163. The same standard, however, applies to CRA's under 1681e(b) and 1681i(a).  *Shaw*, 891 F.3d at 756 (citing, *e.g.*, *Carvalho*, 629 F.3d at 890).

[213] *Carvalho v. Equifax*, 588 F. Supp. 2d 1089, 1095 (N.D. Cal. 2008), *aff'd*, 629 F.3d 876 (9th Cir. 2010) (citing *Thomas v. Trans Union*, 197 F. Supp. 2d 1233, 1236 (D. Or. 2002)).

[214] *Saenz v. Trans Union*, 621 F. Supp. 2d 1074, 1082 (D. Or. 2007).  The requirement that a FCRA plaintiff seeking to prove willfulness need not establish damages and causation has been recently supported by other courts in this District.  *See, e.g.*, *In re Ocwen Loan Servicing LLC Litig.*, 240 F. Supp. 3d 1070, 1075 (D. Nev. 2017) (considering violation of 15 U.S.C. § 1681b); *Smith v. One Nevada Credit Union*, No. 16-cv-2156-GMN-NJK, 2017 WL 2803169 (D. Nev. June 27, 2017) (interpreting *In re Ocwen*).

report was "prepared" (although one was undisputedly prepared and sent to Plaintiff).[215]  Similarly, as noted above in connection with Plaintiff's discussion of Section 1681e(b), the inaccurate information on Plaintiff's reinvestigation stemmed from its unreasonable DRN-notification procedure.[216]  For the same reasons that Experian's reinvestigation procedures are unreasonable in violation of Section 1681e(b), they reflect the fact that Experian conducted an unreasonable reinvestigation of Plaintiff's dispute.

Thus, the undisputed facts establish each element:

(1) Plaintiff's August 25, 2015 disclosure contained both patently incorrect and materially misleading information.[217]

(2) On October 6, 2015, Plaintiff's dispute was sent to Experian, identifying inaccuracies.[218]

(3) Experian's October 19, 2015 reinvestigations did not find the dispute frivolous or irrelevant, but instead explained that Plaintiff's Webbank tradeline had been "updated."[219]

(4) Experian's reinvestigation contained inaccuracies when it stated a "recent balance" of $0 as of August 2015; in continuing to report the post-petition charge-off notations and multiple charge-offs; and in indicating that his account had been "updated" based on the processing of Plaintiff's dispute.[220]

(5) These inaccuracies stemmed from Experian's insufficient procedures in failing to notify Webbank of the pendency of the dispute (and in not even following its own internal policies in concluding that Webbank need not be contacted, as Plaintiff did not submit one of the required bankruptcy schedules as a "proof" document);[221] in failing to provide Webbank with all relevant information it had used in reinvestigating Plaintiff's dispute;[222] in failing to cross-reference the dispute against the bankruptcy docket, which would have demonstrated that no action was taken to reaffirm Plaintiff's debt;[223] and in failing to follow the CRRG guidelines it has declared it

---

[215] *See, e.g., Carvalho*, 588 F. Supp. 2d at 1095.
[216] *See* SUMF, at ¶¶ 4-15.
[217] *See id.* at ¶ 2.
[218] *Id.* at ¶ 3.
[219] *See id.* at ¶¶ 16-17.
[220] *Id.* at ¶¶ 19-22.
[221] *Id.* at ¶¶ 4-15.
[222] *Id.* at ¶¶ 5, 15.
[223] *Id.* at ¶ 13.

followed;[224]

(6) Plaintiff incurred statutory damages, because Experian's conduct was reckless.[225]

(7) Plaintiff incurred actual damages.[226]   A finding of either negligent or willful liability results in an award of reasonable attorney's fees and costs.[227]

### C. Experian's conduct was willful.

A CRA may face liability for willful violations of the FCRA.[228]   Willfulness may be demonstrated through showing a reckless disregard of statutory duty.[229]   A defendant acts in reckless disregard if its action "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless."[230]   "The statutory requirement of willfulness does not require proof of an intent to cause harm, but only an intent to fail to comply with the FCRA."[231]   When the FCRA unambiguously forecloses the defendant's chosen interpretation, a subjective belief in the correctness of a contrary interpretation is immaterial.[232]   A dearth of binding precedent does not render a statutory interpretation reasonable or immunize a party from statutory damages.[233]   "'Willfulness under the FCRA is generally a question of fact for the jury.'"[234]

As noted above, Experian's DRN policy runs contrary to its own oft-argued claim that it must rely on Furnisher data because consumer data is fundamentally untrustworthy,[235] as well as its own

---

[224] *Id.* at ¶ 20.

[225] *Id.* at ¶¶ 27-29.

[226] *Id.* at ¶¶ 23-26.

[227] *See* 15 U.S.C. §§ 1681n, 1681o.

[228] 15 U.S.C. § 1681i(a)(1)(A); *Dennis*, 520 F.3d at 1069; *see also Carvalho*, 629 F.3d at 890; *Guimond*, 45 F.3d at 1333.

[229] *Safeco Ins. Co. v. Burr*, 551 U.S. 47, 56-60 (2007).

[230] *Bateman v. Am. Multi-Cinema*, 623 F.3d 708, 711 n.1 (9th Cir. 2010) (quoting *Safeco*, 551 U.S. at 69). *See also Smith*, 2017 WL 2803169 at *5.

[231] *Centuori v. Experian*, 431 F. Supp. 2d 1002, 1011 (D. Ariz. 2006).

[232] *Syed v. M-I, Inc.*, 853 F.3d 492, 499 (9th Cir. 2017).

[233] *Id.* at 504 (citing, *e.g.*, *Cortez*, 617 F.3d at 721); *Ramirez v. Trans Union LLC*, No. 12-cv-632-JSC, 2017 WL 1133161, at *3 (N.D. Cal. Mar. 27, 2017).

[234] *Taylor v. First Advantage Background Servs. Corp.*, 207 F. Supp. 3d 1095, 1110 (N.D. Cal.) (quoting *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007)) (citing *Guimond*, 45 F.3d at 1333). *See also Heaton v. Soc. Fin.*, No. 14-cv-5191-TEH, 2015 WL 6744525, at *6 n.5 (N.D. Cal. Nov. 4, 2015) (citing *Smith v. LexisNexis Screening Sols.*, 76 F. Supp. 3d 651, 665 (E.D. Mich. 2014)).

[235] SUMF, at ¶ 10-12.

28

argument that it completes a reinvestigation largely by providing notice to the Furnisher.[236]  While Plaintiff stridently disagrees with these assertions, Experian's conflicting positions show that its short-circuiting of the statutorily required dispute-notification process is, by its own arguments, reckless – even if Section 1681i(a)(2) unambiguously requires Experian to provide notice of a consumer's dispute to the Furnisher and an opportunity to respond.[237]  Nor is Experian's refusal to properly notify Webbank an isolated incident; in fact, discovery has shown that Experian make internal updates *over 200,000 times* in a two-year period in connection with "updates" to tradelines alone.[238]  Experian also undisputedly failed to provide Webbank with all relevant information in connection with his dispute, although Section 1681i(a)(2) unambiguously requires Experian to do so.[239]  Experian also failed to review the bankruptcy records,[240] and failed to conform its reporting practices to the CRRG guidelines it had helped write and whose reporting practices Experian employees have declared it follows.[241]

Because Experian's failures were reckless, they were also willful, entitling Plaintiff to statutory damages.

### D. Experian's conduct was at least negligent, and Plaintiff has suffered actual damages.

In addition to being willful, Experian's conduct was negligent, entitling Plaintiff to recover his actual damages under Section 1681o of the FCRA.  "The term 'actual damages' has been interpreted to include recovery for emotional distress and humiliation,"[242] and in the Ninth Circuit, emotional damages can be established through a plaintiff's testimony alone.[243] Further, under the FCRA, a plaintiff's out-of-pocket costs necessary for disputing a consumer report constitute

---

[236] *See Ashcraft*, ECF Dkt. 134, at 16.
[237] 15 U.S.C. §§ 1681i(a)(2), 1681i(a)(5).
[238] SUMF, at ¶ 27.
[239] *See id.* ¶¶ 5, 15; 15 U.S.C. § 1681i(a)(2).
[240] SUMF, at ¶ 13.
[241] *Id.* at ¶ 20.
[242] *Guimond*, 45 F.3d at 1333; *Miller v. Equifax Information Services, LLC*, No. 11-cv-1231-BR, 2012 WL 5984656, at *3 (D. Or. Nov. 28, 2012) (citing *Guimond*, 45 F.3d at 1333).
[243] *See Zhang v. American Gem Seafoods, Inc.*, 339 F.3d 1020, 1040-41 (9th Cir. 2003); *see also Le v. Equifax Info. Servs., LLC*, No. 16-cv-2393-RFB-GWF, 2018 WL 1383808, at *5 (D. Nev. Mar. 19, 2018) ("The statute does not require that expert evidence be submitted to establish" stress arising from an alleged FCRA violation).

cognizable economic damages.[244]  A denial of credit is not a prerequisite to FCRA recovery.[245]

Plaintiff suffered actual damages in this case.  First, his credit report was procured by credit grantors both before and after Experian's reinvestigation; His October 19, 2015 CDF-F and Experian's internal "Admin" report showed that numerous third parties had received information from Experian within the period in which Plaintiff could have requested the reinvestigation to be sent.[246]  Plaintiff's December 2016 CDI showed that Experian had provided the Webbank tradeline – including its post-bankruptcy charge-offs – to at least one third party.  Both third-party information and Experian's own credit-scoring metrics indicate that payment history information, the recency of derogatory statuses, and even the presence of a dispute can be factors considered in calculating a credit score.[247]

Additionally, Plaintiff suffered out-of-pocket expenses and lost time in the form of transportation to and from his counsel's office, as well as communicating with his counsel to correct the errors on his Experian reports.[248]  Finally, he has suffered emotional distress because he did not know if he would be able to make new consumer purchases or not, and had to put a substantial down payment on his wife's car purchase.[249]

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the motion to compel be granted.

Dated: February 19, 2019         Respectfully submitted,

*/s/ Miles N. Clark*
Miles N. Clark, Esq.
Nevada Bar No. 13848
KNEPPER & CLARK LLC
10040 W. Cheyenne Ave., Ste. 170-109
Las Vegas, NV 89129
*Attorneys for Plaintiff*
*Additional counsel on cover page*

---

[244] *Saenz*, 621 F. Supp. 2d at 1085; *cf. also Le*, 2018 WL 1383808, at *5 (D. Nev. Mar. 19, 2018) (finding actual damages stemming from a FCRA violation recoverable "[e]ven when a consumer has not actually been denied credit or faced emotional harm.").  Plaintiff also incurred attorney's fees as a result of prosecuting this action.

[245] *Guimond*, 45 F.3d at 1333 (9th Cir. 1995); *see also Le*, 2018 WL 13803808, at *2 (citing *Guimond*, 45 F.3d at 1333).

[246] SUMF, at ¶ 23.

[247] *Id.* at ¶¶ 25-26.

[248] *See id.* at ¶ 24.

[249] *See id.* at ¶ 24.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2019, and pursuant to the Federal Rules of Civil Procedure, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was served via the U.S. District Court's electronic filing system to all parties entitled to receive notice thereby.

/s/ Lucille Chiusano
An Employee of Knepper & Clark LLC