# EXHIBIT 26

## July 19, 2018 Deposition of Mary Methvin as Experian's 30(b)(6) witness

## (Redacted)

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

LOUIS A. CARDINALI, )
Plaintiff, )
)
v. ) Case No. 2:16-cv-2046-JAD-NJK
)
PLUSFOUR, INC.; RC )
WILLEY HOME )
FURNISHINGS; WEBBANK/ )
DELL FINANCIAL )
SERVICES; EQUIFAX )
INFORMATION SERVICES, )
LLC; and EXPERIAN )
INFORMATION SOLUTIONS, )
INC., )
Defendant. )

-----------------------------------------------

ORAL DEPOSITION OF EXPERIAN INFORMATION
SOLUTIONS, INC. BY AND THROUGH
ITS DESIGNATED 30(B)(6) REPRESENTATIVE
MARY AMES METHVIN
JULY 19, 2018

-----------------------------------------------

(PORTIONS OF THIS TRANSCRIPT CONTAIN CONFIDENTIAL INFORMATION PURSUANT TO A PROTECTIVE ORDER ISSUED IN THIS CASE AND ARE FOR ATTORNEYS' EYES ONLY. PLEASE CONSULT COUNSEL PRIOR TO REVIEW.)

ORAL DEPOSITION OF MARY AMES METHVIN, produced as a witness at the instance of the PLAINTIFF, and duly sworn, was taken in the above-styled and numbered cause on the 19th day of July, 2018, from 9:04 a.m. to 5:27 p.m., before TINA TERRELL BURNEY, CSR in and for the

State of Texas, reported by machine shorthand, at the offices of Jones Day, 2727 North Harwood, Suite 500, Dallas, Texas 75201, pursuant to the Federal Rules of Civil Procedure.



A P P E A R A N C E S

FOR THE PLAINTIFF:

Mr Miles N Clark
KNEPPER & CLARK LLC
10040 W Cheyenne Avenue, Suite 170-109
Las Vegas, Nevada 89129
710 825 6060 Fax 702 447 8048
miles clark@knepperclark com

Mr Mohammed Omar Badwan
SULAIMAN LAW GROUP, LTD
2500 S Highland Avenue, Suite 200
Lombard, Illinois 60148
630 575 8180 Fax 630 575 8181
mbadwan@sulaimanlaw com

Mr Matthew C De Re (APPEARING BY TELEPHONE)
ZIMMERMAN LAW OFFICES, P C
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
312 440 0020 Fax 312 440 4180
matt@attorneyzim com

FOR THE DEFENDANTS:

Mr Christopher A Hall
JONES DAY
77 W Wacker Avenue
Chicago, Illinois 60601
312 782 3939 Fax 312 782 8585
chall@jonesday com



INDEX

PAGE
Appearances.................................... 3
WITNESS: MARY AMES METHVIN
Examination by Mr. Clark....................... 7
Examination by Mr. Hall........................ 283
Further Examination by Mr. Clark............... 296
Signature and Changes.......................... 298
Reporter's Certificate......................... 300

EXHIBITS

DESCRIPTION PAGE
Exhibit 1 Plaintiff's Fourth Amended Notice Bates 30B6 Depo 000001-000031...... 13
Exhibit 2 Disclosure Logs.................... 34
Exhibit 3 Deposition of Ms. Methvin 8/10/16 Bates 30B6 Depo 000874-000912...... 82
Exhibit 4 Letter from Mr. Cardinali to Experian 10/6/15 Bates 30B6 Depo 000032-000067...... 121
Exhibit 5 EPC Sorter Manual Bates 30B6 Depo 000532-000590...... 136
Exhibit 6 First Amended Complaint Bates 30B6 Depo 000917-000938...... 157
Exhibit 7 Credit Profile From Experian Bates 30B6 Depo 000596-000616...... 195
Exhibit 8 Dispute: Trades Bates 30B6 Depo 000131-000320...... 211



EXHIBITS (cont'd)

DESCRIPTION PAGE
Exhibit 9 ACDV Procedures Bates 30B6 Depo 000394-000531...... 229
Exhibit 10 e-OSCAR Disputes and Updates Bates 30B6 Depo 000321-000387...... 239
Exhibit 11 G, H, I and J Updates for Mr. Cardinali Bates 30B6 Depo 000811-000812...... 248
Exhibit 12 Experian's Third Amended Objections and Responses to Plaintiff's First Set of Interrogatories Bates 30B6 Depo 000758-000763...... 250
Exhibit 13 Experian's Amended Objections and Responses to First Set of Requests for Admissions Bates 30B6 Depo 000764-000787...... 258
Exhibit 14 Experian's Answers to Second Set of Requests for Production Bates 30B6 Depo 000788-000810...... 269
Exhibit 15 2015 Credit Reporting Resource Guide Bates 30B6 Depo 000388-000393...... 273

PROCEEDINGS

MR. CLARK: This is the date and time scheduled for Experian's 30(b)(6) deposition in the matter of Cardinali v. Experian, Case No. 2:16-cv-2046 in the U.S. District Court for the District of Nevada. 09:04AM This deposition is taking place in Dallas, Texas, and we may have folks on a conference line as well.

MY name is Miles Clark. I am one of the plaintiff's attorneys in this case, and I'll let every other counsel present have an opportunity to identify 09:04AM themselves for the record starting with defense counsel.

MR. HALL: Christopher Hall from Jones Day for Experian. I guess I should ask. Did you dial in yet? I haven't dialed the number.

MR. CLARK: We have not. 09:04AM

MR. HALL: Let me dial in the number. Nobody else is coming from Experian. I don't know if you guys have anyone else coming or not.

MR. CLARK: Mr. De Re may be joining us.

MR. HALL: I guess, just for the record, 09:04AM we'll go ahead and mark this for 30 days confidential and attorneys' eyes only. I'm not sure what documents you'll talk about, but obviously we'll narrow it down.

MR. CLARK: That's fine. I generally state that any documents introduced at the deposition 09:05AM

Page 6

maintain their confidentiality designations as they were originally designated.

MR. HALL: Great.

MR. BADWAN: For the record, Mohammed Badwan, B-a-d-w-a-n, for the plaintiff. 09:05AM

MARY AMES METHVIN,

having been first duly sworn, testified as follows:

EXAMINATION

Q. Good morning.

A. Good morning. 09:11AM

Q. Ms. Methvin, could you please state your full name and spell your last name for the record?

A. My name is Mary Methvin, spelled M-e-t-h-v-i-n.

Q. Thank you. Ms. Methvin, in the past we have 09:11AM been going on a first name basis, last name basis. How would you like me to address you today?

A. Ms. Methvin is fine.

Q. Thank you. And you can call me Miles if you'd like. You can call me names too, but only if I deserve 09:11AM it. Okay?

A. Okay.

Q. Okay. Great. So, Ms. Methvin, have you been deposed before?

A. Yes, sir. 09:11AM

Page 7

Q. How many times or thereabouts?

A. About 55.

Q. About how many times of those times have been as Experian's 30(b)(6) representative?

A. Most of them. 09:12AM

Q. Have those depositions been recent?

A. Yes, sir.

Q. And have you ever been deposed in an expert capacity?

A. Yes, sir. 09:12AM

Q. And would that be on behalf of Experian?

A. Yes, sir.

Q. Are you aware that you are here to testify today as Experian's 30(b)(6) witness?

A. Yes, sir. 09:12AM

Q. And I take it because you've been deposed before that you're familiar with the ground rules for taking a deposition. Is that correct?

A. Yes, sir.

Q. Would you like me to go over them before we 09:12AM begin?

A. Yes, sir.

Q. Okay. So this is a deposition, and it's the same as if you were testifying in a court of law, so the oath you gave at the beginning of the deposition 09:12AM

Page 8

indicates that you are making this deposition under the penalties of perjury. Do you understand that?

A. Yes, sir.

Q. Do you understand that you must give truthful and accurate testimony today? 09:12AM

A. Yes, sir.

Q. Do you understand that you may be able to correct your answers at a later time if you misspeak or you think of something later that may change one of your answers? 09:13AM

A. Yes, sir.

Q. And that would be during the course of the deposition, correct?

A. Yes, sir.

Q. And after the deposition, although 09:13AM stenographic errors may be corrected, substantive changes are out of bounds. Do you understand that?

MR. HALL: Objection, foundation.

A. Yes, sir.

Q. And so if you'd like to change any of your 09:13AM answers during the course of the day, please just let me know. I'll try to give you the opportunity to do that, but if I don't ask, just make sure to tell me. Okay?

A. Okay.

Q. So if we can refrain from talking over one 09:13AM

Page 9

another, sometimes that happens. It's a little easier when you're here in person because I can see whether or not you're done with an answer. I can pick that up on visual cues.
But because this transcript is being 09:13AM transcribed, the deposition is being transcribed, I will ask that you allow me to complete my question before you answer, and consequently I will do my absolute best not to cut you off in the middle of an answer today. Is that okay? 09:14AM
A. Yes, sir.
Q. Because this is a recorded record, we're going to need you to refrain from nonverbal responses, so if you nod and shake your head, the court can't see that. And consequently also, saying uh-huh or huh-uh is also 09:14AM not as clear as yes or no, so we'd like you to give a verbal response that's clear to these questions.
Are you okay with that?
A. Yes, sir.
Q. Thank you. And at the deposition, I'm 09:14AM entitled to your best estimate to an answer, but you're not required to guess as to what any answer may be. Do you understand the difference between an estimation and a guess, or would you like an example?
A. I understand. 09:14AM



Q So if you need a break during the deposition, the deposition is not an endurance test, and so please just ask for a break and we'll do what we can to provide you with one The only thing I ask is that if a question is pending when you request the break, that you 09:15AM answer the question before we go on break
Do you understand that?
A Yes, sir
Q From time to time I ask questions that are somewhat confusing Sometimes I do Maybe I won't do 09:15AM it today, but I can't promise anything But if you don't understand my question or you need me to rephrase or just restate it because you didn't hear it, I want to make sure that you understand what it is you are being asked to testify to So if that happens, please just 09:15AM ask me to restate the question and I will do so
Is that okay?
A Yes, sir
Q From time to time your counsel may make objections to questions that I ask If he does so, the 09:15AM question is still pending unless there is an instruction to not answer it which you intend to follow
Do you understand that?
A Yes, sir
Q And, let's see, and you're aware that you must 09:15AM



answer my questions today without any active coaching of counsel. Do you understand?
A. Yes, sir.
Q. Do you understand that that includes looking at counsel to see how he would like you to respond in a 09:15AM nonverbal manner?
A. Yes, sir.
Q. Thank you. And let me ask you, Ms. Methvin, I apologize for the invasive question, but I must ask it. Have you taken any medications or any drugs or alcohol 09:16AM in the last 24 hours that might impair your ability to give truthful and accurate testimony today?
A. No, sir.
Q. Is there any other reason you feel you cannot give your truthful and accurate testimony today? 09:16AM
A. No, sir.
Q. Do you have any questions at all for me before we begin?
A. No, sir.
Q. Okay. I may make certain representations to 09:16AM you during the course of today's deposition, and when I represent a fact to you, you are to presume the fact is true. And if it turns out that I'm wrong later, then that's going to be my problem, not yours. Do you understand that? 09:16AM



MR. HALL: Objection, form. Foundation.
A. Yes, sir.
Q. So I will -- the first representation I will make to you is that the scope of Mr. Cardinali's class claims in this case cover the period between April 19th 09:16AM of 2015 through April 19th of 2017. Okay?
A. Okay.
Q. And when I ask you a question today, I am directing you to answer as to that period unless I specify otherwise. Do you understand? 09:17AM
A. Okay. Yes, sir.
Q. Thank you. All right.
MR. CLARK: Let's mark this as Exhibit 1, please.
(Exhibit 1 marked.) 09:17AM
Q. Ms. Methvin, I have handed you a document that I have had marked as Exhibit 1. It's a series of documents. If you could look through them and let me know when you've had a chance to review them.
MR. HALL: Miles, while she's looking 09:18AM through that, I assume you're going to ask her some questions about this, and I'm just going to, for the record, object that this is not the complete record, at least as far as it doesn't include Experian's specific objections and responses and designations of these 09:18AM

topics.
MR. CLARK: I believe it does.
MR. HALL: Mine doesn't, or maybe I missed it.
MR. CLARK: Beginning on Page 18. 09:18AM
MR. HALL: My apologies. I didn't look close enough. Objection withdrawn.
MR. CLARK: Thank you.
A. Okay.
Q. Ms. Methvin, having had an opportunity to 09:19AM review what I have had marked as Exhibit 1, do you recognize what Exhibit 1 is?
A. Yes, sir.
Q. And what is it?
A. This is the plaintiff's fourth amended notice 09:19AM of taking deposition, and also Experian's objections and responses.
Q. And have you seen both of these documents before?
A. I know that I have seen the second one. I 09:19AM believe I have also seen the first one, but I'm not 100 percent sure.
Q. Do you have any question as to whether or not that fourth amended notice is why you're appearing today? 09:19AM

Page 14

A. No, sir.
Q. And I'll note that the time of your appearance was marked as 10:00 a.m., but per stipulation of counsel, we have moved that to 9:00 so we can all get done with our day earlier. Is that okay? 09:19AM
A. Yes, sir.
Q. And so you have been designated as Experian's corporate witness, correct?
A. Yes.
Q. And do you understand the duties of a 09:19AM corporate designee?
A. Yes, sir.
Q. Do you understand that your answers today on the notice's topics bind the company?
A. Yes, sir. 09:20AM
Q. And so I would like you to take a look at the list of topics that are included on Pages -- oh, by the way, Ms. Methvin, as a housekeeping measure, when I refer to page numbers today, I've put a bold letter on the bottom left-hand corner of the page that says 09:20AM 30(b)(6) depo and then a number. Do you see that?
A. Yes, sir.
Q. And I would like to refer to that number as just that number, Page 10, Page 11, Page 50. Is that okay with you? 09:20AM

Page 15

A. Yes.
Q. And I'll be referring to that number unless I tell you otherwise. Okay?
A. Okay.
Q. Great. So I'd like you to first look at Pages 09:20AM 8 through 15. Once you have done looking, just let me know if that is a list of topics in which we have sought to designate you as a witness.
A. Yes, sir.
Q. And having had a chance to review the topics 09:21AM listed on those pages, are there any topics on which you do not believe you are able to testify today?
MR. HALL: Objection, form, foundation.
Q. And for ease of reference, if you could just tell me what the topics are if you find any that you are 09:21AM not prepared to?
MR. HALL: For the record, I object on scope grounds too.
A. On Topic Number 8, I'm not designated to speak on that. Topic Number 12, I'm not designated to speak 09:21AM on that. Number 19, Topic Number 21, Topic Number 22.
Q. And so, Ms. Methvin, if I heard you correctly, those were Topics 8, 12, 19 and 22?
A. I'll have to go back and look.
Q. Okay. 09:23AM

Page 16

A. Yes, sir, that's correct.
Q. And out of an abundance of caution, I'm going to hold the deposition open on the topics for which you stated you are not designated. That's fine if you're not prepared to testify, but that just means that we may 09:24AM have to bring back a corporate representative at another time.
MR. CLARK: I'll put on the record that we received these objections last Thursday and only received a confirmation about what Experian's intentions 09:24AM were by, I believe that was Tuesday night, so that was not adequate time to brief a motion to compel.
So out of an abundance of caution, we will be holding those topics open at this time.
Chris, if you have any response, I'll be 09:24AM happy to let you put it on the record now.
MR. HALL: I don't have anything to put on the record.
Q. Ms. Methvin, have you ever testified as to any quotas or productivity targets that Experian may have 09:25AM had in connection with its dispute agents?
MR. HALL: Objection, scope.
A. Yes.
Q. And do you recall when you would have provided that testimony? 09:25AM

Page 17

MR. HALL: Same objection.
A. No.
Q. Do you recall giving testimony in a case in the Northern District of Illinois called Zorba?
MR. HALL: Same objection. 09:25AM
A. I do.
Q. Do you recall whether that -- now that I have mentioned the name, does that refresh your recollection about whether you would have testified about quotas or productivity targets at the deposition? 09:25AM
A. No, sir. I don't remember which deposition I've talked about it before. I've had a lot of depositions, and it's come up a few times.
Q. Do you recall when else it's come up?
A. I really can't give you the specific case, no, 09:25AM sir.
Q. How many times have you been deposed in the last two years?
MR. HALL: Objection, asked and answered.
A. I don't know exactly in the last two years, 09:25AM but I've been deposed over 50 times in the last four years.
Q. In each of those depositions, did you take the same oath to testify truthfully and accurately that you took this morning? 09:26AM

Page 18

A. Yes, sir.
Q. Are you currently employed at Experian?
A. Yes, sir.
Q. What's your job title?
A. Senior legal and compliance analyst. 09:26AM
Q. Could you tell me in general what your job responsibilities are?
A. Well, I assist Experian's outside counsel in preparing for litigation, providing support, and also assist Experian's internal counsel as well with 09:26AM litigation matters.
Q. How long have you worked at Experian?
A. Since September 23rd, 2002.
Q. And during the course of that time, have all the positions you've held at Experian dealt in one way 09:26AM or another with the reinvestigation of consumer disputes?
MR. HALL: Objection, form.
A. Yes.
Q. And have you ever been -- I believe you said 09:27AM that you've been designated as Experian's expert in other cases?
A. Yes, sir.
Q. And was that -- were those designations on matters related to Experian's reinvestigation of 09:27AM

Page 19

consumer disputes?
MR. HALL: Objection, scope.
A. Yes, sir.
Q. So I take it from your experience at Experian, that you're familiar with Experian's policies, practices 09:27AM and procedures for reinvestigating consumer disputes; is that correct?
MR. HALL: Objection, form.
A. Yes, sir.
Q. And let me ask you, are you a computer expert? 09:27AM
MR. HALL: Objection, form.
A. I guess it depends on what the definition of an expert is. I would say no.
Q. Is computing a hobby of yours?
MR. HALL: Objection, scope. 09:27AM
A. No.
Q. Are you familiar with Experian's computer systems?
A. Yes.
Q. And what is the scope of your familiarity? 09:27AM
A. Well, I've worked with them for the last 16 years, so pretty much on a daily basis.
Q. In the course of your work with Experian's systems, do you work primarily with the presentation tier of those systems, or do you work with some other 09:28AM

Page 20

tier of those systems?
MR. HALL: Objection, form.
A. Primarily with the presentation of them.
Q. Do you know what a presentation tier is?
MR. HALL: Objection, form. Foundation. 09:28AM
A. No. I guess it would just mean in the manner in which a software is presented to the user, but I don't know what the dictionary definition is of it.
Q. And if you were presented with a snippet of Experian's computer language, its algorithms, would you 09:28AM know how to interpret that?
MR. HALL: Objection, form. Scope.
A. No.
Q. Do you know how to write any kind of computer algorithm to be used in programming a computer? 09:28AM
MR. HALL: Objection, scope.
A. No.
Q. If I were to ask you questions about Experian's capacities for querying its internal records, would you be able to answer them at a technical level? 09:29AM
MR. HALL: Objection, form. Vague as to which systems you're referring to.
MR. CLARK: Counsel, if you could please refrain from signifying which portion of the vague objection you take issue with, that does take the form 09:29AM

Page 21

of coaching, and if you could simply make your objection succinctly for the record, then that will be sufficient
Can you do that?
MR HALL: I'll make my objections
MR CLARK: If the coaching continues, we 09:29AM will call the magistrate judge
Q Ms Methvin, the question is pending
A Could you ask it again, please?
Q Certainly
MR CLARK: Could you please read back 09:29AM the question?
(Record read )
MR HALL: Same objection
A Well, it depends on how you ask me and what you're asking me, but I do know some things about how to 09:30AM query information and what can be queried and what can't, so it really depends on what the question is
Q And when you use the word query, what do you mean by your use of that word?
A The same word that you used, I would say that 09:30AM would be request information, and that's what I assumed that you meant when you used the word Is that -- I guess I don't know if it's the same meaning for you
Q How are -- are you familiar with how Experian queries its systems? 09:30AM

Page 22

MR. HALL: Objection, form, vague.
A. Well, like I said, I've worked at Experian for 16 years almost, and I deal with those systems on a daily basis. I've worked with other litigation matters in which information was obtained. 09:31AM
I have a working relationship with the people that work with that system, and I've asked questions over the years, and I've learned the information.
Q. And do you understand what kinds of queries 09:31AM can be made from a presentation tier to a data tier in Experian's system architecture?
A. No.
MR. HALL: Objection, form, vague. Calls for speculation. 09:31AM
A. No.
Q. Do you recall testifying in a case called Viscara v. Experian earlier this year?
MR. HALL: Objection, scope.
A. Yes. 09:31AM
Q. Did you testify as a 30(b)(6) witness in that case?
A. Yes.
Q. Did you later testify in your personal capacity? 09:31AM

Page 23

A. Yes.
Q. And did you take the same oath that you took this morning to testify truthfully and accurately?
A. Yes.
Q. Do you recall during your individual 09:31AM deposition I asked you a number of questions about your familiarity with Experian's internal system architecture?
MR. HALL: Objection, scope.
A. I don't specifically remember that specific 09:32AM deposition, but we've had a lot of depositions together, so I'm sure at some point you probably did ask me that.
Q. And have you taken any steps to improve your understanding of Experian's internal computing infrastructure since January 27th of 2018? 09:32AM
MR. HALL: Objection, form, vague. Calls for speculation.
A. Yes.
Q. What steps have you taken?
A. I have just asked questions. 09:32AM
Q. Who did you see ask?
A. Well, I've spoken with our internal counsel, with Experian's legal counsel, as well as Kim Cave. That's all I can think of at the moment.
Q. What's the name of the internal counsel you 09:33AM spoke with?

Page 24

A. Michael Rozak.
Q. Did you have those discussions in connection with this case?
A. No. 09:33AM
Q. Are you familiar with any research Experian has done to ascertain the number of class members in this case that we're here on today?
MR. HALL: Objection, form.
A. Just what I read in the documents that we 09:33AM provided some data on. I don't have it in front of me, but we did provide some data in this case that we did some queries on, so I'm familiar with that.
Q. And could you tell me what you're familiar with? 09:34AM
MR. HALL: Objection, form. Calls for attorney/client privilege.
You can answer as to any personal facts, but anything from our conversations together or your conversations with Mr. Rozak, I instruct you not to 09:34AM answer those questions.
A. No, sir, not without the document in front of me. I don't remember what the information was. I know there were some queries made and some data provided as a result of that for this case. 09:34AM

Page 25

Q. And to the best of your recollection, did the documents themselves indicate specific queries that were made?
A. No. I think it just gave the answers.
Q. So would the document not be helpful in 09:34AM refamiliarizing you with the types of queries that were made?
MR. HALL: Objection, form. Calls for speculation.
A. No, it may help me. 09:34AM
Q. By the way, I forgot to ask, what did you do, if anything, to prepare for today's deposition?
A. I met with my attorney yesterday.
Q. And was that Mr. Hall?
A. Yes, sir. 09:35AM
Q. And was anyone else present?
A. No, sir.
Q. How long did you meet with Mr. Hall?
A. About seven hours maybe. With lunch it was maybe six hours. 09:35AM
Q. Did you review any documents in preparation for your deposition?
A. Yes, sir.
Q. And what documents did you review?
MR. HALL: Objection. To the extent that 09:35AM

Page 26

that's asking us to reveal our work product and the documents I selected for her, I'll insert a work product objection and instruct her not to answer the question
MR CLARK: And I'm going to hold that question open, notwithstanding counsel's objection 09:35AM
Q Ms Methvin, are you going to follow your counsel's advice?
A Yes, sir
Q Did you review any other documents besides those provided to you by counsel? 09:35AM
A No, sir
Q Have you ever reviewed any documents in this case other than those provided to you by counsel?
A No, sir
Q So sitting here today, you will refuse to 09:36AM testify as to any document you may have looked at in preparation for the deposition?
MR HALL: Objection, mischaracterizes her testimony Just while I have the floor for a second, when you show her documents and ask her if she 09:36AM looked at it before, I will be happy to let her answer that, but I'm not going to let her testify as to the specifics of what I asked her to review
But you can answer the question otherwise 09:36AM

Page 27

MR CLARK: We may take that up with the magistrate judge at another time
A What was the question?
MR CLARK: Tina, could you please read that back? Thank you 09:36AM
(Record read )
A No, sir I don't think so
Q Were you involved -- are you aware whether or not Mr Cardinali made any dispute to Experian in the past? 09:37AM
MR HALL: Objection, vague
A Yes, sir
Q Were you involved personally in handling Mr Cardinali's dispute?
A No, sir 09:37AM
Q Were you involved personally in any actions that Experian may have taken after Mr Cardinali filed his complaint in this case in 2016?
A I don't believe so, no, sir
Q Do you know whether or not Experian would have 09:37AM had personal knowledge of the actions taken in connection with Mr Cardinali's dispute?
A As I'm sitting here, I don't have If I had a document in front of me, I could probably tell you
Q So we would need to depose that person 09:37AM

Page 28

wherever they were to understand whatever personal knowledge they would have about the handling of Mr. Cardinali's dispute directly?
MR. HALL: Objection, form, foundation. Calls for speculation. 09:37AM
A. Well, if you're asking me the agent that actually processed a dispute over two years ago, to ask them if they remember anything about it, you would have to ask them personally, yes, sir.
Q. Where are Experian's dispute agents located? 09:38AM
A. We have dispute agents in Allen, Texas. There's some located at our personal visit office in Santa Ana, California. We have dispute agents in Santiago, Chile. We also have dispute agents in Costa Rica. 09:38AM
Q. About how many dispute agents are located in Chile?
A. It's about 200. The number can fluctuate due to business needs and attrition and things like that, but it's approximately 200. 09:38AM
Q. How about in Costa Rica?
A. The same, about 200.
Q. And how about in Allen, Texas?
A. The same. It's about 200. It's equally split between those three locations, and then there's a small 09:38AM

Page 29

office in Santa Ana that has about five people in it, I believe, something like that.
Q. Do the agents in the various -- aside from the Santa Ana office, which I understand handles walk-in disputes, is there any distinction between the types of 09:39AM disputes handled by the offices in Texas, Costa Rica and Chile?
MR. HALL: Objection, form.
A. Well, the agents in Santiago do not handle telephone disputes, but, otherwise, there is no 09:39AM distinction for the other sites. They handle both telephone and mail disputes.
Q. And would those be -- are the disputes distributed based on the type of dispute, i.e., if it's a mixed file dispute or a status dispute? Would some of 09:39AM those disputes go to Chile and some of those disputes go to Texas? Is there any distinction between the type of dispute on where that dispute is routed?
A. No, sir. There are agents trained to handle different types of disputes in all the locations. 09:39AM
Q. What's the level of English proficiency that Experian requires in the offices that are located in Chile and Costa Rica?
MR. HALL: Objection, scope. Form. Foundation. 09:40AM

Page 30

A. Well, I don't know what the level is, like if there's a number, but I do know that agents have to be able to read and speak English fluently. Part of the application process involves taking a test in reading English, as well as comprehending it, and also in 09:40AM speaking. All of the training is also done in English.
Q. And so if we were trying to assess -- let's assume that Mr. Cardinali's dispute was handled in one of these two offshore offices. And if we wanted to assess whether the agent actually understood Mr. 09:40AM Cardinali's dispute, would we have to look at those training manuals to see how much fluency was required?
MR. HALL: Objection, scope, foundation.
A. I don't know if the training manual would say how much is required. Like I said, they're required to 09:41AM take a test prior to the hiring, and then, you know, show that they are proficient in English as far as reading and speaking.
Q. Have you seen a copy of that test before?
A. I don't know if I have or not. We've been 09:41AM using that since around 2007. So I don't know that I have seen one recently, but I may have seen one in the last 11 years.
Q. Does that test have a name?
A. I don't know what the name of it would be. 09:41AM

Page 31

Q. Do you have any doubt that it's stored somewhere in Experian's files?
MR. HALL: Objection, calls for speculation.
A. I don't doubt it. I don't have it. I don't 09:41AM have access to it right now, but I would imagine that it's something that I could get.
Q. What about the requirements for hiring in the offshore locations? Would Experian have a copy of its requirements in its files? 09:42AM
MR. HALL: Objection, scope. Form.
Q. Only as it relates to English proficiency, not for any other qualification.
MR. HALL: Same objections.
A. I don't know the answer to that. 09:42AM
Q. You're not sure sitting here today if Experian has copies of its own hiring standards?
MR. HALL: Objection, scope. Form. Foundation.
A. Well, I don't know if Experian Services in 09:42AM Chile has that. I don't know the answer to that.
Q. Do you think that document exists somewhere in Experian's files?
MR. HALL: Objection, scope. Form. Foundation. Calls for speculation. 09:42AM

Page 32

A. In Experian Information Solutions, I don't know. I can't answer the question. I don't know that.
Q. Your last answer brings up an interesting point. Is the Chile office under the umbrella of Experian Information Solutions, Inc., or is it a 09:43AM separate company?
MR. HALL: Objection, scope. Form. Foundation.
A. I don't know how all of that is integrated or how that works. I know that those agents process 09:43AM disputes. I don't know if they're part of Experian Information Solutions, Inc. I know they go by the name Experian Services Chile.
Q. And what about Costa Rica?
MR. HALL: Same objections. 09:43AM
Q. Do you know if they are under Experian Information Solutions, Inc., or are they under a separate entity?
A. They're known as Experian Costa Rica, so, again, I don't know what the tie is with that. 09:43AM
Q. And you're here to testify today on behalf of Experian Information Solutions, Inc., correct?
A. Yes, sir.
Q. And if the dispute were handled by another company, are you saying that you just don't know -- you 09:43AM

Page 33

wouldn't know the answer to what that company may have done?

MR. HALL: Objection, mischaracterizes testimony.

A. No. I just don't know the answer on whether 09:43AM the proficiency information would be in the files or not.

MR. CLARK: May I have this please marked as Exhibit 2?

Q. Ms. Methvin, you can set Exhibit 1 aside, if 09:44AM you would.

(Exhibit 2 marked.)

Q. I have handed you what I have had the court reporter mark as Exhibit 2. Please take a look through it and let me know when you've had a chance to review 09:44AM it.

(Pause in proceedings.)

A. Okay.

Q. Ms. Methvin, have you seen what I've had marked as Exhibit 2 before? 09:45AM

A. Yes, sir.

Q. And is this one document or several?

A. It's three documents.

Q. What are the names of those documents?

A. The first one is the disclosure log. The 09:45AM

Page 34

second one is the dispute/response log. And the third one is what I call an admin report.

Q. And these three documents, what's the first page on each document, just for the record?

A. I don't know what you mean what's the first 09:45AM page. Like what the number is you mean?

Q. What the number is, yes, ma'am.

A. These don't have numbers on them.

Q. Okay. Could you -- is there a number on the other side? 09:45AM

A. Over here?

Q. Yes.

A. No, sir.

Q. No, there is not. Let me ask you this, Ms. Methvin: Is the first page of Exhibit 2 the disclosure 09:46AM log?

A. Yes, sir.

Q. And how many -- is the second document the DR log?

A. Yes, sir. 09:46AM

Q. How many pages is the DR log?

A. There's four pages.

Q. So the next four pages are the DR log, right?

A. Yes, sir.

Q. And every page that follows thereafter is the 09:46AM

Page 35

admin?

A Yes, sir

Q Do any of those documents indicate to you the dispute agents that handled Mr Cardinali's disputes?

A Yes, sir 09:46AM

Q Which document is that?

A Well, you can see it on the disclosure log and the DR log as well

Q And having had a chance to identify those agents in question, do you know where those agents would 09:46AM be located?

A Well, it's just one agent, and he was located in Santiago, Chile

Q How do you know that?

A Because I looked it up 09:46AM

Q When you say you looked it up, is there something about an identifier on the disclosure log and DR log that leads you to that conclusion?

A Yes, sir

Q And if you could point that out 09:47AM

A It's the agent ID, which is located here on the disclosure log, and then it's throughout the DR log

Q What about the agent ID tells you that this agent was located in Chile as opposed to the other locations you mentioned? 09:47AM

Page 36

A. Well, nothing about it on the document. You have to decode the agent's ID, and it will tell you their name and their location at that point.

Q. And when did you decode the agent's ID?

A. Yesterday. 09:47AM

Q. And was that a step you took after counsel asked you to do that?

A. Yes, sir.

Q. Did you look at any other documents besides these two to determine that the agent was located in 09:47AM Chile?

A. No, sir.

Q. Do you know the agent's name?

A. I don't remember it exactly. I think his first name was Juan, and his last name was like Aramillo 09:48AM or something close to that. I mean, it's something I could get for you specifically, but I don't have it memorized.

Q. And that would be on a document you saw?

A. No, it wasn't a document. 09:48AM

Q. When I mean document, Ms. Methvin, I want to be clear about what I mean. I'm talking about either a printed copy of a document, or of the document we're seeing right here, or an electronic record that's in Experian's files, something you could look at that is a 09:48AM

Page 37

record. So, for example, an email you pull up on your computer screen would be a document, as I'm understanding that term.
Do you understand how I'm using that term today? 09:48AM
A. Yes, sir.
Q. Based on that explanation, would you like to revisit the prior answer about whether you looked at a document in which the name of that agent was reflected?
A. Well, it was a computer screen. It wasn't an 09:48AM email. But I don't really call that document, but I did look at it on a computer screen.
Q. Do you know what system you accessed to retrieve that information?
A. Yes. 09:49AM
Q. What system was that?
A. It's called OneSys. It's O-n-e-s-y-s.
Q. We're going to come back to Exhibit 2, Ms. Methvin, but you can set it aside.
So we've talked about this term loosely, 09:49AM but let me just back up. Do you know what a dispute is?
A. Yes, sir.
Q. And what is that?
A. When a consumer disagrees with a piece of information that may be contained in their credit file. 09:49AM



Q. And by credit file, do you mean a credit file maintained by Experian?
A. Yes, sir.
Q. And do you know what a direct dispute is?
MR. HALL: Objection, form. 09:50AM
A. I don't know what you mean by that, so I don't know.
Q. Have you ever heard the phrase direct dispute before?
A. Probably. 09:50AM
Q. Have you ever used the phrase direct dispute?
A. Well, I know I've said the words directly from a consumer before, so I probably have.
Q. You just can't recall whether you have or you have not? 09:50AM
A. I probably have.
Q. And would that have been in depositions that you've sat for in the past?
A. Possibly, yes, sir.
Q. If Experian receives a direct dispute, will it 09:50AM begin a reinvestigation?
MR. HALL: Objection, form.
A. Well, it depends on what the direct dispute is.
Q. Let me back up. Do you know what a 09:50AM



reinvestigation is?
A. Yes, sir.
Q. What is it?
A. Well, a reinvestigation is what Experian's duty is when a consumer has a dispute with a piece of 09:50AM information on their credit report. It's the data furnisher's duty to investigate, and it's Experian's duty to reinvestigate.
Q. Let me back up. I'll ask the same question I asked before to lay a foundation, which is: If Experian 09:51AM receives a direct dispute, will it begin a reinvestigation?
MR. HALL: Objection, foundation. Form.
A. Yes.
Q. And Experian does receive disputes from 09:51AM consumers, correct?
A. Yes, sir.
Q. Does it receive them from anyone else?
A. Yes, sir.
Q. And when it receives a dispute from someone 09:51AM else, will it conduct a reinvestigation?
MR. HALL: Objection, form. Vague.
A. Well, it depends on how they receive that information. If there's included a power of attorney there or the letter -- the dispute is coming from a 09:51AM



consumer's -- a party that represents the consumer in a legal capacity such as an attorney, we would still reinvestigate those
Q So would you agree with me that Experian reinitiates a reinvestigation on notification directly 09:52AM from a consumer, including notification from their legal representative?
MR HALL: Objection, form Foundation Scope
A Yes If we receive notice of legal 09:52AM representation for a consumer, and there's also a dispute letter there, then, yes, sir, we would also initiate a reinvestigation
Q Does Experian consider the transmission of the results of the reinvestigation to be one of its 09:52AM obligations under the Fair Credit Reporting Act?
MR HALL: Objection, form Foundation Scope
A Yes, sir
Q Do you know what the Fair Credit Reporting Act 09:52AM is?
MR HALL: Objection
A Yes, sir
Q Does Experian believe it has an obligation to make its dispute correspondence to a consumer clear and 09:53AM

accurate?
MR. HALL: Objection, form. Foundation. Scope.
A. Yes, sir.
Q. Why? 09:53AM
MR. HALL: Same objections.
A. Why?
Q. Yes.
A. Why does it need to be clear to the consumer?
Q. Clear and accurate to the consumer, yes. 09:53AM
MR. HALL: I guess before the witness answers that question, to the extent your understanding of your answer depends on information you've learned from counsel, either outside counsel or inhouse counsel, I'd instruct you not to answer. 09:53AM
To the extent you have independent knowledge or an independent understanding of the question, you can answer it.
MR. CLARK: And I'll note that the witness did look at her counsel during that lengthy 09:53AM objection.
Q. Ms. Methvin, the question is pending.
A. I don't know...
MR. CLARK: Could you please read back the question and answer? 09:53AM



(Record read )
A I don't know why It just seems that it would be common sense, but I don't know the answer
Q Do you know if anyone at Experian -- do you know anyone at Experian who would know that answer? 09:54AM
A I would imagine those decisions would be made by our legal team, as well as senior management and things like that
Q And who in senior management would make a decision like that? 09:54AM
A I don't know I think, like I said, it would probably be done, you know, at the direction of counsel about why things are done the way they are
Q When you say senior management, are you referring to a certain subset of individuals? 09:54AM
A Not particularly, no, sir
Q When you say senior management, what do you mean?
A I mean someone in management that is higher up or someone -- executives, things like that 09:55AM
Q Do you have any executives in mind that are higher up that would make that decision?
A No
Q Do you know the names of any executives that are higher up? 09:55AM



MR. HALL: Objection, form.
A. That work at Experian? I don't know what you mean. Do I know their names?
Q. Yes.
A. Yes. 09:55AM
Q. And what are those names?
MR. HALL: Objection, form. Scope.
A. The only ones I can think of right now are Brian Cassin, Lee Lundy. That's about all I can think of offhand. 09:55AM
Q. What is Mr. Cassin's title at Experian?
A. I don't know.
Q. What is Ms. Lundy's title at Experian?
A. Mr. Lundy? I don't know what his title is.
Q. My apologies. I thought it was a female. 09:56AM
And do you talk frequently with Mr. Lundy or Mr. Cassin?
MR. HALL: Objection, form. Scope.
A. No.
Q. So how do you know they would have any further 09:56AM information about this?
MR. HALL: Objection, form. Misstates prior testimony. Scope.
A. I didn't say they would have prior knowledge. You just asked me what their names were. 09:56AM



Q. Is Experian's list of higher management, as you have described it, contained on any document? And when I say document, I also mean electronically.
MR. HALL: Objection, form. Foundation. Scope. 09:56AM
A. I don't know.
Q. Have you ever -- sitting here today as Experian's 30(b)(6) designee, as someone who has worked at the company since 2002, have you ever seen a document that had a list of Experian's higher management as you 09:56AM have described it?
MR. HALL: Objection, form. Scope.
A. I'm sure I have.
Q. Do you recall when you would have seen a document like that? 09:57AM
MR. HALL: Objection, form. Scope.
A. No, but it would not have been in the last year or two, no, sir.
Q. Do you recall where you would have seen that, what system of record? 09:57AM
MR. HALL: Objection, form. Scope.
A. No.
Q. Sitting here today, you, as Experian's 30(b)(6) witness, cannot answer the question about why Experian believes it has an obligation to make its 09:57AM

reinvestigations clear and accurate; is that correct?
A. Yes.
Q. So out of an abundance of caution, I understand the restriction on that, Ms. Methvin. Nobody wants you to testify to things you don't know. I don't 09:57AM want that as an officer of the court, nobody does, but I will hold the deposition open on that topic and that line of questioning.
MR. HALL: Miles, to make the record clear, which topic do you think that falls under? 09:58AM
MR. CLARK: I think it falls under the topic under systems for processing consumer disputes. And let me -- for the record, I will provide to you a complete list of topics for which I believe that communication falls under. 09:58AM
That's going to be Topic 1. It's going to be Topic 3. I believe Topic 4, Topic 5.
MR. HALL: Did someone just join or disconnect the call?
MR. DE RE: Sorry. That was me. I'm 09:58AM having trouble hearing you, so I dialed in on a different phone. Could you just move it a little closer?
MR. CLARK: For the record, could the person on the call please identify themselves? 09:59AM

Page 46

MR. DE RE: Sorry. This is Matthew De Re.
MR. CLARK: And, Mr. De Re, do you represent the plaintiff?
MR. DE RE: Yes. 09:59AM
MR. CLARK: Thank you.
So to continue with the number of topics for which I believe this line of inquiry is relevant, I believe it's also relevant to Topic 6. Potentially Topic 7, Topic 10, Topic 15, Topic 16 and Topic 24. 09:59AM
MR. HALL: Thank you.
MR. CLARK: You're welcome.
Q. Ms. Methvin, at what point does Experian believe that a consumer's dispute has been resolved?
Actually, you know what, let me back up. 10:00AM Strike that. Let me ask another question.
Could you in general describe Experian's reinvestigation process after it receives a consumer dispute?
MR. HALL: Objection, form. 10:00AM
A. Well, I can give you just kind of a general way it works, because, obviously, every dispute is different. So a consumer will contact a credit reporting agency such as Experian and provide a dispute with an item of information on the credit file that 10:01AM

Page 47

Experian has.
Provided that we have enough identification information to access the consumer's file, we'll go into the file and address the consumer's concerns. Sometimes an ACDV is required or a 10:01AM notification to the data furnisher, or a request for verification from the data furnisher is required.
Sometimes the item is already showing like the consumer wants it to show. Sometimes the item is not even there. So it really depends on what the 10:01AM dispute is as to what steps we take next.
Once the results are received from the data furnisher, we send an ACDV out, or once the item is updated, if we do an internal update, we send notification to the consumer of the results. 10:02AM
Q. And is there a stage in that process when Experian believes that the consumer's dispute has been resolved?
A. Well, I would say once the reinvestigation results are sent to the consumer, then the 10:02AM reinvestigation process is completed. Whether it's resolved or not I think would be up to the consumer and how they feel about it. I don't know if you would say we believe it's resolved, but we believe the investigation process is completed. 10:02AM

Page 48

Q. And I'm paraphrasing a little bit, but you had mentioned in the answer in the second to the last question I posed that sometimes that Experian sends an ACDV to a data furnisher and sometimes it does not. Is that fair? 10:03AM
A. That's true.
Q. And so what is an ACDV?
A. ACDV stands for automated consumer dispute verification. It is the electronic submission of a request for verification that's sent to a data 10:03AM furnisher.
Q. And is an ACDV the form in which Experian sends -- well, strike that.
Is there a platform through which Experian sends an ACDV to a data furnisher? 10:03AM
A. Yes.
Q. And what is that platform?
A. It's called e-OSCAR.
Q. What is e-OSCAR?
A. It's an online platform this is used by all of 10:03AM the credit bureaus for the transmission of disputes, among other things.
Q. Is e-OSCAR an entity that Experian has some degree of oversight over?
MR. HALL: Objection, scope. Form. 10:04AM

Page 49

Foundation.
A. I don't know if it's an oversight, but I know that we're involved or -- involved in it. As far as involved, we've all been -- we use it and maintain it and things like that. 10:04AM
Q. And when you say maintain it, what do you mean?
MR. HALL: Objection, scope.
A. Well, I don't really know if they maintain it. Now that I think about it, I don't know. 10:04AM
Q. Do you know if Experian has any statutory duty to create a platform like e-OSCAR?
MR. HALL: Objection, scope. Foundation.
A. I do believe that that was part of an agreement probably back in the '90s or something like 10:04AM that. I don't really know when. It was before my time. But it is something that the three bureaus created in conjunction with each other.
Q. And by the three bureaus, do you mean TransUnion, Equifax and Experian? 10:05AM
A. Yes, sir.
Q. Did those three bureaus work together to create e-OSCAR?
MR. HALL: Objection, scope. Foundation.
A. Again, it was before my time, but that is my 10:05AM



understanding, yes, sir.
Q. It's your understanding that e-OSCAR was created before you began working at Experian?
A. I know that to be true.
Q. Did Experian's participation and role in 10:05AM e-OSCAR end after it had helped create e-OSCAR, or does it continue to have some kind of management or oversight role?
MR. HALL: Objection, form. Foundation. Scope. 10:05AM
A. I don't know. I believe that might be one of the topics that I was not designated on. I really don't know exactly what the relationship is today with Experian and e-OSCAR.
Q. So if we were to -- and since you don't know, 10:06AM that's fine, again, because you can't testify to what you don't know. Is there someone else at Experian who would know?
A. I don't know.
Q. Would it be -- would either of the two 10:06AM individuals you identified earlier in terms of -- in connection with questions about higher management be a person who would know?
A. I don't know.
Q. Sitting here today -- let me ask this: How 10:06AM



often does Experian use e-OSCAR?
MR. HALL: Objection, scope. Form. Foundation.
Q. And when I say use, I mean send transmissions through e-OSCAR. 10:06AM
A. All the time.
Q. Do you have any estimation as to how many times a year it would transmit an ACDV through e-OSCAR?
A. Every second probably. I mean, we constantly use it. 10:07AM
Q. So at least once a second. And, again, I'm not asking for a hard number here because no one would know that. So at least once every second in your estimation Experian is using e-OSCAR?
MR. HALL: Objection, form. Foundation. 09:52AM Scope.
A. I would imagine so, yes, sir.
Q. I'm not going to do the math about how many seconds in a year because that's a lot. Would you agree with me? 10:07AM
A. Yes.
Q. Does Experian use e-OSCAR for any other purpose aside from transmitting ACDVs to a data furnisher?
A. Yes, sir. 10:07AM



Q. And what are the other ways it uses it?
A. We also use e-OSCAR to receive carbon copies, to receive AUDs, and also to send dispute/response notifications, data furnisher notifications. And there may be some other uses, but that's all I can think of 10:07AM offhand.
Q. What is a -- you said a DRN. Is that one of the things you said?
MR. HALL: Objection.
A. Yes, sir. 10:08AM
Q. A DRN is a dispute/response notification. Did I get that right?
A. I'm not exactly sure. I call it a data furnisher notification, but I think the actual term is DRN. 10:08AM
Q. If we refer to a DRN or a data furnisher notification, we're both talking about the same thing, right?
A. Yes, sir.
Q. And so what's the purpose of a DRN? 10:08AM
A. To notify the data furnisher of an update or deletion.
Q. And when would Experian send a DRN?
A. Well, we send a DRN any time we update information or update trade line information to the -- 10:08AM

excuse me Let me start over

We send a data furnisher notification to the data furnisher any time we update information on a trade line

Q And would that be -- does that include times 10:09AM in which Experian receives an ACDV response and updates the trade line per the data furnisher's ACDV response?

A Yes, sir

Q Is there any distinction between times in which Experian sends a DRN in connection with the ACDV 10:09AM response and when it would not?

A No We always send an DRN

Q What I mean by that: Is there some way to look at DRNs to figure out which ones were sent to a data furnisher as a result of updating from an ACDV 10:09AM response as opposed to DRNs that are sent to a data furnisher when no ACDV would be sent in connection with a dispute?

MR HALL: Objection, form Foundation

A Well, I guess you could look to see which ones 10 09AM had an ACDV Because if a trade line had an ACDV, then a DRN was sent with that If it was updated without an ACDV, a DRN would be sent with that too

Q So would there be anything on the face of the DRN that would signify the distinction you just made? 10:10AM



MR. HALL: Objection, form. Foundation.

A. I don't know.

Q. As part of your familiarity with Experian's systems, do you have occasion to look at DRNs and be familiar with their form and structure? 10:10AM

A. It's not something we look at very often. I have probably only looked at a DRN less than a handful of times.

Q. How many ACDVs have you looked at in connection with your work at Experian? 10:10AM

A. Thousands, tens of thousands probably.

Q. And why the big difference between the ACDVs you have looked and the DRNs you have looked at?

MR. HALL: Objection, form. Foundation. Calls for speculation. 10:10AM

A. To be quite frank with you, it's never really come up, and so I have never had a need to look at it. I've only -- like I said, I've only looked at it a handful of times.

With ACDVs in litigation, those are a lot 10:11AM more prevalent and involved, and so those are things that I look at every day.

Q. As I understand it, Ms. Methvin, when Experian sends an ACDV, is the data furnisher required to respond to that ACDV within a certain amount time? 10:11AM



A. Yes.

Q. And what is your understanding of the time frame for that response?

A. Well, we have 30 days from the date we receive the dispute, so we let the data furnisher know what the 10:11AM date of the responder is. So they have a certain amount of time.

Obviously, we have a few days that -- we have about five business days that we need to get that dispute to the data furnisher. Sometimes it's less. 10:12AM But they give them a date -- I'm sorry. Experian gives them a date in which they need to respond by.

Q. What about for DRNs, is there any response deadline by that the data furnisher must respond to that DRN, if at all? 10:12AM

A. They are not required to respond. We notify them of the information.

Q. So there is no requirement -- so Experian doesn't impose any requirements on the DRN forms?

A. Not that I'm aware of, no, sir. 10:12AM

Q. And so in your preparation to be deposed today, did you familiarize yourself with the way a DRN looks and the format of a DRN?

A. Yes, sir.

Q. Did you review any DRNs for Mr. Cardinali in 10:13AM



this case?

A. No, sir.

Q. Why is that?

A. Because I didn't have one to look at.

Q. Does Experian store DRNs for a specific amount 10:14AM of time?

A. Well, Experian doesn't store DRNs. They're in e-OSCAR for 120 days, I believe, after they are sent.

Q. Is there any notation, for example, a DR log, that would signify that a DRN was sent to a data 10:14AM furnisher?

A. Well, there is not really a notation that a DRN was sent. It's systemic. So if there is an ACDV on the DR log, then we know that a DRN was sent. Or if there is an internal update, just by the fact that 10:14AM there's an internal update on the DR log, we know that.

An agent doesn't get to choose whether a DRN is sent. It's done systemically by the update.

Q. And would -- is only one of those two results 10:14AM possible in response to a dispute, that Experian sends either an ACDV to a furnisher or generates a DRN?

MR. HALL: Objection, form. Foundation.

A. Are any of those...

Q. Let me clarify. Assume with me that Experian 10:15AM

can identify the consumer in question, so when it receives a piece of dispute correspondence it can identify that that is a dispute of some item of information in Experian's file.
A. Okay. 10:15AM
Q. In those circumstances, would Experian in every case either send an ACDV to a data furnisher or generate a DRN?
A. No, because there are some situations that a consumer might dispute a trade line that doesn't -- 10:15AM that's not on the credit file. So there's nothing we can do other than tell the consumer it's not there. There is no one to send a notification to.
There might be a situation in which the consumer is claiming -- or disputing something and it's 10:15AM showing exactly as they want it to show. So, again, even though the consumer believes they have a dispute, the item is reporting as they want it to.
So we would just tell the consumer to look at their report, and we wouldn't send a notice to 10:16AM the data furnisher. Those are some examples I can think of.
Q. So a DRN is only sent to a data furnisher when Experian changes an item of information; is that correct? 10:16AM

Page 58

A. Updates information, yes, sir. I don't know that I'd use the word change, but if the information is updated.
Q. But something -- it's not as though the information is going to be identical that something will 10:16AM be updated such that Experian feels the need to notify the data furnisher. It's not that the information is exactly as the consumer wants it to be, correct?
A. Yes, that's correct.
Q. Now, in a circumstance where Experian receives 10:16AM a dispute, and it determines that the account -- or the trade line is reporting exactly how the consumer wants it such that Experian does not send a DRN or an ACDV, would Experian nonetheless make a notation in the DR log that the dispute was received and resolved in a manner 10:17AM that did not indicate that an ACDV or a DRN was sent?
A. Yes.
Q. Do you know what an internal update is?
A. Yes.
Q. And what is it? 10:17AM
A. It is an update to a piece of information that is done internally and not external.
Q. When you say external, what do you mean when you say external?
A. I would say that means that we did not go to 10:18AM

Page 59

an outside source for verification, meaning like not notify the data furnisher or not contact the public record vendor.
Q. And is the manner in which Experian contacts a public record vendor different than the manner by which 10:18AM it would contact some other furnisher of information?
A. Yes.
Q. What is that distinction?
A. We do not use e-OSCAR for public record vendors verification. 10:18AM
Q. Is a public record verification transmitted by something called a CDV?
MR. HALL: Objection, scope.
A. Yes.
Q. So for furnishers, Experian uses an ACDV, 10:18AM other furnishers, other than a public record vendor?
A. Yes.
Q. When --
A. He's trying to get your attention.
Q. Oh. 10:19AM
Are there any distinctions between the process Experian uses when sending an ACDV versus a CDV?
A. I don't know what you mean.
MR. HALL: Objection, form. Scope.
Q. Well, is a CDV sent electronically? 10:19AM

Page 60

MR. HALL: Objection, scope.
A. No, sir.
Q. A CDV is sent manually?
A. Yes, sir.
Q. And ACDVs are only sent electronically, 10:19AM correct?
A. Yes, sir.
Q. Is there any other distinction in the form of a CDV or the information that's sought to be disputed?
MR. HALL: Objection, form. Scope. 10:19AM
A. Well, the CDV is for public record information like bankruptcies.
Q. Is the information contained in like -- is the look and feel of that information that's transmitted different, meaning are there different fields that are 10:20AM populated?
MR. HALL: Objection, form. Scope.
A. Well, not really, except that obviously a public record has different information than a trade line would have. You know, as far as like a date filed, 10:20AM a trade line wouldn't have the date filed on it, or date discharged, a trade line wouldn't have that.
So other than the fact that they're completely different types of information, they're going to look a little bit different. 10:20AM

Page 61



Veritext Legal Solutions
877-955-3855

Q You had mentioned a little while ago when you
were talking about internal and external, the -- you
used the worded externally, I believe When you used
the word externally, were you referring to the ACDV
process? 10:20AM
A Well, I was answering your question about the
difference between internal and external, so I would say
yes, sir
Q So when Experian has -- determines that it
needs to use an external process to verify an item of 10:21AM
information, other the CDVs we discussed, it would send
an ACDV?
A Yes, sir
Q And would Experian -- in the circumstances in
which Experian either updated or deleted information and 10:21AM
did so internally, would it send a DRN in those
circumstances?
A If it was as a result of a dispute, yes, sir
Q And would we see that information reflected on
a DR log that an internal update was made? 10:21AM
A Yes, sir
Q Would we also see a standard representation of
whether a dispute was externally verified?
A Yes, sir
Q Do you know whether Experian has ever used the 10:22AM



word dispute as a noun?
MR. HALL: Objection, calls for
speculation. Scope.
A. I'm sure probably we have.
Q. How about as a verb? 10:22AM
MR. HALL: Same objection.
A. I'm sure that we have.
Q. Does Experian use the word dispute as a verb
as relates to any aspect of its reinvestigation process?
MR. HALL: Objection, scope. 10:22AM
A. I don't know what you mean. Could you reword
the question?
Q. Sure.
A. Would Experian use that -- use the word
dispute to signify not the fact of a dispute as a thing, 10:22AM
but, rather, an action that it took?
MR. HALL: Objection, scope.
A. I'm not really sure -- I'm not really sure
what you're asking me. I would say that we would use
the word dispute as a verb, but I'm not really sure what 10:23AM
you're asking me about actions. I don't know what that
means.
Q. Well, a verb is an action, right?
A. Right.
Q. So my question is: Would Experian say that a 10:23AM



certain action it would take would be -- it would use
the word dispute to indicate that action?
MR HALL: Objection, form
A I don't really know what you're asking me I
know that like when we're speaking to consumers or we 10:23AM
have information on our Website, we can tell them, "If
you wish to dispute this information," which is a verb,
so we'd use it in that context
And then when we say, "We have
information about your dispute," which it uses it in the 10:23AM
context of a noun So I would say we use it both times
But I don't -- I'm sorry I'm really
having trouble understanding what you're asking me
about
Q Let me make it more -- narrow it 10:24AM
A Okay
Q And that is: Would Experian use the word
dispute as a verb to describe the process of sending an
ACDV to a furnisher?
MR HALL: Objection, scope 10:24AM
A Well, I would call it a reinvestigation, but
probably when we're speaking with a consumer, so it
would help for them to understand, we would call it a
dispute I don't -- it's possible that that's how we
use it when we're talking to the consumer or when we 10:24AM



communicate with a consumer.
Q. Do you know what a CDI is?
A. Yes, sir.
Q. What is it?
A. It's a consumer disclosure. 10:24AM
Q. And what is a consumer disclosure?
A. It's a credit disclosure about a consumer who
is the subject of that information.
Q. And is a CDI a particular kind of consumer
disclosure, or is it not? 10:24AM
A. No. It's just a consumer disclosure that's
provided by Experian.
Q. Who is it provided to?
A. To the consumer that's the subject of the
information. 10:25AM
Q. Is a CDI provided to anyone else besides the
consumer?
MR. HALL: Objection, calls for
speculation.
A. No, not unless -- well, even if it was an 10:25AM
attorney representing a consumer, we would still provide
the disclosure directly to the consumer.
Q. Do you know what a CDF is?
A. Yes.
Q. What is it? 10:25AM

A. The easiest way to describe it is it's the reinvestigation results or a dispute summary that we provide to consumers.
Q. Is that a type of consumer disclosure?
A. It's a type of disclosure. Sometimes it's a 10:25AM full disclosure. Sometimes it's a partial disclosure.
Q. And what do the letters C and D and F stand for?
A. I think it stands for consumer dispute final. I think that's what it means. 10:26AM
Q. Have you ever testified that --
A. No. It's consumer disclosure final, I'm sorry.
Q. Thank you. And what about CDI? What do those three letters stand for? 10:26AM
A. Consumer disclosure initial.
[redacted]
10:26AM



[redacted]
10:28AM



[redacted]
10:29AM



[redacted]
Q. Thank you.
MR. HALL: Miles, I have us at about 90 minutes, so whenever you get to a good stopping point.
MR. CLARK: I was about to suggest that maybe that's a good idea. 10:30AM

Q. Ms. Methvin, would you like to take a break?
A. Okay.
(Recess.)
Q. Ms. Methvin, we just took a break. Are there any answers to the questions I posed in the first 10:45AM session that you'd like to revisit, correct, amend or modify at this time?
A. No, sir.
Q. Previously we were discussing DRNs and ACDVs. Do you recall that? 10:45AM
A. Yes, sir.
Q. And after a furnisher receives an ACDV from Experian, is there a mechanism that permits a furnisher to respond to that ACDV?
A. Yes, sir. 10:46AM
Q. And so is that called an ACDV response?
A. Yes, sir.
Q. In connection with the DRN, is there a mechanism for a data furnisher to respond to a DRN?
MR. HALL: Objection, form. 10:46AM
A. I'm not sure.
Q. Do you recall your testimony in a case called Zorba in the Northern District of Illinois?
A. No.
Q. So sitting here today as Experian's 30(b)(6) 10:46AM

Page 70

witness, you are not sure whether or not a data furnisher is able to respond to a DRN at all by sending a transmission through e-OSCAR to Experian?
A. Well, I know that they can send an AUD, a request to update information. 10:46AM
Q. Is there any indication on the DRN that would indicate that they should send an AUD?
A. I don't have one in front of me, so I'm not sure what it says on it.
Q. Are you generally familiar with the makeup and 10:47AM structure of the DRN? I believe you testified that you weren't as familiar because you haven't seen as many; is that correct?
A. That's correct.
Q. Is a DRN designed to elicit a response from 10:47AM the data furnisher?
A. The DRN is designed to notify the data furnisher.
Q. My question was slightly different, which is whether it was designed to elicit a response from the 10:47AM data furnisher.
A. I don't know.
Q. Is an ACDV designed to elicit a response from a data furnisher?
A. Yes. 10:47AM

Page 71

Q. So why is it, Ms. Methvin, that you know that an ACDV is designed to elicit a response from a data furnisher, but you don't know that answer as it relates to a DRN?
MR. HALL: Objection, form. Foundation. 10:48AM
A. Well, as we talked about earlier, I've looked at ACDVs daily, multiple times a day for years, so I know exactly what it is. And the whole point of an ACDV is consumer dispute verification, so it's a request to the data furnisher to verify information. 10:48AM
By definition, the DRN is a data furnisher notification to notify, and whether it has on the document -- whether it elicits a response, I don't know. As I've told you, I've only looked at a handful over the years, so I'm not sure without looking at it in 10:48AM front of me whether it asks the data furnisher to respond to it.
I do know the difference as far as the ACDVs because I look at those, and I see that we're requesting the data furnisher to verify information with 10:48AM a notification. It's called a notification because we're notifying the consumer. We're not asking for additional information.
Q. Does the DRN request that a data furnisher verify any information? 10:49AM

Page 72

A. Without looking at it in front of me, I don't know the answer to that.
[redacted]

Page 73

[redacted]
Q. Does Experian archive the ACDVs that it sends to data furnishers? 10:50AM
A. Yes, sir, we do.
Q. And does Experian archive the DRNs it sends to data furnishers?
A. No, sir. It only retains them for 120 days. 10:50AM
Q. And by retains, do you mean that e-OSCAR retains it or that Experian retains it for 120 days?
A. E-OSCAR retains it.
Q. Okay. So Experian doesn't independently retain a copy of the DRN that is sent; is that correct? 10:51AM
A. That's correct.
Q. And could Experian retain a copy of the DRN if it wished?
A. I don't know.
Q. Is that -- is it -- but a DRN is a record of updates to an account that Experian has made based on the internal policy, correct? 10:51AM
A. Yes, sir, but the record is also here in the DR log.
Q. Does the DR log contain a representation of 10:51AM



all of the updates that were made on a particular trade line that would have been reflected on a DRN?
A. Yes.
Q. And does the DR log indicate whether there was any additional information sent to a data furnisher in connection with the DRN? 10:51AM
A. Yes.
Q. And what notation would you look at to determine whether or not additional information other than the DRN was sent from Experian to a furnisher? 10:51AM
A. I would look on the DR log to see if there was an image sent.
Q. And if that -- if it said image sent, and the answer was no, would that mean there was no additional information sent? 10:52AM
A. It would mean there was no image sent, yes, sir.
Q. And if that -- if it said yes, would that mean that an image was sent?
A. Yes. 10:52AM
Q. Does it concern you at all -- let me ask you this. Do you know how many ACDVs Experian sends -- we talked about this before. It's about one per second as a reasonable estimation of about how often Experian uses -- sends an ACDV; is that correct? 10:52AM



MR HALL: Objection, form Foundation
A Well, no That's not what I said You just asked me how often do we use it, was it at least once per second, and I said, yes, it was at least that I mean, I can't imagine how many we send on a daily basis 10:52AM I have no idea It's a lot So I know it would be at least that It could be way more than that
Q Sure Again, I'm not asking for a number, just an estimation, so that's fair
And you were testifying in connection 10:53AM with ACDVs when you made that statement, correct?
A Yes
Q What about for DRNs? How often does Experian use e-OSCAR to transmit DRNs?
A I would say -- well, every time Experian does 10:53AM an internal update to an account, we send a DRN It's part of the system's processing, so it would be constantly, you know, often
Q When you say often, would it be fair to say that Experian uses that process at least a thousand 10:53AM times a year?
A Yes
Q What about 100,000?
MR HALL: Objection, calls for speculation 10:53AM



A. I think that's fair to say, but I don't really know the answer to that.
Q. Sure. So somewhere between at least 1,000 and possibly more than 100,000 times a year?
A. I would say that's fair. 10:54AM
Q. And does it concern you at all that Experian doesn't keep a record of the thousands of transactions that it's sending to a third party?
MR. HALL: Objection, scope. Foundation. Form. 10:54AM
A. Well, I think we do keep a record. I mean, the DR log is a record. And we know that because it's a systemic update, like when we choose a certain reason code, it automatically sends a DRN. We have a record of the internal update, so we know that a DRN was sent. 10:54AM
Q. Why does Experian keep an archive record of ACDVs?
A. I don't know why. It's just part of our business records.
Q. Is there someone at Experian who would know 10:54AM the answer to that?
A. Who would know why?
Q. Yes.
A. I don't know.
Q. Would it be someone higher up the corporate 10:54AM

food chain than yourself?
MR. HALL: Objection, form. Foundation.
A. Probably.
Q. Do you happen to know to your best estimation what type of Experian employee that would be? 10:55AM
MR. HALL: Objection.
A. No.
Q. Would that be someone with a title of vice president maybe?
MR. HALL: Same objection. 10:55AM
A. I don't know, maybe.
Q. Have you, Ms. Methvin, during the course of your work at Experian, had any occasion to make recommendations for policy changes to Experian's reinvestigation procedures? 10:55AM
MR. HALL: Objection, scope. Form. Foundation.
To the extent that question calls for communications with legal counsel at Experian, I instruct you not to answer. To the extent you can 10:55AM answer in your individual capacity, please go ahead and answer.
A. Not that hasn't involved speaking with our internal counsel.
Q. Not other than that you mean? 10:56AM



A Right, yes, sir, not other than those
Q And are you going to follow your counsel's advice not to testify to as whatever you have discussed with counsel?
A Yes, sir 10:56AM
Q So let me -- without getting into the particulars, my question was designed more to ascertain whether you're familiar with the process of making policy recommendations Is that something that you are familiar with and have experience doing? 10:56AM
A Yes
Q And have you had any experience -- without getting into the substance of the communications -- with -- have you had any experience with making recommendations about how and what -- and to what extent 10:56AM Experian maintains a record of communications that are generated during the reinvestigation process for a consumer dispute?
MR HALL: Objection, form Foundation Scope 10:57AM
Same instruction, but you can answer
A No
Q Ms Methvin, is a DRN a two-way communication?
MR HALL: Objection, form
A I don't know what you mean 10:57AM



Q. Well, two-way meaning there's a transmission -- let me say it another way. Is an ACDV a two-way communication?
A. Yes, sir.
Q. And is a DRN a two-way communication? 10:57AM
A. I don't know. I believe so, but I don't know that for sure.
Q. Do you recall your testimony in the Zorba case?
A. No. 10:57AM
Q. If I put it in front of you and your answer is different, would that cause you to change your mind about whether you actually know the answer to my last question?
A. I mean, I can certainly take a look at it, 10:57AM but you're asking me about something I talked about and prepared for probably over two years ago, but I can certainly take a look at it.
As I'm sitting here right this minute, to answer truthfully, I don't know. 10:58AM
MR. HALL: Counsel, before you proceed with asking her about testimony in Zorba, I would just like some understanding of how Mr. Cardinali came into possession of any information from the Zorba case.
MR. CLARK: Well, first of all, Chris, 10:58AM



I'm not testifying to that, and I think that your question to me is inappropriate. If you are -- if this is a fishing expedition in an attempt to get behind communications, I am not going to answer that, nor would I answer those questions. 10:58AM
However, what I will point out is that my review of the public record in Zorba has indicated that there is a deposition transcript publicly available. And you can certainly -- as Experian's counsel, I'm sure you can look at the public record and 10:58AM make that decision yourself as well.
MR. HALL: Thank you.
MR. CLARK: I will also note, since we are apparently veering outside of the appropriate boundaries of the scope of the questions and answers at 10:59AM the deposition, that I view counsel's question as yet another attempt by Experian's attorneys at Jones Day to impermissibly get behind some aspect of the attorney/client relationship, and I would certainly point that out to the court at the appropriate time if 10:59AM and when the opportunity arises.
MR. HALL: Just for the record, are you talking about your relationship with Mr. Cardinali or your relationship with Ms. Zorba?
MR. CLARK: I don't understand what 11:00AM

you're asking me.
MR. HALL: I'm not sure which attorney/client relationship you're talking about here. I'm just asking for clarity.
MR. CLARK: I'm not sure what your 11:00AM question is.
MR. HALL: Are you suggesting that my question, just so I understand it, is an attempt to probe into the attorney/client relationship between yourself and Mr. Cardinali or the attorney/client 11:00AM relationship between yourself and Ms. Zorba, if there is one?
MR. CLARK: I don't take your question to be any of those things.
(Exhibit 3 marked.) 11:00AM
Q. Ms. Methvin, I've had placed in front of you what I have marked as Exhibit 3. Please just take a look at that, and I'll direct you to certain pages. I just want to ask you if you're familiar with this.
A. Yes. 11:00AM
Q. And you're familiar with this document. What is it?
A. It looks like my deposition testimony with Mr. Badwan for the Zorba case.
Q. Do you see any -- on the top portion of the 11:01AM

Page 82

document, do you see where it looks like it says "Case" and there's 15-cv-08663, and then there's some information that follows that?
A. Yes, sir.
Q. Do you know whether that indicates this is a 11:01AM document filed in the public record?
A. That's what it appears to be, yes, sir.
Q. I want to direct your attention to Page 99 of this transcript. And by 99, I mean -- here I'm going to talk about the numbers in the deposition transcript 11:01AM itself. You'll see them in the top right-hand corner in each section.
A. Okay.
Q. Please let me know when you're there. Are you there? 11:02AM
A. Yes, sir.
Q. Thank you. I'll direct you to Lines 14 through 16 on Page 99. Let me know when you've had a chance to review that.
A. Okay. 11:02AM
MR. HALL: Miles, while she's reviewing it, I'm just going to make a standing objection on scope to questions about Zorba.
Q. So having had a chance to review Lines 14 through 16, does that refresh your recollection about 11:02AM

Page 83

whether a DRN is a two-way communication?
A Well, if that's what I answered in this case I always tell the truth, and so if I said that, that's what I believed to be the truth at the moment
Q And when did you sit for this deposition? 11:02AM
A August 10th, so almost two years ago
Q August 10th of which year?
A 2016
Q And I believe I represented to you earlier that the class period is between April 19th, 2017 and 11:03AM April 19th, 2015, correct?
A That sounds right, yes, sir
Q So this deposition would have been taken during the time of the relevant time period; is that correct? 11:03AM
A Yes, sir
Q And so having an opportunity to review -- refresh your recollection with this transcript, would you like to correct your prior testimony about whether you know about whether DRN is a two-way communication or 11 03AM not?
A I don't believe that it is, but without -- I can't say that with 100 percent certainty
Q Would you agree with me that your deposition testimony about the two-way communication is materially 11:03AM

Page 84

different in this case than it was in Zorba as you've looked at this excerpt?
MR. HALL: Objection, form.
A. No. I don't know that it's materially different. I think the answer that I gave on August 11:04AM 10th, I don't believe that it does ask for a response, and when I answered that, I believed that to be the case.
It says here: "Is it eliciting a response," and I said, "No, sir." And then you asked me 11:04AM today, and I said, "I don't believe so, but I don't know that for sure."
So materially different, I don't think so. I still don't believe that it does, but without looking at the document in front of me, I don't -- I 11:04AM don't know for sure.
Q. So does a DR notification elicit a response?
A. I don't believe it does, but without looking at the document in front of me, I don't know for sure.
Q. Let's go to Page 122 of this transcript. 11:04AM
A. Okay.
Q. And I'll direct you, Ms. Methvin, to Lines 17 through 25.
MR. HALL: What page was that again?
MR. CLARK: That was Page 122. 11:05AM

Page 85

A. Okay.
Q. And have you had an opportunity to read that section, Page 122?
A. Yes.
Q. And so would you agree with me that the DRN 11:05AM sent to WebBank in response to Mr. Cardinali's dispute did not request WebBank to conduct an investigation?
A. Well, it would have been a notification that we had made an update, so I would say yes.
Q. And would -- hold on. Would you also agree 11:06AM with me that there's no way WebBank would have known what Mr. Cardinali was disputing by the DR notification Experian sent?
MR. HALL: Objection, calls for speculation. 11:06AM
A. I don't know what they would have known. I mean, I can tell you that we did not send the documents. We just would have sent the notification of what was updated.
Would they have been able to glean what 11:06AM his request was from that? You'd have to ask them if they would be able to tell. We would be telling them what we did to update the account.
Q. So since you don't have a copy of the DRN sent to Mr. -- sorry, to WebBank in response to 11:07AM



Mr. Cardinali's dispute in this case, how do you know whether or not the -- whether or not -- whether or not WebBank would have been -- strike that.
Let me ask you this, Ms. Methvin. Do you see on Lines 22 to 25 of Page 122 of your Zorba 11:07AM deposition that you agree with the question that said: "Would you also agree with me that there's no way Bayview or Wells Fargo Home Mortgage would have known what Ms. Zarba was disputing by the DR notification?"
A. Yes. 11:07AM
Q. And would you agree with me that your answer in connection with the DRN that Experian sent to WebBank in connection with Mr. Cardinali's dispute is materially different from what you testified to in Zorba?
MR. HALL: Objection, form. 11:08AM
A. No, I don't agree.
Q. Why not?
A. Because I don't remember what the scenario was in the Zorba case. I don't know what her dispute letter looked like without actually going back and researching 11:08AM it.
I wasn't prepared to talk about Ms. Zorba today. I didn't look at the case yesterday or didn't go over this depo transcript yesterday. And without knowing in full context what I answered and what 11:08AM



happened in that case, I can't say that it's a different situation.
Q. Were you designated as Experian's 30(b)(6) witness in the Zorba case?
A. Yes. 11:08AM
Q. Were you designated to talk about topics including the DRN?
MR. HALL: Objection --
A. Probably. I don't remember.
MR. HALL: -- calls for speculation. 11:08AM Form. Foundation.
Let me finish my objections first.
THE WITNESS: Sorry.
MR. HALL: I should note during a break our court reporter did ask for us all to slow down a 11:09AM bit.
MR. CLARK: Off the record.
(Discussion off the record.)
Q. As you sit here today, Ms. Methvin, do you know what the DR notification that Experian sent to 11:09AM WebBank in connection with Mr. Cardinali's dispute actually said?
A. Yes.
Q. And what did it say?
A. It would reflect what was done in the DR log. 11:10AM



So if you look at the DR log and you see the update that was made, that information would have been conveyed on the DRN.
Q. Does e-OSCAR route DRNs to a separate queue in e-OSCAR, for lack of a better term, than for ACDVs? 11:10AM
MR. HALL: Objection, form.
A. I believe that it does, yes, sir.
Q. Do you have any idea about why it does that?
A. I don't know the reason why. I would imagine because it's a separate type of transaction, but I don't 11:10AM know specifically why.
Q. Is there someone at Experian who would know that?
A. Who would know why?
Q. Yes. 11:10AM
A. I don't know.
Q. You don't know if there's someone at Experian who would know why e-OSCAR is set up to route these two types of disputes that are sent many, many times over the course of the year to different places in e-OSCAR? 11:11AM
A. That's correct.
Q. Do you have any reason to doubt that Experian does possess within its ranks an individual or individuals who would know the answer to that?
MR. HALL: Objection, form. Foundation. 11:11AM

A. I have no idea.
Q. Ms. Methvin, do you know what File One is?
A. Yes, sir.
Q. And what is it?
A. It's Experian's database for storing 11:11AM information.
Q. And what kinds of information, all kinds?
MR. HALL: Objection, form.
A. Primarily consumer information.
Q. What other kinds of -- you say primarily, but 11:11AM what else is there?
A. That's really all I'm familiar with. There may be others that I don't know about.
Q. And do you know what CAPS is?
A. Yes, sir. 11:12AM
Q. And what is CAPS?
A. CAPS is the software that is used to receive information from File One, and it's the software that agents use to process disputes, as well as the disputes that are processed over the Internet. 11:12AM
[redacted]

Page 90

[redacted]
Q. And what is a credit score report?
A. Sometimes consumers can opt to purchase an Experian VantageScore, and that information is stored or archived in CAPS. 11:14AM
Q. Can consumers purchase other types of scores besides a VantageScore from Experian?
A. Yes.
Q. And what other types of scores can they purchase? 11:14AM

Page 91

A. I think they can also purchase FICO scores. I'm not really familiar with all of that.
Q. If a consumer were to purchase a FICO score through Experian, then would an archive of that be stored in CAPS? 11:14AM
MR. HALL: Objection, scope. Foundation.
A. No, sir.
Q. Would it be stored anywhere else in Experian's systems?
A. No, sir, I don't think so. 11:14AM
Q. But Experian does have an archive of any VantageScore you send to a consumer; is that correct?
A. Yes, sir.
Q. So in one way, shape or form Experian does keep copies of credit scores that it can send to a 11:14AM plaintiff --
MR. HALL: Objection.
Q. -- I'm sorry, a consumer?
MR. HALL: Same objection.
A. Well, if a consumer orders an Experian 11:15AM VantageScore, then, yes, we do have a record of that.
Q. Does Experian use the CAPS system to generate credit scores?
A. Well, for an Experian VantageScore, yes, sir, an agent would access the consumer's information from 11:15AM

Page 92

the CAPS system.
Q. How about other kinds of scores like the FICO scores you mentioned?
MR. HALL: Objection, scope. Foundation.
A. No, sir, I don't believe so. 11:15AM
Q. Do you know where those types of scores are generated from?
MR. HALL: Same objection.
A. No, sir.
Q. Do you know if they're generated from File 11:15AM One?
A. I don't know.
Q. And they're not generated from CAPS, right?
A. No, sir.
Q. So it's got to be -- it might be File One. 11:15AM It's not CAPS. It might be some other system?
A. I don't know.
Q. How many systems does Experian have?
A. I have no idea.
Q. Do you know if it has more than two? 11:16AM
A. Probably, yes.
Q. Would you consider CAPS to be a system?
A. Yes.
Q. Would you consider File One to be a system?
A. Yes. 11:16AM

Page 93

Q. Is there a list somewhere of all of Experian's systems in a document that we can look at?
MR. HALL: Objection, scope. Foundation.
A. I don't know.
Q. Are you familiar with a document known as the 11:16AM admin handbook?
A. Yes, sir.
Q. And what is the admin handbook?
A. It is a booklet that is designed to assist certain employees with reading an admin report or 11:16AM reading the data from File One.
Q. To be clear, we talked briefly about an admin report, but going back to that for a moment, is an admin report a record of information that Experian stores in File One? 11:17AM
A. No. I mean, I don't really know if I understand your question. Can you --
Q. Sure.
A. I mean, I'm really trying to answer you, but I'm not sure -- we don't -- go ahead and ask your 11:17AM question.
Q. It's okay. Like I said at the beginning in the instructions, I may ask questions you don't understand. Thank you for asking me to say it again.
A. Okay. 11:17AM



Q. Do you know for an admin report, from what source is the information on an admin report retrieved?
A. It's retrieved from File One.
Q. Thank you. Is all the information contained on a particular consumer that's stored in File One 11:17AM contained on an admin report?
A. Yes.
[redacted] 11:18AM



[redacted]
Q. Other than potentially in the long admin, you're not aware of whether Experian actually stores the 11:20AM



monthly reporting that furnishers may provide to it?
MR. HALL: Objection, scope. Form. Foundation.
A. I'm not aware of any other place that it's stored, no, sir. 11:20AM
Q. Are you aware of anyplace where the updates themselves are archived and stored?
A. Not other than File One, no, sir.
Q. Do you know if Experian routinely destroys that data? 11:20AM
MR. HALL: Objection, form. Foundation. Calls for speculation.
A. I don't know the answer to that question.
Q. So if Experian sent an ACDV to a consumer, it would keep a record of that in CAPS, correct? 11:20AM
A. Yes, sir.
Q. Do you know if 1681-I of the -- well, first of all, do you know what the Fair Credit Reporting Act is?
A. Yes.
Q. What is it? 11:21AM
MR. HALL: Objection, scope. Calls for a legal conclusion. She can answer.
A. I'm sorry, I don't know what you said.
Q. To your understanding, what is the Fair Credit Reporting Act? 11:21AM

A. Well, it is -- it's a law that is designed to govern credit reporting agencies, as well as provide consumers their rights as far as credit reporting goes and instructs data furnishers on what their obligations are. 11:21AM
Q. And do you know if the Fair Credit Reporting Act requires any results of Experian's reinvestigation to take the form of a consumer report?
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion. 11:21AM
A. No, I don't know.
Q. Do you know what a consumer report is?
MR. HALL: Same objections.
A. In what way? Do you mean is it a consumer disclosure? I don't know what you mean. 11:22AM
Q. Sure. Does the phrase consumer report have any meaning for you in the course of your work at Experian?
MR. HALL: Objection, scope. Calls for a legal conclusion. 11:22AM
A. Well, at Experian I call a consumer's personal report their consumer disclosure, and then we call any item or report that we send to third parties, we call those credit reports.
Q. Have you ever used the phrase consumer report 11:22AM



to refer to a credit report?
A. I probably have interchanged those words at some point probably, sure.
Q. If we refer to consumer report and credit report, are we going to be talking about the same thing? 11:23AM
A. If we define it that way, yes, sir. I mean, I usually call a third-party report a credit report, but if we call it -- if we say we're going to call it that, then, yes, sir, I can say it's the same thing.
Q. Do you know whether or not the Fair Credit 11:23AM Reporting Act requires whether any results of a reinvestigation Experian sends to a consumer to take the form of a credit report?
MR. HALL: Objection, scope. Calls for a legal conclusion. 11:23AM
A. Can you ask me that again?
Q. Sure. Do you know whether or not the Fair Credit Reporting Act requires the results of Experian's reinvestigation sent to a consumer to take the form of a credit report? 11:23AM
MR. HALL: Same objections.
A. I don't know.
Q. Ms. Methvin, do you know whether the Fair Credit Reporting Act requires Experian to send all relevant information that it receives from a consumer in 11:24AM



connection with a consumer dispute to the data furnisher to which that relevant information pertains?
MR. HALL: Objection, scope. Calls for a legal conclusion.
A. Well, we do provide -- we do send all relevant 11:24AM information when we send a request to the data furnisher.
Q. And when you say a request to the data furnisher, in what sense are you using that term?
A. In the ACDV request. 11:24AM
Q. Are you using that term in connection with a DRN?
A. Well, if the information is relevant, and we use that information to update a consumer file, then we send that information to the data furnisher, yes, sir. 11:25AM
Q. And would Experian provide a data furnisher an opportunity to respond to that relevant information in all cases prior to the time that it transmitted and sent the reinvestigation results to a consumer?
A. Say that one more time. 11:25AM
Q. Sure. In a circumstance where a DRN contained all relevant information, would Experian provide the data furnisher a reasonable opportunity to respond to the information and update the account prior to the time that Experian sent the reinvestigation results to the 11:25AM



consumer in question?
MR HALL: Objection, form Foundation
A No, sir
Q Why not?
A Well, they would still have an opportunity to 11:25AM respond or update their information, but the updated -- the update would go directly to the consumer as soon as our system updates it
Q So it would be the case that Experian would generate a reinvestigation results letter and send that 11:26AM to the consumer before the data furnisher had a chance to respond?
A Possibly, yes, sir
Q If a data furnisher later responded via perhaps the AUD process, would Experian send a new 11:26AM reinvestigation results summary or CDF notifying the consumer that the data furnisher had something else to say about that?
MR HALL: Objection, form Foundation Calls for speculation 11:26AM
A No, sir
Q And why not?
A I don't know why It just doesn't happen
Q So it's Experian's policy not to have that happen? 11:27AM

MR. HALL: Objection, mischaracterizes testimony.
A. I don't know that it's a policy. It just doesn't happen.
Q. If it doesn't happen, you mean if it 11:27AM categorically doesn't happen, correct?
A. Yes, sir.
Q. So it's something Experian does all the time. Whether it's a written policy or not, that's what Experian's practice is? 11:27AM
MR. HALL: Objection, mischaracterizes prior testimony. Calls for speculation. Lacks foundation.
A. Again, I don't know if there is a policy about it. I just know that we don't -- it doesn't send any 11:27AM type of notification to the consumer when an AUD is sent by a data furnisher.
Q. Well, I mean an AUD in the circumstances I described, which to be clear, a circumstance where a DRN is sent to a data furnisher and the reinvestigation is 11:27AM generated by Experian and sent to a consumer prior to the time that the data furnisher could respond to the DRN notification.
In those circumstances, would Experian send an undated reinvestigation results letter to the 11:28AM

Page 102

consumer, notifying the consumer that based on an AUD the data furnisher had sent to Experian in response to the DRN that was sent, that the data furnisher had actually received the DRN, responded to the DRN and wanted to update the account? 11:28AM
MR. HALL: Objection, scope. Foundation. Form. Calls for speculation.
A. Well, I think it depends on the scenario, what it was. If, for example, a piece of information or an item was deleted as a result of a reinvestigation, if 11:28AM the item was added back to the consumer's credit file, we would send a notification to the consumer within five days after that information was reinserted.
Q. What if it was not deleted and subsequently reinserted? 11:29AM
MR. HALL: Objection, scope. Foundation.
A. Well, how could it be reinserted if it was not deleted? That doesn't make sense to me.
Q. I'm saying what if -- I'll rephrase it. What about a circumstance in which the information was not 11:29AM deleted by Experian but merely updated by Experian in the DRN?
MR. HALL: Same objection.
A. I don't know. I don't know that that -- I don't know. 11:29AM

Page 103

Q You don't know if that's Experian's procedure, to not send that other reinvestigation letter?
MR HALL: Objection, scope Foundation Calls for speculation
A Well, if a piece of information is changed 11:29AM after a reinvestigation response, we do send a notification to the data furnisher -- I mean to the consumer As far as the DRN, I don't know the answer to that
MR CLARK: Will you please read back the 11:29AM last question and response?
(Record read )
Q So it's your testimony, Ms Methvin -- and let me see if I understand this -- that in a circumstance where Experian updates an item of information and does 11:30AM so through an internal update in the DRN, that if the information is subsequently modified by the data furnisher, that Experian will keep the consumer apprised of the modification and send them another piece of dispute correspondence? 11:31AM
MR HALL: Objection, misstates prior testimony
A No, sir
Q So what did I get wrong?
A Well, what she said is what I said I mean, 11:31AM

Page 104

that's correct, but I don't know how that works with the DRN.
Q. Okay. Sitting here today, you're just not prepared to testify about what happens -- what, if anything, the furnisher does and what, if anything, 11:31AM Experian would do in response to that furnisher's reaction?
MR. HALL: Objection, misstates prior testimony.
Go ahead. 11:31AM
A. I think that I did testify that when a data furnisher updates information via AUD, that we do not notify the consumer about that change.
Q. Thank you. And would any response to a DRN that a data furnisher provided come in the form of an 11:32AM AUD?
MR. HALL: Objection, calls for speculation.
A. I'm not -- I believe so. I'm not sure of any other way it would come. 11:32AM
Q. Now, we were talking before about the idea of an internal update. And does Experian have a list of types of internal updates that it can use to update an account and send a DRN to a furnisher?
A. Yes, sir. 11:32AM

Page 105

Q. And is that list contained on any document of which you're aware?
A. Yes, sir.
Q. And what document would it be contained in?
A. I'm not sure what document it is. I believe I 11:32AM looked at one yesterday that had a list of internal dispute reason codes. It's probably -- it might be in the dispute manual. I'm not exactly sure where it is.
Q. Would it be in a document that was titled, in part, "Participant's Guide"? 11:33AM
A. Possibly. Probably.
Q. As you understand the word shall, what do you mean -- what do you take the word shall to mean?
MR. HALL: Objection, calls for speculation. Objection, form. 11:33AM
A. I'm not a dictionary. I mean, the word shall means what it means in the normal course of a conversation.
Q. And how do you use it in the normal course of your conversations? 11:33AM
MR. HALL: Objection, scope.
A. I really don't use the word shall.
Q. Does the word shall signify that a certain thing must happen?
MR. HALL: Same objection. 11:33AM

Page 106

A. I think that's fair to say, yes, sir.
Q. What about the word should? As you understand that term, what do you understand that term to be?
MR. HALL: Same objections.
A. I think that it means that that's what should 11:34AM occur. Is it absolute? I guess it depends on your interpretation.
Q. So it's something that, you know, one might think about doing but isn't necessarily required to do. Is that fair? 11:34AM
MR. HALL: Objection, misstates testimony.
A. I think some people could interpret it that way.
Q. And it may actually be prudent to do that 11:34AM thing, but it's not required to do; is that correct?
A. I think you could interpret that word as that, yes, sir.
Q. Would you agree with me that the word should is discretionary and the word shall is mandatory? 11:34AM
MR. HALL: Same objections.
A. I think it could be interpreted that way, yes, sir.
Q. If there was a requirement in the FRCA that a certain action shall be done and Experian's policy in 11:35AM

Page 107

connection with that section of the FCRA said that the same action should be done, would you agree with me that Experian's policy would not be completely in line with the legal requirement?
MR. HALL: Objection, scope. Foundation. 11:35AM Calls for a legal conclusion.
A. No, I don't agree with that.
Q. Why not?
A. Because, again, that -- the word shall is used by the people that made the law, legislators or people 11:35AM who wrote a legal document. Experian's policies and procedures are designed by individuals who are making this consumer -- I'm sorry, agent friendly or, you know, everyday words.
So, no, I don't agree that that's 11:36AM intentionally two different words.
Q. So are you suggesting that Experian's policies are designed without recourse to the governing law?
MR. HALL: Objection --
A. No. 11:36AM
MR. HALL: I'll just remind you to let me finish my objections.
Scope. Foundation. Calls for a legal conclusion. Misstates prior testimony.
But you can answer. 11:36AM

Page 108

Q. Ms. Methvin, I see that you are looking back through what I have marked as Exhibit 3. Feel free to do that.
A. Okay.
Q. But is there a reason why you're looking at 11:36AM Exhibit 3?
A. No. I can put it down.
Q. Is there a reason why you looked at it?
A. No.
Q. And Exhibit 3 is for your recollection. One 11:37AM of the reasons to put documents in front of a witness is to refresh their recollection and jog their memory a little bit. But do you recall whether or not in Zorba you testified as to the distinction between shall and should? 11:37AM
MR. HALL: Objection, scope.
A. I don't recall it specifically. I do recall having a conversation with Mr. Badwan about this, but I didn't know if it was that case or not.
Q. Does Experian consider the transmission of an 11:37AM internal update to a data furnisher be a DRN to constitute disputing that consumer's information to that data furnisher?
MR. HALL: Objection, scope. Calls for speculation. Form. 11:38AM

Page 109

THE WITNESS: Can you repeat the question, please?
(Record read.)
A. I don't really know what you mean.
Q. Actually maybe the question was not 11:38AM transcribed. What I meant to say -- I'll repeat what I meant to say, which was: Does Experian consider transmission of an internal update to a data furnisher via DRN to constitute disputing the consumer's information to that data furnisher? 11:38AM
MR. HALL: Same objections.
A. Well, what we consider a DRN is to notify the data furnisher that we have updated information. So if the consumer is disputing information that we either can internally fix or internally change without contacting 11:39AM the data furnisher due to a policy we may have, I would say we consider that responding to the consumer's dispute, but we're notifying the data furnisher of the change.
Q. Would Experian consider that to be disputing 11:39AM the information with the data furnisher?
A. I don't think so. I would say we are notifying the data furnisher of the change.
Q. What's the distinction in your mind between notifying a data furnisher and disputing with the data 11:39AM



furnisher?
MR. HALL: Scope. Form.
A. Well, to me the distinction is, whenever we are requesting that the data furnisher verify certain information or certain things that we wouldn't change or 11:39AM that we -- that our policy doesn't allow for us to make changes or deletions, we're going directly to the data furnisher and asking them to verify the information that they are reporting.
When we make a change due to an Experian 11:40AM policy, we're not asking the data furnisher to verify the accuracy. We're informing the data furnisher that we've made this change. And so to me, those are two distinctly different things.
Q. So does Experian believe when it sends a DRN 11:40AM that it has all the information it needs to be able to make that change without asking the data furnisher for information?
A. Yes.
Q. Does Experian in the context of ongoing 11:40AM payments to an account, to a trade line, does Experian have a record of disputed payments such that it can verify that information?
MR. HALL: Objection, form. Foundation. Scope. 11:41AM



A. No.
Q. Who does it get that information from, if at all?
A. From the data furnisher.
Q. And so in a circumstance in which there was a 11:41AM dispute about whether there was an ongoing payment as between a consumer and a data furnisher, would Experian have to ask the data furnisher to verify that information?
A. Well, for one, if the account was present on 11:41AM the credit report, yes, and also if the item didn't already show as the consumer wished it to show, yes.
Q. And with those two conditions as you've described them, would Experian send a DRN in those circumstances? 11:41AM
A. No.
Q. Why?
A. Really? Because if the item is not there, who would we send it to?
Q. It's not -- what I mean is not whether the 11:42AM item isn't there, so I think maybe we lost the train of thought.
A. Maybe so.
Q. My "why" was directed to why Experian would not use a DRN to make an update on an item of 11:42AM



information such as a -- such as the payment history on an account that would be -- that's in the data furnisher's possession
MR HALL: Objection, form Foundation
A Okay Well, maybe if I explain it this way 11:42AM Payment history is not something that we can independently verify So, for example, if a consumer says, "Listen up I made all my payments on time, and here's a copy of every single canceled check," we still don't know that every payment was made on time We do 11:43AM see canceled checks, but we can't know for sure that the account was never late, so we have to verify that information with the data furnisher
So there would not be an instant where we would independently change payment history without 11:43AM verifying it with the data furnisher I guess -- well, I guess there is an example There is a possibility If the consumer said, "Hey, I was never late on my account, and here's a letter from Chase agreeing with me that I was never late," is that possible? I guess it's 11:43AM possible
But in that instance, then we would change the account to never late, attach the document and notify the data furnisher that we've changed the information 11:43AM

Q. Even in a circumstance like the one you just described if a consumer comes forward with evidence indicating that this furnisher sent this to me --
A. Yes.
Q. -- do you think Experian would find it important to notify the data furnisher to make sure that Chase actually said those things and the document wasn't forged somehow? 11:43AM
A. If we believe that the document is authentic, then we would update it. There may be a situation, like you said, there may be some indication that the document may appear to be unauthentic, and in those cases, we would send an ACV and attach the document. 11:44AM
But if we truly believe the document is authentic, then, no, we would update the account and notify the data furnisher. 11:44AM
Q. Would you agree with me that that's probably an exception to Experian's general policy of wanting to notify a data furnisher via an ACDV about a dispute regarding payment history on an account? 11:44AM
MR. HALL: Objection, scope. Form. Foundation. Calls for speculation.
A. Well, I can tell you that in my 16 years I have seen very, very few documents where a data furnisher claimed the account was never late, and they 11:44AM

Page 114

were reporting something different than never late.
So it is not common for that to happen, but, yes, it could happen.
MR. HALL: I'm not sure where you are. I have about a quarter til noon. Do you to break around noon for lunch? 11:45AM
MR. CLARK: Yes. That sounds good to me.
Q. Ms. Methvin, are you okay powering through until noon?
A. Yes, sir. 11:45AM
Q. Would Experian -- if Experian is reporting charge-offs on an account, would Experian know the circumstances of that charge-off?
A. No.
Q. Who would know that information? 11:45AM
A. The data furnisher.
Q. What about a circumstance where the data furnisher was reporting multiple charge-off notations in various months --
MR. HALL: Objection. 11:45AM
Q. -- would the data furnisher be the best source to determine whether or not that was appropriate?
MR. HALL: Objection, form. Foundation.
A. Well, I wouldn't call it multiple charge-off notations. I would call it continuing charge-off 11:46AM

Page 115

notations. It's not different. They are all -- the account is charged off. It's just each month it's still a charge-off.
Q. Are you familiar with the agent provisions under the Fair Credit Reporting Act? 11:46AM
MR. HALL: Objection, scope.
A. Yes.
Q. Are you aware of how long a derogatory entry can appear on a consumer's trade line?
MR. HALL: Objection, scope. Calls for a legal conclusion. 11:46AM
A. Yes.
Q. If a consumer's trade line was reporting, for example, a charge-off in April of 2012 --
A. Yes. 11:46AM
Q. -- how long would that charge-off report?
A. Well, it would depend on when the very first time it was reported as a charge-off that led to that condition. So I think in this case the charge-off was originally reported in 2010 maybe, of the first delinquency really. It doesn't even have to be a charge-off. It's the first delinquency that led to the charge-off. 11:46AM
And if we go from that date, it would be seven years from the initial delinquency that led to the 11:47AM

Page 116

condition that the account is in, and then we purge even a few months before that.
Q. Would that circumstance about exactly how long the charge-off would appear appear on the consumer's credit file? 11:47AM
A. Do you mean would the purged date show on the consumer's credit file?
Q. Yes.
A. Yes. At least I believe it did for Mr. Cardinali. 11:47AM
Q. And did it indicate that that was in response to any derogatory entry or simply the account itself?
A. Well, without looking at it, I believe it says something like this account is scheduled to continue on record until whatever date, like March 2017 or whatever, and then you see the payment history right underneath it. 11:47AM
So you can look at that and tell when the original date of delinquency was.
Q. So is the word account different than payment history? 11:48AM
A. Yes.
Q. How is that different?
MR. HALL: Objection, form.
A. Well, an account is an account, meaning the 11:48AM

Page 117

name of the account, the type of account. It encompasses all of that. And then payment history is the payment history on the account.
Q. Do you know whether or not Experian would have -- let me ask you this. Let's assume that a -- 11:48AM let's assume an account reached a derogatory status and then went into a less derogatory status and went back into a more derogatory status.
A. Okay. Did you say never positive, always positive? 11:48AM
Q. Never positive, always negative. You know, it vacillated between more and less derogatory.
A. Okay.
Q. What would be the trigger for the negative status? 11:49AM
A. It would continue to be the original date of delinquency that led to the condition that it's in. So, for example, if it stays negative or derogatory and it never goes positive, it would go from that very first time it ever became negative. 11:49AM
Q. What about a circumstance where the data furnisher didn't report any data for a certain period of time and then continued reporting the data as negative?
A. As long as the account was never brought back to a current condition or a positive condition, then it 11:49AM

Page 118

would stay from the original date of delinquency, whether there was data or no data.
Q. What about a circumstance where the account was closed?
MR. HALL: Objection, scope. 11:49AM
A. Closed doesn't matter one way or the other.
Q. When an account is closed, is that a final status?
A. It depends on what you mean by final. So you could have a closed credit card that you still have a 11:50AM balance on that you're still paying on, but the account may be closed, so I guess it depends on what you mean by final.
Q. Is charge-off a final status?
MR. HALL: Objection, scope. 11:50AM
A. Well, it can be. Again, a charge-off can have a balance that you could pay later, so there can be action taken on it, but you can't go use the credit card once it's been charged off. So, again, it depends on what you mean by final. 11:50AM
Q. Can a charge-off account be sold from one data furnisher to another?
A. Yes.
Q. And so a consumer could make payments on a charged-off account that wouldn't necessarily change the 11:50AM

Page 119

charged-off status; is that correct?
A. Well, they could. I mean, the data furnisher could change the balance if they chose to. And also once it's paid, the data furnisher could mark it as a paid charge-off, so, yes, sir, it could make a 11:50AM difference.
Q. If there was a dispute about a charged-off notation given the circumstances of the charge-off that you just described, is that a dispute Experian can update internally, or would it need to seek information 11:51AM from the data furnisher to make sure that it's reporting that?
MR. HALL: Objection, scope. Foundation.
A. Again, it depends on what the consumer provides. So if you had an account that was charged off 11:51AM and the consumer provides proof that they paid it or a letter from the data furnisher or creditor, a copy of a canceled check that matched the amount that was on the charge-off, we may be able to update it internally.
Q. What about a circumstance where the consumer 11:51AM provided three things aside from the identifying information that would identify them, provided a letter, provided an Experian credit report, and provided several pages of a bankruptcy schedule that did not identify the account in question? Would Experian be able to use that 11:51AM

Page 120

information to resolve with finality any dispute as to the nature of the reported charge-off without contacting the data furnisher?
MR. HALL: Objection, scope. Form.
A. Well, it depends on what the dispute was. If 11:52AM we're talking specifically about Mr. Cardinali, in his case his dispute was specifically that he did not want -- if I remember correctly without it in front of me, obviously, was that he did not believe there should be a charge-off showing between the petition date and 11:52AM the discharge date because he had filed bankruptcy. I don't believe he said there was never a charge-off.
Again, without it in front me, I'm not 100 percent sure.
Q. Let's go ahead and do that. 11:52AM
MR. CLARK: Let's have this marked as Exhibit 4, please.
(Exhibit 4 marked.)
Q. Ms. Methvin, I'll direct you to the first few pages of Exhibit 4. We'll probably take this up after 11:53AM lunch, but do you recognize the first four pages of Exhibit 4?
A. Yes, sir.
Q. And what are they?
A. They appear to be the dispute letter that was 11:53AM

Page 121

allegedly sent by Mr. Cardinali to Experian.
Q. And with this dispute letter, it looks like at Page -- do you see in this first four pages whether he is disputing an account from WebBank?
A. Yes, sir. 11:53AM
Q. And which page do you see that on?
A. 00035.
Q. And so, Ms. Methvin, can a consumer continue to make payments on an account after the account is included in a bankruptcy? 11:54AM
A. I don't know what the bankruptcy law is on that. I have no idea.
Q. And do you know whether the consumer is foreclosed from making payments on an account after filing for bankruptcy? 11:54AM
A. I don't know.
Q. Are you aware that some interests in bankruptcy actually pass through the bankruptcy process and perhaps continue to be -- or are not discharged through bankruptcy? 11:54AM
MR. HALL: Objection, scope. Foundation.
A. I think it must depend on what type of bankruptcy it is. I know there are some things that are not in bankruptcy, yes, sir.
Q. Do you know that debts can be reaffirmed in 11:54AM

Page 122

bankruptcy?
A Yes, sir
Q And so looking at this trade line here -- or this dispute on this account, it says that -- it says, "Please remove the derogatory information from the 11:55AM following postbankruptcy dates, Feb 2012 and March 2012"; is that correct?
A Yes
Q And looking at the face of this dispute letter, is there enough information here for Experian to 11:55AM determine whether or not Mr Cardinali made any payment at all towards these charge-off during the two months that he is disputing?
A No, but doesn't say that either
Q How would Experian find out whether that was 11:55AM in fact the case?
A Well, he didn't say that he made any payments here
Q My question is slightly different My question is how would Experian determine whether 11:55AM Mr Cardinali had made any of those payments?
A Well, if he had disputed that he had -- stated that he had made payments or that this account should show never late or not late because he had made payments, then we would have sent an ACDV to the data 11:56AM

Page 123

furnisher. That's not what he said.
Q. Let's look through the -- if you look briefly at Page 56 of this document.
MR. HALL: On the depo Bates label?
MR. CLARK: The depo Bates label. 11:56AM
A. Okay.
Q. Just looking through the remainder, are Pages 32 through 56 the sum of Mr. Cardinali's dispute to Experian, all the information he submitted?
A. I believe so, yes, sir. 11:56AM
Q. Now, do you see any pages in there that indicate whether Mr. Cardinali attached a portion of a public record with his dispute?
A. Yes, sir.
Q. And what pages are those? 11:57AM
A. 52, 53, 54.
Q. Do any of those pages, 52 through 54, identify WebBank?
A. No.
Q. What, to the best of your understanding, are 11:57AM these three pages?
A. Well, it looks like it's three pages of a 61-page document that shows a petition for bankruptcy.
Q. And that's your understanding of this document? 11:57AM

Page 124

A. Yes, sir.
Q. Do you know whether Experian's policies and procedures at the time Mr. Cardinali submitted his dispute to Experian would have deemed Mr. Cardinali's -- the three pages of Mr. Cardinali's voluntary petition 11:58AM that he attached here to be sufficient proof that the WebBank account was included in bankruptcy?
A. We wouldn't even need these documents. As long as the public record is on Mr. Cardinali's file, if he states it was included in his Chapter 7 bankruptcy 11:58AM and it meets certain criteria, these wouldn't even be necessary.
Q. And when you say it meets certain criteria, what do you mean?
A. I mean that there are certain criteria that 11:58AM need to be met before an agent can independently update an account to show it included in bankruptcy.
Q. What are those requirements or criteria as you understand it?
A. Well, without the policy in front of me, the 11:58AM criteria is that the account cannot be a student loan, child support, a tax lien. Those are not typically included in bankruptcy.
The account needs to be opened prior to the filing date of the bankruptcy and not in a paid 11:59AM

Page 125

final condition -- or, sorry, not in a positive paid final condition.

If the consumer claims that it was included in their bankruptcy and it's a Chapter 7, then we can look at the public record, and if it meets those 11:59AM criteria, we can update the account without these documents.

Q. Are the documents that you -- Mr. Cardinali had been discharged from bankruptcy at the time that his dispute was received by Experian, correct? 11:59AM

A. I believe so, yes, sir.

Q. And Mr. Cardinali attached a copy of the credit report to the dispute?

A. Yeah, I believe it was. That sounds right.

Q. Feel free to look through the document if you 11:59AM don't believe me.

A. No, I do. I think I remember it was like April 2012 or something like that.

Q. Does Experian know, based on all the documents that were provided by Mr. Cardinali, whether or not the 11:59AM debt to WebBank was reaffirmed in the bankruptcy?

MR. HALL: Objection, calls for speculation.

A. Do we know that it was reaffirmed?

Q. Based on what Mr. Cardinali submitted. 12:00PM

Page 126

A. No. And he also didn't claim it either, so I'm not sure -- he didn't say that it was reaffirmed, nor did he provide any documentation, nor did we have any information from the data furnisher that it was reaffirmed. 12:00PM

Q. If you wanted to figure out whether or not a debt was reaffirmed in bankruptcy such that certain reporting either would or would not occur, what sources of information would you reach out to in the course of a consumer dispute? 12:00PM

A. Well, if a consumer claims that a debt was reaffirmed in bankruptcy, in all of the instances I have ever seen that happen, the consumer provides the document, the reaffirmation document from the court.

I would imagine if they didn't provide 12:00PM it, then we'd have to go directly to the data furnisher. That would be the only other source of information that we would know whether it was reaffirmed.

Q. Are you familiar with the phrase maximum possible accuracy? 12:01PM

A. Yes.

Q. What does that phrase mean to you?

MR. HALL: Objection. To the extent you're asking about that in a legal context, calls for a legal conclusion and outside the scope. 12:01PM

Page 127

But you can answer.

Q. I'm sorry, just a few more, and then we'll let you go to lunch here.

A. Well, Experian is tasked with ensuring maximum possible accuracy. And by that, I believe that it means 12:01PM there's no way that anything can ever be 100 percent accurate, but our goal is maximum possible accuracy and to have procedures in place to try to obtain maximum possible accuracy using the dispute process and using the consumer interface. 12:01PM

That's what that means to me.

Q. Do you think that it is -- do you think that Experian's reporting is more accurate when it sends a consumer dispute to a furnisher via ACDV than it would be if Experian sends a DRN to that data furnisher? 12:02PM

MR. HALL: Objection, scope. Form.

A. Not necessarily, no, sir.

Q. In connection with an interest in a bankruptcy that may or may not have been reaffirmed, would it be more accurate for Experian to verify whether the 12:02PM information -- whether the account was reaffirmed in bankruptcy by sending a dispute to the data furnisher?

MR. HALL: Objection, form. Calls for speculation.

A. Well, if that were the dispute, if the 12:02PM

Page 128

consumer said, "This was reaffirmed," and he had a court document that showed the reaffirmation, I think that would be sufficient to update the account. But absent any type of proof from the consumer, that is the only way to know if it was reaffirmed is to verify it with 12:03PM the data furnisher.

But that's not what he said here, so I'm not sure how to answer your question in the context of Mr. Cardinali.

Q. Well, I guess perhaps I disagree with you 12:03PM over what you believe the scope of what Mr. Cardinali's dispute was. So in your understanding, what was Mr. Cardinali's dispute about?

A. Well, I don't know if this was intentionally written to be vague or if it's vague, but it says this 12:03PM account was discharged at his bankruptcy, which was filed on this date and discharged on this date, and it gives a docket number.

Well, the account did show that, exactly what he said, that it was included in a bankruptcy, a 12:03PM Chapter 7 on this date. Then he said, "There should not be any derogatory reporting after the filing date."

He didn't say he wasn't late. He didn't say it wasn't a charge-off. He just said he believes there should be no derogatory reporting. He doesn't say 12:04PM

Page 129

why.

And then he says, "Please remove this information." He doesn't say it was wrong. He just said he doesn't believe it should be there, and he wants it removed. 12:04PM

And so our response to him was to make sure his account was showing properly with the correct bankruptcy dates as of October 2015 when we did his dispute and then to provide him education or a letter that explained to him that negative information between 12:04PM the petition date and the discharge date may display.

It doesn't say anything on here about him reaffirming it or making any payments or really even saying it was wrong. He just said it shouldn't be there because of the bankruptcy, or at least that's how I 12:04PM interpret it. It was in my bankruptcy; therefore -- that's how I read it -- there should be no derogatory reporting after the file date.

Q. If a consumer is paying as agreed on an account, would Experian in the payment history reflect 12:04PM that account as having a derogatory payment history?

A. Well, I guess it depends on what happened in the past. If they're paying as agreed right now, if it stayed current, but if he had any late payments or negative information in the past, that would also 12:05PM



display

Q Paying as agreed on a disputed item of information So if the derogatory entry says 180 days late, and the consumer says, "I was paying as agreed," would it be the -- should Experian change that 12:05PM derogatory entry to a nonderogatory entry if it finds out the consumer was correct?

A Yes

Q What about with the -- and how would Experian go about determining whether the consumer was saying the 12:05PM right thing or not?

A Well, we would look at all of the consumer's relevant information that he provided, and then if we were able to use that information, we'd update it If we're not, which is very difficult to do with a monthly 12:06PM payment agreement to make sure, we would contact the data furnisher and ask them to verify the payment history

Q So typically Experian could send an ACDV asking WebBank to verify whether or not those charge-off 12:06PM accounts -- those charge-off notations on Mr Cardinali's trade line that he disputed were in fact accurate?

A Yes We could have, but he didn't say that it wasn't a charge-off He just said, "There shouldn't be 12:06PM



any derogatory reporting after the file date of my bankruptcy." He didn't say that he was making payments on it.

Q. Is there any way that a charge-off notation is not derogatory? 12:06PM

A. No.

Q. We can go to lunch.

(Lunch recess.)

Q. Ms. Methvin, we just took a lunch break, and so I wanted to ask you if there were any answers to my 12:56PM prior questions that you wanted to amend, correct or clarify at this time?

A. Yes.

Q. Okay. Which questions are those?

A. So whenever I went to my lunch break, I talked 12:56PM to my attorney, and he felt like the answer that I gave about the numbers, that maybe that wasn't exactly what my intent was. So we talked about, you know, how many times a day the disputes are sent, and you said more than 1,000, and I said probably. And then you said more 12:56PM than -- I don't remember what the exact wording was, but it ended up where I said probably at least one per second. That sounds about right.

I don't really know the answer to that. I mean, I know how many disputes, approximately, letters 12:57PM



that we get. I know how many dispute agents we have and how many hours they work. So I know it's a lot, but I don't really know if it's one per second, so I don't think that's fair to say that.

Q. Okay. That's fine. And thank you for the 12:57PM clarification. Are there any other questions besides that that you'd like to amend, correct or clarify?

A. No, sir.

Q. That's fine, because I was going to ask you a few other questions in that line now. So I believe you 12:57PM just said you have a general understanding about how many dispute letters Experian receives; is that correct?

A. Yes, sir.

Q. And to the best of your recollection, what's the approximate number? 12:57PM

A. Well, the last time that I looked at our statistics, which was earlier this year, it can range anywhere from around 3,000 pieces of mail a day to ten to 12,000 pieces of mail, depending on if it's a holiday or, you know, what day of the week it is. So it can 12:58PM range anywhere from there.

Q. So are all those pieces of mail correspondence consumer disputes after Experian has had a chance to look at them?

A. No, sir, not all of them. 12:58PM

Q. Do you know what the approximate percentage would be?
A. No, I don't.
Q. Do you recall testifying at trial in a case in Alabama called Younger? 12:58PM
A. Yes.
Q. And do you recall testifying about the number of pieces of mail that Experian received?
A. I think that's about what I just said, 3,000 to 12,000 pieces. I think that's what I said, but I'd 12:58PM have to go look at the trial transcript to see if that's what I said.
Q. And do you have any estimation as to the approximate percentage of mail that Experian receives that among those three to 12,000 would constitute 12:59PM disputes, like 50 percent, 60 percent?
MR. HALL: Objection, scope. Asked and answered.
A. You know, I don't know the answer to that.
Q. Is there someone at Experian who would know 12:59PM the answer to that?
A. Yes, I would imagine there is.
Q. Do you happen to know who that person is or what their job title would be?
A. Well, if I were to try to find out that 12:59PM

Page 134

answer, I would probably start with the supervisor over -- that's over that -- the mailroom department. I would have to figure out who exactly is the supervisor of EPC, which is Experian's processing center, and then I'd go from there. 12:59PM
Q. So it would be the EPC supervisor who would be the person who would likely know that information?
MR. HALL: Objection, scope. Foundation.
Go ahead.
A. Actually I would not go to the EPC supervisor. 01:00PM I would actually go to the manager, who is above the supervisor of that department. That's where I would start to try to find my information.
Q. Do you happen to know who the EPC manager is right now? 01:00PM
A. Not as I'm sitting right here, but I can get that for you.
Q. Is there a -- have you known the names of any managers in the past?
A. Yes. 01:00PM
Q. And what are the names of those folks?
A. Well, in the past, it would have been Carolyn Helm. Also I may have asked Pat Henderson.
Q. And Helm, is that H-e-l-m?
A. Yes, sir. 01:00PM

Page 135

Q. And do you know where these folks are located? Are they located in Costa Mesa or Dallas or somewhere else?
MR. HALL: Objection, scope.
A. Well, both of them are located in Allen. 01:00PM Ms. Helm is retired now, so she's not with Experian.
Q. Is Ms. Henderson still an Experian employee, to the best of your knowledge?
A. Yes, sir.
Q. And do you think that Experian makes a record 01:01PM of the disputes that -- or the mail correspondence that it receives and how those pieces are sorted?
MR. HALL: Objection, scope. Foundation.
You can answer.
A. Yes. 01:01PM
Q. Is Experian's processing and sorting of the mail subject to any written policies and procedures?
A. Yes.
MR. CLARK: May I have this marked as Exhibit 5, please? 01:02PM
(Exhibit 5 marked.)
Q. Ms. Methvin, I have just handed you what I have had marked as Exhibit 5. Please take a look through it and let me know when you've had a chance to do so. 01:02PM

Page 136

(Pause in proceedings.)
A. Okay.
Q. Have you seen this document before?
A. Yes, sir.
Q. And what is it? 01:02PM
A. It's Experian's EPC sorter manual.
Q. And does this document contain Experian's procedures for how to sort incoming mail?
A. Yes, sir.
Q. Does it contain Experian's procedures for how 01:03PM to log incoming mail into an electronic system of record?
A. I think it does, yes, sir.
Q. Do you happen to know what the electronic system of record is that they would store that mail 01:03PM correspondence?
MR. HALL: Objection, scope. Foundation.
A. You mean what the name of it is?
Q. Yes.
A. We call it NIS, which stands for -- NCAC 01:03PM imaging system is what it originally stood for. I don't know what the actual technical name of it is.
Q. That's fine. And I asked what it was referred to as. Is that okay?
A. NIS, yes, sir. 01:03PM

Page 137



Veritext Legal Solutions
877-955-3855

Q. Is NIS a system that is accessible from CAPS or File One, or is it not?
A. No. It's its own system. Like the two can interact with each other, but you don't get to the imaging system through the CAPS system. If that's what 01:04PM you're asking, the answer is no.
Q. So they can interact. And how would they interact, those two systems, NIS and CAPS?
A. Well, the agent will use the CAPS system to access the consumer's file, and whenever the consumer's 01:04PM file is opened or a report is created, that CAPS ID is automatically captured in our imaging system so that the CAPS ID or the consumer report number is attached to that piece of mail correspondence.
And then also if the agent needs to 01:04PM attach the mail correspondence to the ACDV, they work together. It pulls it from the imaging system when it sends it through the CAPS system.
Q. I see. So through CAPS you can access the documents in the imaging system? 01:04PM
A. Not exactly. What the agent does is they pull up the CAPS system on their computer, and they also have to pull up the imaging system on their computer. And the two work together, but you don't get to the image through the CAPS system. 01:05PM



Q. When an agent sends an ACDV or, I suppose, some kind of DRNs and attaches an image, then the system will automatically go into NIS, retrieve the information and then add it to the ACDV so it can be sent to the data furnisher? 01:05PM
A. Yes, sir, that's correct.
Q. Okay. So there is a way for -- whether it's manual or electronic, for CAPS to query NIS and retrieve information and then send it; is that correct?
A. Well, I don't know if CAPS can query, like go 01:05PM and search for it. They work together at the same time, so the image that is on the screen at the moment your CAPS screen is up, they go together.
Q. Would the NIS system, once a dispute is categorized as either a dispute or some other type of 01:05PM correspondence, would NIS keep a record of that categorization such that Experian's agents would know what they need to look at?
A. Yes.
Q. And what I mean by that is: How does a 01:06PM dispute agent actually know what to look for when they are beginning a dispute in the CAPS system? Is there some kind of tag of the image that would indicate that this is what the consumer sent that the agent is going to use to figure out what the dispute is about and then 01:06PM



make a decision on what to do?
A. Yes, sir. So a dispute is imaged, and we call it a package, for lack of a better word. The package is the entirety of the correspondence, and then each package is sorted into different queues. So if you're a 01:06PM dispute agent, you would work in the dispute queue, and it would just go to the dispute queue and retrieve the next package that was available and open it.
Q. So then if Experian is making an electronic record of what type of mail correspondence it is, would 01:06PM it be reasonable to assume that Experian can figure out how many packages it has received based on that electronic record in NIS?
MR. HALL: Objection, scope. Foundation.
A. Yes. But, I mean, the package could change 01:07PM though. You could get -- it could be that something may be sorted into a particular queue, and then once it's opened and reviewed a second time, an agent may go, "oh, you know what, this is not a dispute. This is a request for a disclosure, and it needs to go into a different 01:07PM queue."
So it could change, but, yes, sir, you could do that.
Q. And if the nature of the correspondence changed from, say, a dispute to something other than a 01:07PM



dispute, would an Experian dispute agent be able to make that change, the categorization of the information, such that it was no longer categorized as a dispute?
MR. HALL: Objection, scope. Form. Foundation. 01:07PM
A. I'm not sure if a dispute agent would have the -- like the security level to recategorize something. They may just have to send it back to the mailroom and ask for them to recategorize it. I'm not sure if they could do that themselves or not, but it 01:08PM does get recategorized.
Q. So somebody has the ability to basically take that electronic record and then properly categorize it, even if it's miscategorized at first, right?
A. Yes, sir. 01:08PM
Q. And what I'm getting at is, based on our discussion of these references Experian receives and archives, do you have any reason to doubt that we could get an answer on how many disputes Experian received if we looked at those electronic records? 01:08PM
MR. HALL: Objection, scope. Foundation. Form.
A. Well, I do believe that you could ascertain how many pieces of mail that we received that were classified as dispute mail, but it also -- I'm not 01:08PM

trying to be difficult, but it depends on what you mean by how many disputes, because one piece of mail may have 20 disputes and one piece of mail may have one dispute.
So is that 21 disputes in one piece of mail, or is that just two disputes? It depends on what 01:09PM you are asking for and how you identify a dispute.
Q. Let's say a consumer like Mr. Cardinali, as he did in this case, has several disputes contained within a single letter. Would all of those disputes be contained within a single package if they were contained 01:09PM within a single letter?
A. Yes.
Q. And a DR log is -- a DR log will indicate how many disputes were within a certain dispute cycle, correct? 01:09PM
A. Again, maybe. Because if the item is already showing as it needs to show, there wouldn't be anything in the DR log other than a note. So you could say Mr. Cardinali may have had ten disputes on his letter, but we only processed eight accounts. 01:09PM
That doesn't mean he had -- did he have ten disputes or did he have eight? It depends on how you identify it.
Q. Would Experian have a way of determining how many packages contained at least one dispute? 01:10PM

Page 142

A. I don't see how we could do that.
Q. So how would Experian determine whether or not any package contained any disputes such that a dispute agent would have to review it?
A. Well, we review all dispute packages, but it 01:10PM is possible to open a dispute letter, realize that the item that the consumer -- at that point open the -- go to the consumer's file, realize the item is not on the file, let the consumer know that and complete your package. 01:10PM
So technically there really was no dispute because we didn't have anything to address other than to tell the consumer something is not there.
Q. But at some level, a dispute agent would have to review the correspondence in that circumstance to 01:10PM make the decision you just described; is that correct?
A. Yes, sir.
Q. So at some point, that would be a dispute as Experian classified it?
A. Yes, sir. 01:10PM
Q. Do you know how many -- when Experian was processing Mr. Cardinali's WebBank dispute, did it apply any policies and procedures?
A. Yes.
Q. And are there any that -- policies and 01:11PM

Page 143

procedures that led Experian to send a DRN and not an ACDV?
A. Yes.
Q. And what were those policies and procedures?
MR. HALL: Objection, form. 01:12PM
A. Well, it would be our bankruptcy policy, Experian's internal policy, or updating accounts included in bankruptcy.
Q. Is there a particular internal dispute reason that Experian would use to represent the fact that it 01:12PM had chosen that policy as opposed to others?
A. For the time frame here for Mr. Cardinali, yes, sir.
Q. Can Experian provide more than one internal reason code on a DRN if multiple policies have the same 01:12PM impact that a DRN sent in response to a dispute?
A. I'm not sure if I understand your question. I believe you're asking if there can be more than one reason code used at one time?
Q. In connection with one dispute, yes. 01:12PM
A. No.
Q. So Experian is going to have to -- regardless of what -- actually let's -- so if, for example, a consumer disputes several inaccurate items of information on a trade line, and Experian decides that 01:13PM

Page 144

each one of those items can be updated or deleted based on its internal policy without sending an ACDV, in that circumstance, on the DRN that Experian sends to the data furnisher, how does it choose which internal dispute reason to select? 01:13PM
A. Well, the dispute reason would be based on the action really. So what we would do is either update or delete the information. We would choose the best reason.
So, for example, if we updated an account 01:14PM to paid per a proof document, that's the internal reason we would choose. If we update an account per bankruptcy policy, that's the reason we would choose.
So the two really -- I don't know how there would be more than one that would work, because 01:14PM updating an account to paid isn't the same as updating an account in bankruptcy, or deleting per Experian policy wouldn't be the same as deleting per a proof document. So I don't know how there would be more than one reason. 01:14PM
Q. So in your experience at Experian, every time a consumer submits a dispute on a single trade line, that letter is written however it's going to be written and described however it's going to be described, and inaccuracies with however they're going to be described, 01:14PM

Page 145

that in every single one of those instances, Experian believes that the consumer is only disputing one thing?
A. No.
Q. Did Experian design the DRN form that it sends to consumers -- or to furnishers? 01:15PM
A. I don't know who designed it.
Q. But Experian uses the form?
A. Yes, sir.
Q. But Experian can only put one internal dispute reason on that form? 01:15PM
A. Yes, sir.
Q. Let's look back at Mr. Cardinali's dispute letter, which was on Exhibit -- I believe it was 4.
A. Okay.
Q. And I'd like to direct you again to that 01:15PM WebBank trade line. So I believe from what I understand your testimony a moment ago to mean, is that even if Experian's dispute agent had determined that the charge-off notation was subject to a different policy at Experian that would have warranted an internal dispute 01:16PM code, that Experian would not be able to inform the data furnisher as to the fact that it believed that Mr. Cardinali's dispute implicated more than one of its policies?
MR. HALL: Objection, misstates prior 01:16PM

Page 146

testimony.
A. Well, no. I mean, you can still do two things. It would just have to be a two-step process because we can only put in one reason code at a time.
So, for example, in the example you gave, 01:16PM we would have to update the account to bankruptcy, let that update complete, and then send an ACDV if that's what needed to be done. We couldn't do an internal thing and at the same exact moment send an ACDV. It would have to be two different steps. 01:16PM
Q. What about -- aside from an ACDV, what if there were two internal reasons that would -- two policies that triggered internal dispute codes that were different as it related to a single trade line, how would Experian notify the data furnisher that it was not 01:17PM one but several dispute reasons that warranted the changes in question?
A. Well, I can't think of an example where that would happen, so I don't know the answer to that. I don't know that there would be a reason -- an internal 01:17PM policy for two different things. I can't think of any reason for that.
Q. Might the reason be that the consumer disputes multiple items of information on a trade line?
A. I can't think of a reason why there would be 01:17PM

Page 147

more than one internal policy that would apply.
Q. And that would be in connection with any disputes submitted by any consumer ever?
A. I can't think of any, no, sir.
Q. So is it your testimony today that each and 01:17PM every one of Experian's internal policies that would result in a DRN are completely separate from one another and that these policies are never in conflict and that they -- you could never have a dispute that implicates more than one policy at a time? 01:18PM
MR. HALL: Objection, form. Mischaracterizes testimony.
A. Well, that's not my testimony. My testimony is I can't think of an instance where there would be one. 01:18PM
Q. If you had to look at any information to determine whether or not that was or was not true, what documents would you look at?
MR. HALL: Same objections.
A. Well, I would look at all of our internal 01:18PM reason codes that we use, and then I would try to imagine a scenario where both internal reason codes may apply, but I can't think of any as I'm sitting here.
Q. Does Experian ever send multiple DRNs to the same furnisher in connection with a dispute from a 01:19PM

Page 148

consumer?
A. You mean at the same time or the same transaction?
Q. Yes, in connection with the same dispute package. 01:19PM
A. No, sir, I don't believe so.
Q. And Experian was the one that designed its own internal dispute codes, correct?
A. Yes, sir.
Q. And those dispute codes are all premised on 01:19PM Experian's policies and procedure; is that correct?
A. Yes, sir.
Q. So we had talked about the policies that applied to Mr. Cardinali's account, and I believe you talked about the bankruptcy policy procedure; is that 01:20PM correct?
A. Yes, sir.
Q. And what's your understanding of that policy as it applied at the time of Mr. Cardinali's dispute?
A. Well, at the time of Mr. Cardinali's dispute, 01:20PM Experian's bankruptcy policy was that if a consumer claimed that an account was in bankruptcy, that as long as it met certain criteria -- and we've already gone over those -- that the agent could internally update the account to show that it was included in bankruptcy, and 01:20PM

Page 149

we use a discharge date to update the account information.
Also, at that time it was Experian's policy that if a consumer disputed delinquencies between the petition date and the discharge date, that we would 01:21PM send the consumer a letter explaining to them that that could happen.
Q. And do you know -- it sounds like -- sorry.
Did there come a time that Experian changed that internal policy? 01:21PM
A. Yes, sir.
Q. And when abouts did that change occur?
A. I don't remember the exact date, but it was December of 2015.
Q. And how, to the best of your recollection, did 01:21PM the policy change?
A. The policy changed in that we began to use the petition date for the bankruptcy date rather than the discharge date.
Q. And did that have any impact on Experian's 01:21PM reporting of interim bankruptcy account history -- I'm sorry, payment history?
A. Yes.
Q. And what was the effect?
A. The payment history stopped at the petition 01:22PM



date for Chapter 7.
Q. What about for Chapter 13?
A. I believe for some time it did show a payment history until the discharge, and then once the discharge was completed, it would stop at petition. 01:22PM
Q. Okay. So the policy was -- so before at the time of Mr. Cardinali's dispute, Experian's policies for both Chapters 7 and Chapters 13 had to deal with the -- it would be that the account would -- the reporting would stop as of the discharge date and there would be 01:22PM interim reporting; is that correct?
A. Yes, sir, that is correct.
Q. And then it changed around December of 2015, and here there was distinction between Chapter 7 reporting and Chapter 13 reporting; is that correct? 01:22PM
A. I believe so, yes, sir. But Mr. Cardinali's was a Chapter 7, so for the purposes of this lawsuit, it would have stopped at the petition date.
Q. And why did Experian decide to change its policy to report the account only as of the petition 01:23PM date and not the discharge date?
MR. HALL: Objection, form. Foundation. I'm also going to object to the extent that if it calls for information to or from Experian's inhouse or outside counsel, I'll instruct the witness not to answer. To 01:23PM



the extent she has independent knowledge, she can answer.
A. I don't know the answer why it changed. I just know that it did change and what it changed to and on what date. 01:23PM
Q. And I just want to be careful about your last answer, Ms. Methvin, because it is directly relevant to the class prosecution in this case. So I want to make sure -- in answering my question, are you following your counsel's advice to not provide any testimony as it 01:24PM relates to any information you heard from your counsel?
A. Yes, sir.
Q. Have you withheld information in your last answer or the answer two answers ago based on that instruction? 01:24PM
A. No, sir. I don't know the answer why.
Q. Is there anyone at Experian who would know?
A. Maybe our legal department might know the answer why.
Q. Is there anyone else besides the people in 01:24PM your legal department who would know?
A. I don't know.
Q. Who in your legal department would know the answer to that question?
A. I don't know. I would probably -- do you want 01:24PM



to talk to him?
MR. BADWAN: Sorry, I apologize.
THE WITNESS: It's distracting. I'm sorry.
A. I don't know who would know. I would probably 01:24PM start with Michael Rozak and ask him who -- ask him who to go to. That's where I would start probably.
Q. Is there anyone at a higher up position at Experian, like a vice president or a manager or something, who might know as well? 01:25PM
MR. HALL: Objection, foundation. Scope.
A. There probably is, but, again, I would start with our legal counsel and ask them.
Q. Do you know who Tiffany Brown is?
A. I do. 01:25PM
Q. And who is Tiffany Brown?
A. She works at Experian. I think she's been there since around November or December of 2002. And I'm not exactly sure what her job title is, but I know she's in the training department now. 01:25PM
Q. Do you know if she's been responsible for any changes to Experian's policies and procedures as listed on a change control procedure of a policy procedure?
A. Well, she would be responsible for making the changes in the manuals. I don't know that she would be 01:25PM

responsible for instituting the change.
Q. And who would be responsible for instituting the change?
MR. HALL: Objection, asked and answered.
A. Again, I would have to defer to our legal counsel to find out who would have made the decision to change the policy. 01:26PM
Q. Did you ever talk to anybody at Experian about why this particular policy changed other than your counsel? 01:26PM
A. No, sir. There was a notification from -- or to all of the agents in around December -- in December of 2015 -- again, I don't remember the date -- that said that beginning immediately, the agents were to use a petition date. 01:26PM
Q. And who was it that sent that notification?
A. Our communications department.
Q. Who in your communications department?
A. Who sent it?
Q. Yes. 01:26PM
A. The email doesn't come from a human -- a person's name. It just comes from Experian communications so...
Q. Is Experian communications a different company? 01:26PM



A. No.
Q. It's a part of EIS. It's just a different department?
A. Yes, sir. I just mean there's no name on the email. It doesn't say like from John Smith. It just says from communications, so I don't know who's the owner of that email. 01:27PM
Q. Is there a way to find that out?
A. Yes.
Q. And how would you do that? 01:27PM
A. Well, I would probably go to the person that I know that works in communications and ask them.
Q. And who would that be?
A. His name is Lee Carstens, C-a-r-s-t-e-n-s.
Q. And Mr. Carstens is still working in the communications department? 01:27PM
A. Yes.
Q. And he was working in the communications department as of December of 2015?
A. Yes, sir. 01:27PM
Q. So you never had an occasion to question why that policy was changed?
A. No.
Q. Have you ever been asked to provide expert testimony on that position? 01:28PM



A. No.
Q. Do you know who Kimberly Cave is?
A. Yes.
Q. Who is she?
A. She's a co-worker of mine. 01:28PM
Q. Does she hold the same job title as you?
A. Yes, sir.
Q. Do you know if she's ever -- let me ask you this. Do you know if she knows anything more than you do about why that policy changed? 01:28PM
MR. HALL: Objection, calls for speculation.
A. I don't know what she knows.
Q. Do you talk to Ms. Cave on a regular basis?
A. Yes. 01:28PM
Q. Is she a friend of yours?
A. Yes.
Q. And so there was another policy that you mentioned, which was the reporting of the interim months between the petition date and the discharge date. And that, as I understand it, was something that was different from Chapters 7 to Chapters 13 after the implementation of the new policy; is that correct? 01:29PM
A. You know, as I remember it was, but I didn't really prepare to talk about Chapter 13 today, so I don't know that I can speak on that definitively. 01:29PM



But for Chapter 7, which is Mr. Cardinali, I do know that it stopped at the petition date once we changed our policy.
Q. Are you aware of what the class definition is in this case? 01:29PM
A. Not without looking at it in front of me.
MR. CLARK: This is Exhibit 6, please.
(Exhibit 6 marked.)
Q. Ms. Methvin, let me know when you've had a chance to review that. 01:30PM
A. Okay. Is there a specific page you'd like me to go to?
Q. There will be. I just wanted to ask if you have seen this document before. 01:30PM
A. Yes, sir.
Q. Do you know what it is?
A. Yes, sir.
Q. What is it?
A. This is the first amended complaint for this matter. 01:30PM
Q. And without telling me when you saw this, you saw this before today, correct?
A. Yes, sir.
Q. So I'd like to direct your attention to 01:30PM

Page -- well, I'll use the Bates number we've been using today. I will use 931.
A. Okay.
Q. And I'll direct your attention to Paragraph 73. 01:31PM
A. Okay.
Q. And do you see Paragraph 73 starts with the phrase, "Mr. Cardinali represents and is a member of the class consisting of" and there's a colon?
A. Yes. 01:31PM
Q. And below that is a single block of single-spaced text?
A. Yes.
Q. Do you see anything in that single-spaced block of text that talks about Chapter 7? 01:31PM
A. No.
Q. What about Chapter 13?
A. No.
Q. But it's your testimony today that you are not prepared to talk about Experian's policies as they 01:31PM relate to Chapter 13 bankruptcies?
And if you're not, it's okay. I don't want you to testify --
A. Well, I did study the policies and procedures as it related to Mr. Cardinali, and Mr. Cardinali's 01:31PM

Page 158

Chapter 7, so I prepared on that yesterday.
Q. So is it your testimony that you are not prepared to testify today about Experian's policies as they would relate to Chapter 13 bankruptcies and Experian's internal disputes -- internal updates to 01:32PM those types of disputes?
MR. HALL: Objection, asked and answered, and misstates prior testimony.
A. Well, it would depend on what your question is. Some things I do have memorized, and there are some 01:32PM things that I can answer without doing additional prep or memory, memorization.
But as far as the question that we talked about earlier, I was not comfortable saying that without additional research. 01:32PM
Q. So, Ms. Methvin, just out of an abundance of caution, again, I appreciate your candor in saying what you have not done and what you have done. I will hold the deposition open on the topic of Chapter 13, the application of Experian's policies as they relate to 01:32PM Chapter 13 or disputes involving a Chapter 13 process. These are within the notice of deposition topics or within, I believe, the class definition.
So with that, we'll see what you can do and, hopefully, we don't have to bring you back. 01:33PM

Page 159

MR. HALL: Miles, just for the record, I'd like you to identify the topics you have in mind.
MR. CLARK: Sure. Topic 3, Topic 4, Topic 5, Topic 6, Topic 9, Topic 11, Topic 12, Topic 13, Topic 14, Topic 16, Topic 17, Topic 18, Topic 19, Topic 01:33PM 20, Topic 21, Topic 22, Topic 23, Topic 24, and that's it.
MR. HALL: Thank you.
Q. So, Ms. Methvin, do you know why Experian made a distinction when it updated that interim bankruptcy 01:34PM suppression policy as between Chapter 7s and Chapter 13s?
A. No.
Q. Do you know whether or not Experian's policy pertained to any account that was included in a Chapter 01:34PM 13 bankruptcy or only some types of accounts?
A. I don't know what you're asking me.
Q. Well, I mean a bankruptcy can seek a discharge of more than one obligation, correct?
A. Yes. 01:35PM
Q. And as part of a bankruptcy filing, customarily consumers identify all the debts that they have. Is that your understanding?
A. For which type of bankruptcy?
Q. For a Chapter 13, sorry, or a 7. 01:35PM

Page 160

A. You know, I don't know what people do when they file bankruptcy as far as the listing of debts. I have never filed bankruptcy or really known anyone to file bankruptcy or that talked about that they did, so I don't know. 01:35PM
Q. Do you know whether or not -- I think we talked about this before, but interest can be treated in different ways, depending on what type of interest it is and what everyone agrees to once an account is included in bankruptcy, correct? 01:35PM
A. Okay.
Q. It could be reaffirmed. It could be discharged. It could pass through the bankruptcy. There might be other things that could happen; is that fair to say? 01:35PM
A. Yes, sir.
Q. And so in connection with a Chapter 13 bankruptcy, do you know whether or not Experian's policy of providing the interim reporting during the pendency of the bankruptcy applied to -- until discharge applied 01:36PM to all types of accounts, or did it only apply to some like unsecured accounts?
A. Well, during the time frame for Mr. Cardinali's dispute in October of 2015?
Q. We can start there, and then I'll ask you the 01:36PM

Page 161

question with respect to the new policy.
A. Well, in October of 2015, yes, the payment history between the petition date and the discharge date if reported by the data furnisher would be reported.
Q. And that would be for all types of trade 01:36PM lines?
A. As far as I know, yes, sir.
Q. And what about after the new policy that went into effect in December of 2015?
A. Well, for Chapter 7, I know that the reporting 01:36PM stops at the petition, and for Chapter 13, I believe that there still may be some reporting between the petition and the discharge until the date the Chapter 13 is discharged, at which point it's suppressed from the petition. 01:37PM
But, again, that's something that I'd need to do further research on to be sure, but I believe that's the correct answer.
Q. Would you agree with me that today if you received Mr. Cardinali's dispute, that Experian would 01:37PM have suppressed the information on Mr. Cardinali's trade line as of the date he filed his bankruptcy petition?
A. Well, the item is not on his report today, because it would have been deleted back in 2017 because it had been charged off since 2010. But if you're 01:38PM

Page 162

asking me like in today's environment if everything were the same --
Q. Yes.
A. -- we would have actually updated the account to show that it was included in a Chapter 7 bankruptcy 01:38PM petition in January of 2012, which would have effectively masked anything after January of 2012.
Q. And that would have masked all those charge-offs after the date of petition?
A. Just from the date of petition, yes, sir, but 01:38PM not all the charge-offs from 2012 back to 2010 when it had originally charged off. That would still show even today.
Q. I believe you testified before that closed is not a derogatory status; is that correct? 01:38PM
A. Well, no. You asked me was closed a final status, and I said not necessarily, but it's also not a derogatory status. So I didn't say that before, but it is true.
Q. Okay. To the best of your knowledge, can an 01:39PM account that has been closed accelerate to a charge-off status within a one-month period?
MR. HALL: Objection, scope. Foundation.
A. Yes.
Q. And under what circumstances would it do so? 01:39PM

Page 163

MR. HALL: Same objections.
A. Well, I can give you an example. You could have a credit card that is closed, and it can go to a charge-off status within one month. I don't -- it doesn't usually happen that way. 01:39PM
Typically accounts go six months past due before they are charged off, but that's up to the data furnisher at what point they want to charge an account off. And it's not our decision. It's the data furnisher who decides that. 01:39PM
And have I ever seen an account being charged off after one month, yes. It's rare, but it does happen.
Q. So let's go back to Mr. Cardinali's WebBank trade line as represented on his dispute. 01:40PM
A. Okay.
Q. My apologies, ma'am. If we could just have you look at the representations on the WebBank trade line itself on the Experian credit report.
A. Where would I find that? 01:40PM
Q. That would be -- that would be in between the dispute letter and the bankruptcy petition in his dispute correspondence.
A. What page would you like me to look at?
Q. Let's see. 01:41PM

Page 164

A. There's several different disclosures here. I just want to make sure we are looking at the right one.
Q. I understand. Hang on a second.
MR. HALL: I think you want Depo 41 and 42. 01:41PM
MR. CLARK: That is correct.
A. Okay.
Q. And so let's look at the payment history section of Mr. Cardinali's account.
A. Okay. 01:41PM
Q. That's on Page 42.
A. Yes, sir.
Q. So how did Experian know that this account was charged off?
A. Well, because it's reporting the charge-off as 01:41PM of May of 2010.
Q. And how did Experian know that the account was closed?
A. Because the data furnisher told us that.
Q. Did the data furnisher also tell you that it 01:42PM was charged off?
A. Yes.
Q. And are there any red flags in Experian's system for -- because you testified that it's not common for an account to be charged off a month after it's not 01:42PM

Page 165

in negative -- it's closed. Usually more time elapses before a charge-off notation; is that correct?
A. Well, this isn't reporting that it's on time or not. It's just reporting closed, so we don't know if it was derogatory or past due. They're just reporting 01:42PM closed, not reporting any late payments.
So you'd have to ask Dell what the actual -- you know, if it was late or not. They're just telling us to report it as closed and no history, and then in May of 2010, they tell us it's a charged off 01:42PM account.
They didn't give us any specific charge-off or late payment history prior -- in the months prior to that. They just told us to report it as closed. 01:43PM
Q. Are there any checks and balances in Experian's system to account for reporting that looks suspicious or is out of line with common industry practice?
MR. HALL: Objection, form. Vague. 01:43PM
A. I don't know. This to me is not out of line or there's no red flag here.
Q. And how long does it usually take for an account, in your experience, to reach a charge-off status? 01:43PM

Page 166

A. Well, it depends on what's going on between the consumer and their creditor. Typically it's usually four to six months, but like I said, sometimes accounts charge off sooner than that.
Q. And how would Experian figure out what the -- 01:43PM whether that reporting was accurate?
A. Well, we rely on the data furnishers to report accurate information to us, and if the consumer claims it's inaccurate, then we would ask the data furnisher to verify that. They are in the best position to know what 01:44PM is going on between them and the consumer.
Q. Is that also true when a consumer disputes information with Experian?
A. Is what also true?
Q. That the data furnisher is in the best 01:44PM position to know the answer.
A. Well, I think the data furnisher and the consumer are in the best position to know what's going on between the two of them.
Q. Is it Experian's policy if there is a 01:44PM fundamental disagreement between the information that a consumer thinks should be reported and the information the data furnisher thinks should be reported, Experian will side with the data furnisher?
MR. HALL: Objection, form. 01:44PM

Page 167

A. No, I don't think that's correct.
Q. Do you know if any Experian witnesses ever submitted a declaration stating that it's Experian's policy to that effect?
MR. HALL: Objection, form. Foundation. 01:44PM
A. I don't know that, no, sir.
Q. Do you know who Anna Simmons is?
A. Yes.
Q. Who is she?
A. She is a co-worker of mine. 01:45PM
Q. And what does she -- you said she's a co-worker. Does she also testify as a 30(b)(6) witness at Experian?
MR. HALL: Objection, scope.
A. Yes, sir. 01:45PM
Q. Do you know her as somebody who is knowledgeable in Experian's policies and procedures?
MR. HALL: Objection, scope and foundation.
A. Yes, sir. 01:45PM
Q. So you're not aware of whether Anna Simmons has submitted any declaration in a public filing in which she indicated that in the case of a disagreement between Experian and the data furnisher, Experian would side with the reporting of the data furnisher -- sorry, 01:45PM

Page 168

a consumer and the data furnisher?
MR. HALL: Objection, form. Scope.
A. No. I'm not aware of it, no.
Q. So it would surprise you if Experian had a policy where, all things being equal, the consumer says 01:45PM one thing and the data furnisher says another thing, that Experian would have a policy of saying that the data furnisher has probably got it right?
A. I think you'd have to look at every case -- you know, each item on a case-by-case basis. I mean, if 01:46PM you just say, "I wasn't late," and you don't -- and that's all you have to say, you don't have any relevant information or any proof to back it up, then, you know, we go to the data furnisher and they say, "No, we have a record of the payment on this date; he missed a payment 01:46PM on that date; his next payment came on this date; we've checked our records; we have verified it; we are certifying to you that we are reporting accurate information," that, to me, is not the same as just saying, "Well, you say one thing. You say the other. 01:46PM We're just going to go with what the data furnisher says." That's not really how it works.
Q. You're fighting my hypothetical here, Ms. Methvin.
A. Sorry. 01:46PM

Page 169

Q. My question was all things being equal, without recourse to circumstances which might tilt the question in favor of one or the other, what -- you know, we're talking about Experian's policies, and it's a categorical matter. 01:47PM

Would Experian have -- it wouldn't surprise you, as I understand it, you let me know if this is correct, that Experian has a policy that all things being equal, it's going to side with the data furnisher over the consumer if there is a disagreement 01:47PM on how a account should be reported?

MR. HALL: Objection, form. Foundation.

A. I don't know that it would surprise me. I don't know how you could say all things would be equal so... 01:47PM

Q. So you just -- it's not that it wouldn't surprise you, it's that you think it is impossible for things to be equal?

MR. HALL: Objection, misstates testimony. 01:47PM

A. I said I don't see how it could be, all things being equal.

Q. So if Ms. Simmons said something to that effect in a declaration, you would think that she would be wrong because things couldn't possibly be equal? 01:47PM

Page 170

MR. HALL: Objection, misstates testimony.

A. I'd have to look at the declaration and the circumstances surrounding what she said.

Q. Do you know if Ms. Simmons verified 01:47PM interrogatories in this case?

A. I think that she did. I'm pretty sure that I remember seeing that yesterday.

Q. Do you know if she helped respond to any other written discovery in this case? 01:48PM

MR. HALL: Objection.

To the extent that calls for work product, I will instruct you not to answer. If you have independent knowledge from interactions with Ms. Simmons, you can answer. 01:48PM

A. I don't have any independent knowledge about that.

Q. Are you withholding information from me based on following the instruction of your counsel?

A. I don't have -- no, sir. I'm not withholding 01:48PM anything. I don't know the answer.

Q. Okay. Has anyone at Experian ever told you that they think that Experian's internal notice policy violates the notice provisions in the Fair Credit Reporting Act? 01:49PM

Page 171

MR. HALL: Objection, scope. Foundation.

To the extent that asks you to reveal any communications with counsel, I instruct you not to answer; otherwise, you can answer.

A. Not that I remember, sir. 01:49PM

Q. And forgive me if I already asked you this, but do you know why Experian changed its interim bankruptcy payment history reporting policies?

MR. HALL: Objection, asked and answered.

A. No, sir. I just know what it changed to and 01:49PM the date that it was changed.

Q. So let me just round out that discussion, because we were talking about Chapter 13 and we got off on a little tangent, but I want to bring it back to the policy change in December of 2015 as it related to 01:50PM Chapter 7 interests.

So the policy changed to from the date of discharge to the date of petition for a bankruptcy reporting; is that correct?

A. Yes, sir. That's the date -- well, that 01:50PM policy was -- the policy change was that when an agent is internally updating accounts to show it included in bankruptcy per our policy, to use the petition date rather than the discharge date.

Q. And that had the consequence of suppressing 01:50PM

Page 172

more payment history than before, correct, if there was any reported?

A. Yes, sir.

Q. So is it fair to say that really Experian only changed one policy as it relates to Chapter 7s in 2015, 01:51PM which is that it moved the suppression date back in time because the suppression policy for post reporting would be the same in either case; is that correct?

A. Yes, I think that's correct.

Q. And then for Chapter 13s, there were really 01:51PM two policy changes, right? There was the policy change about the date that it would be -- that the inclusion would be reported, but also there was a change related to the actual reporting of the interim payment history; is that correct? 01:51PM

A. I believe so, yes, sir.

Q. Do you know why Experian would have changed its policy for Chapter 7 but not Chapter 13 -- sorry. I got that wrong.

Do you know why Experian would change its 01:51PM policy as it relates to Chapter 13 but not Chapter 7?

MR. HALL: Objection, form and foundation.

A. Well, the policy was across the board as far as changing the date that we used. The policy was to 01:52PM

Page 173

change to using the petition date instead of the discharge date when we updated accounts, and that was for both Chapter 7 and Chapter 13.
Q. But then there was an additional change for Chapter 13 as it related to the interim reporting, 01:52PM right?
A. As I understand it, yes, sir, that's right.
Q. Do you know why Experian made the change for 13 as it related to the interim reporting but to not do so for Chapter 7? 01:52PM
MR. HALL: Objection, asked and answered.
A. I don't know why, no, sir.
Q. Is there anyone in Experian who would?
A. Maybe someone in our legal department.
Q. Anyone else? 01:52PM
A. I don't know.
Q. If you would look further on the exhibit that contains Mr. Cardinali's dispute letter, can you identify after the dispute correspondence the other documents that appear there? 01:53PM
A. Yes, sir.
Q. Thank you.
A. So just to be clear, Experian -- I mean 30(b)(6) Depo 32 through 56 is all of Mr. Cardinali's mail correspondence, but there is a disclosure in there, 01:54PM



but that's actually part of his mail correspondence
Q Thank you
A Does that make sense?
Q Yes
A Okay And then it looks like 57 -- 57 through 01:54PM 76 are correction summaries One is letting Mr Cardinali know that we added a consumer statement to the items that he wanted a statement added to, and then the other one was notifying him that we had updated his account to include it in bankruptcy 01:55PM
So there are two, but they were sent on the same day
Q Are there different report numbers that are associated with those two documents?
A Yes, sir, there are 01:55PM
Q What's the date they were sent?
A They were both sent to Mr Cardinali on October 19th, 2015 And then Depo 77 through 90 is a copy of a consumer disclosure for Mr Cardinali dated December 12th, 2016 01:55PM
And then the next one is -- Depo 91 through 106 appears to be a disclosure for Mr Cardinali dated January 16th, 2018
Q Thank you So let's look at the two reinvestigation documents you mentioned on October 19th, 01:56PM



2015. And so would those -- I'll wait until you're...
A. Okay.
Q. So with those two documents, what I'd like you to do is turn over to the first page on each document. Let's look at the second page on each one. 01:56PM
A. Okay.
Q. Do you see -- do both documents on the right -- upper right-hand side say "Dispute Results" -- or upper left-hand side?
A. Yes, sir. 01:57PM
Q. And what's the first sentence of each -- each -- what's the first sentence of each line directly below that statement that says "Dispute Results"?
A. "This summary shows the revisions made to your credit file as a result of our processing of your 01:57PM dispute."
Q. Thank you.
And then there are three columns, and the third column appears to have a list of results. Do you see that? 01:57PM
A. Yes, sir.
Q. And are the same furnishers listed on each one of those results?
A. No.
Q. How many are in the first -- and just so we're 01:57PM



clear on which document it is, the first reinvestigation document, what's the report number?
A. It ends in 9166.
Q. How about the second one?
A. It ends in 2819. 01:57PM
Q. Can we refer to those as the 91 -- what was it?
A. 66.
Q. 9166 and --
A. 2819. 01:58PM
Q. Can we refer to that as the names of those so we don't get confused?
A. Sure.
Q. Thank you.
So the 9166 document, how many different 01:58PM furnishers is Experian updating?
A. Three.
Q. And in the second document, whose numbers I have forgotten, how many is Experian updating?
A. Seven. 01:58PM
Q. And so is it -- why would Experian update three in one of these documents and seven in the other?
A. Well, if you go back and look at Exhibit 4, which is Mr. Cardinali's dispute, he's specifically disputing three accounts, and part of his request in 01:58PM

those three accounts is that we add a statement to his credit file

And so if you look at 9166, that is the result of us adding those statements to those three accounts that he specifically asked a statement to be 01:59PM added to And that's all this is This is confirming to Mr Cardinali that we added that consumer statement to those three accounts

Q Now, does a consumer statement -- do the consumer statements that Experian added, do they show up 01:59PM on the other reinvestigation that Experian sent to him?

A No, because the agent did this first The agent updated all the accounts to show it included in bankruptcy, waited until that process had been completed So once that process had been completed, 01:59PM this was sent out to him, obviously not that second, but it was ready to go out to him that day

After that process was completed, then we added the statement so that he could see that the statement was added, and then that went out to him 01:59PM

Q Is that Experian's customary practice on how to add a statement of dispute, is to make all the updates the consumer requests and then add statements to the consumer with any subsequent piece of correspondence? 02:00PM



MR. HALL: Objection, scope. Form.

A. Well, first of all, it's pretty rare that we add a statement at the same time we do -- that we do any type of update. So typically what happens is if a consumer asks that a statement be added to his credit 02:00PM file, and the item has never been disputed before, and we have to send an ACDV out, what we would do is send the ACDV out and then send the consumer a letter that says, "Hey, we know you want to add a statement, but before we add the statement, let us get this item 02:00PM investigated for you. Once you get the results, if you're not happy, contact us again and we will add the statement."

That's what usually happens. Or the consumer is aware of everything, and it's already been 02:00PM investigated, and he says, "Well, I want to add my side of the story."

So then we'll just add the statement. It's extremely rare that we would do two things at one time. And as I was explaining to you earlier, we can't 02:00PM do two internal reason things -- internal reason codes at one time.

So in a situation like this, what this agent did was a two-step process because we can't do two things at once. So we can't say add a statement and 02:01PM



update the account. So he updated the accounts. He held on to the consumer's piece of mail for period of time, same day. You know, he just put it to the side.

Once that cycle completed and the update was ready, the agent was able to go back in and then add 02:01PM the statement.

Q. Is the process of adding a statement of dispute that you described -- you mentioned the ACDVs. Is the process of adding a statement of dispute to a trade line different in any respect in circumstances 02:01PM where Experian internally updates each item and does not send an ACDV?

A. Well, no. The process isn't really different, but if you think about -- I can only think about if we're internally updating or deleting something using 02:02PM Experian's policy. For example, if a consumer says this is paid, and they give us proof, and so we internally update it, well, why would you want to add a statement of dispute to the item if we just did what you asked us to do? 02:02PM

I have never really seen somebody say, "Here, correct this or update this like I want it, and also, by the way, I want a statement."

I guess it would be the same though if that's -- or if we deleted something per policy, there 02:02PM



wouldn't be anything for us to add a statement to, unless you wanted a general statement. But if something was deleted, I don't know why a consumer would say, "Add a statement about it that it was here," you know. The policy would be the same though. We'd have to do it as 02:02PM a two-step process.

Q. Is Experian's reinvestigation of consumer credit information able to extend to conduct an independent review with respect to each account being reported? 02:03PM

MR. HALL: Objection, form.

A. Can you ask me that again?

Q. Sure. Is Experian's reinvestigation of -- I'll just say consumer credit information -- able to extend to conducting an independent review with respect 02:03PM to each account being reported?

A. Yes.

Q. Let's look at some of the language on some of these reinvestigations. And before I do so, for simplicity's sake, Ms. Methvin, would you agree with me 02:04PM that other than the addition of the statement of disputes, that otherwise the format and substance of these two documents is the same?

A. Well, they're a little bit different. I don't really know what you mean -- I mean, they're both 02:05PM

investigation summaries or correction summaries. But they are different, because over here all we did was add a statement and we told Mr. Cardinali we added a statement. And then over here we made some updates. So they do look a little bit different. 02:05PM

Q. Aside from the names of the furnishers who appear on the dispute result section, is Page 2 of these two documents the same?

A. Yes, except for obviously the report number is different, but you know that. 02:05PM

Q. Sure. So what does the phrase dispute results mean?

A. It means that, you know, whatever the consumer concerns were, issues were, our response to their request is here are the results of that request. 02:05PM

Q. And does dispute have any meaning different as used in the first sentence below dispute results?

A. No.

Q. On the other side on the third column it says, "We have completed the processing of your disputes." 02:06PM

Do you see that?

A. Yes, sir.

Q. Does the word disputes as used there, aside from the fact that it's in plural with the parenthesis, have any different meaning than the way that word was 02:06PM

Page 182

used in the first column?

A. No.

Q. And on the trade line where that -- I'm sorry, where the reinvestigation did not pertain to the additional statements of disputes, do you see there's an 02:07PM account for WebBank among the dispute results?

A. Yes.

Q. And it says "updated"?

A. Yes, sir.

Q. And what does updated mean there? 02:07PM

A. It just means that the account itself, some elements of the trade line were updated.

Q. Does anywhere on that reinvestigation, does it -- and you can look at the whole document if you want -- does Experian state that it made an internal 02:07PM update to the account?

A. No, sir.

Q. Anywhere other than on that document does it indicate that it sent an ACDV to the data furnisher?

A. No, sir. 02:07PM

Q. And does Experian explain anywhere on the reinvestigation that it might use an internal update in connection with an account that is marked updated?

A. No, sir.

Q. How about for deleted? 02:08PM

Page 183

A. No, sir.

Q. What about processed?

A. No, sir.

Q. And what about remains?

A. No, sir. 02:08PM

Q. Does Experian specify anywhere in this reinvestigation which furnishers it actually contacted?

A. No, sir.

Q. Does it specify which furnishers it did not send an ACDV to? 02:08PM

A. No.

Q. Does it specify which furnishers it sent a DRN to?

A. Well, we send a DRN every time, so it doesn't say that we did, but we did. 02:08PM

Q. Would you agree with me that Experian has an obligation to notify a data furnisher who a consumer identifies as having an item of information in dispute?

A. Yes.

Q. Are there circumstances in which Experian 02:09PM would use the term deleted to refer to the results of a dispute in which it sent an ACDV?

A. Yes.

Q. How about for remains?

A. Well, we would only send remains if an ACDV 02:09PM

Page 184

was sent.

Q. What about updated?

A. It could be internal or ACDV.

Q. What about processed?

A. That would be as an ACDV. 02:09PM

Q. Would deleted be for internal or ACDV?

A. Yes, sir.

Q. And processed would have to be an ACDV?

A. Yes, sir.

Q. Why is that? What does processed mean? 02:09PM

A. Well, processed happens when an ACDV is sent out and while the ACDV is out there is a key change to the data such that when the ACDV comes back, it's unable to update. It could be that the item has been deleted, so even though the request is for us to update, the item 02:10PM is deleted.

So what will happen is on the consumer's results, it will just say, "Processed. Look at your report for the outcome." So they can see it's been deleted, because it wasn't actually deleted as a result 02:10PM of the ACDV. It was deleted sometime in the interim because of the timing.

So it's pretty rare that you see the word processed, but that's what happens whenever you see that. 02:10PM

Page 185

Q. And by the time that -- when Experian says under "Results," "We have completed the process of your dispute," does that indicate that Mr. Cardinali's reinvestigation is complete aside from the transmission of the results? 02:11PM
A. Yes, sir.
Q. Let's look at the middle column.
A. Okay.
Q. I want to direct you there. There are a few dashes with some paragraphs set off there. I want to 02:11PM direct your attention to the third dash which begins, "Requests that we send these results." Do you see where I'm looking?
A. Yes, sir.
Q. Now, as I read that, it says this is something 02:11PM that the consumer can request to have done, to have their results sent to organizations that are specifically designated?
A. Yes.
Q. And as used in this sentence, what does these 02:11PM results mean?
A. It means the results that these items were -- the results of these specific accounts or these results for this dispute.
Q. So by these results, do you mean Experian's 02:12PM

Page 186

reinvestigation?
A. For this case, yes, sir.
Q. Would that be the entire CDF?
A. I believe it would be the same type of information that was sent to the consumer. So if an 02:12PM abbreviated CDF was sent to the consumer, then an abbreviated CDF would be sent to whoever they designate. Or if we send a full disclosure, it would be a full disclosure. I'm pretty sure that's how that works.
Q. And this reinvestigation, is this a full 02:12PM disclosure to Mr. Cardinali?
A. I believe that it is. Without looking -- I can look at the DR log and tell you. Give me a second.
Q. I believe that is Exhibit 2.
A. Yes, it was. 02:13PM
Q. So the whole CDF and the dispute results would be sent to the person who --
A. That he would designate, as long as there's someone who reviewed his credit report, I guess, in the last two years for employment purposes or the last six 02:13PM months, or 12 months for certain states.
Q. For employment purposes, right?
A. Two years for employment purposes or six months for other purposes, yes, sir.
MR. CLARK: Do you guys want to take a 02:14PM

Page 187

break?
MR. HALL: Sure.
(Recess.)
Q. All right. Ms. Methvin, just to clarify, would it be -- is it Experian's policy in a circumstance 02:27PM where it receives a dispute that accounts included in bankruptcy where the account was open before the bankruptcy and Experian can verify that the account was -- that the bankruptcy is on file, is it Experian's policy not to send an ACDV to the data furnisher in that 02:28PM circumstance?
A. Well, it depends on what the consumer's dispute is. If the consumer says something to the effect like, "This was included in my bankruptcy, and you have the open date wrong," or, "This was included in 02:28PM my bankruptcy, and also it was never late."
So if there are other elements of the trade that need to be verified, then we need to send an ACDV. But if the dispute was simply, "This was in my bankruptcy," and we can update it to show it included in 02:28PM bankruptcy without notifying the data furnisher, we would.
But like I said, it depends on what the consumer is saying.
Q. And we would see an indication on Experian's 02:28PM

Page 188

choice on whether to send an ACDV or a DRN on the DR log, right?
A. Yes, sir. You can see what the agent did by looking in the DR log.
Q. We were talking before about the 02:29PM reinvestigation document and the potential that that document could be sent to people of Mr. Cardinali's choosing, correct?
A. Well, anybody that people -- entities of his choosing that had looked at his credit report, yes, sir. 02:29PM
Q. So this information on the CDF could be sent to a third party?
A. If he asked us to, yes, sir.
Q. You can set that aside -- or actually I spoke too soon. I'm sorry. 02:30PM
Should a consumer's correspondence be attached to the DRN?
MR. HALL: Objection, form.
A. Well, if the information that's in the correspondence is used to make the internal change. So, 02:30PM for example, if the consumer gave us a copy of a canceled check and we used that to make the update, then we would attach the correspondence to the DRN.
Q. In this case, did Experian use Mr. Cardinali's correspondence to determine what type of dispute 02:31PM

Page 189

Mr. Cardinali had sent?
A. Well, we used it to determine what his dispute was, but we didn't use it to make the update. Like we didn't need any of the documents as far as like the bankruptcy papers. We just used our internal policy and 02:31PM updated it.
Q. Did Experian need Mr. Cardinali's dispute letter?
A. Well, we needed his dispute letter to know what his request was. 02:31PM
Q. Did Experian attach that dispute letter to the DRN it sent to WebBank?
A. No, sir.
Q. Why not?
A. Because we didn't use the actual documents to 02:31PM make the change. It wasn't like -- he didn't give us a copy of -- well, we didn't need a copy of his bankruptcy schedule with that account on it because we have an internal policy that allows us to update it based on what's on his file. 02:31PM
But if we had used a document for proof, like I said, a canceled check or something like that, we would have attached it, but in this case we did not.
Q. Isn't Mr. Cardinali's dispute letter proof that he's disputing in a certain manner? 02:32PM



MR. HALL: Objection, form.
A. Well, his dispute letter is evidence that he's disputing in a certain way, yes, sir.
Q. I want to take you back to the -- let's actually go to the WebBank trade line as it was 02:32PM reinvestigated by Experian.
A. Okay.
Q. That's going to be -- it's on the October 19th, 2015 report.
A. Which one? There's two of them. 02:32PM
Q. There. I want to direct you to the one -- not the one that indicates there's a statement of dispute.
A. Okay.
Q. I believe you'll find the relevant page on -- I think it's going to be 60. 02:33PM
A. Okay.
Q. Let me be sure about that. Yes. So can you tell me what updates Experian made to Mr. Cardinali's dispute as a result of receiving this correspondence?
A. It looks like the update that was made was 02:33PM that this was included in a Chapter 7 bankruptcy, discharged on April 30th, 2012, and that the most recent balance was reported in August of 2015, which was zero.
Q. Let's go to the December 12th, 2016 document you had identified before. It begins on Page 77. 02:34PM



A. Okay.
Q. Ms. Methvin, is this a CDI or a CDF?
A. It's a CDI.
Q. And how about the January 2018 document, is that a CDI or a CDF? 02:34PM
A. It's a CDI or a consumer disclosure.
Q. So they are both the same kind of document, right?
A. Yes, sir.
Q. I want to direct you to -- let's go to the 02:34PM December 12th, 2016 document, and I want to direct you to a list of inquiries.
A. Okay.
Q. Do you see a list of both hard and soft inquiries listed there? 02:34PM
A. Yes, sir.
Q. I just want to ask: Do you see the name Quality Acceptance, LLC on the list of inquiries that appear on Mr. Cardinali's December 12th, 2016 CDI?
A. No. 02:35PM
[redacted]



[redacted]





Veritext Legal Solutions
877-955-3855

[redacted]

Page 194

[redacted]

Q. And so this inquiry would not be disclosed to 02:41PM

Page 196

[redacted]

Page 195

Mr. Cardinali in the CDI?
A. That's correct.
Q. Is there a reason why not?
A. Yes.
Q. And what is that reason? 02:41PM
A. Because this type of inquiry doesn't fall under the FCRA. It falls under the Gramm–Leach–Bliley Act. The type of information that's delivered to the person doing the inquiry is what we call above-the-line data, which is there's no credit information. 02:41PM
Q. Do you know whether or not -- what's your definition of credit information?
A. Information that is related to credit transactions such as trade line information.
Q. Do you know if the address search inquiry is 02:41PM used in skip tracing?
A. I believe that it is. I don't work in the collections business, I'm not sure, but I believe that it is, yes, sir.
Q. And is skip tracing something that -- you said 02:41PM it's something handled by collections?
A. I believe the collections department uses skip tracing, yes, sir.
Q. What's your understanding of collections and how that works? 02:42PM

Page 197

MR. HALL: Objection, scope.
A. I really don't -- I don't have a lot of knowledge about collections and how it works.
Q. Is it something that debt collectors use?
A. Yes. 02:42PM
Q. And debt collectors would be trying to collect on something that they believe a certain individual owes, right?
MR. HALL: Objection, scope. Foundation.
A. They might be. They might just be trying to 02:42PM located an individual to help them locate another individual. I don't know.
Q. But you would expect them to take those steps in connection with collection on an account, right?
A. Possibly, yes, sir. 02:42PM
Q. To be fair, if I wanted to get somebody's consumer file at Experian, I would need to give Experian a reason why, right?
A. Yes, sir.
Q. I couldn't just call up Experian right now and 02:42PM say, hey, I'd like Mr. Badwan's credit information because I'm just interested in it, right?
A. No, you couldn't do that.
Q. And so what -- what kind of third parties can access a consumer's information for purposes of 02:43PM

Page 198

collections?
MR. HALL: Objection, scope. Foundation.
A. Well, it would be an entity that has been onboarded and has subscribed to do business with Experian, who has certified that that is one of their 02:43PM inquiry purpose types.
Q. Does the location of a consumer ever have an impact on what kind of credit actions they can obtain?
MR. HALL: Objection, scope. Foundation.
A. I don't know. 02:43PM
Q. Do you think that where a consumer lives in terms of -- for example, if they live in a high-risk area where there's a lot of crime, do you think that could affect their insurance rate?
MR. HALL: Objection, scope. Foundation. 02:44PM
A. I don't know. I don't work in the insurance business. I don't know.
Q. Well, do you have a car, Ms. Methvin?
A. I have a truck.
Q. It's Texas. Are you familiar -- do you have 02:44PM insurance on your truck?
A. Yes.
Q. And in your experience, does insurance on your truck vary depending on your driving habits and where you live? 02:44PM

Page 199

MR. HALL: Objection, scope and foundation.
A. I don't know if it varies where I live. I don't know that. I know it does matter about my driving habits, but I don't know if it matters about where I 02:44PM live.
Q. You're not sure whether or not you might pay more money for insurance if you lived in an urban environment as opposed to a rural environment?
MR. HALL: Same objections. 02:44PM
A. I don't know, sir.
Q. Let me ask you this. Are you aware that in certain parts of Louisiana you can't get flood insurance?
MR. HALL: Objection, scope and 02:45PM foundation.
A. Am I aware of that, no, but it doesn't surprise me.
Q. Why not?
A. Because I would imagine that if someone lives 02:45PM in an area that's known to flood, an insurance company may not be willing to insure them, or that has flooded in the past. I don't really know, but it doesn't surprise me that that might happen.
Q. And so is a consumer report something that can 02:45PM

Page 200

be provided for purposes of -- to a potential insurer as opposed to a potential creditor?
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion.
A. Yes. 02:45PM
Q. And if where you lived depended on what kind of insurance you can get, wouldn't you say that could be a factor in a credit decision?
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion. 02:46PM
A. Well, I don't know if an insurance company would be allowed to use just an address search to make any type of lending decision or insurance decision. I don't know if that's possible.
Q. But would it be fair to say that an insurer 02:46PM might use a consumer's address to determine, in part, whether they would be willing to provide that consumer with a particular insurance product?
MR. HALL: Same objections.
A. I don't know. I mean, I don't know if they 02:46PM should use an address search to do that, make that decision.
Q. Are you aware that there are certain jobs for which there's a residential requirement in terms of where you have to live? 02:46PM

Page 201

MR. HALL: Same objection.
A. No.
Q. So you're not aware that for certain types of public service jobs you need to actually reside in the county or city or state in which you're working? 02:46PM
A. No, I didn't know that.
Q. If there was such a requirement, then wouldn't the address of the consumer be a relevant factor in considering whether a potential employer would grant employment to that consumer? 02:47PM
MR. HALL: Same objections.
A. It may be, but, again, I don't know that they would be allowed to use that type of information to make their decision. I mean, they may still be able to do an address search, but they may not be allowed to use the 02:47PM information they found to make an employment decision or a lending decision.
Q. I guess what I'm trying to get at is: You said that the information in the address search is all above-the-line information. Did I hear you correctly? 02:47PM
A. Yes, sir.
Q. And by above the line do you mean -- what is actually contained on an address search?
MR. HALL: Objection, scope. Foundation.
A. Well, without having one directly in front of 02:47PM



me, I'm just going by memory here. It would be names of individuals that reside at that address, that are associated with that address or receive mail at that address.
I think there might be a phone number if 02:48PM available. It's demographic information. There is no credit information.
Q. And the names of the individuals might be people other than Mr. Cardinali residing at that address, correct? 02:48PM
A. It would be anyone that is associated with that address or has received mail at that address.
Q. I guess if -- when you say that the information is not credit information, based on the circumstances that we just described, insurance and 02:48PM employment, if it is true that where you live can determine what insurance you get or where you live can determine what jobs you get, is it really fair to say that that information, the above-the-line information, is not credit information? 02:48PM
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion.
A. I don't believe it is credit information. Again, I'm not an attorney, but to me, someone's name or address really doesn't have any implications about their 02:48PM



creditworthiness.
Q. And when you say I don't believe it, are you saying that Experian doesn't believe it or that you don't personally?
A. Well, that information is not credit 02:49PM information as Experian understands it.
Q. So Experian would understand that name and address information is not credit information?
MR. HALL: Objection, scope. Foundation.
A. It's demographic information. It's not 02:49PM information that would have anything to do with the consumer's creditworthiness. Your name -- just simply your name or your address would not indicate whether you're a good credit risk or not.
Q. Is File One Experian's consumer credit 02:49PM reporting database?
A. Yes.
Q. Does File One contain the information that is populated on an address search?
A. Yes. 02:50PM
Q. And so if Quality Acceptance had made the inquiry that it made and is as reflected on the admin report, would it have obtained that information from File One?
A. Yes. 02:50PM



Q. And File One is the same place where consumer disclosures are generated, correct?
A. Yes.
Q. You had mentioned the Gramm–Leach–Bliley Act a moment ago. What's your understanding of that act? 02:50PM
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion.
A. I don't have intimate knowledge of the act. I just know that some of -- some types of inquiries don't fall under the FCRA, but they do fall under the 02:50PM Gramm–Leach–Bliley Act, which is not FCRA mandated, and that type of inquiry does not require the data furnisher to list a permissible purpose.
Q. Does the Gramm–Leach–Bliley Act cover collection companies? 02:51PM
MR. HALL: Same objections.
A. I don't know.
Q. Does it cover insurance companies?
MR. HALL: Same objections.
A. I don't know. 02:51PM
Q. Does it cover potential employers?
MR. HALL: Same objections.
A. I don't know.
Q. Does it cover potential creditors?
MR. HALL: Same objections. 02:51PM

A. I don't know.
Q. And so I appreciate that you're not intimately familiar with the Gramm–Leach–Bliley Act, but could you kind of tell me what your understanding of that act is and why you believe that this PPN code falls inside of 02:51PM it?
MR. HALL: Same objections.
A. No. I know that there is a specific designation for the address search because it doesn't return credit data, so it's not a type of inquiry that 02:51PM is displayed to the consumer.
Q. And that data is the name, address and potentially a phone number and a list of all other people associated with that address?
A. Yes, sir. That's what I remember looking at. 02:52PM
Q. Do you know if there is anything in that address search that's displayed?
A. Not without looking at an example.
Q. And I'll represent to you that I was curious about this, and I tried to look online for an example of 02:52PM an address search pull. Experian has several examples of its credit products, which are helpful to see what is being reported, but I couldn't find one example of the address search. Maybe I wasn't looking in the right place. 02:52PM

Page 206

But do you know whether or not Experian has a publicly available sample report and what that report would look like?
MR. HALL: Objection, scope.
A. Yes. 02:52PM
Q. Does it?
A. Yes.
Q. Do you know where that is located?
A. Well, I looked it up myself online.
Q. Well, great. Can you tell me where you looked 02:52PM and maybe you can help me out, because you know Experian better than I do?
A. I did an Experian product sheet address search.
[redacted]

Page 207

[redacted]

Page 208

[redacted]
Q. Do you recall the name of the website you were on to see what that sample looked like?
A. No. I just Googled those words, and a PDF came up and I printed it out.
Q. Okay. What were the words again? 02:55PM
A. I believe it was -- I believe it was product information sheet and Experian address search.
Q. Thank you.
I just want to ask you in terms of the January 16 -- well, you know -- hang on a second. So 02:56PM there are a few other listings in the admin handbook that say nonpermissible purpose in connection with the pulls, are there not?
A. Yes, sir.
[redacted]

Page 209

[redacted]



[redacted]

Q. Thank you. You can set this exhibit aside.
A. I need just a minute.
Q. Sure.
(Exhibit 8 marked.) 03:01PM



Q. So, Ms. Methvin, I have handed you what I have had marked as Exhibit 8. There are several documents contained in it, but if you can take a moment to look through that and let me know if you recognize those documents. If I've done this right, there are three of 03:02PM them.
A. Okay.
Q. And I can give you page ranges.
A. Okay.
Q. The first page range that I hope is there is 03:02PM 131 to 234.
A. Yes, sir.
Q. And the second page range is 245 to 320.
A. That's all there is here.
Q. Okay. Then I have done something wrong. You 03:02PM can just keep on. I'll do the next one.
A. Okay.
Q. So, Ms. Methvin, have you had a chance to look through Exhibit 8?
A. Yes, sir. 03:03PM
Q. And do you recognize the documents that are contained therein?
A. Yes, sir.
Q. And what are they?
A. These are participant guides for disputes. It 03:03PM



looks like they are relevant to the time period.
Q. And which dispute manuals are present in Exhibit 8?
A. It looks like there is a "Dispute: Trade," and then there is also "Dispute: Additional 03:03PM Information."
Q. Are these Experian's policies and procedures for handling aspects of its reinvestigation?
A. Some of them, yes, sir.
Q. And in the trades manual, does that manual 03:03PM include the bankruptcy inclusion policy we've been talking about?
A. Yes, sir, it does.
Q. And which pages of this manual is that located on? 03:04PM
A. The table of contents says it's on Page 25. It looks like the bankruptcy-related disputes starts on 25 and goes through 168.
Q. Okay. Having had a chance to review that bankruptcy policy, is that bankruptcy policy -- if you 03:04PM want to take another minute?
A. Can I just clarify, because I said it started on Page 25 and goes through 168, but it actually starts on Depo 156 and goes to 168?
Q. Sure. No worries. Having had an opportunity 03:05PM

to look through -- and feel free to do so again if you wish -- the bankruptcy policies on the pages you just identified, does that policy reflect the testimony you gave earlier today on Experian's bankruptcy policy?

A. Yes, sir. 03:06PM

[redacted]

Page 214

[redacted]

Page 215

[redacted]

Page 216

[redacted]

Page 217

[redacted]

Page 218

[redacted]

Q I'll direct you to Page 184 03:17PM

Page 220

[redacted]

Page 219

A. Okay. I don't -- my document goes from 183 to 200. You said 184?

Q. 184, yes, ma'am. It should be a part of the trades manual.

MR. HALL: My copy has it. 03:18PM

THE WITNESS: Well, maybe I messed up.

Q. Is it behind that maybe?

A. No, sir. It's just not here.

MR. HALL: Where do you stop?

THE WITNESS: Well, I go to 183, and it 03:18PM goes from 183 to 200.

Q. Let me see. Maybe I made a mistake here.

MR. HALL: The copy you handed me has it. Do you want to swap in these pages, or we can mark it as a separate exhibit if you want. 03:18PM

MR. CLARK: If you want to stipulate to putting them in.

MR. HALL: Yes, and I have the produced version.

MR. CLARK: Thank you, Chris. I 03:19PM appreciate that.

A. I don't see it anywhere. I don't think it's here.

Q. My apologies. I'll have words with Office Max when I get there. 03:19PM

Page 221

A So, Mr Clark, I'll just let you know You gave me 184 -- I don't need 200 -- 184 through 199, so it should make it complete now

MR HALL: If you want to inspect it, I'm pretty sure I didn't mark them up or anything 03:19PM

MR CLARK: I trust you

A Okay And you said go to Page 184?

Q Yes, ma'am

A Okay I'm there now

[redacted]

Page 222

[redacted]

Q. Is it Experian's position that a debtor who discharges their debts in a bankruptcy proceeding has not paid them?

MR. HALL: Objection, calls for a legal conclusion. 03:20PM

A. We don't have a position on that. Our position is, is that there is no balance.

Q. If there is no balance, and there was a balance before for whatever reason, has that balance been paid? 03:21PM

A. Not necessarily.

Q. If a debtor performs all the obligations in accordance with their Chapter 13 plan -- sorry, their bankruptcy and obeys the court's orders and obtains a discharge, it's Experian's position that they have not 03:21PM paid what they owed?

MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion.

A. It's our position there is no balance. It doesn't say paid. It doesn't say unpaid. It just says 03:21PM

Page 223

no balance.

Q. Did Mr. Cardinali owe any more money to WebBank after the discharge?

MR. HALL: Objection, scope. Foundation.

A. I don't know. What was reporting was no 03:21PM balance.

Q. Did Mr. Cardinali owe any money to WebBank before the bankruptcy was filed?

MR. HALL: Objection, scope. Foundation.

A. I don't know. I'd have to look at what his 03:21PM report looked like before January of 2012, and I don't know that -- did he have a report before then? We could look at it, but I don't know.

Q. We have a long admin. Would that be of any assistance to you in determining whether or not there 03:22PM was a balance being reported prior to his bankruptcy?

A. No, sir. The long admin report -- the current balance on the day the admin was generated, and that admin wouldn't have been generated until after litigation. It would just show that it was a 03:22PM charge-off.

Q. That would be true of the long admin as well?

A. Yes, sir.

Q. Does the long admin reflect all updates to an account that remain? 03:22PM

Page 224

A. I don't know.

Q. Is there a field in either the admin or the long admin that indicates when Mr. Cardinali's account achieved the status of having a zero balance?

A. No. 03:23PM

Q. Is there any field in the long admin which would indicate when an account went into a paid status?

A. If there was paid on the trade line, and this item doesn't have paid on it. But, yes, sir, if the paid indicator was placed on the trade line, yes, we 03:23PM could see that.

Q. And the paid indicator, would that show up as an account status in the account?

A. It would show up in the payment history, yes, sir. 03:23PM

Q. What's -- do you know -- actually take out the long admin. I just want to check something on it. It's Exhibit 6, I believe. Sorry, was it Exhibit 7? It's Exhibit 7, my apologies.

A. 7? 03:24PM

Q. Yes.

A. There it is. Okay.

Q. Can you take a look and see if you can identify Mr. Cardinali's WebBank trade line?

A. Yes. 03:24PM

Page 225

[redacted]

Page 226

[redacted]

Page 227

[redacted]

Page 228

[redacted]

Page 229

[redacted]

Q. Is there a list of internal reason codes somewhere in Experian's files?

A. Yes.

Q. And do you know any document on which that is maintained? 03:36PM

A. I know that it's -- I know that I have seen it. I don't know where it's maintained, but I'm sure it's something that I could probably retrieve.

MR. HALL: Could we go off the record for a second? 03:37PM

MR. CLARK: Sure.

(Discussion off the record.)

Q. Ms. Methvin, does the ACDV manual have a list of internal dispute reasons? 03:37PM

A. It does. It does on Page 506. Before I referred to 523, and that's as it relates to the actual ACDV in e-OSCAR, but the actual codes in CAPS that agents use is listed on 506.

Q. Would the codes in those two sections of the 03:38PM

Page 230

manual that you described, would they coincide with one another? The code for e-OSCAR would match up with one that we see in Experian's internal CAPS record?

MR. HALL: Objection, foundation.

[redacted]

Page 231

[redacted]

Page 232

[redacted]

Page 233

[redacted]

Page 234

[redacted]

Page 235

[redacted]

Page 236

[redacted]

Page 237

[redacted]



[redacted]
Q Thank you
(Exhibit 10 marked )
Q So please take a look at Exhibit 9 and let me 03:53PM know when you have had a chance to do so 10, sorry
A Okay
Q Is Experian listed as -- oh, sorry Are you familiar with this document?
A I saw it yesterday Before that, no 03:53PM
Q You had never seen it before yesterday?
A I wouldn't say that I've never seen it I don't remember seeing it before, so it's possible that I have seen it, but I don't remember
Q Having had a chance to look at it today and, I 03:53PM suppose, yesterday, do you have any idea what it is?
A It looks to me like it's a guide that assists data furnishers on how to use e-OSCAR and how they respond and update on ACDVs and how they respond and review updated notifications and how to create AUDs and 03:54PM



things like that.
Q. Is this a document that Experian co-authored?
MR. HALL: Objection, scope. Foundation.
A. I don't know. It says at the bottom it's confidential and proprietary information of Equifax, 03:54PM Experian, Innovis, TransUnion and OLDE. I'm not sure what they were doing.
Q. But is it fair to say that Experian owns this document, in part, because it is listed as one of the -- or owns some of the content of this document because the 03:54PM information is confidential and proprietary information?
MR. HALL: Objection, scope. Foundation. Calls for a legal conclusion.
A. I don't know.
Q. Is there someone at Experian who would know? 03:54PM
A. I don't know.
Q. Let me take you to Page -- at the very back of this document, there is a form, what looks like a form.
A. Okay.
Q. Do you see that's the last three pages? 03:55PM
A. Okay.
Q. The last four, but the last three appear to be a form, do they not?
A. Yes, sir.
Q. Are the last three pages of Exhibit 10 a 03:55PM



sample DRN?
A. Yes, sir.
Q. And the page directly before that says, "Dispute/Response Notification," right?
A. Yes, sir. 03:55PM
Q. And does it say anywhere in there -- I note under the first diamond it says, "No action is required in e-OSCAR on the part of the data furnisher after he/she has reviewed the DR notification."
Do you see that? 03:56PM
A. Yes.
Q. So what do you take that to mean?
A. I take that to mean that there's no action required of the data furnisher in e-OSCAR, that the notification is provided to them for their information. 03:56PM
Q. So having had a chance to review this -- and I understand you just saw this document for the first time yesterday -- does this improve your understanding as to whether or not a DRN is a two-way communication or not?
A. Well, again, I don't believe they're required 03:56PM to respond, so is it a two-way communication? I don't know as far as can they respond. It just says they are not required to. There is no action necessary. I think my answer is the same as it was earlier today when I testified -- he wants to talk to you. 03:57PM

Q Well, you're the witness, Ms Methvin, so --
A It's very distracting
MR BADWAN: I didn't say a word I was looking at you I'm entitled to look at you
Q It's been a long day, and I appreciate your 03:57PM testimony, Ms Methvin If you weren't done with your answer, if you would continue, that would be great
A Sure So when I testified a couple of years ago, I think I was asked the question is it a two-way communication, and I said no You asked me something 03:57PM similar to that today, and I said I don't know
I don't believe that -- well, according to this document, I don't believe that the data furnisher is required to respond to the data notification or DRN, the dispute/response notification 03:57PM I don't know if they have the ability to do it They have the ability to do the two-way communication, but I know it's not required
Q Ms Methvin, I believe you testified you have not reviewed that many DRNs during the course of your 03:58PM career at Experian
A Yes, sir, that's correct
Q Was the number -- is it more than 20, less than 20, more than 50, less than 50 if you were to estimate? 03:58PM

Page 242

A. I would say less than 20 is accurate.
Q. On the DRN form that we see on the last few pages of this exhibit, do you see any field here for which the data furnisher can actually respond?
A. No, sir. 03:58PM
Q. Now, you're more familiar with ACDV forms, correct?
A. Yes, sir.
Q. And does an ACDV form sent to a data furnisher provide fields for which the data furnisher can respond? 03:59PM
A. Yes, sir.
Q. You can set this exhibit aside. Thank you.
A. Okay.
Q. Do you want to take a brief break, or do you want to power through? 03:59PM
A. No. We can continue if you'd like.
MR. HALL: Let's go off the record for a second.
MR. CLARK: Sure.
(Discussion off the record.) 03:59PM
Q. Ms. Methvin, in a perfect world is it optimal for Experian to contact a data furnisher to notify them of the dispute and have a chance for the data furnisher to respond?
MR. HALL: Objection, scope. Calls for 04:02PM

Page 243

speculation.
A. Well, I think it depends on what you mean by optimal, because, you know, the data furnisher has 30 days to complete a reinvestigation or complete an investigation. So for a consumer, if we can solve their 04:02PM issues quicker by doing an internal update in just a matter of a couple of days, it might be more optimal, so I think it just depends on who you're asking.
Q. Does Experian have any procedures or policies that would allow it to determine whether the consumer 04:02PM wants the information to be acted on quicker than the 30-day period?
A. No.
Q. Did Mr. Cardinali in his dispute letter say anything about whether he wanted you -- sorry, Experian 04:02PM to complete its investigation as soon as possible as opposed to doing a thorough job and making sure they got it right?
A. Well, he didn't say that, but I don't know that doing it as soon as possible -- the two things are 04:02PM not necessarily opposite.
Q. Are you familiar with the concept of an express request?
A. Am I familiar with what?
Q. The concept of an express request. 04:03PM

Page 244

A. Yes, sir.
Q. And what is an express request?
MR. HALL: Objection, scope.
A. Well, express requests are situations, and it's usually when a consumer is trying to get a 04:03PM mortgage. In fact, I think it's almost always done then, when consumers are trying to get a mortgage. And time is of the essence, and they want to expedite information being updated or deleted on their file.
They can request information or their 04:03PM mortgage company can request information to be updated or deleted sooner when they have a proof document or some type of thing they could use to get it done quicker.
Sometimes even with express requests, an 04:03PM ACDV has to go out, which requires the full 30 days.
Q. Have you ever described Experian's bankruptcy internal update policy as being consumer friendly?
A. Probably. I may have.
Q. When you say consumer friendly, what do you 04:04PM mean?
MR. HALL: Objection, foundation.
A. Well, I think it Experian's desire to assist consumers when we can. There are some situations, such as bankruptcy, where it may not be necessary to go to a 04:04PM

Page 245

data furnisher to confirm if something was in bankruptcy. We have enough information even in his case, Mr. Cardinali's case, without him providing any bankruptcy documents.

We can the see the public record on file. 04:04PM The account was open prior to the bankruptcy. It was not one of the accounts that are typically excluded. He's claiming it was in bankruptcy. It was already showing bankruptcy. It makes sense to go ahead and just update it rather than send it out. 04:05PM

I think that is consumer friendly. He's going to get his item updated as he asked, and it's going to be quicker than sending out an ACDV for 30 days.

Q. Does Experian believe that it does not have an 04:05PM obligation under the Fair Credit Reporting Act to send a consumer's dispute along with all relevant information related to the dispute if the dispute can be resolved internally by Experian without assistance from the relevant information submitted by the consumer or the 04:05PM assistance of the data furnisher?

MR. HALL: Objection, scope. Foundation.

A. Can you read that again?

Q. I can. Does Experian believe that it does not have an obligation under the Fair Credit Reporting Act 04:05PM

Page 246

to send a consumer's dispute along with all relevant information relating to the dispute if the dispute can be resolved internally by Experian without assistance from the relevant information submitted by the consumer or the assistance of the data furnisher? 04:06PM

MR HALL: Same objections

A No I think it depends on what the situation is, so the examples I gave you before If the consumer gives us enough information that we can independently update it, we will update it for the consumer 04:06PM

We will still notify the data furnisher of the consumer's dispute and let them know we have already updated it In those cases, we may provide the actual relevant information or the documents

But if the relevant information is -- we 04:06PM have an internal policy that would apply, then we let the data furnisher know that Experian has an internal policy that applied here

[redacted]

Page 247

[redacted]

Page 248

[redacted]

Page 249

[redacted]
Q. Fair enough. Let me try to do something else for you that may assist.
MR. CLARK: Let me have that marked as Exhibit 12, please. 04:11PM
(Exhibit 12 marked.)
Q. Ms. Methvin, have you seen what I have had marked as Exhibit 12?
A. Yes, sir.
Q. What is it? 04:11PM
A. This is Experian's third amended objections and response to plaintiff's first set of interrogatories.
Q. Okay. And do you see in some of the amended responses -- I'll direct you to Number 2, for example -- 04:11PM it identifies a number of disputes and a number of consumers for which those disputes related?
A. Yes, sir.
Q. And it identifies four internal dispute reasons. I think they call them dispute trade codes or 04:11PM something for which those codes were derived?
A. Yes, sir.
Q. Having had an opportunity to review Exhibit 12, does that give you any more indication about what I have marked as Exhibit 11 is? 04:12PM

Page 250

[redacted]

Page 252

A. Yes.
[redacted]

Page 251

[redacted]

Page 253

[redacted]

Page 254

[redacted]

Page 255

[redacted]

Page 256

[redacted]

Page 257

[redacted]

Q. All right. Thank you. You can set this document aside. Just a few more of these here. 04:21PM
(Exhibit 13 marked.)
Q. Ms. Methvin, can I see what the first page of that is?
A. (Witness complies.)
Q. Thank you. 04:22PM
Have you had an opportunity to look through Exhibit 13?
A. I looked through it, yes, sir. I haven't read every word, but I looked through it.
Q. Are you familiar with that document? 04:25PM



A. Yes, sir.
Q. And what is it?
A. It's Experian's responses to plaintiff's request for admissions.
Q. I want to direct your attention -- before I do 04:26PM that -- well, I'll direct your attention to Page 781.
A. Okay.
Q. I want to direct your attention to Number 32. Let me know when you've had a chance to read that.
(Pause in proceedings.) 04:26PM
A. Okay.
Q. So the request says, "Admit that you did not send WebBank any communication after receiving plaintiff's dispute notice requesting a response regarding the accuracy of the WebBank trade line." 04:26PM
Did I read that correctly?
A. Yes.
Q. And Experian's answer is, "Deny" after its objections, correct?
A. Yes. 04:26PM
Q. What communications did Experian send to WebBank after receiving plaintiff's dispute?
A. We sent them a DRN, and as part of that DRN, they are instructed to contact Experian if they have any questions about it. 04:27PM



Q And we looked at a copy of that e-OSCAR document that was part of Experian's confidential information that said that a furnisher is not required to respond to a DRN; is that correct?
A They are not required to, yes, sir 04:27PM
Q So other than sending the DRN to Experian, did Experian have any other communication with WebBank?
A Not that I'm aware of, no, sir
Q Is there anyone who would be aware of those communications if they did exist? 04:27PM
A No
Q Let's go to Number 30
A Okay
Q It says, "Admit that you do not have any record of the information sent to WebBank with the DRN " 04:27PM
Did I read that correctly?
A Yes, sir
Q Experian denied that?
A Yes, sir
Q Why? 04:28PM
A Because you can see in the DR log that there was an internal update done, and we know it's a systemic change An agent doesn't have a choice to send a DRN or not It automatically goes any time an internal update is made, so that's our record of us sending the DRN 04:28PM



Q. I see. So Experian does have a record of the information sent. You would just have to derive that from the DR log, correct?
A. Well, you can see in the DR log that we made an internal change, and one of the things that drives 04:28PM the DRN is the internal change that we did.
Q. Does Experian keep -- retain records of inquiries that are made by third parties on a consumer's file?
MR. HALL: Objection, form. 04:28PM
A. For a certain amount of time, yes, sir.
Q. Do you understand how long they retain that?
A. I believe it's 25 months for third parties.
Q. Do you know if Experian has preserved any records related to inquiries as they would have after 04:29PM the filing of plaintiff's amended complaint in April of 2017?
MR. HALL: Objection, form.
A. Yes, sir. I mean, it hasn't been 25 months since April of 2017, so we would have any record of 04:29PM inquiries from that date.
Q. Well, I guess what I mean is, the class period we defined as between April 15th, 20 -- April 19th, 2015 through April 19th, 2017, right?
A. Yes, sir. 04:29PM

Q. And would Experian -- and that's about 24 months after the -- between April 2015 and April 2017, correct?
A. Uh-huh.
Q. So my question is: After the plaintiff filed 04:29PM the class claim, did Experian retain copies of any records it would have otherwise purged because there was a pending class allegation?
A. I don't know. I mean, we could still look at his earlier disclosures to determine inquiries on that. 04:30PM
Q. Could we determine what information was sent in connection with any of those inquiries?
A. No.
Q. Why not?
A. Because we don't keep records of information 04:30PM that we send to third parties. We just note the inquiry.
Q. If the information on the inquiries was relevant to determine some element of the class, then it would be your testimony if that information was purged 04:30PM based on Experian's ordinary recordkeeping practices, that Experian no longer has information relevant to disclose related to those class members?
MR. HALL: Objection, form. Foundation. Calls for speculation. 04:30PM

Page 262

A. I'm not really sure what you just asked.
Q. Let's go back to Mr. Cardinali's reinvestigation results of October 19th of 2015.
A. Okay.
Q. I'd like to direct you to the list of 04:31PM inquiries on Pages 68 through 70.
A. Okay.
Q. These three pages, do they list all the inquiries that were made on Mr. Cardinali's file as of this date within the time period for reporting that 04:32PM information?
A. Yes.
Q. And so this is a record of any information that was published about Mr. Cardinali to a third party?
A. This is a record of any inquiry that was made 04:32PM for Mr. Cardinali.
Q. If an inquiry is made and listed on a disclosure like this, would Experian publish that information that was relevant to the inquiry in question? 04:33PM
MR. HALL: Objection, form.
A. Yes.
Q. And would we see on Mr. Cardinali's admin report a list of these inquiries?
A. If it were within two years, yes, sir. 04:33PM

Page 263

Q. And so would we be able to look at the dispute of the inquiry purpose types to determine what information was sent in connection with any of those inquiries?
A. No. 04:33PM
Q. And why is that?
A. Because the inquiry purpose type doesn't tell us what information was sent. It just tells us what the purpose of the inquiry was.
Q. The purpose of the inquiry, is that a line 04:33PM with a certain Experian credit product?
A. Sometimes it is, yes, sir.
Q. And sometimes it is not?
A. Well, sometimes it's not specified. It's just a general extension of credit. 04:34PM
Q. Other than when it's a general extension of credit, are there other times in which you can't look at the inquiry purpose type and figure out maybe not the precise information but the type of information that would show up that particular report? 04:34PM
MR. HALL: Objection, form. Foundation.
A. I don't know.
[redacted]

Page 264

[redacted]
Q. Could you do it for most of them?
A. No.
Q. Why not?
A. Because I don't know what information was sent 04:34PM to the data furnisher on every single type of inquiry. There's some products that I do know about. You and I probably talked about them in the past. For example, there are inquiries where I know exactly what would have been sent to the data furnisher. 04:35PM
So there are some that I do know, but there are quite a few that I don't.
Q. Maybe you don't know personally, but is there a way that Experian has records that would be sufficient to be able to determine what type of information was on 04:35PM

Page 265

any of those inquiries?
MR. HALL: Objection, scope. Foundation.
A. I don't know the answer to that.
Q. Do you think that Experian has inquiry purpose types that relate to credit products for which it does know what information is being disclosed? 04:35PM
MR. HALL: Same objections.
A. Well, I know that we don't keep records of what actually was sent, so I don't know the answer to that. 04:35PM
Q. And why doesn't Experian keep records of what was sent?
MR. HALL: Objection, scope. Function. Calls for speculation.
A. It's a business decision that was made. I don't know. I wasn't part of it. 04:35PM
Q. Do you know who was part of that?
A. No.
Q. Would it be somebody who was a higher-level employee than yourself? 04:36PM
A. Yes.
Q. And, similarly, Ms. Methvin, with the December 2016 and January 2018 inquiries, those also list a list of hard and soft inquiries, correct?
A. Yes, sir. 04:36PM

Page 266

Q. And could we compare those inquiries with what's on an admin report to see perhaps what types of credit products that inquiry was about?
MR. HALL: Objection, form.
A. Well, we could look at the inquiry purpose types, yes, sir. 04:36PM
Q. And could we, perhaps, with some of the historical data in the long admin piece together part of what the reporting would look like?
MR. HALL: Objection, form. Foundation. Calls for speculation. 04:36PM
A. What the reporting would look like to who?
Q. To the third party who requested the credit report.
A. No. 04:37PM
Q. And is that because you don't personally know or because it's not possible for Experian to do that?
A. I don't know if it's possible.
Q. Now, the information on Mr. Cardinali's trade line, you testified earlier that it aged off at a certain point, correct? 04:37PM
A. Yes.
Q. But prior to that point, would that be information that could be seen by a third party who had requested Mr. Cardinali's consumer report? 04:37PM

Page 267

A. Yes. I'm not sure if I said that it had aged off. I do know at some point it was scheduled to age off. It may have come off even before that. I'm not sure when it actually came off as I'm sitting right here. It may have been before that. 04:37PM
Q. Sure. One way or the other, it's your understanding that the account would have come off?
A. Was deleted, yes, sir.
Q. Okay. And, in fact, we had talked earlier about the fact that the CDF itself might have been sent to a third party if Mr. Cardinali requested it, correct? 04:38PM
A. If he had asked us to, yes, sir.
Q. So sitting here today, if we wanted to reconstruct what was exactly on one of these inquiries, we would have to -- Experian has deleted the records that we could use to determine what was on many of those credit reports, correct? 04:38PM
MR. HALL: Objection, scope. Form. Vague. Foundation. Calls for speculation.
But you can answer. 04:38PM
A. Well, I know that we keep inquiry information in our File One database for 25 months from the date of the inquiry, so if it is there, we can look on the admin for the purpose type.
If it's not on the admin, we can -- we 04:39PM

Page 268

could still go back and look at previous disclosures to see the entities that inquired, but I don't know that there would be a way of finding the purpose type for that since they are not on file after 25 months.
Q. Could you look at the disclosure itself to identify what the purpose type was? 04:39PM
A. Sometimes it talks about -- like if you'll notice, on some of these it will say unspecified. For example, on Mr. Cardinali's, there is one that says auto loan. So sometimes it does give you an idea of what the purpose was, but many times it says unspecified. 04:39PM
Q. Would that be true of any member of the class who was within the period, that Experian wouldn't have any more information for any other member of the class regarding the potential publication of derogatory information than it has for Mr. Cardinali, as we discussed? 04:40PM
MR. HALL: Objection, scope. Function. Calls for speculation.
A. Yes. Mr. Cardinali doesn't have -- there's nothing special about his that would be different, sir. 04:40PM
Q. Okay. We're on the home stretch here.
(Exhibit 14 marked.)
(Pause in proceedings.)
A. Okay. 04:42PM

Page 269

Q. Have you seen this document before, Ms. Methvin?
A. I'm not sure. I may have looked at it yesterday. I don't remember.
Q. After having had a chance to look through it, 04:42PM do you have an understanding about what it is?
A. It looks like it's Experian's answers to plaintiff's second set of requests for production, is what it says.
Q. Let me ask you this very briefly. If these 04:43PM requests were calling for information about Experian's internal systems or its query language or its ability to ascertain the class through automatic, manual or semi-manual means, are those questions that you feel you are qualified to answer? 04:43PM
MR. HALL: Objection, scope. Foundation.
A. Well, I think it depends on what you ask me. There are some things I do know about and some things I don't.
Q. Okay. Then let's find out. Let's go first to 04:43PM the second request for production you see there. Do you know anything about Experian's IT infrastructure as it relates to File One?
A. No.
Q. How about CAPS? 04:44PM

Page 270

MR. HALL: Objection, form. Vague.
A. No.
Q. How about any other database that holds data elements for class members?
MR. HALL: Objection, form. Vague. 04:44PM
A. No.
Q. Let's go to the next one. This is Request Number 31. Do you know the precise storage location of any data element relevant to the class claims?
MR. HALL: Objection, scope. 04:45PM
A. No.
Q. Let's go to Number 32. Do you know the computing language used in File One?
MR. HALL: Objection, scope.
A. No. 04:45PM
Q. How about CAPS?
MR. HALL: Same objection.
A. No.
MR. CLARK: Chris, if you'd like to make a standing objection. 04:45PM
MR. HALL: Sure. For all questions about this document, that's fine.
MR. CLARK: Sure.
Q. How about for CAPS?
A. What's that? 04:45PM

Page 271

Q. How about for CAPS?
A. No, sir.
Q. Do you know anything about the extensible markup language or other markup language as used in File One, CAPS or any other database? 04:45PM
A. No.
Q. Let's go to 33. It's on Page 796. And do you know the method by which queries can be performed in the File One system?
MR. HALL: Objection, form. 04:46PM
A. No.
Q. How about the CAPS system?
A. No.
Q. How about any other database system that holds information relevant to the class members? 04:46PM
A. No.
Q. Let's go to 34. It's on Page 797. And would you be able to answer any portions of this question?
A. No.
Q. I'll just short circuit it here. If we go to 04:46PM 35, are you able to answer any portions of this question?
A. No.
Q. Okay. How about 36? Are you able to answer any portions of that question? 04:47PM

Page 272

A. No.
Q. And how about 37? Are you able to answer any portions of that question?
A. No.
Q. How about 38? Are you able to answer any 04:47PM portions of that question?
A. No.
Q. And how about 39? Are you able to answer any portions of that question?
A. No. 04:47PM
Q. And that's entirely fine, but is that because you're not a computer expert?
A. Yes, that's correct.
Q. So I just need to talk to somebody else who might be a little more knowledgeable about Experian's 04:48PM technical specifications?
MR. HALL: Objection, form. Foundation. Calls for speculation.
A. I don't know if there's anyone else for you to talk to, but I can't answer those questions. 04:48PM
Q. Okay. And that's fine. I don't want you to testify to what you don't know. You can put that aside. We have one more exhibit, and that is going to be it for the day.
(Exhibit 15 marked.) 04:48PM

Page 273

(Pause in proceedings.)
A. Okay.
Q. I'll represent to you that these are portions of a larger document which was produced in discovery in this case. Do you know what these excerpts are? 04:49PM
A. They look to be part of the credit reporting resource guide that's from 2015.
Q. And what is the CRRG?
A. It's a guide that was put together by the Consumer Data Industry Association that's designed to 04:50PM assist data furnishers or guide them on reporting information.
Q. And is Experian a member of the CDIA?
A. I'm not sure what the relationship is. I know there are people that work for Experian that are also 04:50PM members of the CDIA.
Q. Do you know if Experian helps draft the Consumer Reporting Resource Guide?
MR. HALL: Objection, scope. Calls for speculation. 04:50PM
A. I don't know if Experian helps draft it. I do know that there are people who work at Experian that assist with the guide.
Q. Is there anything in these excerpts that -- so are you familiar with the CRRG? 04:50PM

Page 274

A. Well, it's not an Experian document per se, but I have reviewed it and I am familiar with it, yes, sir.
Q. And so looking at these excerpts, I wanted to ask you, do these excerpts provide any guidance in 04:51PM response to the dispute process, the consumer dispute process?
A. Well, it talks about what it is and what the dispute process is and how it works, yes, sir.
Q. Does anything in there indicate that a data 04:51PM furnisher must respond to a dispute?
A. Well, it says here in bold on Page Depo 389, "Regardless of the source at which the dispute originates, the data furnisher must respond."
Q. And does it say anything about DRNs in there? 04:51PM
A. I don't see it on the pages you provided me, no, sir.
Q. We talked before about how e-OSCAR indicated that the data furnisher need not respond, right, to a DRN? 04:52PM
A. Yes, sir, we did.
Q. And so is the CRRG a guide that data furnishers use to determine how they should properly report?
A. It is a guide to assist them in that, yes, 04:52PM

Page 275

sir.
MR. CLARK: Can we go off for about three or four minutes?
MR. HALL: Yes.
(Recess.) 04:57PM
Q. Ms. Methvin, let me refer you back to the disclosure, the December 2016 disclosure that we were looking at, and I'll direct you back to that list of inquiries.
A. December 12th, 2016? 04:58PM
Q. Yes, ma'am.
A. Okay.
Q. And I've seen a number of hard inquiries in 2016. Do you see those?
A. I see two. 04:58PM
Q. And there's one on November 20th, 2015 as well, "Caliber Home Loans"?
A. Yes, sir.
Q. Would those inquiries have included the charge-off notations that we saw on Mr. Cardinali's 04:58PM consumer reinvestigation in 2012?
A. Probably, yes, sir.
Q. And when you say probably, what's your hesitation?
A. Well, we can't go back in time and see what 04:59PM

Page 276

his report looked like on any given day unless he got a credit report that day, right? So on 2015, do I 100 percent know that that charge-off was there, I don't.
But probably it was -- well, it's not there now, but it was there at the time of litigation, 04:59PM and it was there back in 2012, so probably it was there.
Q. And November 20th of 2015, that's only about a month after Mr. Cardinali's reinvestigation, right?
A. Yes, sir.
Q. So it's more likely than not that that 04:59PM information was on Mr. Cardinali's --
A. I would say that's a fair statement, but, like I said, you can't know 100 percent because we can't go back in time and see what it looked like that day.
Q. Sure. But if Mr. Cardinali's trade line had 04:59PM been deleted or the information had come off, would we see an exclusion code to that effect?
A. When?
Q. On Mr. Cardinali's trade line, either in the admin report or the long admin? 05:00PM
A. Well, I think it does have an exclusion code on it now, on the admin here.
Q. Okay. And this admin was generated after November 20th, 2015, correct?
A. Yes, sir. 05:00PM

Page 277

Q. And do we know when that exclusion code was placed on Mr. Cardinali's trade line?
A. I believe that was on March 24th, 2016.
Q. So before then, the account would have reported on a consumer report? 05:00PM
A. It's very likely, yes, sir.
Q. Okay. Thank you very much.
Last questions here. Could you please locate -- I believe it's Exhibit 13 -- the responses to plaintiff's interrogatories? 05:00PM
A. You said Number 13?
Q. I believe it's Number 13, but I have been wrong before. It says Experian's responses to plaintiff's first set of interrogatories.
A. This is requests for admissions. 05:01PM
MR. HALL: It would have been 11 or 12.
A. Well, 12 is -- yes, that's it. 12 is it.
Q. Okay. I was close, but not quite.
Ms. Methvin, if you look at the responses, I wanted to direct your attention to -- now, 05:01PM in response to Number 4, which is on Page 745, near the bottom of that response it says, "Experian further states that it believes all consumers identified in this research would have been sent in a CDF, indicating that the trade line at issue was updated or deleted." 05:02PM

Page 278

Do you see that?
MR. HALL: What's the Bates number?
A. I don't see that.
Q. Sorry. It's 745.
A. Okay. I'm not looking at the right document 05:02PM then. It's not Number 12.
Q. My apologies. Okay.
A. Can you tell me the name of the document I'm looking for again?
Q. Sure. It's the third amended objections and 05:03PM responses to plaintiff's first set of interrogatories. Is that what you have?
A. I do, but that's --
Q. That's not the right number?
A. Well, when you read Number 4, I didn't see 05:03PM that on there.
Q. My apologies. Let me try again.
MR. HALL: What's on the bottom of your page number?
THE WITNESS: 760. 05:03PM
A. This is the third amended objections and responses.
Q. Got it. Okay. I think I got my signals crossed. So sorry.
A. Okay. 05:03PM

Page 279

Q. In response to Number 4, Number 4 is asking for the number identified in Interrogatory Number 3, the number of CDFs for which the dispute results section of the CDF contained at least one disputed trade line which Experian identified as having been updated, processed or 05:04PM deleted as a result of Experian's reinvestigation, correct?
A. Yes.
Q. And Experian refers -- in its response, Experian refers back to its response in Interrogatory 05:04PM Number 2, correct?
A. Yes.
Q. And so is it your understanding, Ms. Methvin, that the number of dispute notices that Experian received during the relevant time period as it relates 05:04PM to Trade Dispute Codes G, H, I or J is about 200,000 for 48,000 and some change individual consumers, regardless of whether or not that internal dispute would have resulted in a notation on the CDF that said updated, processed or deleted -- oh, sorry, updated or deleted 05:05PM because we talked about processed before.
A. Right. So any time we would have used those internal reason codes, a CDF has to be generated. And if you use an internal reason code, you can only get updated or deleted. But I don't know off the top of my 05:05PM

Page 280

head if G, H, I and J are delete codes. I think they are all update codes.
So the answer would be all of the consumers, individual consumers that we listed, the 48,000 and change, would have gotten a CDF. 05:05PM
[redacted]

Page 281

[redacted]

And so would it be your understanding then, if only those four codes, G, H, I and J, were used as queries, that there might be a lot more codes that could be queried and there might be a lot more consumers identified? 05:07PM

A. There might be. I don't know. There are some codes here that I know haven't been used for years and years. So is it possible you could query for that code and get a zero? Yes. 05:08PM

So I don't know if there would be a lot more, no, sir.

Q. But there might be some more, right?

A. There might be, yes, sir. 05:08PM

Page 282

Q. Okay. And we'd just have to round it out by figuring out which codes would be identified and then running those searches, which you said we could run similar to the code searches already run?

A. Yes, sir. 05:08PM

Q. And I think with that, Ms. Methvin, I want to thank you very much for being here today and answering my many questions, and I have nothing further for you at this time.

A. Thank you. 05:08PM

MR. HALL: I have got just a couple. Do you want to keep going?

THE WITNESS: Yes, sir.

MR. CLARK: Sure. I will just note for the record Mr. Badwan has left the room, and now he's actually coming back in. 05:08PM

EXAMINATION

BY MR. HALL:

Q. I guess I'll ask you to pull back up Exhibit 2. 05:09PM

A. Okay. Can you tell me --

Q. That was the internal log.

A. I have that in front of me.

Q. You identified this earlier as a DR log; is that right? 05:09PM

Page 283

A. Well, there's three pieces, a disclosure log, a DR log and an admin.

[redacted]

Page 284

[redacted]

Page 285

[redacted]

Q. Is that the process that actually generates the CDF on the internal update? Is that the step -- 05:13PM I'll strike that question.
Is that the step the agent takes that will begin the process of generating the CDF?
A. Right. Yes, sir. Once all of the updates are completed, the CDF will be generated. 05:13PM
Q. Okay. As far as the agent goes making the changes to the trade lines, once they have submitted that J internal reason and the corresponding information, do they need to do anything else to send the CDF? 05:13PM



A. No. The CDF is automatically generated.
Q. Is that also true for dispute/response notifications?
A. Yes, sir.
Q. Looking at the steps the agent took here, if 05:13PM you recall the bankruptcy policy that Mr. Clark asked you about earlier, is it your understanding that this agent applied the policy as it existed in October of 2015?
A. Yes. 05:14PM
Q. I want you to keep this, but I want you to look at Exhibit 10, the last five or six pages, the DR notification, the e-OSCAR documents that we looked at earlier.
A. Okay. 05:14PM
Q. Is it your understanding that it's Experian's expectation that data furnishers retrieve and view DR notifications in the e-OSCAR?
A. Yes, sir.
Q. And if you look at Bates 384, you might recall 05:14PM Mr. Clark asking you some questions about the ability of a data furnisher to respond to a DR notification. Do you remember questions about that?
A. Yes, sir.
Q. I believe you pointed out that it says here 05:15PM



the data furnisher must contact the CRA directly if there are questions about information in the DR notification.
A. Yes, sir.
Q. To your knowledge, has a data furnisher ever 05:15PM called after receiving a DR notification, called Experian?
A. Yes, sir.
Q. So that happens sometimes?
A. Yes, sir. 05:15PM
Q. Now I want to look at the form sample of the DR notification. It starts at 385. You said you had looked at DR notifications in the past a handful of times, right?
A. Yes, sir. 05:15PM
Q. So to the best of your recollection, is this sort of what they look like?
A. Yes, sir. This is what they look like.
Q. And you're familiar with ACDVs as well, right?
A. Yes, sir. 05:16PM
Q. Is it true that both ACDVs and DRNs use Metro 2 formatting language?
MR. CLARK: Objection, foundation.
A. Yes, sir.
Q. I believe you also testified earlier that by 05:16PM



looking at the DR log, you could infer some of the information that had been transmitted in the DR notification sent to Dell; is that right?
A. Yes.
Q. So, for instance, in this sample 05:16PM DR notification, about halfway down the first page it says, "FCRA relevant information." And here it says, "Experian may internally update disputed items when certain conditions exist or proof has been received."
Did I read that right? 05:17PM
A. Yes, sir.
Q. To the best of your knowledge, would you have expected a similar statement to have been included in the DR notification sent to WebBank in this case?
A. Yes, sir. This DRN is an example of updating 05:17PM a consumer's account to show included in a Chapter 13 bankruptcy due to Experian's bankruptcy policy. So for Mr. Cardinali, it would have had the same information there.
Q. But for a Chapter 7? 05:17PM
A. Well, it's still the bankruptcy policy, so it would still say Experian may internally update a dispute. It would have the same language.
Q. What is the significance of the gray and white fields next to each other? So like if I look under last 05:17PM

name, there is a white box, a gray box. Spouse's name, white box, gray box.

A. Well, the gray box is for what was changed. The white box is what was previously there.

Q. So if we look on 386 in the upper left-hand corner, do you see the box that says, "Consumer Information Indicator"? 05:18PM

A. Yes, sir.

Q. What's a consumer information indicator?

A. That stands for CII, and that's the field in which the bankruptcy information is placed. 05:18PM

Q. So I think Mr. Clark showed you an Experian document earlier that had a table of codes for CIIs. Does that correspond with what this is?

A. Yes, sir. 05:18PM

Q. So what's H?

A. H is a Chapter 13 discharge bankruptcy.

Q. Do you know offhand the letter code for a Chapter 7 discharge?

A. E like Edward. 05:19PM

Q. So looking at the gray and white here, what is your understanding of what this signifies?

A. Well, in this example, we are notifying the data furnisher, CitiMortgage, that we are updating their account, the trade line, to show that it was included in 05:19PM



the Chapter 13 bankruptcy discharge.

Q. So in Mr. Cardinali's case, these fields would have Es; is that right?

MR. CLARK: Objection, calls for speculation. 05:19PM

A. It would have had an E because Chapter 7 -- you can see on the DR log that the agent updated it with an E, so it would have an E in the notification as well.

Q. So to the extent WebBank had reviewed the DR notification that Experian sent, this would inform 05:19PM them that we were reporting the account as discharged in Chapter 7?

MR. CLARK: Same objection.

A. Yes, sir.

Q. Down below towards the bottom of the page in 05:19PM the sort of grid which has "Disputed Account History," do you see that grid?

A. Yes, sir.

Q. What is that information?

A. The top field is what the history was already 05:20PM reporting, and the bottom field would be if Experian had physically gone into the grid and made some changes, we would notify the data furnisher of the changes that were made in the grid.

Q. In this instance, does it look like Experian 05:20PM



made any changes to the payment grid?

A. No, sir. We just put the bankruptcy information on there. It might mask some of the payment history because of the date that was used, but we didn't actually physically go in and change anything in the 05:20PM grid.

Q. But it still showed the payment history here for this account?

A. Yes. To the data furnisher, yes, sir.

Q. Is it your understanding, looking at the 05:20PM DR log for Mr. Cardinali, that the DR notification that would have been sent to WebBank here would have shown the payment history for the Dell WebBank account?

A. Yes, because the agent didn't change anything in the grid. 05:21PM

Q. And that would include the reported -- repeated charge-off statuses?

A. Yes, sir.

Q. I think just a couple of other questions about policies. I think I skipped that. I think you said 05:21PM that the documents that Mr. Cardinali submitted with his dispute weren't necessary for the update the agent made; is that right?

A. Yes, sir.

Q. And you said that's because the policy 05:21PM



operates based on conditions of certain information in the consumer's file; is that right?

MR CLARK: Objection to the degree it mischaracterizes testimony

A That's correct 05:21PM

Q So even though I think you've said a couple of times, what were the conditions for updating the Dell WebBank account to be reported as discharged in Chapter 7?

A Well, it was already showing a discharge of 05:22PM bankruptcy The agent just did a data quality to make sure all the dates were correct But the conditions that needed to be met are there's a public record on the consumer's file showing the status of the consumer claims, which in this case he was claiming were 05:22PM discharged, and it was also shown discharged

The account needs to already -- I'm sorry The account, if it already shows bankruptcy, you can just update it with the correct dates If it hadn't shown bankruptcy, as long as the account had been open 05:22PM prior to the bankruptcy filing date and it wasn't an excluded type of account such as child support or a student loan that aren't typically included in bankruptcy, then you can update the account to show it included in bankruptcy without sending an ACDV to the 05:23PM

data furnisher.
Q. If Mr. Cardinali had called on the phone and not submitted any documents, could the agent have made this change?
A. Yes. 05:23PM
Q. If he had made the long trip to California and walked up to the in-person office without any documents, could the agents have made this change?
A. Yes.
Q. I apologize for jumping around, but we talked 05:23PM about ways a data furnisher could respond to a dispute/response notification. You've looked in the long admin at the Dell WebBank account, right?
A. Yes.
Q. And it shows that Dell continued to report the 05:23PM account after this dispute; is that right?
A. Well, they continued to -- they didn't make any other requested changes after October of 2015. The --
Q. The history of the -- oh, sorry. 05:24PM
A. The next update was to delete it in March of 2016.
Q. But it looks like more or less for months after this dispute, every month they included it in their batch transmission? 05:24PM



A No There's no reporting from them after --
Q I'm sorry I think we're talking past each other
A Well, after October of 2015, they didn't report anything anymore, and then the next update was in 05:24PM March of 2016 to delete

[redacted]

Q If Dell had wanted to change the reporting in the meantime, could they have done so in a batch transmission?
A Yes
Q Nothing in Experian's procedures or policies, 05:25PM



as you understand it, would have prevented them from further updating the account?
A. No. They asked us to delete it through a batch transmission in March of 2016.
MR. HALL: That's all I have. 05:26PM
MR. CLARK: I have just a few brief questions.

FURTHER EXAMINATION

BY MR. CLARK:
Q. You had mentioned the agent did a data quality 05:26PM in cross-examination. Do you recall that?
A. Yes, sir.
Q. Okay. And did you mean a data quality initiative?
A. Yes, sir. 05:26PM
Q. Okay. And were you referring to the agent's actions as it related to Mr. Cardinali's WebBank dispute?
A. Well, no. He had specifically disputed that particular account, so it needed to be addressed even 05:26PM outside of the data quality initiative. But part of the data quality initiative is when a consumer disputes an account included in bankruptcy, the agent checks all of the accounts.
So had he not disputed it, the agent 05:26PM



still would have touched it.
Q. Okay. So there's nothing inconsistent about running a data quality initiative and having a dispute. Those two things can be coterminous.
A. Yes, sir. 05:26PM
Q. Thank you.
MR. CLARK: I have nothing further.
MR. HALL: Nothing further for me. We further reserve signature.
(Deposition concluded at 5:27 p.m.)

I declare under penalty of perjury under the laws that the foregoing is true and correct.

Executed on ________________, 20___,
at ____________, __________________________.

____________________________
MARY AMES METHVIN



UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

LOUIS A. CARDINALI, §
Plaintiff, §
§
v. § Case No. 2:16-cv-2046-JAD-NJK
§
PLUSFOUR, INC.; RC §
WILLEY HOME §
FURNISHINGS; WEBBANK/ §
DELL FINANCIAL §
SERVICES; EQUIFAX §
INFORMATION SERVICES, §
LLC; and EXPERIAN §
INFORMATION SOLUTIONS, §
INC., §
Defendant. §

---

REPORTER'S CERTIFICATION
TO ORAL DEPOSITION OF
EXPERIAN INFORMATION SOLUTIONS, INC.
BY AND THROUGH ITS DESIGNATED 30(B)(6)
REPRESENTATIVE MARY AMES METHVIN
JULY 19, 2018

---

I, Tina Terrell Burney, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, MARY AMES METHVIN, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by



the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_XXX______ was requested by the deponent or a party before the completion of the deposition and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

________ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any of the parties or attorneys to the action in which this deposition was taken. Further, I am not a relative or employee of any attorney of record in this case, nor am I financially interested in the outcome of the action.

Subscribed and sworn to on this the 28th day of July, 2018.

TINA TERRELL BURNEY, CSR No. 2908
Certified Shorthand Reporter
in and for the State of Texas
Certification expires 12/31/18

**&**

**&** 3:3

**0**

**000001-000031** 4:14
**000032-000067** 4:19
**000131-000320** 4:25
**000321-000387** 5:5
**00035** 122:7
**000388-000393** 5:16
**000394-000531** 5:3
**000532-000590** 4:20
**000596-000616** 4:23
**000758-000763** 5:9
**000764-000787** 5:12
**000788-000810** 5:14
**000811-000812** 5:7
**000874-000912** 4:17
**000917-000938** 4:22
**00600** 195:19
**07** 227:10
**08663** 83:2

**1**

**1** 4:14 13:13,15,17 14:11,12 34:10 46:16 73:11 284:9 285:16 300:3
**1,000** 77:3 132:20
**10** 5:4 15:24 47:10 239:9,11 240:25 287:12
**10/27/15** 295:18 295:18
**10/6/15** 4:18
**100** 14:21 84:23 121:14 128:6 277:2,13
**100,000** 76:23 77:4
**10040** 3:4
**106** 175:22
**10:00** 15:3
**10th** 84:6,7 85:6
**11** 5:6 15:24 31:23 160:4 193:4,6,7,9 193:16 231:23,25 232:13 233:19 238:8,13 239:3,5 248:16,21,22,24 250:25 278:16
**12** 5:8 16:20,23 160:4 187:21 226:18 250:5,6,8 250:24 278:16,17 278:17 279:6
**12,000** 133:19 134:10,15
**12/31/18** 300:25
**120** 57:8 74:2,10 74:12
**121** 4:19
**122** 85:20,25 86:3 87:5
**1220** 3:11
**12th** 175:20 191:24 192:11,19 276:10
**13** 4:14 5:10 151:2 151:8,15 156:22 156:25 158:17,21 159:4,19,21,21 160:4,16,25 161:17 162:11,13 172:13 173:18,21 174:3,5,9 214:8,11 214:13 215:10 217:7 218:14 223:18 258:16,22 278:9,11,12 289:16 290:17 291:1
**131** 212:11
**136** 4:20
**13s** 160:12 173:10
**14** 5:13 83:17,24 160:5 269:23
**15** 5:15 16:6 47:10 83:2 273:25
**156** 213:24
**157** 4:22
**158** 218:7
**159** 214:10
**15th** 261:23
**16** 20:21 23:3 47:10 83:18,25 114:23 160:5 209:15
**160** 220:6,7
**162** 220:19
**165** 215:10 220:24
**168** 213:18,23,24
**1681** 97:17
**16th** 175:23
**17** 85:22 160:5
**170-109** 3:4
**18** 14:5 160:5
**180** 131:3
**183** 221:1,10,11
**184** 220:25 221:2,3 222:2,2,7 227:11 227:17
**19** 1:15 16:21,23 160:5 299:17
**195** 4:23
**199** 222:2
**19th** 1:24 13:5,6 84:10,11 175:18 175:25 191:9 261:23,24 263:3
**1st** 232:2

**2**

**2** 4:15 34:9,12,14 34:20 35:15 38:18 73:3 182:7 187:14 192:22 233:8 250:15 280:11 282:1 283:20 284:3 288:22
**2,000** 248:25,25
**2,600** 249:24,25
**20** 142:3 160:6 242:23,24 243:1 261:23 298:5
**200** 3:7 29:18,20 29:22,24 221:2,11 222:2
**200,000** 280:16
**2002** 19:13 45:9 153:18
**2007** 31:21
**2010** 116:20 162:25 163:11 165:16 166:10 227:10
**2012** 116:14 123:6 123:7 126:18 163:6,7,11 191:22 224:11 276:21 277:6
**2015** 5:15 13:6 84:11 130:8

150:14 151:13 154:13 155:19 161:24 162:2,9 172:15 173:5 175:18 176:1 191:9,23 217:18 217:19 261:23 262:2 263:3 274:7 276:16 277:2,7,24 287:9 294:18 295:4
**2016** 28:18 84:8 175:20 191:24 192:11,19 193:22 193:24 210:9 232:2 236:1 266:23 276:7,10 276:14 278:3 294:22 295:6,20 296:4
**2017** 13:6 84:10 117:15 162:24 261:17,20,24 262:2
**2018** 1:15,24 24:15 175:23 192:4 266:23 299:17 300:19
**2046** 1:4 6:4 299:4
**20th** 276:16 277:7 277:24
**21** 16:21 142:4 160:6
**211** 4:25
**22** 16:21,23 87:5 160:6 195:16
**229** 5:3
**23** 160:6
**234** 212:11
**239** 5:5
**23rd** 19:13
**24** 12:11 47:10 160:6 262:1
**245** 212:13
**248** 5:7
**24th** 236:1 278:3
**25** 85:23 87:5 213:16,18,23 261:13,19 268:22 269:4
**250** 5:9
**2500** 3:7
**258** 5:12
**269** 5:14
**2727** 2:2
**273** 5:16
**27th** 24:15
**2819** 177:5,10
**283** 4:6
**28th** 300:18
**2908** 300:23
**292** 215:14 216:4 217:8,9 220:24 285:4
**296** 4:7
**298** 4:8
**2:16** 1:4 6:4 299:4

**3**

**3** 4:3,16 46:17 73:11 82:15,17 109:2,6,10 160:3 193:22 280:2
**3,000** 133:18 134:9
**30** 1:13 6:3,21 8:4 8:14 15:21 23:21 45:8,24 56:4 70:25 88:3 168:12 174:24 219:9,11 244:3,12 245:16 246:13 260:12 299:15 300:3,6
**300** 4:9
**30b6** 4:14,17,19 4:20,22,23,25 5:3 5:5,7,9,12,14,16
**30th** 191:22
**31** 271:8
**312.440.0020** 3:12
**312.440.4180** 3:12
**312.782.3939** 3:17
**312.782.8585** 3:17
**32** 124:8 174:24 259:8 271:12
**320** 212:13
**33** 272:7
**34** 4:15 272:17
**35** 272:21
**36** 272:24
**37** 273:2
**38** 273:5
**384** 287:20
**385** 288:12
**386** 290:5
**389** 275:12
**39** 273:8

**4**

**4** 4:18 46:17 121:17,18,20,22 146:13 160:3 177:23 194:21,22 194:24 278:21 279:15 280:1,1
**41** 165:4
**42** 165:5,11
**48,000** 280:17 281:5

**5**

**5** 4:20 46:17 136:20,21,23 160:4
**50** 15:24 18:21 134:16 242:24,24
**500** 2:2
**506** 230:21,24 231:13 238:6 281:22,24,24
**507** 233:2 238:6
**52** 124:16,17
**523** 230:3,22 231:5
**53** 124:16
**54** 124:16,17
**55** 8:2
**56** 124:3,8 174:24
**57** 175:5,5
**58** 249:15
**59** 249:16
**599** 226:19 233:10

**6**

**6** 1:13 4:21 6:3 8:4 8:14 15:21 23:21 45:8,24 47:9 70:25 88:3 157:8 157:9 160:4 168:12 174:24 219:9,11 225:18 299:15
**60** 134:16 191:15
**60148** 3:8
**60601** 3:16
**60602** 3:11
**61** 124:23
**614** 209:23
**616** 195:20 196:11 209:23
**630.575.8180** 3:8
**630.575.8181** 3:8
**66** 177:8
**68** 263:6

**7**

**7** 4:5,23 47:10 125:10 126:4 129:21 151:1,8,14 151:17 156:22 157:2 158:15 159:1 160:25 162:10 163:5 172:16 173:18,21 174:3,10 191:21 195:4,6,9,13 217:6 218:14 225:18,19 225:20 233:7,13 233:14,19,19,23 234:6,11,18,25 235:1,2,11 237:7 289:20 290:19 291:6,12 293:9
**70** 263:6
**702.447.8048** 3:5
**710.825.6060** 3:5
**73** 158:5,7
**745** 278:21 279:4
**75201** 2:3
**76** 175:6
**760** 279:20
**77** 3:11,16 175:18 191:25
**781** 259:6
**796** 272:7
**797** 272:17
**7s** 160:11 173:5

**8**

**8** 4:24 16:6,19,23 193:4,6,16 211:25 212:2,19 213:3
**8/10/16** 4:16
**813** 253:19
**82** 4:17
**84** 95:13,15,18
**85** 210:13
**858** 249:9
**859** 249:11
**89129** 3:4

**9**

**9** 5:3 160:4 193:5 193:16 229:25 230:1 239:10 281:24
**9/30/2015** 295:16 295:16
**90** 69:22 175:18
**90156** 254:6
**90s** 50:15
**91** 175:21 177:6
**9166** 177:3,9,15 178:3
**931** 158:2
**97** 295:9,14
**99** 83:8,9,18
**9:00** 15:4
**9:04** 1:24

**a**

**a.m.** 1:24 15:3
**a1** 227:2
**abbreviated** 67:4 187:6,7
**ability** 12:11 141:12 242:16,17 270:12 287:21
**able** 9:7 16:12 21:20 31:3 71:2 86:20,22 111:16 120:19,25 131:14 141:1 146:21 180:5 181:8,14 202:14 255:3 258:2,6 264:1 265:25 272:18,21 272:24 273:2,5,8
**abouts** 150:12
**absent** 129:3
**absolute** 10:9 107:6
**abundance** 17:2 17:13 46:3 159:16
**ac** 226:2 227:2 295:9,14
**accelerate** 163:21
**acceptance** 192:18 193:13 194:12 204:21 210:4
**accepted** 218:23 218:25 219:2,5
**access** 32:6 48:3 92:25 138:10,19 198:25
**accessed** 38:13
**accessible** 138:1
**account** 59:11 74:21 76:16 86:23 100:24 103:5 105:24 111:21 112:10 113:2,12 113:19,23 114:15 114:20,25 115:12 116:2 117:1,12,14 117:20,25,25 118:1,1,3,6,24 119:3,7,11,21,25 120:15,25 122:4,9 122:9,14 123:4,23 125:7,17,21,24 126:6 128:21 129:3,16,19 130:7 130:20,21 145:10 145:12,16,17 147:6 149:14,22 149:25 150:1,21 151:9,20 160:15 161:9 163:4,21 164:8,11 165:9,13 165:17,25 166:11 166:17,24 170:11 175:10 180:1 181:9,16 183:6,11 183:16,23 188:7,8 190:18 198:14 210:1 214:21 215:2,5,18 216:6 216:17,21 217:10 217:12,21 219:21 219:23,24 220:10 222:21,23 223:1 224:25 225:3,7,13 225:13 226:8 227:7 228:9,17,19 229:2 233:1,15,20 233:21 234:4,8,20 234:22,24 236:1,4 236:8 246:6 268:7 278:4 285:11,15 289:16 290:25 291:11,16 292:8 292:13 293:8,17 293:18,20,22,24 294:13,16 295:19 296:2,20,23
**accounts** 131:21 142:20 144:7 160:16 161:21,22 164:6 167:3 172:22 174:2 177:25 178:1,5,8 178:13 180:1 186:23 188:6 214:12 217:24 220:10,12,13,15 220:15 238:5 246:7 285:1,2,7 286:10 296:24

**accuracy** 111:12 127:20 128:5,7,9 259:15
**accurate** 9:5 12:12 12:15 42:1,10 46:1 128:7,13,20 131:23 167:6,8 169:18 243:1
**accurately** 18:24 24:3
**acdv** 5:3 48:5,13 49:4,7,8,12,15 52:8 54:6,7,10,15 54:17,21,21,23 55:24,25 57:13,22 58:7 59:13,16 60:15,22 62:4,12 64:19 70:12,14,16 71:23 72:2,8 75:25 80:2 97:14 100:10 114:19 123:25 128:14 131:19 138:16 139:1,4 144:2 145:2 147:7,9,11 179:7,8 180:12 183:19 184:10,22 184:25 185:3,5,6,8 185:11,12,13,21 188:10,19 189:1 230:4,19,23 231:9 238:24,25 243:6,9 245:16 246:13 281:8,18 293:25
**acdvs** 52:23 55:9 55:12,20 61:5 70:9 72:7,19 74:5 75:22 76:11 77:17 89:5 180:8 231:6 239:24 288:19,21
**achieved** 225:4
**act** 41:16,20 97:18 97:25 98:7 99:11 99:18,24 116:5 171:25 197:8 205:4,5,8,11,14 206:3,4 246:16,25
**acted** 244:11
**action** 63:16,23 64:1,2 107:25 108:2 119:18 145:7 241:7,13,23 300:14,17
**actions** 28:16,21 63:21 199:8 284:14 296:17
**active** 12:1
**actual** 53:14 91:5 137:22 166:7 173:14 190:15 218:17 230:22,23 247:14 252:2
**acv** 114:13
**add** 139:4 178:1 178:22,23 179:3,9 179:10,12,16,18 179:25 180:5,18 181:1,3 182:2
**added** 103:11 175:7,8 178:6,7,10 178:19,20 179:5 182:3 232:2 235:3 235:10 258:5 285:6
**adding** 178:4 180:7,9
**addition** 181:21
**additional** 72:23 75:5,9,14 159:11 159:15 174:4 183:5 213:5 229:7 252:13
**additionally** 95:13
**address** 7:17 48:4 143:12 196:14 197:15 201:12,16 201:21 202:8,15 202:19,23 203:2,3 203:4,10,12,12,25 204:8,13,19 206:9 206:12,14,17,21 206:24 207:13,15 207:18 208:1,20 208:24,25 209:12 211:6 217:17 253:1 254:11,13 258:11
**addressed** 296:20
**adequate** 17:12
**admin** 35:2 36:1 94:6,8,10,12,13 95:1,2,6,9,11,12 95:24 96:5,7,14,17 96:24 192:22,23 193:1,7 194:21 195:15,18,20 196:5,20,23 204:22 207:23 209:4,16,22 210:3 211:20 224:14,17 224:18,19,22,24 225:2,3,6,17 233:7 233:11,12 234:8,9 235:20 236:16,20 236:22,23,24 237:19,22 238:18 263:23 265:6 267:2,8 268:23,25 277:20,20,22,23 284:2 294:13 295:8
**admins** 96:8
**admissions** 5:11 259:4 278:15
**admit** 259:12 260:14
**advice** 27:7 79:3 152:10
**affect** 199:14 210:23
**age** 268:2
**aged** 267:20 268:1
**agencies** 98:2
**agency** 47:24
**agent** 29:6 31:10 36:12,21,23,24 37:10 38:9 57:18 67:6,22 68:13 92:25 108:13 116:4 125:16 138:9,15,21 139:1 139:21,24 140:6 140:18 141:1,6 143:4,14 146:18 149:24 172:21 178:12,13 179:24 180:5 189:3 215:24 216:23 217:1,4 220:11,16 220:21 230:6 256:15 260:23 284:14,17,21,25 285:2,5,14,19,25 286:10,17,21 287:5,8 291:7 292:14,22 293:11 294:3 296:10,23 296:25
**agent's** 37:2,4,13 285:17 296:16
**agents** 17:21 29:10 29:11,13,14,16

30:3,9,19 31:2 33:10 36:4,10,10 90:19 133:1 139:17 154:12,14 229:20 230:24 256:12 294:8
**ago** 29:7 62:1 80:17 84:6 146:17 152:14 205:5 242:9
**agree** 41:4 52:19 73:23 84:24 86:5 86:10 87:6,7,11,16 107:19 108:2,7,15 114:17 162:19 181:20 184:16
**agreed** 130:19,23 131:2,4
**agreeing** 113:19
**agreement** 50:15 131:16 253:25
**agrees** 161:9
**ahead** 6:21 78:21 94:20 105:10 121:15 135:9 246:9
**alabama** 134:5
**alcohol** 12:10
**algorithm** 21:15
**algorithms** 21:10
**allegation** 262:8
**allegedly** 122:1
**allen** 29:11,23 136:5
**allow** 10:7 111:6 244:10
**allowed** 201:12 202:13,15
**allows** 190:19
**amend** 70:6 132:11 133:7
251:20
**amended** 4:14,21 5:8,10 14:15,24 157:20 250:11,14 261:16 279:10,21
**ames** 1:14,21 4:4 7:6 298:12 299:16 299:23
**amount** 55:25 56:6 57:5 120:18 261:11
**ana** 29:13 30:1,4
**analyst** 19:5
**anna** 168:7,21
**anonymized** 253:25
**answer** 10:3,8,10 10:21,22 11:6,22 12:1 13:9 21:20 25:18,21 27:3,21 27:24 32:15,21 33:2,3 34:1,5 38:8 42:13,15,18,25 43:3,5 45:24 49:2 67:16,18 69:10,18 72:3 73:2 75:14 77:2,21 78:20,21 78:22 79:21 80:11 80:13,20 81:4,5 85:5 87:11 89:24 94:19 97:13,22 104:8 108:25 128:1 129:8 132:16,24 134:19 134:21 135:1 136:14 138:6 141:19 147:19 151:25 152:2,3,7 152:14,14,16,19 152:24 159:11 162:18 167:16
171:13,15,21 172:4,4 241:24 242:7 259:18 266:3,9 268:20 270:15 272:18,21 272:24 273:2,5,8 273:20 281:3
**answered** 18:19 84:2 85:7 87:25 134:18 154:4 159:7 172:9 174:11 238:7 286:9
**answering** 62:6 152:9 283:7
**answers** 5:13 9:8 9:10,21 15:13 26:4 42:12 70:5 81:15 132:10 152:14 251:21 270:7
**anybody** 154:8 189:9
**anymore** 295:5
**anyplace** 97:6
**apologies** 14:6 44:15 164:17 221:24 225:19 236:23 279:7,17
**apologize** 12:9 153:2 294:10
**apparently** 81:14
**appear** 114:12 116:9 117:4,4 121:25 174:20 182:7 192:19 215:22 217:6 238:18 240:22
**appearance** 15:2
**appearances** 4:3
**appeared** 237:8
**appearing** 3:10 14:24
**appears** 83:7 175:22 176:19
**application** 31:4 159:20
**applied** 149:14,19 161:20,20 237:1 247:18 287:8
**apply** 143:22 148:1,23 161:21 247:16
**appreciate** 159:17 206:2 221:21 242:5
**apprised** 104:18
**appropriate** 81:14 81:20 115:22
**approximate** 133:15 134:1,14
**approximately** 29:20 132:25
**april** 13:5,6 84:10 84:11 116:14 126:18 191:22 261:16,20,23,23 261:24 262:2,2
**aramillo** 37:15
**architecture** 23:12 24:8
**archive** 74:5,8 77:16 92:4,11
**archived** 91:6,20 97:7
**archives** 141:18
**area** 199:13 200:21
**arises** 81:21
**ascertain** 25:7 79:7 141:23

270:13
**aside** 30:3 34:10 38:19 52:23 68:22 120:21 147:11 182:6,23 186:4 189:14 211:22 243:12 258:15 273:22
**asked** 11:15 18:19 23:7 24:6,20 27:23 37:7 40:10 44:25 76:3 85:10 134:17 135:23 137:23 154:4 155:24 159:7 163:16 172:6,9 174:11 178:5 180:19 189:13 238:7 242:9,10 246:12 263:1 268:12 287:6 296:3
**asking** 22:15 27:1 29:6 52:12 63:19 63:21 64:4,13 72:22 76:8 80:16 80:22 82:1,4 94:24 111:8,11,17 127:24 131:20 138:6 142:6 144:18 160:17 163:1 229:14 244:8 280:1 287:21
**asks** 72:16 172:2 179:5
**aspect** 63:9 81:18
**aspects** 213:8
**assess** 31:7,10
**assigned** 252:22 255:24 256:17
**assist** 19:8,10 94:9 245:23 250:3 274:11,23 275:25
**assistance** 224:15 246:19,21 247:3,5
**assists** 239:22
**associated** 175:14 203:3,11 206:14 233:21 251:14 257:18
**association** 236:17 236:25 274:10
**assume** 13:21 31:8 57:25 118:5,6 140:11
**assumed** 22:21
**assuming** 251:5
**assumption** 252:14
**attach** 113:23 114:13 138:16 189:23 190:11 218:18 252:11
**attached** 124:12 125:6 126:12 138:13 189:17 190:23 252:5,8,9 257:10 285:22 300:7
**attaches** 139:2
**attempt** 81:3,17 82:8
**attention** 60:19 83:8 157:25 158:4 186:11 226:1 259:5,6,8 278:20
**attorney** 25:17 26:13 40:24 41:2 65:21 81:19 82:3 82:9,10 132:16 203:24 300:12,16
**attorneys** 1:18 6:9 6:22 81:17 300:14
**attorneyzim.com** 3:12
**attrition** 29:19
**aud** 71:4,7 101:15 102:16,18 103:1 105:12,16
**auds** 53:3 239:25
**august** 84:6,7 85:5 191:23 193:22
**authentic** 114:9,15
**authored** 240:2
**auto** 269:9
**automated** 49:8
**automatic** 67:24 270:13
**automatically** 69:16 77:14 138:12 139:3 260:24 287:1
**available** 81:9 95:13,19 140:8 203:6 207:2
**avenue** 3:4,7,16
**aware** 8:13 11:25 28:8 56:20 96:18 96:19,25 97:4,6 106:2 116:8 122:17 157:5 168:21 169:3 179:15 200:12,17 201:23 202:3 208:3,6 219:9,10 247:19 260:8,9 282:7

**b**

**b** 1:13 6:3 7:5 8:4 8:14 15:21 23:21 45:8,24 70:25 88:3 168:12 174:24 219:9,11 226:2,4,9,20 282:2 299:15
**back** 16:24 17:6 22:10 28:5 38:18 38:21 39:25 40:9 42:24 47:15 50:15 87:20 94:13 103:11 104:10 109:1 118:7,24 141:8 146:12 159:25 162:24 163:11 164:14 169:13 172:14 173:6 177:23 180:5 185:13 191:4 210:8,10 218:20 227:11 233:7 236:20 240:17 263:2 269:1 276:6,8,25 277:6,14 280:10 283:16,19 285:6
**badwan** 3:6 7:4,5 82:24 109:18 153:2 242:3 283:15
**badwan's** 198:21
**balance** 119:11,17 120:3 191:23 214:15,22 222:22 222:24 223:1,5,5 223:12,13,14,14 223:24 224:1,6,16 224:18 225:4
**balances** 166:16
**bankruptcies** 61:12 158:21 159:4 218:15
**bankruptcy** 73:22 120:24 121:11

122:10,11,15,18
122:18,20,23,24
123:1 124:23
125:7,10,17,23,25
126:4,9,21 127:7
127:12 128:18,22
129:16,20 130:8
130:15,16 132:2
144:6,8 145:12,17
147:6 149:15,21
149:22,25 150:18
150:21 160:10,16
160:18,21,24
161:2,3,4,10,13,18
161:20 162:22
163:5 164:22
172:8,18,23
175:10 178:14
188:7,8,9,14,16,20
188:21 190:5,17
191:21 213:11,17
213:20,20 214:2,4
214:11,13 215:10
215:20 217:12,22
217:23 218:8,9,24
219:5,22,24 220:2
220:13 222:16,20
223:7,19 224:8,16
227:24,25 228:6
228:10,12 231:14
233:3,5 234:20
235:16 236:3
237:13 245:17,25
246:2,4,6,8,9
285:1,11 286:4
287:6 289:17,17
289:21 290:11,17
291:1 292:2
293:11,18,20,21
293:24,25 296:23

**based** 30:14 38:7 73:12 74:21 103:1 126:19,25 140:12 141:16 145:1,6 152:14 171:18 190:19 203:14 222:19 228:24 258:1 262:21 293:1
**basically** 141:12
**basis** 7:16,16 20:22 23:4 76:5 96:10 156:14 169:10
**batch** 294:25 295:22 296:4
**bates** 4:14,17,19 4:20,22,23,25 5:3 5:5,7,9,12,14,16 124:4,5 158:1 249:7,10,13 279:2 284:5 287:20
**bayview** 87:8
**began** 51:3 150:17
**beginning** 8:25 14:5 94:22 139:22 154:14
**begins** 186:11 191:25
**behalf** 8:11 33:21
**believe** 14:2,21 16:12 17:11 19:20 28:19 30:2 41:24 46:14,17 47:8,9,14 48:24,24 50:14 51:11 57:8 62:3 66:20 71:11 80:6 84:9,22 85:6,11,14 85:18 89:7 93:5 105:19 106:5 111:15 114:9,14

117:9,13 121:9,12 124:10 126:11,14 126:16 128:5 129:11 130:4 133:10 141:23 144:18 146:13,16 149:6,14 151:3,16 159:23 162:11,17 163:14 173:16 187:4,12,14 191:14 194:20 197:17,18,22 198:7 203:23 204:2,3 206:5 207:18,20 209:11 209:11 220:6 225:18 227:21 236:24 241:20 242:12,13,19 246:15,24 248:14 249:7 251:20 253:14 256:8 257:4 261:13 278:3,9,12 287:25 288:25
**believed** 84:4 85:7 146:22
**believes** 45:25 48:17 58:17 129:24 146:2 278:23
**beneficial** 68:5
**best** 10:9,21 26:1 78:4 115:21 124:20 133:14 136:8 145:8 150:15 163:20 167:10,15,18 288:16 289:12
**better** 67:9 69:1 89:5 140:3 207:12

**big** 55:12
**bind** 15:14
**birth** 253:3 254:14 254:15
**bit** 49:1 61:25 88:16 109:13 181:24 182:5 295:17
**bk** 233:10,13,14 233:19,23 234:6 234:11,18,25 235:1,2,11 237:7
**black** 196:3
**blank** 255:7 257:12
**bliley** 197:7 205:4 205:11,14 206:3
**block** 158:11,15
**board** 173:24
**bold** 15:19 210:22 275:12
**booklet** 94:9
**bottom** 15:20 195:25 227:1 233:9 240:4 278:22 279:18 291:15,21
**boundaries** 81:15
**bounds** 9:17
**box** 215:17,21 217:1 290:1,1,2,2 290:3,4,6
**break** 11:1,3,5,6 70:1,4 88:14 115:5 132:9,15 188:1 243:14
**brian** 44:9
**brief** 17:12 243:14 296:6
**briefly** 94:12 124:2 249:22

270:10 284:21
**bring** 17:6 159:25 172:14
**brings** 33:3
**brought** 118:24
**brown** 153:14,16
**built** 67:24
**bunch** 196:2
**bureaus** 49:21 50:17,19,22
**burney** 1:25 299:20 300:23
**business** 29:19 56:9 68:8,24 77:19 197:18 199:4,17 266:15

**c**

**c** 3:1,10 6:1 66:7 155:14 227:2,4 282:2
**caliber** 276:17
**california** 29:13 294:6
**call** 7:19,20 22:6 35:2 38:11 46:19 46:25 53:13 64:21 64:23 98:21,22,23 99:7,8,8 115:24,25 137:20 140:2 197:9 198:20 250:20 256:23 257:8
**called** 18:4 23:17 38:17 49:18 60:12 70:16,22 72:21 95:24 96:20,22 134:5 236:15 288:6,6 294:2
**calling** 270:11
**calls** 23:14 24:16 25:16 26:8 29:5 32:3,25 55:15 63:2 65:18 76:24 78:18 86:14 88:10 97:12,21 98:10,19 99:14 100:3 101:20 102:12 103:7 104:4 105:17 106:14 108:6,23 109:24 114:22 116:10 126:22 127:24 128:23 151:23 156:11 171:12 201:4,10 203:22 205:7 223:9,23 232:11 240:13 243:25 256:24 262:25 265:9 266:14 267:11 268:19 269:19 273:18 274:19 284:23 291:4
**canceled** 113:9,11 120:18 189:22 190:22
**candor** 159:17
**cap** 251:24 254:19
**capacities** 21:19
**capacity** 8:9 23:25 41:2 69:11 78:21
**caps** 90:14,16,17 90:21,24 91:1,6,20 92:5,22 93:1,13,16 93:22 97:15 138:1 138:5,8,9,11,13,18 138:19,22,25 139:8,10,13,22 230:6,23 231:3,7 247:20 248:1 251:5 270:25 271:16,24 272:1,5 272:12
**captured** 138:12
**car** 199:18
**carbon** 53:2
**card** 119:10,18 164:3
**cardinali** 1:2 4:18 5:6 6:4 28:9,17 56:25 80:23 81:23 82:10 86:12 117:10 121:6 122:1 123:11,21 124:12 125:3 126:8,12,20,25 129:9 142:7,19 144:12 157:3 158:8,25 175:7,17 175:19,23 178:7 182:3 187:11 190:1 197:1 203:9 210:9 211:1,9,19 215:24 218:18 222:15 224:2,7 228:8 244:14 249:9 251:8 253:20 254:1 263:14,16 268:11 269:16,20 289:18 292:11,21 294:2 299:2
**cardinali's** 13:4 28:14,22 29:3 31:8,11 36:4 86:6 87:1,13 88:21 124:8 125:4,5,9 129:11,13 131:22 143:22 146:12,23 149:14,19,20 151:7,16 158:25 161:24 162:20,21 164:14 165:9 174:18,24 177:24 186:3 189:7,24 190:7,24 191:18 192:19 195:15 220:3,14,22 225:3 225:24 227:6,22 246:3 252:10,24 253:24 263:2,9,23 267:19,25 269:9 276:20 277:8,11 277:15,19 278:2 291:2 296:17
**career** 242:21
**careful** 152:6
**carolyn** 135:22
**carstens** 155:14,15
**case** 1:4,18 6:4,9 13:5 18:3,15 23:17,22 25:4,8,12 25:25 27:13 28:18 57:1 58:7 70:22 73:24 80:9,24 82:24 83:1 84:2 85:1,8 87:1,19,23 88:1,4 101:9 109:19 116:19 121:7 123:16 134:4 142:8 152:8 157:6 168:23 169:9,10,10 171:6 171:10 173:8 187:2 189:24 190:23 217:21 220:14 226:7 237:10 246:3,3 247:20 252:11 274:5 289:14 291:2 293:15 299:4 300:16
**cases** 19:22 100:18 114:12 247:13

**cassin** 44:9,17
**cassin's** 44:11
**categorical** 170:5
**categorically** 102:6
**categorization** 139:17 141:2
**categorize** 141:13
**categorized** 139:15 141:3
**cause** 1:23 80:12
**caution** 17:2,13 46:3 159:17
**cave** 24:23 156:2 156:14
**cci** 233:13 234:1,5
**cdf** 65:23 101:16 187:3,6,7,16 189:11 192:2,5 268:10 278:24 280:4,19,23 281:5 286:15,18,20,25 287:1
**cdfs** 66:18 91:12 280:3
**cdi** 65:2,9,16 66:14 192:2,3,5,6 192:19 197:1 210:9 237:18
**cdia** 274:13,16
**cdv** 60:12,22,25 61:3,9,11
**cdvs** 62:11
**center** 135:4
**certain** 12:20 43:15 55:25 56:6 64:1 77:13 82:18 94:10 106:23 107:25 111:4,5 118:22 125:11,13 125:15 127:7 142:14 149:23 187:21 190:25 191:3 198:7 200:13 201:23 202:3 208:14 219:17,18 232:25 235:13 247:22 261:11 264:11 267:21 289:9 293:1
**certainly** 22:9 80:15,18 81:9,19
**certainty** 84:23
**certificate** 4:9
**certification** 299:12 300:25
**certified** 199:5 299:20 300:24
**certify** 299:21 300:2,12
**certifying** 169:18
**chain** 78:1
**chall** 3:17
**chance** 13:19 16:10 34:15 36:9 83:19,24 101:11 133:23 136:24 157:11 212:18 213:19 239:11,20 241:16 243:23 259:9 270:5
**change** 9:9,20 59:2 73:21 80:12 105:13 110:15,19 110:23 111:5,10 111:13,17 113:15 113:23 119:25 120:3 131:5 140:15,22 141:2 150:12,16 151:19 152:4 153:23 154:1,3,7 172:15 172:21 173:11,13 173:20 174:1,4,8 185:12 189:20 190:16 214:13 228:17,24 231:24 232:1,15,24,25 260:23 261:5,6 280:17 281:5 282:8 286:4 292:5 292:14 294:4,8 295:21
**changed** 104:5 113:24 140:25 150:10,17 151:13 152:3,4 154:9 155:22 156:10 157:4 172:7,10,11 172:17 173:5,17 290:3
**changes** 4:8 9:17 58:24 67:5 78:14 111:7 147:17 153:22,25 173:11 286:22 291:22,23 292:1 294:18 300:7,8
**changing** 173:25 228:19 232:18
**chapter** 125:10 126:4 129:21 151:1,2,14,15,17 156:25 157:2 158:15,17,21 159:1,4,19,21,21 160:11,11,15,25 161:17 162:10,11 162:13 163:5 172:13,16 173:5 173:10,18,18,21 173:21 174:3,3,5 174:10 191:21 214:8,11,13 215:10 217:6 218:14,14 223:18 289:16,20 290:17 290:19 291:1,6,12 293:8
**chapters** 151:8,8 156:22,22
**charge** 115:12,13 115:18,24,25 116:3,14,16,18,19 116:22,23 117:4 119:14,16,21 120:5,8,19 121:2 121:10,12 123:12 129:24 131:20,21 131:25 132:4 146:19 163:9,11 163:21 164:4,8 165:15 166:2,13 166:24 167:4 222:13 224:21 226:16 227:18 228:14,16,19,21 276:20 277:3 292:17 295:19
**charged** 116:2 119:19,25 120:1,7 120:15 162:25 163:12 164:7,12 165:14,21,25 166:10
**chart** 229:22
**chase** 113:19 114:7
**check** 113:9 120:18 189:22 190:22 218:21 220:11 225:17

**checked** 169:17
**checks** 113:11 166:16 296:23
**cheyenne** 3:4
**chicago** 3:11,16
**child** 125:22 219:22 293:22
**chile** 29:14,17 30:7 30:16,23 32:21 33:4,13 36:13,24 37:11
**choice** 189:1 260:23
**choose** 57:18 67:22 77:13 145:4 145:8,12,13 252:18
**choosing** 189:8,10
**chose** 120:3 285:25
**chosen** 144:11
**chris** 17:15 80:25 221:20 271:19
**christopher** 3:15 6:12
**cii** 231:14 233:3,5 233:9,11,14,21,22 233:24 234:7,10 234:13,16,17,24 235:9 238:3 290:10
**ciis** 290:13
**circuit** 272:20
**circumstance** 59:10 100:21 102:19 103:20 104:14 112:5 114:1 115:17 117:3 118:21 119:3 120:20 143:15 145:3 188:5,11
**circumstances** 58:6 62:14,17 102:18,24 112:15 115:13 120:8 163:25 170:2 171:4 180:10 184:20 203:15 219:15 252:4,6
**citimortgage** 290:24
**city** 202:5 253:2
**civil** 2:4
**claim** 127:1 262:6
**claimed** 114:25 149:22
**claiming** 58:15 216:18 246:8 293:15
**claims** 13:5 126:3 127:11 167:8 271:9 293:15
**clarification** 133:6
**clarify** 57:25 132:12 133:7 188:4 213:22
**clarity** 82:4 207:22
**clark** 3:3,3 4:5,7 6:2,8,15,19,24 13:13 14:2,5,8 17:8 21:23 22:5 22:10 27:4 28:1,4 34:8 42:19,24 46:11,24 47:3,6,12 69:24 80:25 81:13 81:25 82:5,13 85:25 88:17 104:10 115:7 121:16 124:5 136:19 157:8 160:3 165:6 187:25 221:16,20 222:1,6 229:25 230:17 243:19 249:12,17 250:4 251:18 271:19,23 276:2 283:14 284:23 287:6,21 288:23 290:12 291:4,13 293:3 296:6,9 297:7
**class** 13:4 25:7 84:10 152:8 157:5 158:9 159:23 261:22 262:6,8,19 262:23 269:12,14 270:13 271:4,9 272:15
**classified** 141:25 143:19
**clear** 10:16,17 37:22 41:25 42:9 42:10 46:1,10 94:12 102:19 174:23 177:1 209:20
**click** 286:11
**client** 25:17 81:19 82:3,9,10
**close** 14:7 37:16 278:18
**closed** 119:4,6,7 119:10,12 163:14 163:16,21 164:3 165:18 166:1,4,6,9 166:15
**closer** 46:23
**coaching** 12:1 22:1,5
**code** 77:14 144:15 144:19 146:21 147:4 196:8,13 206:5 207:22,25 208:5 226:2 228:23 229:6,20 229:21 230:5 231:2,25 232:2,18 233:1,9,11 248:13 248:15,15,16 252:18 253:3,4,6,7 253:7,9 264:24 265:5,5 277:17,21 278:1 280:24 282:7,8,20 283:4 286:4,7,10 290:18
**coded** 233:25 234:2,15
**codes** 106:7 147:13 148:21,22 149:8,10 179:21 229:10 230:3,7,23 230:25 231:15 232:9 233:3 239:2 247:22,25 248:3 248:17 250:20,21 280:16,23 281:1,2 281:7,10,11,12,25 282:4,11,14,15,19 283:2 290:13
**coincide** 231:1
**collect** 198:6
**collection** 198:14 205:15 229:2 234:4,20,22,24 285:2
**collections** 197:18 197:21,22,24 198:3 199:1
**collectors** 198:4,6
**colon** 158:9
**column** 176:19 182:19 183:1

186:7 249:1
**columns** 176:18
**come** 18:13,14 38:18 55:17 68:17 73:13 105:15,20 150:9 154:21 268:3,7 277:16 295:11
**comes** 114:2 154:22 185:13
**comfortable** 159:14
**coming** 6:17,18 40:25 283:16
**comment** 68:14 215:13 237:3
**common** 43:3 115:2 165:24 166:18
**communicate** 65:1
**communicated** 67:15
**communicating** 67:14
**communication** 46:15 79:23 80:3 80:5 84:1,20,25 241:19,21 242:10 242:17 259:13 260:7
**communications** 78:19 79:13,16 81:4 154:17,18,23 154:24 155:6,12 155:16,18 172:3 259:21 260:10
**companies** 205:15 205:18
**company** 15:14 33:6,25 34:1 45:9 154:25 200:21 201:11 245:11
**compare** 267:1
**compel** 17:12
**complaint** 4:21 28:18 157:20 195:17 216:16 261:16
**complete** 10:7 13:23 46:14 143:9 147:7 186:4 222:3 244:4,4,16 254:13
**completed** 48:21 48:25 151:5 178:15,15,18 180:4 182:20 186:2 285:5 286:20
**completely** 61:24 108:3 148:7
**completion** 300:5 300:11
**compliance** 19:5
**complies** 258:19
**comprehending** 31:5
**comprehensive** 238:12
**comprised** 195:10
**computer** 20:10 20:17 21:10,14,15 38:2,10,12 67:24 138:22,23 273:12
**computing** 20:14 24:14 271:13
**concept** 244:22,25
**concern** 75:21 77:6
**concerns** 48:5 182:14
**concluded** 297:10
**conclusion** 36:18 73:13 97:22 98:10 98:20 99:15 100:4 108:6,24 116:11 127:25 201:4,10 203:22 205:7 216:25 223:10,23 240:13
**condition** 116:19 117:1 118:17,25 118:25 126:1,2 226:5,6,10,13,24 234:5
**conditions** 112:13 289:9 293:1,7,12
**conduct** 40:21 86:7 181:8
**conducted** 247:20
**conducting** 181:15
**conduit** 90:22
**conference** 6:7
**confidential** 1:17 6:21 240:5,11 260:2
**confidentiality** 7:1
**confirm** 246:1 248:7
**confirmation** 17:10
**confirming** 178:6
**conflict** 148:8
**confused** 177:12
**confusing** 11:10
**conjunction** 50:18
**connection** 17:21 25:3 28:22 51:22 54:10,17 55:10 70:18 75:6 76:10 87:12,13 88:21 100:1,11 108:1 128:18 144:20 148:2,25 149:4 161:17 183:23 198:14 209:17 262:12 264:3
**consequence** 172:25
**consequently** 10:8 10:15
**consider** 41:14 93:22,24 109:20 110:7,12,17,20
**considering** 202:9
**consisting** 158:9
**constantly** 52:9 76:18
**constitute** 109:22 110:9 134:15
**consult** 1:19
**consumer** 19:16 20:1,6 38:24 39:13 40:5 41:1,6 41:11,25 42:9,10 46:12 47:18,23 48:9,15,20,22 49:8 58:1,10,12,15,17 58:19 59:8,12 64:22,25 65:1,5,6 65:7,9,11,14,17,21 65:22 66:4,9,12,16 66:24,25 67:3,7,9 67:21 68:1,3,4,9 68:15,19 72:9,22 79:18 90:9 92:3 92:12,18,20 95:5 97:14 98:8,12,14 98:16,22,25 99:4 99:12,19,25 100:1 100:14,19 101:1,7 101:11,17 102:16 102:21 103:1,1,12 104:8,18 105:13

108:13 110:14
112:7,12 113:7,18
114:2 119:24
120:14,16,20
122:8,13 126:3
127:10,11,13
128:10,14 129:1,4
130:19 131:4,7,10
133:23 138:13
139:24 142:7
143:7,9,13 144:24
145:22 146:2
147:23 148:3
149:1,21 150:4,6
167:2,8,11,12,18
167:22 169:1,5
170:10 175:7,19
178:7,9,10,23,24
179:5,8,15 180:16
181:3,7,14 182:13
184:17 186:16
187:5,6 188:13,24
189:21 192:6
194:24 198:17
199:7,11 200:25
201:17 202:8,10
204:15 205:1
206:11 215:11,18
215:22 216:18
217:4,5,15,18,20
219:11 223:4
234:13,25 237:16
237:22 244:5,10
245:5,18,20
246:11,20 247:4,8
247:10 251:13
252:17 254:8,20
254:23 255:24
256:15 258:3,7
267:25 274:10,18
275:6 276:21
278:5 284:12
285:3,6,6,8 290:6
290:9 293:14
296:22
**consumer's** 41:1
47:14 48:3,4,17
92:25 98:21
103:11 109:22
110:9,17 116:9,13
117:4,7 131:12
138:10,10 143:8
180:2 185:17
188:12 189:16
198:25 201:16
204:12 209:4
211:7 215:2,4
216:15 220:10
232:19 234:12
237:2 246:17
247:1,12 261:8
289:16 293:2,14
**consumers** 40:16
64:5 66:3 91:12
91:14,15,18,21
98:3 146:5 160:22
245:7,24 250:17
254:16 255:1,2,4
278:23 280:17
281:4,4 282:16
**cont'd** 5:1
**contact** 47:23 60:2
60:6 131:16
179:12 243:22
259:24 288:1
**contacted** 184:7
235:6
**contacting** 110:15
121:2
**contacts** 60:4
254:21
**contain** 1:17 74:25
95:24 137:7,10
196:5 204:18
238:13
**contained** 38:25
45:2 61:13 95:4,6
100:21 106:1,4
142:8,10,10,25
143:3 195:13
202:23 208:4
212:3,22 238:24
239:6 280:4
281:17
**contains** 95:12
174:18 300:8
**content** 240:10
249:20
**contents** 213:16
**context** 64:8,11
87:25 111:20
127:24 129:8
**continue** 47:7 51:7
117:14 118:16
122:8,19 242:7
243:16
**continued** 118:23
294:15,17
**continues** 22:5
**continuing** 115:25
**control** 153:23
**conversation**
106:18 109:18
**conversations**
25:19,20 106:20
**conveyed** 89:2
**copies** 32:17 53:2
92:15 262:6
**copy** 31:19 32:9
37:23 74:1,15,17
86:24 113:9
120:17 126:12
175:19 189:21
190:17,17 195:15
221:5,13 260:1
**corner** 15:20
83:11 290:6
**corporate** 15:8,11
17:6 77:25
**correct** 8:18 9:8
9:13 15:8 17:1
20:7 33:22 40:16
46:1 58:25 59:8,9
61:6 70:6 71:13
71:14 73:24 74:15
74:16,22 75:25
76:11 84:11,15,19
89:21 92:12 97:15
102:6 105:1
107:16 120:1
123:7 126:10
130:7 131:7
132:11 133:7,12
139:6,9 142:15
143:16 149:8,11
149:16 151:11,12
151:15 156:23
157:23 160:19
161:10 162:18
163:15 165:6
166:2 168:1 170:8
172:19 173:1,8,9
173:15 180:22
189:8 193:24
197:2 203:10
205:2 209:25
210:6 211:19
216:6 217:23,24
226:20 227:19
237:25 242:22
243:7 254:23
257:4 258:13
259:19 260:4

**[correct - data]**


261:3 262:3 264:24 266:24 267:21 268:11,17 273:13 277:24 280:7,11 293:5,12 293:19 298:3
**corrected** 9:16
**correction** 175:6 182:1
**correctly** 16:22 68:24 121:8 202:20 208:24 216:18 259:16 260:16
**correlate** 234:15
**correspond** 231:6 290:14
**correspondence** 41:25 58:2 104:20 133:22 136:11 137:16 138:14,16 139:16 140:4,10 140:24 143:15 164:23 174:19,25 175:1 178:25 189:16,20,23,25 191:19 215:25 251:14 252:7,8,12 255:22 256:25 257:20 285:20
**corresponding** 286:23
**corresponds** 255:21
**costa** 29:14,21 30:6,23 33:14,19 136:2
**coterminous** 297:4
**counsel** 1:19 6:10 6:11 11:19 12:2,5 15:4 19:8,10 21:23 24:22,23,25 27:10,13 37:6 42:14,14,14,20 43:12 67:15 69:10 78:19,24 79:4 80:21 81:10 151:25 152:11 153:13 154:6,10 171:19 172:3 253:25 300:13
**counsel's** 27:5,7 79:2 81:16 152:10
**county** 202:5
**couple** 242:8 244:7 283:11 292:19 293:6
**course** 9:12,21 12:21 19:14 20:23 78:12 89:20 96:6 98:17 106:17,19 127:9 242:20
**court** 1:1 6:5 8:24 10:14 34:13 46:6 81:20 88:15 127:14 129:1 299:1
**court's** 223:19
**cover** 13:5 205:14 205:18,21,24
**cra** 288:1
**create** 50:12,23 51:6 239:25
**created** 50:17 51:3 138:11
**credit** 4:23 5:15 38:25 39:1,1 40:6 41:16,20 47:23,25 49:21 58:11 65:7 68:5,6 91:14,17 92:15,23 97:18,24 98:2,3,6,24 99:1,4 99:7,10,13,18,20 99:24 103:11 112:11 116:5 117:5,7 119:10,18 120:23 126:13 164:3,19 171:24 176:15 178:2 179:5 181:8,14 187:19 189:10 197:10,12,13 198:21 199:8 201:8 203:7,14,20 203:23 204:5,8,14 204:15 206:10,22 208:14,17 210:19 210:23 211:5,6 232:19 246:16,25 251:6,24 264:11 264:15,17 265:7 266:5 267:3,13 268:17 274:6 277:2
**creditor** 120:17 167:2 201:2 229:4
**creditors** 205:24
**creditworthiness** 204:1,12
**crime** 199:13
**criteria** 125:11,13 125:15,18,21 126:6 149:23 219:18,20 232:25
**cross** 296:11
**crossed** 279:24
**crrg** 274:8,25 275:22
**csr** 1:25 300:23
**cues** 10:4
**curious** 206:19
**current** 118:25 130:24 224:17 227:5,7
**currently** 19:2
**customarily** 160:22
**customary** 178:21
**cut** 10:9 253:10
**cv** 1:4 6:4 83:2 299:4
**cycle** 142:14 180:4 285:19

**d**

**d** 6:1 7:5 66:7 218:19,23 282:2
**da** 226:2,7
**daily** 20:22 23:4 72:7 76:5 96:10
**dallas** 2:3 6:6 136:2
**dash** 186:11 257:2
**dashes** 186:10
**data** 23:11 25:11 25:12,24 40:6 48:6,7,13 49:4,10 49:15 52:23 53:4 53:13,16,21 54:2,3 54:7,15,16 55:24 56:5,10,14 57:10 58:7,21,23 59:7 60:2 70:19 71:1 71:16,17,21,24 72:2,10,11,16,20 72:24 74:6,9 75:5 91:5 94:11 96:9 96:12,13,19,20 97:10 98:4 100:1 100:6,8,15,16,23 101:11,14,17 102:17,20,22 103:2,3 104:7,17 105:11,15 109:21 109:23 110:8,10

**[data - deleted]**


110:13,16,18,21 110:23,25,25 111:4,7,11,12,17 112:4,7,8 113:2,13 113:16,24 114:6 114:16,19,24 115:16,17,21 118:21,22,23 119:2,2,21 120:2,4 120:11,17 121:3 123:25 127:4,16 128:15,22 129:6 131:17 139:5 145:3 146:21 147:15 162:4 164:7,9 165:19,20 167:7,9,15,17,23 167:24 168:24,25 169:1,6,8,14,21 170:9 183:19 184:17 185:13 188:10,21 197:10 205:12 206:10,12 214:12,18,20,23 214:25 215:3,6 220:8,16 232:21 239:23 241:8,14 242:13,14 243:4,9 243:10,22,23 244:3 246:1,21 247:5,11,17 265:16,20 267:8 271:3,9 274:10,11 275:10,14,19,22 285:24 287:17,22 288:1,5 290:24 291:23 292:9 293:11 294:1,11 296:10,13,21,22 297:3

**database** 90:5 204:16 268:22 271:3 272:5,14 295:17

**date** 6:2 56:4,6,11 56:12 61:20,21,21 116:24 117:6,15 117:19 118:16 119:1 121:10,11 125:25 129:17,17 129:21,22 130:11 130:11,18 132:1 150:1,5,5,13,18,18 150:19 151:1,10 151:18,21,21 152:5 154:13,15 156:20,20 157:4 162:3,3,13,22 163:9,10 169:15 169:16,16 172:11 172:17,18,20,23 172:24 173:6,12 173:25 174:1,2 175:16 188:15 193:18,21 214:23 215:6,12,12,23 217:6 228:3 232:3 235:7,8,8,23 236:10,17,25 237:1,19,24 253:3 253:3,3 254:14,15 255:12,13 257:6,6 257:6,13,13,19,22 257:23 261:21 263:10 268:22 285:19,20 292:4 293:21 300:6

**dated** 175:19,23

**dates** 123:6 130:8 217:24,25 257:8 293:12,19

**day** 1:24 2:2 3:15 6:13 9:21 15:5 55:22 72:7 81:17 132:19 133:18,20 175:12 178:17 180:3 224:18 242:5 244:12 273:24 277:1,2,14 300:19

**days** 6:21 56:4,8,9 57:8 74:2,10,12 103:13 131:3 244:4,7 245:16 246:14 300:6

**de** 3:10 6:19 46:20 47:1,1,3,5

**deadline** 56:14

**deal** 23:3 151:8 256:12

**dealt** 19:15

**debt** 126:21 127:7 127:11 198:4,6 228:5

**debtor** 223:6,17

**debts** 122:25 160:22 161:2 223:7

**deceased** 232:20 233:1

**december** 150:14 151:13 153:18 154:12,12 155:19 162:9 172:15 175:20 191:24 192:11,19 193:24 210:9 227:10 266:22 276:7,10

**decide** 151:19

**decides** 144:25 164:10

**decision** 43:10,22 81:11 140:1 143:16 154:6 164:9 201:8,13,13 201:22 202:14,16 202:17 266:15

**decisions** 43:6

**declaration** 168:3 168:22 170:24 171:3

**declare** 298:1

**decode** 37:2,4

**deemed** 125:4

**defendant** 1:9 299:9

**defendants** 3:14

**defense** 6:11

**defer** 154:5

**define** 99:6

**defined** 261:23

**definition** 20:12 21:8 72:11 157:5 159:23 196:12 197:12 236:21

**definitively** 157:1

**degree** 49:24 293:3

**delete** 145:8 226:7 232:23 237:3 281:1,6,11 282:7 282:11 294:21 295:6 296:3

**deleted** 62:15 103:10,14,18,21 145:1 162:24 180:25 181:3 183:25 184:21 185:6,14,16,20,20 185:21 245:9,12 268:8,15 277:16 278:25 280:6,20

280:20,25 285:2
**deletes** 281:25
**deleting** 145:17,18 180:15
**deletion** 53:22
**deletions** 67:6 111:7
**delinquencies** 150:4 215:9,11,15 215:19,22 217:5 217:15
**delinquency** 116:21,22,25 117:19 118:17 119:1 216:19 229:3
**delivered** 197:8
**dell** 1:6 166:7 289:3 292:13 293:7 294:13,15 295:21 299:6
**demographic** 203:6 204:10
**denied** 260:18
**deny** 259:18
**department** 135:2 135:12 152:18,21 152:23 153:20 154:17,18 155:3 155:16,19 174:14 197:22
**depend** 116:17 122:22 159:9 219:14
**depended** 201:6
**depending** 133:19 161:8 199:24 216:15 235:5
**depends** 20:12 22:14,17 39:23 40:23 42:13 48:10 103:8 107:6 119:9 119:12,19 120:14 121:5 130:22 142:1,5,22 167:1 188:12,23 244:2,8 247:7 270:17
**depo** 4:14,17,19 4:20,22,23,25 5:3 5:5,7,9,12,14,16 15:21 87:24 124:4 124:5 165:4 174:24 175:18,21 196:11 209:23 213:24 214:10 215:10 218:7 220:6,7 230:3 231:13 275:12 281:24
**deponent** 300:3,4 300:10
**depose** 28:25
**deposed** 7:24 8:8 8:16 18:17,21 56:21
**deposition** 1:11,21 4:16 6:3,6,25 8:18 8:23,25 9:1,13,15 10:6,20 11:1,2 12:21 14:16 17:3 18:10,11 24:6,11 26:12,22 27:17 46:7 81:8,16 82:23 83:10 84:5 84:13,24 87:6 159:19,22 281:23 297:10 299:13,25 300:5,11,15
**depositions** 8:6 18:13,23 24:11 39:17
**derive** 261:2
**derived** 250:21
**derogatory** 116:8 117:12 118:6,7,8 118:12,18 123:5 129:22,25 130:17 130:21 131:3,6 132:1,5 163:15,18 166:5 228:2 269:15
**describe** 47:17 64:18 66:1,18
**described** 45:2,11 102:19 112:14 114:2 120:9 143:16 145:24,24 145:25 180:8 203:15 231:1 245:17
**description** 4:13 5:2 209:21
**descriptions** 210:11
**deserve** 7:20
**design** 146:4
**designate** 16:8 187:7,18
**designated** 1:13 7:2 15:7 16:19,20 17:4 19:21 51:12 88:3,6 186:18 299:15
**designation** 206:9
**designations** 7:1 13:25 19:24
**designed** 71:15,17 71:20,23 72:2 79:7 94:9 98:1 108:12,18 146:6 149:7 217:14 274:10
**designee** 15:11 45:8
**desire** 245:23
**destroys** 97:9
**determine** 37:10 75:9 115:22 123:11,20 143:2 148:17 189:25 190:2 201:16 203:17,18 236:9 237:7 244:10 247:21 257:9 258:2 262:10,11 262:19 264:2 265:25 268:16 275:23
**determined** 146:18
**determines** 59:11 62:9
**determining** 131:10 142:24 224:15 265:6
**dial** 6:13,16
**dialed** 6:14 46:21
**diamond** 241:7
**dictionary** 21:8 106:16
**difference** 10:23 55:12 62:7 72:18 120:6 222:25 223:3
**different** 30:20 46:22 47:23 60:5 61:15,15,19,24,25 71:19 80:12 85:1 85:5,13 87:14 88:1 89:20 108:16 111:14 115:1 116:1 117:20,23 123:19 140:5,20

146:19 147:10,14 147:21 154:24 155:2 156:22 161:8 165:1 175:13 177:15 180:10,13 181:24 182:2,5,10,16,25 214:20 216:8 253:16 257:8,15 269:21
**difficult** 131:15 142:1
**direct** 39:4,8,11,20 39:23 40:11 73:4 82:18 83:8,17 85:22 121:19 146:15 157:25 158:4 186:9,11 191:11 192:10,11 192:22 210:10 220:25 226:1 250:15 259:5,6,8 263:5 276:8 278:20 284:3
**directed** 112:24
**directing** 13:9
**direction** 43:12
**directly** 29:3 39:12 41:5 65:22 101:7 111:7 127:16 152:7 176:12 202:25 241:3 288:1
**disagree** 129:10
**disagreement** 167:21 168:23 170:10
**disagrees** 38:24
**disc** 237:7
**discharge** 121:11 130:11 150:1,5,19 151:4,4,10,21 156:20 160:18 161:20 162:3,13 172:18,24 174:2 215:12 217:16,25 222:17,20 223:20 224:3 233:13,14 233:19,23 234:6 234:11,18 235:11 290:17,19 291:1 293:10
**discharged** 61:22 122:19 126:9 129:16,17 161:13 162:14 191:22 227:25 228:10,11 291:11 293:8,16 293:16
**discharges** 223:7
**disclose** 211:1,7 262:23
**disclosed** 196:25 249:7 266:6
**disclosure** 4:15 34:25 35:15 36:7 36:17,22 65:5,6,7 65:10,11,22 66:4,5 66:6,6,12,16,23 67:1,4,7,21,23 68:3,9,12,14,15,22 69:2,5 91:3 98:15 98:22 140:20 174:25 175:19,22 187:8,9,11 192:6 210:25 237:16,20 237:23 263:18 269:5 276:7,7 284:1
**disclosures** 91:11 165:1 205:2 235:7 262:10 269:1
**disconnect** 46:19
**discovery** 171:10 274:4
**discretionary** 107:20
**discussed** 62:11 79:3 216:4 217:2 220:1 238:3,6 239:5 269:17
**discussing** 70:9
**discussion** 88:18 141:17 172:12 230:18 243:20 251:19
**discussions** 25:3
**display** 130:11 131:1 211:5
**displayable** 196:23,23
**displayed** 196:17 206:11,17 234:12
**displays** 196:20
**dispute** 4:24 17:21 28:9,14,22 29:3,7 29:10,11,13,14,16 30:14,15,15,18,18 31:8,11 33:24 35:1 36:4 38:21 39:4,8,11,20,23 40:5,11,20,25 41:12,25 47:14,19 47:22,24 48:11,17 49:8 53:3,11 54:18 56:5,10 57:21 58:2,3,10,17 59:11,15 62:18,23 63:1,8,15,15,20 64:2,7,10,18,24 66:2,9 68:3,19 72:9 73:7,7,21 79:18 86:6 87:1 87:13,19 88:21 100:1 104:20 106:7,8 110:18 112:6 114:19 120:7,9 121:1,5,7 121:25 122:2 123:4,9 124:8,13 125:4 126:10,13 127:10 128:9,14 128:22,25 129:12 129:13 130:9 133:1,12 139:14 139:15,21,22,25 140:2,6,6,7,19,25 141:1,1,3,6,25 142:3,6,14,25 143:3,5,6,12,14,18 143:22 144:9,16 144:20 145:4,6,22 146:9,12,18,20,23 147:13,16 148:9 148:25 149:4,8,10 149:19,20 151:7 161:24 162:20 164:15,22,23 174:18,19 176:8 176:13,16 177:24 178:22 180:8,9,19 182:7,11,16,17 183:6 184:18,22 186:3,24 187:16 188:6,13,19 189:25 190:2,7,9 190:11,24 191:2 191:12,19 213:2,4 213:5 216:5,8,11 216:13,16,23,24 216:25 217:19 218:19 220:3,20 220:22 222:10 227:22 228:9,13

228:18 229:10 230:3,20 231:16 231:17,20 232:9 232:16 238:2,4,18 238:22 241:4 242:15 243:23 244:14 246:17,18 246:18 247:1,2,2 247:12,22,25 248:3,13 250:19 250:20 253:3,3,6,9 253:24 255:13,21 256:4,12 257:6,13 257:22,23 258:7 259:14,22 264:1 275:6,6,9,11,13 280:3,14,16,18 281:25 284:11,11 284:14,16 285:17 285:18,20,25 286:3 287:2 289:23 292:22 294:12,16,24 296:18 297:3
**disputed** 61:9 67:5 111:22 123:22 131:2,22 150:4 179:6 220:15 222:16 280:4 289:8 291:16 296:19,25
**disputes** 5:4 19:17 20:1,6 30:5,6,10 30:12,13,16,16,20 33:11 36:4 40:15 46:12 49:21 89:19 90:19,19 132:19 132:25 133:23 134:16 136:11 141:19 142:2,3,4,5 142:8,9,14,19,22 143:3 144:24 147:23 148:3 159:5,6,21 167:12 181:22 182:20,23 183:5 212:25 213:17 215:11 227:18 231:5 250:16,17 252:8,9 256:6,13,19,22 257:3 258:2,6 284:18 296:22
**disputing** 58:15 86:12 87:9 109:22 110:9,14,20,25 122:4 123:13 146:2 177:25 190:25 191:3 215:18
**distinction** 30:5,11 30:17 54:9,25 60:8 61:8 66:17 66:19 109:14 110:24 111:3 151:14 160:10 208:4 218:14
**distinctions** 60:21
**distinctly** 111:14
**distracting** 153:3 242:2
**distributed** 30:14
**district** 1:1,1 6:5,5 18:4 70:23 299:1 299:1
**doc** 256:9,20
**docket** 129:18
**document** 13:16 25:22 26:5 27:16 28:24 32:22 34:22 35:4,18 36:6 37:1 37:19,20,21,23,23 38:2,9,11 45:2,3,9 45:15 72:13 73:13 82:21 83:1,6 85:15,19 94:2,5 95:8 96:2 106:1,4 106:5,9 108:11 113:23 114:7,9,11 114:13,14 124:3 124:23,25 126:15 127:14,14 129:2 137:3,7 145:11,19 157:15 176:4 177:1,2,15,18 183:14,18 189:6,7 190:21 191:24 192:4,7,11 194:17 195:10,11,19 218:13,17 221:1 227:13 229:9,23 230:10 238:11,16 239:14 240:2,9,10 240:18 241:17 242:13 245:12 248:5 249:6 251:9 251:9,22 252:1,2,5 252:11,14,23 253:4,7,8 255:19 255:20,24 256:1,3 256:7,14,18 257:10,17 258:15 258:25 260:2 270:1 271:22 274:4 275:1 279:5 279:8 285:21 290:13
**documentation** 127:3 256:16
**documents** 6:22 6:25 13:18 14:18 25:10 26:2,21,24 27:2,9,12,20 34:23 34:24 35:3 36:3 37:9 86:17 109:11 114:24 125:8 126:7,8,19 138:20 148:18 174:20 175:14,25 176:3,7 177:22 181:23 182:8 190:4,15 195:13,14 211:19 212:2,5,21 218:3,7 218:8,10,15,25 219:5 228:24 246:4 247:14 249:19,20 287:13 292:21 294:3,7
**doing** 79:10 107:9 159:11 197:9 240:7 244:6,17,20 252:13
**doubt** 32:1,5 89:22 141:18
**dr** 35:18,21,23 36:8,18,22 57:9,14 57:16 59:14 62:20 73:4,8,18 74:24,25 75:4,11 77:12 85:17 86:12 87:9 88:20,25 89:1 91:3 142:13,13,18 187:13 189:1,4 241:9 260:21 261:3,4 283:24 284:2,7,10,11 285:16 287:12,18 287:22 288:3,6,12 288:13 289:1,3,6 289:14 291:7,10 292:11,11
**draft** 274:17,21
**draw** 217:1
**drive** 234:18

**drives** 234:25 261:5
**driving** 199:24 200:4
**drn** 53:7,11,15,16 53:20,23,24 54:10 54:12,22,23,25 55:7 56:15,19,22 56:23 57:10,13,14 57:19,22 58:8,23 59:13,16 62:16 70:18,19 71:2,6,11 71:15,17 72:4,11 72:24 73:14,16,22 73:23 74:1,15,17 74:20 75:2,6,10 76:16 77:14,15 79:23 80:5 84:1 84:20 86:5,24 87:12 88:7 89:3 100:12,21 102:19 102:23 103:3,4,4 103:22 104:8,16 105:2,14,24 109:21 110:9,12 111:15 112:14,25 128:15 144:1,15 144:16 145:3 146:4 148:7 184:12,14 189:1 189:17,23 190:12 241:1,19 242:15 243:2 252:4,9 259:23,23 260:4,6 260:15,23,25 261:6 275:20 289:15
**drns** 54:14,16 55:4 55:13 56:13,25 57:5,7 70:9 73:16 74:8 76:13,14 89:4 139:2 148:24 242:20 275:15 288:21
**drugs** 12:10
**due** 29:18 110:16 111:10 164:6 166:5 228:19 289:17
**duly** 1:22 7:7 299:23
**duties** 15:10
**duty** 40:5,7,8 50:11

**e**

**e** 3:1,1 5:4 6:1,1 7:14 38:17 49:18 49:19,23 50:12,23 51:2,6,6,14 52:1,5 52:8,14,22 53:2 57:8 60:9 71:3 74:11,13 76:14 89:4,5,18,20 135:24 155:14 230:5,23 231:2,5 233:10 234:1,5 239:23 241:8,14 260:1 275:18 287:13,18 290:20 291:6,8,8
**earlier** 15:5 23:18 51:21 69:13 72:6 84:9 133:17 159:14 179:20 214:4,9 219:16 241:24 262:10 264:23 267:20 268:9 283:24 286:5 287:7,14 288:25 290:13
**ease** 16:14
**easier** 10:1 295:13
**easiest** 66:1
**ecoa** 232:18,25
**education** 130:9
**edward** 290:20
**effect** 150:24 162:9 168:4 170:24 188:14 277:17
**effectively** 163:7
**eight** 66:21 68:23 69:2,5,15 142:20 142:22
**eis** 155:2
**either** 37:22 42:14 51:20 57:22 58:7 62:15 73:12 110:14 123:14 127:1,8 139:15 145:7 173:8 225:2 232:3 277:19
**elapsed** 257:13
**elapses** 166:1
**elect** 67:7
**electronic** 37:24 49:9 137:11,14 139:8 140:9,13 141:13,20
**electronically** 45:3 60:25 61:5
**element** 214:23 215:6 262:19 271:9
**elements** 183:12 188:17 214:12,14 214:18,20,25 215:3 271:4
**elicit** 71:15,20,23 72:2 85:17
**eliciting** 85:9
**elicits** 72:13
**email** 38:1,11 154:21 155:5,7
**employed** 19:2 300:13
**employee** 78:5 136:7 266:20 300:16
**employees** 94:10
**employer** 202:9
**employers** 205:21
**employment** 187:20,22,23 202:10,16 203:16
**encompasses** 118:2
**ended** 132:22
**ends** 177:3,5
**endurance** 11:2
**english** 30:21 31:3 31:5,6,17 32:12
**ensuring** 128:4
**entered** 254:16,17 254:18
**entire** 187:3 195:24
**entirely** 273:11
**entirety** 140:4
**entities** 189:9 211:2 269:2
**entitled** 10:21 210:5 242:4
**entity** 33:18 49:23 199:3
**entries** 228:2
**entry** 116:8 117:12 131:3,6,6 196:6 227:2 256:3 295:10,20
**environment** 163:1 200:9,9

**epc** 4:20 135:4,6 135:10,14 137:6
**equal** 169:5 170:1 170:9,14,18,22,25
**equally** 29:24
**equifax** 1:7 50:20 240:5 299:7
**errors** 9:16
**es** 291:3
**essence** 245:8
**established** 222:16
**estimate** 10:21 242:25
**estimation** 10:23 52:7,14 75:24 76:9 78:4 134:13
**everyday** 108:14
**evidence** 114:2 191:2
**exact** 132:21 147:9 150:13
**exactly** 18:20 37:14 51:13 53:13 58:16 59:8,12 66:21 72:8 106:8 117:3 129:19 132:17 135:3 138:21 153:19 231:10 249:10 257:9 265:19 268:14
**examination** 4:5,6 4:7 7:8 283:17 296:8,11
**example** 10:24 38:1 57:9 68:4 103:9 113:7,17 116:14 118:18 144:23 145:10 147:5,5,18 164:2 180:16 189:21 199:12 206:18,20 206:23 208:11,13 229:1 231:9 232:17,18 234:19 235:19,21 237:16 250:15 264:23 265:18 269:9 282:8 289:15 290:23
**examples** 58:21 68:16 206:21 215:16 216:2,9,9 216:10 247:8
**exception** 114:18 239:2
**exceptions** 282:5
**excerpt** 85:2 249:3
**excerpts** 274:5,24 275:4,5
**excluded** 246:7 293:22
**exclusion** 226:2 277:17,21 278:1
**excuse** 54:1
**executed** 298:5
**executives** 43:20 43:21,24
**exhaustive** 218:24
**exhibit** 4:14,15,16 4:18,20,21,23,24 5:3,4,6,8,10,13,15 13:13,15,17 14:11 14:12 34:9,10,12 34:14,20 35:15 38:18 73:3 82:15 82:17 109:2,6,10 121:17,18,20,22 136:20,21,23 146:13 157:8,9 174:17 177:23 187:14 192:21 194:21 195:4,6,9 195:13 211:22,25 212:2,19 213:3 221:15 225:18,18 225:19 229:25 230:1 233:7,8 239:9,10 240:25 243:3,12 248:21 248:22,24 250:5,6 250:8,23,25 258:16,22 269:23 273:23,25 278:9 281:24 283:19 284:4 287:12
**exhibits** 4:12 5:1
**exist** 260:10 289:9
**existed** 239:6 287:8
**exists** 32:22 219:19 232:25
**expect** 198:13
**expectation** 287:17
**expected** 289:13
**expedite** 245:8
**expedition** 81:3
**experian** 1:8,11 4:18,23 6:4,13,17 8:11 17:20 19:2 19:12,15 20:4 22:24 23:2,18 25:6 28:9,17,20 30:22 32:9,16,20 33:1,5,11,13,16,19 33:22 39:2,20 40:10,15 41:4,14 41:24 43:4,5 44:2 44:11,13 45:25 47:13,24 48:1,17 49:3,12,15,23 50:11,20 51:3,14 51:17 52:1,14,22 53:23 54:6,10 55:10,23 56:11,18 57:5,7,21,25 58:6 58:24 59:6,10,13 59:14 60:4,15,22 62:9,14,15,25 63:8 63:14,25 64:17 65:12 68:18,21 69:4,6,18 70:13 71:3 73:14,24 74:5,8,12,14,17,21 75:10,22,24 76:13 76:15,20 77:6,16 77:20 78:5,13,19 79:16 86:13 87:12 88:20 89:12,17,22 91:19,22 92:4,11 92:14,20,22,24 93:18 94:14 96:25 97:9,14 98:18,21 99:12,24 100:16 100:22,25 101:9 101:15 102:8,21 102:24 103:2,21 103:21 104:15,18 105:6,22 109:20 110:7,20 111:10 111:15,20,21 112:7,14,24 114:5 115:11,11,12 118:4 120:9,23,25 122:1 123:10,15 123:20 124:9 125:4 126:10,19 128:4,15,20 130:20 131:5,9,19 133:12,23 134:8 134:14,20 136:6,7 136:10 140:9,11 141:1,17,19

142:24 143:2,19 143:21 144:1,10 144:14,22,25 145:3,17,21 146:1 146:4,7,9,20,21 147:15 148:24 149:7 150:9 151:19 152:17 153:9,17 154:8,22 154:24 160:9 162:20 164:19 165:13,17 167:5 167:13,23 168:2 168:13,24,24 169:4,7 170:6,8 171:22 172:7 173:4,17,20 174:8 174:13,23 177:16 177:19,21 178:10 178:11 180:11 183:15,21 184:6 184:16,20 186:1 188:8 189:24 190:7,11 191:6,18 196:24 198:17,17 198:20 199:5 204:3,6,7 206:21 207:1,11,13 209:12,22,24 211:1,12,17 216:5 227:21 231:17,20 238:5 239:13 240:2,6,8,15 242:21 243:22 244:9,15 246:15 246:19,24 247:3 247:17,19 248:11 257:19 259:21,24 260:6,7,18 261:1,7 261:14 262:1,6,22 263:18 264:11 265:24 266:4,11 267:17 268:15 269:13 274:13,15 274:17,21,22 275:1 278:22 280:5,9,10,14 281:6 288:7 289:8 289:22 290:12 291:10,21,25 299:8,14

**experian's** 5:8,10 5:13 6:3 8:4,14 13:24 14:16 15:7 17:10 19:8,10,21 19:25 20:5,17,23 21:10,19 23:12 24:7,14,23 29:10 32:2,23 37:25 40:4,7 45:1,8,10 45:23 47:17 51:5 55:3 58:4 68:13 70:25 78:14 81:9 81:17 88:3 90:5 92:8 94:1 98:7 99:18 101:24 102:10 104:1 107:25 108:3,11 108:17 114:18 125:2 128:13 135:4 136:16 137:6,7,10 139:17 144:7 146:18 148:6 149:11,21 150:3,20 151:7,24 153:22 158:20 159:3,5,20 160:14 161:18 165:23 166:17 167:20 168:3,17 170:4 171:23 178:21 180:16 181:7,13 186:25 188:5,9,25 204:15 213:7 214:4 219:9,10 220:1 223:6,20 230:8 231:3 234:14 245:17,23 250:11 259:3,18 260:2 262:21 270:7,11,22 273:15 278:13 280:6 285:3 287:16 289:17 295:25

**experience** 20:4 79:10,12,14 145:21 166:24 199:23

**expert** 8:8 19:21 20:10,13 155:24 273:12

**expires** 300:25

**explain** 113:5 183:21 211:12 216:1 217:4,8,18 217:19 295:13

**explained** 130:10

**explaining** 150:6 179:20 285:8

**explains** 229:21

**explanation** 38:7

**explanatory** 255:9

**express** 244:23,25 245:2,4,15

**extend** 181:8,15

**extensible** 272:3

**extension** 264:15 264:16

**extent** 26:25 42:12 42:16 67:13,14 78:18,20 79:15 127:23 151:23 152:1 171:12 172:2 291:9

**external** 59:22,23 59:24 62:2,7,10

**externally** 62:3,4 62:23 216:5,8,11

**extremely** 179:19

**eyes** 1:18 6:22

**f**

**f** 66:7 218:19,23 300:3

**face** 54:24 123:9

**fact** 12:22,22 57:15 61:23 63:15 73:19 123:16 131:22 144:10 146:22 182:24 245:6 268:9,10

**factor** 201:8 202:8

**facts** 25:18

**fair** 41:16,20 49:5 76:9,19 77:1,5 97:18,24 98:6 99:10,17,23 107:1 107:10 116:5 133:4 161:15 171:24 173:4 198:16 201:15 203:18 240:8 246:16,25 250:2 277:12

**fairly** 208:14

**fall** 197:6 205:10 205:10

**falls** 46:10,11,15 197:7 206:5

**familiar** 8:17 20:5 20:17 22:24 25:6 25:13,14 55:5 71:10,12 79:8,10 82:19,21 90:12

**[familiar - follows]**


92:2 94:5 95:8 96:3,4 116:4 127:19 199:20 206:3 239:14 243:6 244:22,24 258:25 274:25 275:2 288:19
**familiarity** 20:20 24:7 55:3
**familiarize** 56:22
**far** 13:24 31:17 50:3 61:20 72:18 98:3 104:8 159:13 161:2 162:7 173:24 190:4 239:1 241:22 282:10 286:21
**fargo** 87:8
**favor** 170:3
**fax** 3:5,8,12,17 256:6
**fcra** 108:1 197:7 205:10,11 289:7
**feb** 123:6
**federal** 2:3
**feel** 12:14 48:23 61:14 109:2 126:15 214:1 233:7 248:11 270:14
**feels** 59:6
**felt** 132:16
**female** 44:15
**fico** 92:1,3 93:2
**field** 95:25 225:2,6 233:25 234:2,15 234:17 235:9,9,12 235:16,16,18 236:10,12,15,18 237:6,6,8 243:3 253:10 254:14,21 255:11,13,15,18 255:19 290:10 291:20,21
**fields** 61:15 214:17,24 238:4 238:12 243:10 253:5,14 254:3 255:1 289:25 291:2
**fifth** 254:12
**fighting** 169:23
**figure** 54:14 127:6 135:3 139:25 140:11 167:5 216:24 235:12 264:18
**figuring** 283:2
**file** 30:15 38:25 39:1,1 47:25 48:4 48:4 58:4,11 90:2 90:18,23,25 91:2,4 91:7 93:10,15,24 94:11,15 95:3,5 97:8 100:14 103:11 117:5,7 125:9 130:18 132:1 138:2,10,11 143:8,9 161:2,4 176:15 178:2 179:6 188:9 190:20 198:17 204:15,18,24 205:1 234:12,21 245:9 246:5 251:7 261:9 263:9 268:22 269:4 270:23 271:13 272:4,9 285:6 293:2,14
**filed** 28:17 61:20 61:21 83:6 121:11 129:17 161:3 162:22 214:12 224:8 262:5
**files** 32:2,10,23 34:6 37:25 230:8
**filing** 122:15 125:25 129:22 160:21 168:22 217:6 261:16 293:21
**final** 66:9,12 119:7 119:9,13,14,20 126:1,2 163:16 215:23
**finality** 121:1
**finalized** 226:5,6 226:10,13,23
**financial** 1:6 299:6
**financially** 300:17
**find** 16:15 114:5 123:15 134:25 135:13 154:6 155:8 164:20 191:14 206:23 270:20
**finding** 269:3
**finds** 131:6
**fine** 6:24 7:18 17:4 51:16 133:5,9 137:23 271:22 273:11,21
**finish** 88:12 108:22
**first** 4:21 5:8,11 7:7,16 13:3 14:21 16:5 34:25 35:3,5 35:15 37:15 70:5 80:25 88:12 97:17 116:17,20,22 118:19 121:19,21 122:3 141:14 157:20 176:4,11 176:12,25 177:1 178:12 179:2 182:17 183:1 195:14 212:10 215:17 216:2,9,13 217:13 218:6 235:15 236:2 241:7,17 250:12 252:25,25 253:19 254:6 255:11 258:17 270:20 278:14 279:11 284:7,25 285:10 285:16 289:6
**fishing** 81:3
**five** 30:1 56:9 103:12 251:10,11 251:12 284:25 287:12
**fix** 110:15
**flag** 166:22
**flags** 165:23
**flash** 295:9
**flood** 200:13,21
**flooded** 200:22
**floor** 27:19
**fluctuate** 29:18
**fluency** 31:12
**fluently** 31:3
**focus** 285:10,11
**focused** 281:12
**folks** 6:7 135:21 136:1
**follow** 11:22 27:6 79:2
**following** 123:6 152:9 171:19 210:17 299:22
**follows** 7:7 35:25 83:3

**food** 78:1
**foreclosed** 122:14
**foregoing** 298:2
**forged** 114:8
**forgive** 172:6
**forgot** 26:11
**forgotten** 177:19
**form** 13:1 16:13 19:18 20:8,11 21:2,5,12,21,25 23:1,14 24:16 25:9,16 26:8 29:4 30:8,24 32:11,18 32:24 33:7 39:5 39:22 40:13,22 41:8,17 42:2 44:1 44:7,18,22 45:4,12 45:16,21 47:20 49:12,25 51:9 52:2,15 54:19 55:1,5,14 57:23 60:24 61:8,10,17 64:3 70:20 72:5 76:1 77:10 78:2 78:16 79:19,24 85:3 87:15 88:11 89:6,25 90:8 92:14 96:13 97:2 97:11 98:8 99:13 99:19 101:2,19 103:7 105:15 106:15 109:25 111:2,24 113:4 114:21 115:23 117:24 121:4 128:16,23 141:4 141:22 144:5 146:4,7,10 148:11 151:22 166:20 167:25 168:5 169:2 170:12 173:22 179:1 181:11 189:18 191:1 211:4 240:18,18,23 243:2,9 261:10,18 262:24 263:21 264:21 265:8 267:4,10 268:18 271:1,5 272:10 273:17 288:11
**format** 56:23 181:22
**formatting** 288:22
**forms** 56:19 243:6
**forward** 114:2
**found** 202:16
**foundation** 9:18 13:1 16:13 21:5 29:4 30:25 31:13 32:19,25 33:8 40:10,13 41:8,17 42:2 45:4 50:1,13 50:24 51:9 52:3 52:15 54:19 55:1 55:14 57:23 67:12 69:8 72:5 76:1 77:9 78:2,17 79:19 88:11 89:25 92:6 93:4 94:3 97:3,11 98:9 101:2,19 102:13 103:6,16 104:3 108:5,23 111:24 113:4 114:22 115:23 120:13 122:21 135:8 136:13 137:17 140:14 141:5,21 151:22 153:11 163:23 168:5,19 170:12 172:1 173:23 198:9 199:2,9,15 200:2 200:16 201:3,9 202:24 203:21 204:9 205:6 207:17 211:15 219:13 223:22 224:4,9 231:4 240:3,12 245:22 246:22 262:24 264:21 265:8 266:2 267:10 268:19 270:16 273:17 288:23
**four** 18:21 35:22 35:23 121:21 122:3 167:3 240:22 249:5 250:19 276:3 282:14 295:13
**fourth** 4:14 14:15 14:24 254:12
**frame** 56:3 144:12 161:23
**frank** 55:16
**frca** 107:24
**frcp** 300:2
**free** 109:2 126:15 214:1 233:7 248:11
**frequently** 44:16
**friend** 156:16
**friendly** 108:13 245:18,20 246:11
**front** 25:11,22 28:24 71:8 72:16 73:1 80:11 82:16 85:15,19 96:2 109:11 121:8,13 125:20 157:7 202:25 249:24 258:1 283:23
**full** 7:11 66:6,23 67:1,7,21,23 68:3 68:6,9,11,14,15,22 69:1,5 87:25 187:8,8,10 245:16
**function** 266:13 269:18
**fundamental** 167:21
**furnisher** 48:6,7 48:13 49:4,11,15 52:24 53:4,14,16 53:21 54:2,3,15,17 55:24 56:5,10,14 57:11,22 58:7,21 58:23 59:7 60:2,6 64:19 70:12,13,19 71:2,16,18,21,24 72:3,10,12,16,20 72:24 75:5,10 100:1,7,9,15,16,23 101:11,14,17 102:17,20,22 103:2,3 104:7,18 105:5,12,15,24 109:21,23 110:8 110:10,13,16,18 110:21,23,25 111:1,4,8,11,12,17 112:4,7,8 113:13 113:16,24 114:3,6 114:16,19,25 115:16,18,21 118:22 119:22 120:2,4,11,17 121:3 124:1 127:4 127:16 128:14,15 128:22 129:6 131:17 139:5 145:4 146:22

147:15 148:25 162:4 164:8,10 165:19,20 167:9 167:15,17,23,24 168:24,25 169:1,6 169:8,14,21 170:10 183:19 184:17 188:10,21 205:12 232:22 241:8,14 242:14 243:4,9,10,22,23 244:3 246:1,21 247:5,11,17 260:3 265:16,20 275:11 275:14,19 287:22 288:1,5 290:24 291:23 292:9 294:1,11
**furnisher's** 40:7 54:7 105:6 113:3
**furnishers** 60:15 60:16 74:6,9 96:9 97:1 98:4 146:5 167:7 176:22 177:16 182:6 184:7,9,12 239:23 274:11 275:23 287:17
**furnishings** 1:6 299:6
**further** 4:7 44:20 162:17 174:17 278:22 283:8 295:17 296:2,8 297:7,8,9 300:2,12 300:15

**g**

**g** 5:6 6:1 248:4 251:4 280:16 281:1 282:14
**general** 19:6 47:17 47:21 114:18 133:11 181:2 264:15,16
**generally** 6:24 71:10
**generate** 58:8 92:22 101:10
**generated** 79:17 91:7 93:7,10,13 102:21 193:9,9 205:2 224:18,19 237:17,18 277:23 280:23 286:20 287:1
**generates** 57:22 286:14
**generating** 286:18
**generation** 237:24
**getting** 79:6,13 141:16 216:12
**give** 9:4,22 10:16 12:12,15 18:15 47:21 56:11 164:2 166:12 180:17 187:13 190:16 198:17 212:8 249:2 250:24 254:16 269:10
**given** 120:8 195:2 277:1 299:25
**gives** 56:11 129:18 215:16 247:9 284:13
**giving** 18:3
**glean** 86:20
**go** 6:21 8:20 11:6 16:24 30:16,16 33:12 48:4 59:25 74:4 78:21 85:20 87:23 94:20 101:7 105:10 116:24 118:19 119:18 121:15 127:16 128:3 131:10 132:7 134:11 135:5,9,10,11 139:3,10,13 140:7 140:18,20 143:7 153:7 155:11 157:13 164:3,6,14 169:14,21 177:23 178:17 180:5 191:5,24 192:10 218:20 221:10 222:7 226:17 227:1,11 229:7 230:15 238:14 243:17 245:16,25 246:9 251:16 253:15 255:6 257:16 260:12 263:2 269:1 270:20 271:7,12 272:7,17,20 276:2 276:25 277:13 281:24 292:5 295:13,17
**goal** 128:7
**goes** 69:16 98:3 118:19 195:19 213:18,23,24 220:7 221:1,11 252:3 260:24 286:21
**going** 7:16 10:12 12:24 13:21,22 17:2 27:4,6,22 38:18 46:16,16 52:18 59:5 61:24 67:23 79:2 81:4 83:9,22 87:20 94:13 99:5,8 111:7 133:9 139:24 144:22 145:23,24,25 151:23 167:1,11 167:18 169:21 170:9 191:8,15 193:4 203:1 210:8 231:22 232:23,24 246:12,13 248:23 273:23 281:19 283:12
**good** 7:9,10 68:8 68:23 69:23,25 115:7 204:14 284:17
**googled** 209:8
**gotten** 281:5
**govern** 98:2
**governing** 108:18
**gramm** 197:7 205:4,11,14 206:3
**grant** 202:9
**gray** 289:24 290:1 290:2,3,21
**great** 7:3,23 16:5 207:10 242:7
**grid** 291:16,17,22 291:24 292:1,6,15
**ground** 8:17
**grounds** 16:18
**group** 3:7
**guess** 6:13,20 10:22,24 20:12 21:6 22:23 42:11 54:20 68:25 107:6 113:16,17,20 119:12 129:10 130:22 180:24 187:19 202:18 203:13 215:4,17

216:12 219:7 248:25 252:25 253:12 255:8 257:25 261:22 283:19
**guidance** 275:5
**guide** 5:15 106:10 239:22 274:7,9,11 274:18,23 275:22 275:25
**guides** 212:25
**guys** 6:18 187:25

**h**

**h** 5:6 7:14 135:24 248:4 251:4,5 280:16 281:1 282:14 290:16,17
**habits** 199:24 200:5
**half** 227:8
**halfway** 289:6
**hall** 3:15 4:6 6:12 6:12,16,20 7:3 9:18 13:1,20 14:3 14:6 16:13,17 17:17,22 18:1,5,19 19:18 20:2,8,11,15 21:2,5,12,16,21 22:4,13 23:1,14,19 24:9,16 25:9,16 26:8,14,18,25 27:18 28:11 29:4 30:8,24 31:13 32:3,11,14,18,24 33:7,15 34:3 39:5 39:22 40:13,22 41:8,17,22 42:2,6 42:11 44:1,7,18,22 45:4,12,16,21 46:9 46:18 47:11,20 49:25 50:8,13,24 51:9 52:2,15 53:9 54:19 55:1,14 57:23 60:13,24 61:1,10,17 63:2,6 63:10,17 64:3,20 65:18 67:12,18 69:8,22 70:20 72:5 76:1,24 77:9 78:2,6,10,16 79:19 79:24 80:21 81:12 81:22 82:2,7 83:21 85:3,24 86:14 87:15 88:8 88:10,14 89:6,25 90:8 92:6,17,19 93:4,8 94:3 97:2 97:11,21 98:9,13 98:19 99:14,21 100:3 101:2,19 102:1,11 103:6,16 103:23 104:3,21 105:8,17 106:14 106:21,25 107:4 107:11,21 108:5 108:19,21 109:16 109:24 110:11 111:2,24 113:4 114:21 115:4,20 115:23 116:6,10 117:24 119:5,15 120:13 121:4 122:21 124:4 126:22 127:23 128:16,23 134:17 135:8 136:4,13 137:17 140:14 141:4,21 144:5 146:25 148:11,19 151:22 153:11 154:4 156:11 159:7 160:1,8 163:23 164:1 165:4 166:20 167:25 168:5,14 168:18 169:2 170:12,19 171:1 171:11 172:1,9 173:22 174:11 179:1 181:11 188:2 189:18 191:1 194:3 198:1 198:9 199:2,9,15 200:1,10,15 201:3 201:9,19 202:1,11 202:24 203:21 204:9 205:6,16,19 205:22,25 206:7 207:4,17 211:4,15 219:13 221:5,9,13 221:18 222:4 223:9,22 224:4,9 230:15 231:4 232:11 238:7 240:3,12 243:17 243:25 245:3,22 246:22 247:6 249:11,15 251:16 261:10,18 262:24 263:21 264:21 265:8 266:2,7,13 267:4,10 268:18 269:18 270:16 271:1,5,10,14,17 271:21 272:10 273:17 274:19 276:4 278:16 279:2,18 281:22 283:11,18 296:5 297:8
**hand** 15:20 83:11 176:8,9 210:12 248:20,23 290:5
**handbook** 94:6,8 194:21 195:21 196:5 207:23 209:16,22 236:22 236:23 238:19,21 265:6
**handed** 13:16 34:13 136:22 212:1 221:13
**handful** 55:7,19 72:14 288:13
**handle** 30:9,11,19
**handled** 30:6 31:8 33:24 36:4 197:21
**handles** 30:4
**handling** 28:13 29:2 213:8
**hang** 165:3 209:15
**happen** 78:4 101:23,25 102:4,5 102:6 106:24 115:2,3 127:13 134:23 135:14 137:14 147:19 150:7 161:14 164:5,13 185:17 200:24
**happened** 88:1 130:22
**happens** 10:1 11:15 105:4 179:4 179:14 185:11,24 288:9
**happy** 17:16 27:21 179:12
**hard** 52:12 192:14 266:24 276:13
**harwood** 2:2
**hate** 281:14
**head** 10:14 281:1

**header** 193:16
**headers** 252:1
**hear** 11:13 68:24 202:20
**heard** 16:22 39:8 152:11 208:23
**hearing** 46:21
**held** 19:15 180:2
**helm** 135:23,24 136:6
**help** 26:10 64:23 67:8 194:18 198:11 207:11
**helped** 51:6 171:9
**helpful** 26:5 206:22 236:21
**helps** 274:17,21
**henderson** 135:23 136:7
**hesitation** 276:24
**hey** 113:18 179:9 198:21 216:18
**high** 199:12
**higher** 43:19,22,25 45:1,10 51:22 77:25 153:8 266:19
**highland** 3:7
**hiring** 31:16 32:8 32:17
**historical** 267:8
**history** 95:13,15 95:18,20,21,22 113:1,6,15 114:20 117:16,21 118:2,3 130:20,21 131:18 150:21,22,25 151:4 162:3 165:8 166:9,13 172:8 173:1,14 214:9 225:14 291:16,20 292:4,7,13 294:20
**hobby** 20:14
**hold** 17:3 27:4 46:7 86:10 156:6 159:18
**holding** 17:14
**holds** 271:3 272:14
**holiday** 133:19
**home** 1:5 87:8 269:22 276:17 299:5
**hope** 212:10
**hopefully** 159:25
**hours** 12:11 26:19 26:20 133:2
**housekeeping** 15:18
**huh** 10:15,15 226:11 262:4
**human** 154:21
**hypothetical** 169:23

**i**

**i.e.** 30:14
**idea** 69:25 76:6 89:8 90:1 93:19 105:21 122:12 239:21 269:10 284:13,17
**identical** 59:5
**identification** 48:3 237:2 252:2
**identified** 51:21 191:25 214:3 216:3 218:3 219:25 278:23 280:2,5 282:4,17 283:2,24
**identifier** 36:17
**identifies** 184:18 250:16,19
**identify** 6:10 36:9 46:25 58:1,3 120:22,24 124:17 142:6,23 160:2,22 174:19 195:12 225:24 255:4 258:6 269:6
**identifying** 120:21
**ids** 251:6,24
**illinois** 3:8,11,16 18:4 70:23
**image** 75:12,13,16 75:19 138:24 139:2,12,23 285:22
**imaged** 140:2
**imagine** 32:6 43:6 52:17 76:5 89:9 127:15 134:22 148:22 200:20
**imaging** 137:21 138:5,12,17,20,23 256:9
**immediately** 154:14
**impact** 144:16 150:20 199:8
**impair** 12:11
**impermissibly** 81:18
**implementation** 156:23
**implicated** 146:23 227:22
**implicates** 148:9
**implications** 203:25
**important** 114:6
**impose** 56:19
**impossible** 170:17
**improve** 24:13 241:18 251:2
**inaccuracies** 145:25
**inaccurate** 144:24 167:9
**inappropriate** 81:2
**include** 13:24 54:5 175:10 213:11 292:16
**included** 15:17 40:24 122:10 125:7,10,17,23 126:4 129:20 144:8 149:25 160:15 161:9 163:5 172:22 178:13 188:6,14 188:15,20 191:21 214:12 217:12 227:24 253:24 276:19 285:1 289:13,16 290:25 293:23,25 294:24 296:23
**includes** 12:4
**including** 41:6 88:7 216:3
**inclusion** 173:12 213:11
**incoming** 137:8,11
**incomplete** 195:15
**inconsistent** 297:2
**independent** 42:16 42:17 152:1 171:14,16 181:9 181:15

**independently** 74:14 90:21 113:7 113:15 125:16 247:9
**index** 4:1
**indicate** 26:2 36:3 59:16 64:2 71:7 75:4 117:11 124:12 139:23 142:13 183:19 186:3 204:13 214:16 216:5 225:7 228:5 233:20 257:7 275:10
**indicated** 69:18 81:7 168:23 228:9 275:18
**indicates** 9:1 83:5 191:12 218:22 225:3 233:14
**indicating** 114:3 278:24
**indication** 71:6 73:7 114:11 188:25 196:16 214:6 250:24
**indicator** 225:10 225:12 234:13,21 234:25 290:7,9
**individual** 24:5 78:21 89:23 198:7 198:11,12 233:1 257:5 258:3 280:17 281:4
**individuals** 43:15 51:21 89:24 108:12 203:2,8 247:21
**industry** 166:18 274:10
**infer** 289:1
**inform** 146:21 211:9 291:10
**information** 1:7,8 1:11,18 22:16,21 23:5,9 25:23 33:1 33:5,12,17,22 34:6 38:14,25 40:6,24 42:13 44:21 47:25 48:3 53:25,25 54:3 56:17 58:4 58:24 59:1,2,5,7 59:21 60:6 61:9 61:11,13,14,19,24 62:11,15,19 64:6,7 64:10 65:8,15 67:9 69:19 71:5 72:10,20,23,25 75:5,9,15 80:24 83:3 89:2 90:6,7,9 90:18,21,22,24 91:1,6,9,19 92:25 94:14 95:2,4,25 99:25 100:2,6,13 100:14,15,17,22 100:24 101:6 103:9,13,20 104:5 104:15,17 105:12 109:22 110:10,13 110:14,21 111:5,8 111:16,18,23 112:2,9 113:1,13 113:25 115:15 120:10,22 121:1 123:5,10 124:9 127:4,9,17 128:21 130:3,10,25 131:3 131:13,14 135:7 135:13 139:3,9 141:2 144:25 145:8 147:24 148:16 150:2 151:24 152:11,13 162:21 167:8,13 167:21,22 169:13 169:19 171:18 181:8,14 184:18 187:5 189:11,19 195:25 196:17 197:8,10,12,13,14 198:21,25 202:13 202:16,19,20 203:6,7,14,14,19 203:19,20,23 204:5,6,8,8,10,11 204:18,23 208:4 208:14,17 209:12 210:19 211:2,6,7 213:6 214:17 215:3 217:11,11 217:22 219:18 229:7 234:13,25 237:2,13,21 240:5 240:11,11 241:15 244:11 245:9,10 245:11 246:2,17 246:20 247:2,4,9 247:14,15 253:16 256:17 260:3,15 261:2 262:11,15 262:18,20,22 263:11,13,19 264:3,8,19,19 265:1,15,25 266:6 267:19,24 268:21 269:14,16 270:11 272:15 274:12 277:11,16 286:24 288:2 289:2,7,18 290:7,9,11 291:19 292:3 293:1 299:7 299:8,14
**informing** 111:12
**infrastructure** 24:15 270:22
**inhouse** 42:14 151:24
**initial** 66:16 116:25
**initiate** 41:13
**initiated** 210:16
**initiative** 220:8,17 296:14,21,22 297:3
**innovis** 240:6
**inquired** 269:2
**inquiries** 192:12 192:15,18,23 193:12 205:9 209:21,24 210:5 210:10,14,17,23 211:10,13,18 261:8,15,21 262:10,12,18 263:6,9,24 264:4 265:19 266:1,23 266:24 267:1 268:14 276:9,13 276:19
**inquiry** 47:8 193:18 194:1,2,5,7 194:8,9,11,16 196:22,25 197:6,9 197:15 199:6 204:22 205:12 206:10 208:7 210:1 211:20 248:12 262:17 263:15,17,19 264:2,7,9,10,18 265:2,4,16 266:4 267:3,5 268:21,23

**ins** 256:11,12,14
**insert** 27:2
**inside** 206:5
**inspect** 222:4
**instance** 1:22 113:22 148:14 209:5 289:5 291:25
**instances** 127:12 146:1 229:19 251:12
**instant** 113:14
**instituting** 154:1,2
**instruct** 25:20 27:3 42:15 67:16 69:9 78:20 151:25 171:13 172:3
**instructed** 259:24
**instruction** 11:21 79:21 152:15 171:19
**instructions** 94:23
**instructs** 98:4 229:20
**insurance** 199:14 199:16,21,23 200:8,14,21 201:7 201:11,13,18 203:15,17 205:18
**insure** 200:22
**insurer** 201:1,15
**integrated** 33:9
**intend** 11:22
**intent** 132:18
**intention** 217:3
**intentionally** 108:16 129:14
**intentions** 17:10
**interact** 138:4,7,8
**interactions** 171:14
**interchanged** 99:2
**interest** 128:18 161:7,8
**interested** 198:22 300:17
**interesting** 33:3
**interests** 122:17 172:16
**interface** 128:10
**interim** 150:21 151:11 156:19 160:10 161:19 172:7 173:14 174:5,9 185:21 214:9
**internal** 19:10 21:19 24:7,14,22 24:25 48:14 57:15 57:16 59:18 62:2 62:7,20 73:21 74:22 76:16 77:15 78:24 104:16 105:22,23 106:6 109:21 110:8 144:7,9,14 145:2,4 145:11 146:9,20 147:8,12,13,20 148:1,6,20,22 149:8 150:10 159:5,5 171:23 179:21,21 183:15 183:22 185:3,6 189:20 190:5,19 211:18 216:14 220:1,21 228:13 228:15,16 229:10 229:10,20 230:5,7 230:20 231:3,6,8 231:11,15,17,19 232:8,9,15 238:2,4 238:18,22 239:2 244:6 245:18 247:16,17,22 248:13 250:19 251:13 252:18 255:15 260:22,24 261:5,6 270:12 280:18,23,24 281:10,11,25 282:11 283:22 285:23 286:3,7,15 286:23
**internally** 59:22 62:16 110:15,15 120:10,19 149:24 172:22 180:11,15 180:17 216:6,13 246:19 247:3 289:8,22
**internet** 90:20 252:16,19,22 255:23,23 256:2
**interpret** 21:11 107:13,17 130:16
**interpretation** 107:7
**interpreted** 107:22
**interrogatories** 5:9 171:6 250:13 278:10,14 279:11
**interrogatory** 280:2,10
**intimate** 205:8
**intimately** 96:3 206:2
**introduce** 194:17
**introduced** 6:25 194:20
**invasive** 12:9
**investigate** 40:7
**investigated** 179:11,16
**investigation** 48:25 66:24 67:1 86:7 182:1 244:5 244:16
**involved** 28:8,13 28:16 50:3,3,4 55:21 78:23
**involves** 31:4
**involving** 159:21 227:18
**issue** 21:25 69:16 278:25
**issued** 1:18
**issues** 182:14 244:6
**item** 47:25 48:8,9 48:13 58:3,18,24 62:10 67:4 68:4 98:23 103:10,11 104:15 112:11,18 112:21,25 131:2 142:16 143:7,8 162:23 169:10 179:6,10 180:11 180:19 184:18 185:14,15 225:9 235:17 246:12
**itemized** 258:9
**items** 144:24 145:1 147:24 175:8 186:22 253:16 289:8

**j**

**j** 5:6 220:21 248:4 251:4 280:16 281:1 282:14 286:4,10,23
**jad** 1:4 299:4

**january** 24:15 163:6,7 175:23 192:4 193:23 209:15 210:8 224:11 266:23
**job** 19:4,6 134:24 153:19 156:6 244:17
**jobs** 201:23 202:4 203:18
**jog** 109:12
**john** 155:5
**join** 46:18
**joining** 6:19
**jones** 2:2 3:15 6:12 81:17
**jonesday.com** 3:17
**juan** 37:15
**judge** 22:6 28:2
**july** 1:15,24 299:17 300:19
**jumping** 294:10
**june** 227:10 232:2

**k**

**keep** 77:7,11,16 92:15 97:15 104:18 139:16 212:16 227:14,15 261:7 262:15 266:8,11 268:21 283:12 287:11
**key** 185:12 237:2 237:4
**kim** 24:23
**kimberly** 156:2
**kind** 21:14 47:21 51:7 65:9 139:2 139:23 192:7 198:24 199:8 201:6 206:4 265:1 295:13
**kinds** 23:10 90:7,7 90:10 91:9 93:2
**knepper** 3:3
**knepperclark.com** 3:5
**know** 6:17 9:22 13:19 14:20 16:7 18:20 21:4,8,11,14 22:15,23 25:23 28:20 31:1,2,14,16 31:20,21,25 32:15 32:20,21 33:2,2,9 33:10,11,12,16,20 33:25 34:1,5,15 35:5 36:10,14 37:13 38:13,21 39:4,6,7,12,25 41:20 42:23 43:2 43:3,4,5,5,11,12 43:24 44:2,3,12,14 44:20 45:6 46:5 47:15 48:23 50:2 50:2,9,10,11,16 51:4,11,13,15,17 51:18,19,23,24 52:13 55:2 56:5 57:14,16 59:1,18 60:23 61:20 62:25 63:11,21 64:4,5 65:2,23 69:12,13 69:14,17 71:4,22 72:1,3,8,14,18 73:2,22 74:3,19 75:22 76:6,18 77:2,12,15,18,20 77:22,24 78:4,11 79:25 80:6,6,13,20 83:5,14,18 84:20 85:4,11,16,19 86:16 87:1,19 88:20 89:9,11,12 89:14,16,17,18,24 90:2,13,14 93:6,10 93:12,17,20 94:4 94:16 95:1 96:2 97:9,13,17,18,23 98:6,11,12,15 99:10,17,22,23 101:23 102:3,14 102:15 103:24,24 103:25 104:1,8 105:1 107:8 108:13 109:19 110:4 113:10,11 115:12,15 118:4 118:11 122:11,13 122:16,23,25 125:2 126:19,24 127:18 129:5,14 132:18,24,25 133:1,2,3,20 134:1 134:19,19,20,23 135:7,14 136:1,24 137:14,22 139:10 139:17,21 140:19 143:9,21 145:14 145:19 146:6 147:19,20 150:8 152:3,4,16,17,18 152:21,22,23,25 153:5,5,10,14,19 153:21,25 155:6 155:12 156:2,8,9 156:13,24 157:1,3 157:10,17 160:9 160:14,17 161:1,1 161:5,6,18 162:7 162:10 165:13,17 166:4,8,21 167:10 167:16,18 168:2,6 168:7,16 169:10 169:13 170:3,7,13 170:14 171:5,9,21 172:7,10 173:17 173:20 174:8,12 174:16 175:7 179:9 180:3 181:3 181:4,25 182:10 182:13 190:9 194:5,14,15,16 195:1,2,12 196:3 197:11,15 198:12 199:10,16,17 200:3,4,4,5,11,23 201:11,14,20,20 202:6,12 205:9,17 205:20,23 206:1,8 206:16 207:1,8,11 207:20 208:6,8,18 208:19 209:3,15 211:16 212:4 219:7,15 222:1,19 224:5,10,12,13 225:1,16 230:10 230:12,12,13 232:7,13 233:23 235:15 236:18 237:5,20 238:9,14 238:15,17,20 239:1,11 240:4,14 240:15,16 241:22 242:11,16,18 244:3,19 247:12 247:17 248:10 249:25 252:10 256:25 257:15 258:10,11,12 259:9 260:22 261:14 262:9 264:22 265:15,17 265:19,21,23 266:3,6,8,9,16,17

267:16,18 268:2 268:21 269:2 270:18,22 271:8 271:12 272:3,8 273:19,22 274:5 274:14,17,21,22 277:3,13 278:1 280:25 281:9,17 282:10,18,19,22 290:18
**knowing** 87:25
**knowledge** 28:21 29:2 42:17 44:24 136:8 152:1 163:20 171:14,16 198:3 205:8 234:14 288:5 289:12
**knowledgeable** 168:17 273:15
**known** 33:19 86:11,16 87:8 94:5 95:8 135:18 161:3 200:21
**knows** 156:9,13

**l**

**l** 135:24 226:15 295:14
**label** 124:4,5 249:13
**lack** 89:5 140:3
**lacks** 102:12
**landscape** 249:5,5 249:16 251:22 253:13
**language** 21:10 181:18 270:12 271:13 272:4,4 288:22 289:23
**larger** 274:4
**las** 3:4
**late** 113:12,18,20 113:23 114:25 115:1 123:24,24 129:23 130:24 131:4 166:6,8,13 169:11 188:16 215:18
**law** 3:7,10 8:24 67:8,10 68:11,18 98:1 108:10,18 122:11
**laws** 298:2
**lawsuit** 151:17
**lay** 40:10
**leach** 197:7 205:4 205:11,14 206:3
**leads** 36:18
**learned** 23:8 42:13 69:10
**led** 116:18,22,25 118:17 144:1
**lee** 44:9 155:14
**left** 15:20 176:9 210:12 283:15 290:5
**legal** 19:5 24:23 41:2,6,10 43:7 78:19 97:22 98:10 98:20 99:15 100:4 108:4,6,11,23 116:11 127:24,25 152:18,21,23 153:13 154:5 174:14 201:4,10 203:22 205:7 223:9,23 240:13
**legally** 69:4,7,13 69:19
**legislators** 108:10
**lending** 201:13 202:17
**lengthy** 42:20
**letter** 4:18 15:19 40:25 41:12 87:19 101:10 102:25 104:2 113:19 120:17,22 121:25 122:2 123:10 130:9 142:9,11,19 143:6 145:23 146:13 150:6 164:22 174:18 179:8 190:8,9,11 190:24 191:2 218:1 228:9,17,20 228:25 229:4 244:14 285:3 290:18
**letters** 66:7,15 91:13 132:25 133:12 194:10,15
**letting** 175:6
**level** 21:20 30:21 31:1 141:7 143:14 266:19
**lien** 125:22
**line** 6:7 46:8 47:8 53:25 54:4,7,21 58:10 59:12 61:20 61:21,22 75:2 95:14 96:9 108:3 111:21 116:9,13 123:3 131:22 133:10 144:25 145:22 146:16 147:14,24 162:22 164:15,19 166:18 166:21 176:12 180:10 183:3,12 191:5 197:9,14 202:20,22 203:19 214:24 215:5 225:8,10,24 228:24 232:19 233:6,10 235:3 237:18,21 259:15 264:10 267:20 277:15,19 278:2 278:25 280:4 290:25 295:10
**lines** 83:17,24 85:22 87:5 162:6 286:22 295:9,11 295:14
**list** 15:17 16:7 45:1,10 46:14 94:1 105:22 106:1 106:6 176:19 192:12,14,18,23 193:12 196:5 205:13 206:13 218:24 229:9,11 229:15 230:3,7,19 238:12,17 247:21 253:14 263:5,8,24 266:23,23 276:8 281:6
**listed** 16:11 153:22 176:22 192:15 211:20 217:12 230:24 239:13 240:9 253:5 263:17 281:4
**listen** 113:8
**listing** 161:2 193:13 285:24
**listings** 209:16
**lists** 210:4 284:11
**litigation** 19:9,11 23:4 55:20 224:20

249:7 277:5
**little** 10:1 46:22 49:1 61:25 62:1 67:9 109:13 172:14 181:24 182:5 273:15 295:17
**live** 199:12,25 200:3,6 201:25 203:16,17
**lived** 200:8 201:6
**lives** 199:11 200:20
**llc** 1:8 3:3 192:18 193:13 299:8
**loan** 125:21 219:22 269:10 293:23
**loans** 276:17
**locate** 198:11 278:9
**located** 29:10,12 29:16 30:22 36:11 36:12,21,24 37:10 136:1,2,5 198:11 207:8 213:14
**location** 37:3 199:7 271:8
**locations** 29:25 30:20 32:9 36:25
**log** 34:25 35:1,16 35:19,21,23 36:7,8 36:17,18,22,22 57:9,14,16 59:14 62:20 73:4,8,18 74:24,25 75:4,11 77:12 88:25 89:1 91:3,4 137:11 142:13,13,18 187:13 189:2,4 260:21 261:3,4 283:22,24 284:1,2 284:7,10,11 285:16 289:1 291:7 292:11
**logs** 4:15
**lombard** 3:8
**long** 19:12 26:18 95:9,11,24 96:4,7 96:8,14,17,24 116:8,16 117:3 118:24 125:9 149:22 166:23 187:18 195:15,18 224:14,17,22,24 225:3,6,17 233:11 235:20 236:24 242:5 261:12 267:8 277:20 293:20 294:6,13 295:8
**longer** 141:3 262:22
**look** 13:18 14:6 15:16 16:5,24 31:11 34:14 37:9 37:25 38:12 42:20 54:14,20 55:4,6,17 55:22 57:4 58:20 61:14,25 72:19 73:3 74:4 75:8,11 80:15,18 81:10 82:18 87:23 89:1 94:2 117:18 124:2 124:2 126:5,15 131:12 133:24 134:11 136:23 139:18,21 146:12 148:16,18,20 164:18,24 165:8 169:9 171:3 174:17 175:24 176:5 177:23 178:3 181:18 182:5 183:14 185:18 186:7 187:13 192:23 195:5 206:20 207:3 208:8,9,10 208:22 210:11 212:3,18 214:1 215:17 216:7 224:10,13 225:23 234:3,19 235:5,6 235:11,20,21 236:20 239:10,20 242:4 257:5 258:10,11,21 262:9 264:1,17 267:5,9,12 268:23 269:1,5 270:5 274:6 278:19 281:12,23 287:12 287:20 288:11,17 288:18 289:25 290:5 291:25 295:8
**looked** 27:16,21 36:15,16 38:8 55:7,9,13,13,18 72:6,14 85:2 87:20 106:6 109:8 133:16 141:20 189:10 207:9,10 209:7 224:11 236:12 258:23,24 260:1 265:7 270:3 277:1,14 286:5 287:13 288:13 294:12
**looking** 12:4 13:20 16:6 72:15 73:1 73:10,12,19 85:15 85:18 96:1 109:1 109:5 117:13 123:3,9 124:7 157:7 165:2 186:13 187:12 189:4 193:12 196:10 206:15,18 206:24 207:15,20 207:23 209:20 210:4 216:2,23 218:5 233:16 236:4,5,11 239:1 242:4 248:5 258:4 265:5 275:4 276:8 279:5,9 284:16,22 285:13 287:5 289:1 290:21 292:10
**looks** 56:23 82:23 83:1 122:2 124:22 166:17 175:5 191:20 195:14,20 209:3 213:1,4,17 231:14 235:22 239:22 240:18 251:3 257:11,12 257:15 270:7 294:23
**loosely** 38:20
**lost** 112:21
**lot** 18:12 24:11 52:19 55:20 76:6 133:2 198:2 199:13 282:15,16 282:22
**lots** 256:23
**louis** 1:2 299:2
**louisiana** 200:13
**lunch** 26:19 115:6 121:21 128:3 132:7,8,9,15

**lundy** 44:9,14,16
**lundy's** 44:13

**m**

**m** 7:14 135:24
**ma'am** 35:7 164:17 194:23 221:3 222:8 276:11
**machine** 2:1
**magistrate** 22:6 28:2
**mail** 30:12 133:18 133:19,22 134:8 134:14 136:11,17 137:8,11,15 138:14,16 140:10 141:24,25 142:2,3 142:5 174:25 175:1 180:2 194:25 203:3,12 215:25 251:14 252:6,7,7,12 255:22,25 256:1 256:25 285:20
**mailed** 91:13
**mailroom** 135:2 141:9
**maintain** 7:1 50:4 50:6,9
**maintained** 39:2 230:11,13
**maintains** 79:16
**makeup** 71:10
**making** 9:1 79:8 79:14 108:12 122:14 130:13 132:2 140:9 153:24 244:17 286:21
**management** 43:7 43:9,14,17,19 45:1 45:10 51:7,22
**manager** 135:11 135:14 153:9
**managers** 135:19
**mandated** 205:11
**mandatory** 107:20
**manner** 12:6 21:6 59:15 60:4,5 190:25
**manual** 4:20 31:14 106:8 137:6 139:8 213:10,10,14 217:3 220:3 221:4 222:11 227:12 229:13 230:19 231:1 232:1,4 238:24,25 239:6 270:13,14 281:8 281:18
**manually** 61:3
**manuals** 31:12 153:25 213:2
**march** 117:15 123:6 236:1 278:3 294:21 295:6,20 296:4
**mark** 6:21 13:13 34:14 120:4 221:14 222:5
**marked** 13:15,17 14:11 15:3 34:8 34:12,20 82:15,17 109:2 121:16,18 136:19,21,23 157:9 183:23 195:4,6 211:25 212:2 230:1 239:9 248:20,22,23 250:4,6,8,25 258:16 269:23 273:25
**markup** 272:4,4
**mary** 1:14,21 4:4 7:6,13 298:12 299:16,23
**mask** 292:3
**masked** 163:7,8
**match** 231:2
**matched** 120:18 217:25
**matches** 251:8,10
**materially** 84:25 85:4,13 87:13
**math** 52:18
**matt** 3:12
**matter** 6:4 119:6 157:21 170:5 200:4 244:7 248:15
**matters** 19:11,25 23:4 200:5
**matthew** 3:10 47:1
**max** 221:24
**maximum** 127:19 128:4,7,8
**mbadwan** 3:9
**mean** 21:6 22:19 35:5,6 37:16,21,22 39:1,6 43:18,19 44:3 45:3 50:7,19 52:4,9 54:13 59:23 60:23 63:11 67:11 74:11 75:14 75:16,18 76:5 77:11 78:25 79:25 80:15 83:9 86:17 94:16,19 95:16,17 96:20 98:14,15 99:6 102:5,18 104:7,25 106:13 106:13,16 110:4 112:20 117:6 119:9,12,20 120:2 125:14,15 127:22 132:25 137:18 139:20 140:15 142:1,21 146:17 147:2 149:2 155:4 160:18 169:10 174:23 181:25,25 182:12 183:10 185:10 186:21,25 196:21 201:20 202:14,22 207:25 214:19 219:17 226:9,9,10,15 235:4,16 236:2 241:12,13 244:2 245:21 252:12 254:18 255:25 256:23 261:19,22 262:9 295:10 296:13
**meaning** 22:23 60:1 61:15 80:1 98:17 117:25 182:16,25 234:20
**means** 17:5 59:25 63:22 66:10 106:17,17 107:5 128:5,11 182:13 183:11 186:22 196:22 220:9 223:4,5 226:13 270:14 281:21 295:18
**meant** 22:22 110:6 110:7 252:19
**measure** 15:18
**mechanism** 70:13 70:19
**medications** 12:10

**meet** 26:18
**meets** 125:11,13 126:5
**member** 158:8 269:12,14 274:13
**members** 25:7 262:23 271:4 272:15 274:16
**memorization** 159:12
**memorized** 37:18 159:10
**memory** 109:12 159:12 203:1 231:23
**mention** 214:10 215:9 229:15
**mentioned** 18:8 36:25 49:2 62:1 66:17 68:23 93:3 156:19 175:25 180:8 205:4 296:10
**merely** 103:21
**mesa** 136:2
**messed** 221:6
**met** 26:13 125:16 149:23 293:13
**method** 272:8
**methvin** 1:14,21 4:4,16 7:6,11,13 7:15,18,23 12:8 13:16 14:10 15:18 16:22 17:19 22:7 27:6 34:10,19 35:15 37:21 38:19 42:22 46:4 47:13 55:23 70:1,4 72:1 73:3 78:12 79:23 82:16 85:22 87:4 88:19 90:2 99:23 104:13 109:1 115:8 121:19 122:8 132:9 136:22 152:7 157:10 159:16 160:9 169:24 181:20 188:4 192:2 199:18 212:1,18 230:19 242:1,6,19 243:21 247:19 249:18 250:7 251:20 257:25 258:17 266:22 270:2 276:6 278:19 280:13 283:6 298:12 299:16,23
**metro** 96:20 288:21
**michael** 25:2 153:6
**middle** 10:9 186:7
**midway** 193:17 282:1
**miles** 3:3 6:8 7:19 13:20 46:9 69:22 83:21 160:1
**miles.clark** 3:5
**mind** 43:21 80:12 110:24 160:2
**mine** 14:3 156:5 168:10
**minute** 80:19 195:5 211:23 213:21
**minutes** 69:23 276:3
**miscategorized** 141:14
**mischaracterizes** 27:18 34:3 102:1 102:11 148:12 293:4
**misfiled** 254:25
**missed** 14:4 169:15 229:12
**missing** 231:23 232:6,9 238:23 282:7
**misspeak** 9:8
**misspoke** 69:13 195:2
**misstates** 44:22 104:21 105:8 107:11 108:24 146:25 159:8 170:19 171:1
**mistake** 221:12
**misunderstanding** 295:7
**mixed** 30:15
**modification** 104:19
**modified** 104:17
**modify** 70:7
**mohammed** 3:6 7:4
**moment** 24:24 84:4 94:13 139:12 146:17 147:9 205:5 212:3
**money** 200:8 222:20 224:2,7
**month** 116:2 163:22 164:4,12 165:25 277:8 294:24
**monthly** 96:10 97:1 131:15 214:21
**months** 95:13,15 95:18 115:19 117:2 123:12 156:19 164:6 166:14 167:3 187:21,21,24 257:12 261:13,19 262:2 268:22 269:4 294:23
**morning** 7:9,10 18:25 24:3
**mortgage** 87:8 245:6,7,11
**motion** 17:12
**move** 46:22
**moved** 15:4 173:6
**multiple** 72:7 115:18,24 144:15 147:24 148:24

**n**

**n** 3:1,3 6:1 7:5,14 38:17 155:14
**name** 6:8 7:12,12 7:13,16,16 18:8 24:25 31:24,25 33:12 37:3,13,15 37:15 38:9 118:1 137:18,22 154:22 155:4,14 192:17 203:24 204:7,12 204:13 206:12 209:6 215:2,4 253:1 254:9 258:11,12 279:8 290:1,1
**names** 7:20 34:24 43:24 44:3,6,25 135:18,21 177:11 182:6 203:1,8 253:25
**narrative** 284:24
**narrow** 6:23 64:15

**nature** 121:2 140:24
**ncac** 137:20
**near** 278:21
**necessarily** 107:9 119:25 128:17 163:17 223:16 244:21
**necessary** 125:12 241:23 245:25 292:22
**need** 10:13 11:1,12 28:25 42:9 55:17 56:9,12 59:6 120:10 125:8,16 139:18 162:17 188:18,18 190:4,7 190:17 198:17 202:4 208:20 211:23 215:19 216:16,20,22 218:12 219:16 222:2 273:14 275:19 286:24
**needed** 147:8 190:9 229:5 293:13 296:20
**needs** 29:19 62:10 111:16 125:24 138:15 140:20 142:17 217:10 229:3 293:17
**negative** 118:11 118:14,18,20,23 130:10,25 166:1
**neither** 300:12
**nevada** 1:1 3:4 6:5 299:1
**never** 55:16,17 113:12,18,20,23 114:25 115:1 118:9,11,19,24 121:12 123:24 148:8,9 155:21 161:3 179:6 180:21 188:16 208:18 209:2,4 211:10 215:18 239:16,17
**new** 101:15 156:23 162:1,8
**night** 17:11
**nis** 137:20,25 138:1,8 139:3,8,14 139:16 140:13
**njk** 1:4 299:4
**nod** 10:14
**nonderogatory** 131:6
**nonpermissible** 196:14 207:16 209:17
**nonverbal** 10:13 12:6
**noon** 115:5,6,9
**normal** 106:17,19
**north** 2:2
**northern** 18:4 70:23
**notation** 57:9,12 59:14 75:8 120:8 132:4 146:19 166:2 280:19
**notations** 115:18 115:25 116:1 131:21 276:20
**note** 15:2 42:19 81:13 88:14 142:18 232:1 241:6 262:16 283:14
**notice** 4:14 14:15 14:24 41:10 58:20 159:22 171:23,24 220:14 259:14 269:8
**notice's** 15:14
**noticed** 232:13
**notices** 280:14
**notification** 41:5,6 48:6,15 53:11,14 53:17 54:2 58:13 72:12,21,21 73:18 85:17 86:8,12,18 87:9 88:20 102:16 102:23 103:12 104:7 154:11,16 241:4,9,15 242:15 242:15 285:22 287:13,22 288:3,6 288:12 289:3,6,14 291:8,10 292:11 294:12
**notifications** 53:4 53:4 239:25 287:3 287:18 288:13
**notify** 53:21 56:16 59:6 60:2 71:17 72:12 105:13 110:12 113:24 114:6,16,19 147:15 184:17 232:21 243:22 247:11 291:23
**notifying** 72:22 101:16 103:1 110:18,23,25 175:9 188:21 290:23
**notwithstanding** 27:5
**noun** 63:1 64:11
**november** 153:18 276:16 277:7,24
**number** 6:14,16 15:21,23,24 16:2 16:19,20,21,21,21 24:6 25:7 29:18 31:2 35:6,7,9 47:7 52:12 76:8 129:18 133:15 134:7 138:13 158:1 177:2 182:9 193:3 194:22 195:24 203:5 206:13 215:5 238:8 239:3 239:5 242:23 249:10 250:15,16 250:16 252:2,5 254:6,7,22 255:3 255:19,20 256:12 256:19,21,22 258:5 259:8 260:12 271:8,12 276:13 278:11,12 278:21 279:2,6,14 279:15,19 280:1,1 280:2,2,3,11,14 282:1 285:18,21
**numbered** 1:23
**numbers** 15:19 35:8 83:10 132:17 175:13 177:18 233:18 249:7 251:6,24

**o**

**o** 6:1 38:17 248:16
**oath** 8:25 18:24 24:2
**obeys** 223:19
**object** 13:23 16:17 151:23 284:23

**objection** 9:18 13:1 14:7 16:13 17:22 18:1,5,19 19:18 20:2,8,11,15 21:2,5,12,16,21,25 22:1,13 23:1,14,19 24:9,16 25:9,16 26:8,25 27:3,5,18 28:11 29:4 30:8 30:24 31:13 32:3 32:11,18,24 33:7 34:3 39:5,22 40:13,22 41:8,17 41:22 42:2,21 44:1,7,18,22 45:4 45:12,16,21 47:20 49:25 50:8,13,24 51:9 52:2,15 53:9 54:19 55:1,14 57:23 60:13,24 61:1,10,17 63:2,6 63:10,17 64:3,20 65:18 67:12 69:8 70:20 72:5 76:1 76:24 77:9 78:2,6 78:10,16 79:19,24 83:22 85:3 86:14 87:15 88:8 89:6 89:25 90:8 92:6 92:17,19 93:4,8 94:3 97:2,11,21 98:9,19 99:14 100:3 101:2,19 102:1,11 103:6,16 103:23 104:3,21 105:8,17 106:14 106:15,21,25 107:11 108:5,19 109:16,24 111:24 113:4 114:21 115:20,23 116:6 116:10 117:24 119:5,15 120:13 121:4 122:21 126:22 127:23 128:16,23 134:17 135:8 136:4,13 137:17 140:14 141:4,21 144:5 146:25 148:11 151:22 153:11 154:4 156:11 159:7 163:23 166:20 167:25 168:5,14,18 169:2 170:12,19 171:1 171:11 172:1,9 173:22 174:11 179:1 181:11 189:18 191:1 194:3 198:1,9 199:2,9,15 200:1 200:15 201:3,9 202:1,24 203:21 204:9 205:6 207:4 207:17 211:4,15 219:13 223:9,22 224:4,9 231:4 232:11 238:7 240:3,12 243:25 245:3,22 246:22 261:10,18 262:24 263:21 264:21 265:8 266:2,13 267:4,10 268:18 269:18 270:16 271:1,5,10,14,17 271:20 272:10 273:17 274:19 288:23 291:4,13 293:3

**objections** 5:8,10 11:20 13:25 14:16 17:9 22:4 32:14 33:15 42:6 88:12 98:13 99:21 107:4 107:21 108:22 110:11 148:19 164:1 200:10 201:19 202:11 205:16,19,22,25 206:7 247:6 250:11 259:19 266:7 279:10,21

**obligation** 41:24 45:25 160:19 184:17 246:16,25

**obligations** 41:16 98:4 223:17

**obtain** 128:8 199:8

**obtained** 23:5 204:23

**obtains** 223:19

**obviously** 6:23 47:22 56:8 61:18 121:9 178:16 182:9 217:18 220:23 232:20

**occasion** 55:4 78:13 155:21

**occasions** 96:7

**occur** 107:6 127:8 150:12 215:11 217:20

**occurred** 73:20 257:14

**october** 130:8 161:24 162:2 175:18,25 191:8 217:18 263:3 287:8 294:18 295:4

**odd** 249:1

**offer** 210:19

**offhand** 44:10 53:6 290:18

**office** 29:12 30:1,4 33:4 221:24 294:7

**officer** 46:6 299:24

**offices** 2:2 3:10 30:6,22 31:9

**offs** 115:12 163:9 163:11 227:18 228:21

**offshore** 31:9 32:9

**oh** 15:17 60:20 140:18 195:2 208:18 235:20 239:13 252:19 253:9 255:20 280:20 294:20

**okay** 7:21,22,23 8:23 9:23,24 10:10,18 11:17 12:20 13:6,7,11 14:9 15:5,25 16:3 16:4,25 34:18 35:9 58:5 64:16 67:17 70:2 73:5 74:14 83:13,20 85:21 86:1 94:22 94:25 105:3 109:4 113:5 115:8 118:9 118:13 124:6 132:14 133:5 137:2,24 139:7 146:14 151:6 157:12 158:3,6,22 161:11 163:20 164:16 165:7,10 171:22 175:5 176:2,6 186:8

191:7,13,16 192:1 192:13,25 193:6 194:19,22 195:8 196:4 209:10 212:7,9,15,17 213:19 215:8 216:12 217:17 221:1 222:7,9 225:22 227:13,16 229:8 231:8,11,16 234:14 236:22,25 237:15 239:12 240:19,21 243:13 248:7,8 249:23 250:14 252:24 253:9 254:2,5,25 255:6,7,8,10 257:24 259:7,11 260:13 263:4,7 268:9 269:22,25 270:20 272:24 273:21 274:2 276:12 277:23 278:7,18 279:5,7 279:23,25 281:14 283:1,21 285:12 286:21 287:15 296:13,16 297:2

**olde** 240:6

**older** 235:7

**omar** 3:6

**onboarded** 199:4

**once** 16:6 48:12,13 48:19 52:11,13 76:3 119:19 120:4 139:14 140:17 151:4 157:4 161:9 178:15 179:11,25 180:4 214:11 286:19,22

**ones** 44:8 54:14,20 66:22 238:10,23 257:2,2,8

**onesys** 38:17

**ongoing** 111:20 112:6

**online** 49:20 206:20 207:9

**open** 17:3,14 27:5 46:7 140:8 143:6 143:7 159:19 188:7,15 214:23 219:21 246:6 293:20

**opened** 125:24 138:11 140:18

**operates** 293:1

**opportunity** 6:10 9:22 14:10 81:21 84:17 86:2 100:17 100:23 101:5 195:9 213:25 250:23 258:21

**opposed** 36:24 54:16 144:11 200:9 201:2 244:17

**opposite** 244:21

**opt** 91:18

**optimal** 243:21 244:3,7

**oral** 1:11,21 299:13,24

**order** 1:18

**orders** 92:20 223:19

**ordinary** 262:21

**organizations** 186:17

**original** 117:19 118:16 119:1 285:24

**originally** 7:2 116:20 137:21 163:12

**originates** 275:14

**oscar** 5:4 49:18,19 49:23 50:12,23 51:2,6,6,14 52:1,5 52:8,14,22 53:2 57:8 60:9 71:3 74:11,13 76:14 89:4,5,18,20 230:5 230:23 231:2,5 239:23 241:8,14 260:1 275:18 287:13,18

**outcome** 185:19 300:17

**outside** 19:8 42:14 60:1 81:14 127:25 151:24 296:21

**overall** 256:21

**overlay** 235:9,16

**oversight** 49:24 50:2 51:7

**owe** 224:2,7

**owed** 222:20 223:5 223:21

**owes** 198:8

**owner** 155:7

**owns** 240:8,10

**p**

**p** 3:1,1 6:1

**p.c.** 3:10

**p.m.** 1:25 297:10

**pa** 216:4

**package** 140:3,3,5 140:8,15 142:10 143:3,10 149:5 255:21

**packages** 140:12 142:25 143:5

**page** 4:2,13 5:2 14:5 15:19,20,24 15:24,24 35:4,6,15 35:25 73:10,11,11 83:8,18 85:20,24 85:25 86:3 87:5 122:3,6 124:3,23 157:12 158:1 164:24 165:11 176:4,5 182:7 191:14,25 193:1,4 193:5,6,16,16,17 195:24 196:10 210:10,13 212:8 212:10,13 213:16 213:23 216:23 220:19,25 222:7 226:17,18 227:11 230:21 231:12,20 233:2,19 240:17 241:3 248:25 249:8 250:1 253:2 253:13,19 255:2,6 255:7,9 258:17 259:6 272:7,17 275:12 278:21 279:19 281:20,24 282:1 284:3,4,7,9 285:16 289:6 291:15 300:8

**pages** 15:17 16:5 16:11 35:21,22,23 73:12 82:18 120:24 121:20,21 122:3 124:7,11,15 124:17,21,22 125:5 193:7,9 195:16,17 196:3 209:20,23 213:14

214:2,6,7 218:2,5 219:25 220:2,5,18 221:14 238:3 239:5 240:20,25 243:3 248:24 249:5,5,6,24,25 252:24 263:6,8 275:16 281:8 282:4 287:12

**paid** 120:4,5,16 125:25 126:1 145:11,16 180:17 222:13,23 223:1,4 223:4,8,15,21,25 225:7,8,9,10,12 227:23 228:4,14 228:16 229:2

**papers** 190:5

**paragraph** 158:4 158:7 215:14,24 216:10,22 217:8,9 220:24 285:4,8

**paragraphs** 186:10

**paraphrasing** 49:1

**parenthesis** 182:24

**part** 31:3 33:11 50:14 55:3 76:17 77:18 106:10 155:2 160:21 175:1 177:25 201:16 214:20 218:6 221:3 240:9 241:8 259:23 260:2 266:16,17 267:8 274:6 285:10 296:21

**partial** 66:6

**participant** 212:25

**participant's** 106:10

**participation** 51:5

**particular** 65:9 75:1 95:5 140:17 144:9 154:9 201:18 226:12 229:21 232:4 233:15 254:8 257:17 264:20 265:2,6 284:12 296:20

**particularly** 43:16

**particulars** 79:7

**parties** 98:23 198:24 261:8,13 262:16 300:14

**parts** 200:13 214:20

**party** 41:1 77:8 99:7 189:12 263:14 267:13,24 268:11 300:5,11

**pass** 122:18 161:13

**pat** 135:23

**pause** 34:17 137:1 195:7 218:21 229:18 230:2 259:10 269:24 274:1

**pay** 119:17 200:7

**paying** 119:11 130:19,23 131:2,4

**payment** 95:20,22 112:6 113:1,6,10 113:15 114:20 117:16,20 118:2,3 123:11 130:20,21 131:16,17 150:22 150:25 151:3 162:2 165:8 166:13 169:15,15 169:16 172:8 173:1,14 214:9,15 214:22 225:14 233:12 292:1,3,7 292:13

**payments** 111:21 111:22 113:8 119:24 122:9,14 123:17,21,23,25 130:13,24 132:2 166:6

**pdf** 209:8

**penalties** 9:2

**penalty** 298:1

**pendency** 161:19

**pending** 11:5,21 22:7 42:22 262:8

**people** 23:7 30:1 107:13 108:10,10 152:20 161:1 189:7,9 203:9 206:14 256:23 274:15,22

**percent** 14:22 84:23 121:14 128:6 134:16,16 277:3,13

**percentage** 134:1 134:14

**perfect** 243:21

**perform** 248:12 248:17

**performed** 248:13 272:8

**performs** 223:17

**period** 13:5,9 84:10,14 118:22 163:22 180:2 213:1 244:12 261:22 263:10 269:13 280:15

**perjury** 9:2 298:1

**permissible** 205:13 207:16 208:1,20 209:1 210:20 211:2

**permits** 70:13

**person** 10:2 28:25 46:25 51:23 134:23 135:7 155:11 187:17 197:9 294:7

**person's** 154:22

**personal** 23:24 25:18 28:21 29:1 29:12 69:11 98:21

**personally** 28:13 28:16 29:9 204:4 265:23 267:16

**pertain** 183:4

**pertained** 160:15

**pertains** 100:2

**petition** 121:10 124:23 125:5 130:11 150:5,18 150:25 151:5,18 151:20 154:15 156:20 157:3 162:3,11,13,15,22 163:6,9,10 164:22 172:18,23 174:1 215:12 217:16 228:3

**phone** 46:22 203:5 206:13 215:25 217:8 256:24 257:8 294:2

**phrase** 39:8,11 96:20 98:16,25 127:19,22 158:8

182:11 214:19
**physically** 291:22 292:5
**pick** 10:3
**piece** 38:24 40:5 58:2 59:21 103:9 104:5,19 138:14 142:2,3,4 178:24 180:2 252:12 255:22,25 267:8
**pieces** 133:18,19 133:22 134:8,10 136:12 141:24 284:1
**pin** 253:1 254:8,18 254:18,22 255:3 257:5,17 258:5,9 258:10 284:12
**place** 6:6 97:4 128:8 205:1 206:25
**placed** 82:16 225:10 278:2 290:11
**places** 89:20
**plaintiff** 1:3,22 3:2 7:5 47:4 92:16 262:5 284:8 299:3
**plaintiff's** 4:14 5:8 6:9 14:15 250:12 259:3,14,22 261:16 270:8 278:10,14 279:11
**plan** 223:18
**platform** 49:14,17 49:20 50:12
**please** 1:18 7:11 9:21 11:2,15 13:14 21:23 22:8 22:10 28:4 34:8 34:14 42:24 46:25 78:21 82:17 83:14 104:10 110:2 121:17 123:5 130:2 136:20,23 157:8 195:5 229:25 239:10 250:5 278:8
**plural** 182:24
**plusfour** 1:5 233:20 234:7 236:4,6 299:5
**point** 24:12 33:4 36:20 37:3 47:13 69:23 72:8 81:6 81:20 99:3 143:7 143:18 162:14 164:8 227:6 267:21,23 268:2
**pointed** 287:25
**policies** 20:5 108:11,17 125:2 136:17 143:23,25 144:4,15 146:24 147:13 148:6,8 149:11,13 151:7 153:22 158:20,24 159:3,20 168:17 170:4 172:8 213:7 214:2 244:9 292:20 295:25
**policy** 68:13 73:22 74:22 78:14 79:9 101:24 102:3,9,14 107:25 108:3 110:16 111:6,11 114:18 125:20 144:6,7,11 145:2 145:13,18 146:19 147:21 148:1,10 149:15,18,21 150:4,10,16,17 151:6,20 153:23 154:7,9 155:22 156:10,18,23 157:4 160:11,14 161:18 162:1,8 167:20 168:4 169:5,7 170:8 171:23 172:15,17 172:21,21,23 173:5,7,11,11,18 173:21,24,25 180:16,25 181:5 188:5,10 190:5,19 213:11,20,20 214:3,4,8 220:2 227:21 229:21 231:24 232:1,15 232:24,24 245:18 247:16,18 285:3 286:4,11 287:6,8 289:17,21 292:25
**populated** 61:16 204:19
**portion** 21:24 82:25 124:12 222:10 256:21
**portions** 1:17 195:18,20,23,23 249:19 251:3 272:18,21,25 273:3,6,9 274:3
**portrait** 249:6,8 249:15
**posed** 49:3 70:5
**position** 153:8 155:25 167:10,16 167:18 223:6,11 223:12,20,24
**positions** 19:15
**positive** 118:9,10 118:11,19,25 126:1
**possess** 89:23
**possession** 80:24 113:3
**possibility** 113:17
**possible** 57:21 64:24 113:20,21 127:20 128:5,7,9 143:6 201:14 219:4,8 229:11 232:2,8 239:18 244:16,20 249:22 267:17,18 282:9 282:10,20
**possibly** 39:19 77:4 101:13 106:11 170:25 198:15 252:15,16
**post** 173:7
**postbankruptcy** 123:6
**potential** 189:6 201:1,2 202:9 205:21,24 269:15
**potentially** 47:9 96:24 206:13
**power** 40:24 243:15
**powering** 115:8
**ppm** 264:24
**ppn** 194:13,14,16 196:8,13 206:5 207:21 208:5,11 208:15,16 211:6
**ppp** 207:19,22 208:4,7,11,17 209:4
**practice** 68:13 102:10 166:19 178:21

**practices** 20:5 262:21
**precise** 264:19 271:8
**premised** 149:10
**prep** 159:11
**preparation** 26:21 27:17 56:21
**prepare** 26:12 156:25
**prepared** 16:16 17:5 80:17 87:22 105:4 158:20 159:1,3
**preparing** 19:9
**present** 6:10 26:16 112:10 213:2
**presentation** 20:24 21:3,4 23:11
**presented** 21:7,9
**preserved** 261:14
**president** 78:9 153:9
**presume** 12:22
**pretty** 20:22 96:7 171:7 179:2 185:23 187:9 222:5 255:8 256:20 284:17
**prevalent** 55:21
**prevented** 296:1
**previous** 269:1
**previously** 70:9 290:4
**primarily** 20:24 21:3 90:9,10
**print** 249:1
**printed** 37:23 209:9 248:25 253:23
**printing** 249:23
**prior** 1:19 31:16 38:8 44:23,24 84:19 100:18,24 102:12,21 104:21 105:8 108:24 125:24 132:11 146:25 159:8 166:13,14 219:21 224:16 246:6 251:21 267:23 293:21
**privilege** 25:17
**probably** 24:12 28:24 39:10,13,16 43:12 50:15 52:9 55:7,11 63:4 64:22 78:3 80:17 88:9 93:21 99:2,3 106:7,11 114:17 121:20 132:20,22 135:1 152:25 153:5,7,12 155:11 169:8 230:14 234:23 245:19 256:20 265:18 276:22,23 277:4,6
**probe** 82:9
**problem** 12:24
**procedure** 2:4 104:1 149:11,15 153:23,23
**procedures** 5:3 20:6 78:15 108:12 125:3 128:8 136:17 137:8,10 143:23 144:1,4 153:22 158:24 168:17 213:7 238:24,25 244:9 281:8 295:25
**proceed** 80:21
**proceeding** 223:7
**proceedings** 34:17 137:1 195:7 229:18 230:2 259:10 269:24 274:1
**process** 31:4 33:10 47:18 48:16,21,25 60:22 62:5,10 63:9 64:18 76:20 79:8,17 90:19 101:15 122:18 128:9 147:3 159:21 178:14,15 178:18 179:24 180:7,9,13 181:6 186:2 275:6,7,9 286:11,14,18
**processed** 29:7 90:20 142:20 184:2 185:4,8,10 185:11,18,24 257:23 280:5,20 280:21
**processing** 46:12 76:17 135:4 136:16 143:22 176:15 182:20
**produced** 1:21 221:18 274:4
**product** 27:1,2 171:13 201:18 207:13 209:11 264:11 265:7
**production** 5:13 249:8 253:23 270:8,21
**productivity** 17:20 18:10
**products** 206:22 265:17 266:5 267:3
**proficiency** 30:21 32:12 34:6
**proficient** 31:17
**profile** 4:23 211:8
**profiles** 196:20
**programming** 21:15
**promise** 11:11
**proof** 120:16 125:6 129:4 145:11,18 169:13 180:17 190:21,24 218:3,7,8,9,15,23 218:25 219:2,5 228:17,20,24 229:1,3 232:20 245:12 289:9
**properly** 130:7 141:13 216:21 275:23
**proprietary** 240:5 240:11
**prosecution** 152:8
**protective** 1:18
**provide** 11:3 25:12 46:13 47:24 65:21 66:3 69:19 97:1 98:2 100:5 100:16,22 127:3 127:15 130:9 144:14 152:10 155:24 201:17 243:10 247:13 275:5
**provided** 17:24 25:11,24 27:10,13 48:2 65:12,13,16 66:23 91:11

105:15 120:21,22 120:23,23 126:20 131:13 201:1 208:14 229:1,2,3 241:15 247:22 249:3 275:16
**provides** 91:15 120:15,16 127:13 254:20 256:15
**providing** 19:9 161:19 246:3
**provisions** 116:4 171:24
**prudent** 107:15
**public** 60:2,5,9,11 60:16 61:11,19 81:7,10 83:6 124:13 125:9 126:5 168:22 202:4 217:25 219:18 246:5 293:13
**publication** 269:15
**publicly** 81:8 207:2
**publish** 263:18
**published** 263:14
**pull** 38:1 138:21 138:23 192:21 206:21 283:19
**pulls** 138:17 209:18
**purchase** 91:18,21 91:25 92:1,3
**purely** 90:22
**purge** 117:1
**purged** 117:6 262:7,20
**purpose** 52:23 53:20 194:1,5,7,8 196:6,15 199:6 205:13 207:16,16 208:2,20 209:1,17 210:1 211:3 264:2 264:7,9,10,18 265:5 266:4 267:5 268:24 269:3,6,11
**purposes** 151:17 187:20,22,23,24 198:25 201:1 210:20
**pursuant** 1:18 2:3 300:2
**put** 15:19 17:8,16 17:17 80:11 109:7 109:11 146:9 147:4 180:3 236:3 249:24 256:9 273:22 274:9 292:2
**putting** 221:17

**q**

**qualification** 32:13
**qualified** 270:15
**quality** 192:18 193:13 194:11 204:21 210:4 220:8,16 293:11 296:10,13,21,22 297:3
**quarter** 115:5
**queried** 22:16 247:25 282:16
**queries** 22:25 23:10 25:13,24 26:2,6 272:8 282:15
**query** 22:16,18 139:8,10 270:12 282:20
**querying** 21:19
**question** 10:7 11:5 11:6,12,16,21 12:9 13:8 14:23 22:7 22:11,17 27:3,5,24 28:3 33:2 36:10 40:9 42:12,18,22 42:25 45:24 47:16 49:3 58:1 62:6 63:12,25 67:19 69:10 71:19 78:18 79:7 80:14 81:2 81:16 82:6,8,13 87:6 94:17,21 97:13 101:1 104:11 110:2,5 120:25 123:19,20 129:8 144:17 147:17 152:9,24 155:21 159:9,13 162:1 170:1,3 238:1 242:9 262:5 263:20 272:18,22 272:25 273:3,6,9 281:20 282:3 286:16
**questioning** 46:8
**questions** 10:17 11:9,20 12:1,17 13:22 21:18 23:8 24:6,20 25:21 51:22 70:5 81:5 81:15 83:23 94:23 132:11,14 133:6 133:10 259:25 270:14 271:21 273:20 278:8 283:8 287:21,23 288:2 292:19 296:7
**queue** 89:4 140:6 140:7,17,21
**queues** 140:5
**quick** 251:17
**quicker** 244:6,11 245:14 246:13
**quite** 55:16 265:22 278:18
**quotas** 17:20 18:9

**r**

**r** 3:1 6:1 155:14
**range** 133:17,21 212:10,13
**ranges** 212:8
**ranks** 89:23
**rare** 96:8 164:12 179:2,19 185:23
**rate** 199:14
**rc** 1:5 299:5
**reach** 127:9 166:24
**reached** 118:6
**reaction** 105:7
**read** 22:10,12 25:10 28:4,6 31:3 42:24 43:1 86:2 104:10,12 110:3 130:17 186:15 218:11,12,13 246:23 258:23 259:9,16 260:16 279:15 289:10
**reading** 31:4,18 94:10,11 295:12
**ready** 178:17 180:5
**reaffirmation** 127:14 129:2
**reaffirmed** 122:25 126:21,24 127:2,5 127:7,12,18

128:19,21 129:1,5 161:12 228:5
**reaffirming** 130:13
**real** 251:16
**realize** 143:6,8
**really** 18:15 22:17 38:11 48:10 50:9 50:16 51:12 55:16 57:12 61:18 63:18 63:18,20 64:4,12 77:1 90:12 92:2 94:16,19 106:22 110:4 112:18 116:21 130:13 132:24 133:3 143:11 145:7,14 156:25 161:3 169:22 173:4,10 180:13,21 181:25 198:2 200:23 203:18,25 208:8 263:1
**reason** 12:14 73:21 74:4 77:13 89:9,22 106:7 109:5,8 141:18 144:9,15,19 145:5 145:6,9,11,13,20 146:10 147:4,20 147:22,23,25 148:21,22 179:21 179:21 197:3,5 198:18 220:21 223:14 228:13,15 228:16 229:6,10 229:20 230:5,7 231:7 232:8,16 239:2 252:18 253:4,6,7,9 255:16 280:23,24 281:25
285:25 286:3,23
**reasonable** 75:24 100:23 140:11
**reasons** 109:11 147:12,16 229:10 230:20 231:9,11 231:16,17,20 232:9 238:2,5,18 238:22 250:20 300:8
**recall** 17:24 18:3,7 18:14 23:17 24:5 39:14 45:14,19 70:10,22 80:8 109:13,17,17 134:4,7 194:23 209:6 249:17 287:6,20 296:11
**recategorize** 141:7 141:9
**recategorized** 141:11
**receipt** 300:6
**receive** 40:15,18 40:23 41:10 53:2 53:3 56:4 67:3 90:17 203:3 219:2
**received** 17:9,10 48:12 59:15 103:4 126:10 134:8 140:12 141:19,24 162:20 203:12 257:19 280:15 289:9
**receives** 39:20 40:11,20 47:18 54:6 58:2 59:10 70:12 99:25 133:12 134:14 136:12 141:17 188:6
**receiving** 191:19 259:13,22 288:6
**recess** 70:3 132:8 188:3 276:5
**recognize** 14:12 121:21 212:4,21 282:6
**recollection** 18:8 26:1 83:25 84:18 109:10,12 133:14 150:15 288:16
**recommendations** 78:14 79:9,15
**reconstruct** 268:14
**record** 6:11,20 7:4 7:12 10:12 13:23 13:23 16:17 17:8 17:16,18 22:2,12 28:6 35:4 37:24 38:1 43:1 45:20 46:9,13,24 60:3,5 60:9,11,16 61:11 61:19 74:20,23 77:7,11,12,14,16 79:16 81:7,10,22 83:6 88:17,18 92:21 94:14 96:17 97:15 104:12 110:3 111:22 117:15 124:13 125:9 126:5 136:10 137:12,15 139:16 140:10,13 141:13 160:1 169:15 217:25 218:12 219:18 230:15,18 231:3 243:17,20 246:5 251:16,19 260:15 260:25 261:1,20
263:13,15 283:15 293:13 299:25 300:16
**recorded** 10:12
**recordkeeping** 262:21
**records** 21:19 77:19 141:20 169:17 248:12,17 261:7,15 262:7,15 265:24 266:8,11 268:15
**recourse** 108:18 170:2
**red** 165:23 166:22
**redacted** 195:24 195:25
**refamiliarizing** 26:6
**refer** 15:19,23 53:16 99:1,4 177:6,11 184:21 211:18 233:7,18 276:6
**reference** 16:14 214:7 234:16
**references** 141:17
**referred** 137:23 230:22 234:8
**referring** 16:2 21:22 43:15 62:4 296:16
**refers** 252:5 280:9 280:10
**reflect** 88:25 130:20 214:3 224:24
**reflected** 38:9 62:19 75:2 96:12 96:14 204:22 226:20 232:3

237:21
**reflects** 234:2,5
**refrain** 9:25 10:13 21:24
**refresh** 18:8 83:25 84:18 109:12
**refuse** 27:15
**regarding** 114:20 259:15 269:15
**regardless** 144:22 275:13 280:17
**regular** 96:14 156:14 207:21 233:12
**regularly** 96:9
**reinitiates** 41:5
**reinserted** 103:13 103:15,17
**reinvestigate** 40:8 41:3
**reinvestigated** 191:6
**reinvestigating** 20:6
**reinvestigation** 19:16,25 39:21 40:1,4,12,21 41:5 41:13,15 47:18 48:19,21 63:9 64:21 66:2 78:15 79:17 91:12 98:7 99:12,19 100:19 100:25 101:10,16 102:20,25 103:10 104:2,6 175:25 177:1 178:11 181:7,13 183:4,13 183:22 184:7 186:4 187:1,10 189:6 213:8 244:4 263:3 276:21
277:8 280:6
**reinvestigations** 46:1 181:19
**relate** 158:21 159:4,20 266:5
**related** 19:25 73:8 147:14 158:25 172:15 173:13 174:5,9 197:13 213:17 217:1 231:19 246:18 250:17 258:3,7 261:15 262:23 296:17 300:13
**relates** 32:12 63:9 72:3 152:11 173:5 173:21 195:17 214:8 230:4,22 253:20 270:23 280:15
**relating** 247:2
**relationship** 23:6 51:13 81:19,23,24 82:3,9,11 274:14
**relative** 300:15
**relevant** 47:8,9 84:14 99:25 100:2 100:5,13,17,22 131:13 152:7 169:12 191:14 195:16 202:8 213:1 220:3,21 246:17,20 247:1,4 247:14,15 248:18 262:19,22 263:19 271:9 272:15 280:15 289:7
**rely** 167:7
**remain** 224:25
**remainder** 124:7
**remains** 184:4,24 184:25
**remarks** 91:4
**remember** 18:11 24:10 25:23 29:8 37:14 87:18 88:9 95:23 121:8 126:17 132:21 150:13 154:13 156:24 171:8 172:5 206:15 237:10 239:18,19 249:22 270:4 287:23
**remind** 108:21
**remove** 123:5 130:2
**removed** 130:5 229:4
**repeat** 110:1,6
**repeated** 292:17 295:9
**rephrase** 11:12 103:19
**report** 35:2 40:6 58:20 67:2 68:5,6 68:7,10 91:17 94:10,13,14 95:1,2 95:6,12 98:8,12,16 98:22,23,25 99:1,4 99:5,7,7,13,20 112:11 116:16 118:22 120:23 126:13 138:11,13 151:20 162:23 164:19 166:9,14 167:7 175:13 177:2 182:9 185:19 187:19 189:10 191:9 192:22,24 193:1,7
200:25 204:23 207:2,3 210:3 211:20 217:13 224:11,12,17 233:7 234:9 235:20 236:20 237:19,22 251:6 251:24 263:24 264:20 267:2,14 267:25 275:24 277:1,2,20 278:5 294:15 295:5
**reported** 2:1 116:18,20 121:2 162:4,4 167:22,23 170:11 173:2,13 181:10,16 191:23 206:23 224:16 227:7 278:5 292:16 293:8
**reporter** 34:14 88:15 299:21 300:24
**reporter's** 4:9 299:12
**reporting** 5:15 41:16,20 47:24 58:18 59:12 97:1 97:18,25 98:2,3,6 99:11,18,24 111:9 115:1,11,18 116:5 116:13 118:23 120:11 127:8 128:13 129:22,25 130:18 132:1 150:21 151:9,11 151:15,15 156:19 161:19 162:10,12 165:15 166:3,4,5,6 166:17 167:6 168:25 169:18

171:25 172:8,19 173:7,14 174:5,9 204:16 214:8 222:25 223:1 224:5 227:17 232:19 246:16,25 263:10 265:7 267:9,12 274:6,11 274:18 291:11,21 295:1,19,21
**reports** 91:14 98:24 268:17
**represent** 12:22 47:4 144:10 194:10 195:22 206:19 226:4 227:4 248:3,24 253:13 254:7 274:3
**representation** 13:3 41:11 62:22 74:25 233:6 249:18
**representations** 12:20 164:18
**representative** 1:13 8:4 17:6 41:7 299:16
**represented** 84:9 164:15
**representing** 65:21
**represents** 41:1 158:8 226:5 236:18 237:1
**request** 11:5 22:21 48:6 49:10 71:5 72:9,24 86:7,21 100:6,8,10 140:19 177:25 182:15,15 185:15 186:16 190:10 220:11 244:23,25 245:2 245:10,11 259:4 259:12 270:21 271:7
**requested** 267:13 267:25 268:11 294:18 300:4,10
**requesting** 72:20 111:4 259:14
**requests** 5:11,13 178:23 186:12 245:4,15 270:8,11 278:15
**require** 66:23 67:21 68:2,11 205:12
**required** 10:22 31:12,15,15 48:5,7 55:24 56:16 67:8 67:10 68:22 69:1 69:4,7,14,14,19 107:9,16 218:16 241:7,14,20,23 242:14,18 260:3,5
**requirement** 56:18 107:24 108:4 201:24 202:7
**requirements** 32:8 32:10 56:19 125:18
**requires** 30:22 68:18 98:7 99:11 99:18,24 245:16
**research** 25:6 159:15 162:17 208:9 235:5 247:20 252:13 257:5,9,16 278:24
**researching** 87:20
**reserve** 297:9
**reside** 68:2 202:4 203:2
**residential** 201:24
**residing** 203:9
**resolve** 121:1 216:25
**resolved** 47:14 48:18,22,24 59:15 246:18 247:3
**resource** 5:15 274:7,18
**respect** 91:10 162:1 180:10 181:9,15
**respond** 12:5 55:24 56:12,14,16 68:3 70:14,19 71:2 72:17 100:17 100:23 101:6,12 102:22 171:9 239:24,24 241:21 241:22 242:14 243:4,10,24 260:4 275:11,14,19 287:22 294:11
**responded** 101:14 103:4
**responder** 56:6
**responding** 110:17 284:14,17
**response** 10:17 17:15 35:1 53:3 53:11 54:6,7,11,16 56:3,13 57:21 68:18 70:16 71:15 71:20,23 72:2,13 85:6,10,17 86:6,25 103:2 104:6,11 105:6,14 117:11 130:6 144:16 182:14 217:7 241:4 242:15 250:12 259:14 275:6 278:21,22 280:1,9,10 287:2 294:12
**responses** 5:8,11 10:13 13:25 14:17 250:15 259:3 278:9,13,20 279:11,22 284:12
**responsibilities** 19:7
**responsible** 153:21,24 154:1,2
**rest** 255:1,2
**restate** 11:13,16
**restriction** 46:4
**result** 25:25 54:15 62:18 91:12 103:10 148:7 176:15 178:4 182:7 185:20 191:19 280:6
**resulted** 280:19
**results** 41:15 48:12,15,20 57:20 66:2,24,25 98:7 99:11,18 100:19 100:25 101:10,16 102:25 176:8,13 176:19,23 179:11 182:11,15,17 183:6 184:21 185:18 186:2,5,12 186:17,21,22,23 186:23,25 187:16 248:18 263:3 280:3

**retain** 74:15,17 261:7,12 262:6
**retains** 74:10,11 74:12,12,13
**retired** 136:6
**retrieve** 38:14 139:3,8 140:7 230:14 287:17
**retrieved** 95:2,3 96:7
**retrieving** 90:22
**return** 206:10 248:18
**returned** 300:6,7
**reveal** 27:1 69:9 172:2
**review** 1:19 13:19 14:11 16:10 26:21 26:24 27:9,23 34:15 56:25 68:15 81:7 83:19,24 84:17 143:4,5,15 157:11 181:9,15 195:9 213:19 239:25 241:16 250:23
**reviewed** 27:12 74:1 140:18 187:19 241:9 242:20 275:2 291:9
**reviewing** 83:21
**revised** 285:9
**revisions** 176:14
**revisit** 38:8 70:6
**reword** 63:11
**rica** 29:15,21 30:6 30:23 33:14,19
**right** 13:12 32:6 35:23 37:24 44:8 53:12,18 63:23,24 79:1 80:19 83:11 84:12 91:16 93:13 117:16 126:14 130:23 131:11 132:23 135:15,16 141:14 165:2 169:8 173:11 174:6,7 176:8,8 187:22 188:4 189:2 192:8 193:5 193:10 198:8,14 198:18,20,22 206:24 210:12 212:5 215:7 222:17 226:19 227:17 228:22 234:8,16,17 237:23 241:4 244:18 248:4 255:21,22 257:14 257:20 258:9,14 261:24 268:4 275:19 277:2,8 279:5,14 280:22 282:6,24 283:25 286:12,19 288:14 288:19 289:3,10 291:3 292:23 293:2 294:13,16
**rights** 98:3
**risk** 199:12 204:14
**role** 51:5,8
**room** 283:15
**round** 172:12 283:1
**route** 89:4,18
**routed** 30:18
**routinely** 97:9
**rozak** 25:2,20 153:6
**rule** 300:2
**rules** 2:3 8:17
**run** 283:3,4
**running** 283:3 297:3
**rural** 200:9

**s**

**s** 3:1,7 6:1 38:17 38:17 155:14,14
**sake** 181:20
**sample** 207:2 208:10 209:7 220:20 241:1 288:11 289:5
**santa** 29:13 30:1,4
**santiago** 29:14 30:9 36:13
**sat** 39:18
**saw** 37:19 157:22 157:23 208:13 237:18 239:15 241:17 255:3 276:20 282:8
**saying** 10:15 33:25 103:19 130:14 131:10 159:14,17 169:7,20 188:24 204:3 208:24 217:15 229:4
**says** 15:20 71:9 83:1 85:9 113:8 117:13 123:4,4 129:15 130:2 131:3,4 155:6 169:5,6,22 176:13 179:9,16 180:16 182:19 183:8 186:1,15 188:13 193:5,6 208:1 210:13,16,19,22 213:16 215:14 216:4 217:9 218:11 223:25 227:2 231:14,15 233:2 234:3,19 235:11 240:4 241:3,7,22 259:12 260:14 269:9,11 270:9 275:12 278:13,22 286:3 287:25 289:7,7 290:6 295:14,16 295:17
**scanned** 256:17
**scenario** 87:18 103:8 148:22
**schedule** 120:24 190:18 218:18,19 218:19,22,23,23 219:16,24
**scheduled** 6:3 117:14 214:14,21 268:2
**schedules** 219:2 219:12
**scope** 13:4 16:18 17:22 20:2,15,20 21:12,16 23:19 24:9 30:24 31:13 32:11,18,24 33:7 41:9,18 42:3 44:7 44:18,23 45:5,12 45:16,21 49:25 50:8,13,24 51:10 52:2,16 60:13,24 61:1,10,17 63:3,10 63:17 64:20 69:8 77:9 78:16 79:20 81:15 83:22 92:6 93:4 94:3 97:2,21 98:9,19 99:14 100:3 103:6,16

104:3 106:21 108:5,23 109:16 109:24 111:2,25 114:21 116:6,10 119:5,15 120:13 121:4 122:21 127:25 128:16 129:11 134:17 135:8 136:4,13 137:17 140:14 141:4,21 153:11 163:23 168:14,18 169:2 172:1 179:1 194:3 198:1,9 199:2,9,15 200:1 200:15 201:3,9 202:24 203:21 204:9 205:6 207:4 207:17 211:15 219:13 223:22 224:4,9 240:3,12 243:25 245:3 246:22 266:2,13 268:18 269:18 270:16 271:10,14 274:19
**score** 91:14,17 92:3 95:25 210:23
**scores** 91:21,24 92:1,15,23 93:2,3 93:6
**screen** 38:2,10,12 139:12,13 220:20
**se** 275:1
**search** 139:11 196:14 197:15 201:12,21 202:15 202:19,23 204:19 206:9,17,21,24 207:14,15 208:1 208:21,24,25 209:12 238:14 248:10,17
**searches** 207:19 283:3,4
**second** 5:13 14:20 27:20 35:1,18 49:2 52:9,11,13 75:23 76:4 132:23 133:3 140:18 165:3 176:5 177:4 177:18 178:16 187:13 209:15 212:13 215:21 216:3 217:1 230:16 243:18 248:7 253:2,13 254:9 255:6,13 257:12 270:8,21 284:4
**seconds** 52:19
**section** 83:12 86:3 108:1 165:9 182:7 210:3,5 217:13 253:23 280:3
**sections** 230:25
**security** 141:7
**see** 10:2,14 11:25 12:5 15:21 24:21 31:12 36:7 54:20 62:19,22 68:6 72:19 73:6 75:11 82:25 83:1,11 87:5 89:1 104:14 109:1 113:11 117:16 122:3,6 124:11 134:11 138:19 143:1 158:7,14 159:24 164:25 170:21 176:7,20 178:19 182:21 183:5 185:19,23,24 186:12 188:25 189:3 192:14,17 193:12,15 195:23 196:8 206:22 207:19 209:7 210:13 218:6 221:12,22 225:11 225:23 226:17,20 229:9,11,19,22,23 231:3,8,21,23 233:2,3,17,19,23 233:25 234:7,10 235:7,9,15,17,22 235:25 238:8 240:20 241:10 243:2,3 246:5 250:14 251:5 252:4 253:9 254:6 257:5,17 258:17 260:21 261:1,4 263:23 267:2 269:2 270:21 275:16 276:14,15 276:25 277:14,17 279:1,3,15 281:13 282:1 290:6 291:7 291:17
**seeing** 37:24 171:8 239:18
**seek** 120:10 160:18
**seen** 14:18,20,21 31:19,22,22 34:19 45:9,14,19 71:12 96:8 114:24 127:13 137:3 157:15 164:11 180:21 207:19 208:7,18,21 209:3 209:4 230:12 237:22 239:16,17 239:19 249:19,21 249:25 250:1,7 267:24 270:1 276:13
**select** 145:5
**selected** 27:2
**self** 255:9
**semi** 270:14
**send** 48:13,14 52:4 53:3,23,24 54:2,12 58:7,13,20 59:13 62:11,16 67:7,23 68:9,11,14,18,22 69:1,5 71:4,7 73:16 76:5,16 86:17 92:12,15 98:23 99:24 100:5 100:6,15 101:10 101:15 102:15,25 103:12 104:2,6,19 105:24 112:14,19 114:13 131:19 139:9 141:8 144:1 147:7,9 148:24 150:6 179:7,7,8 180:12 184:10,14 184:25 186:12 187:8 188:10,18 189:1 215:24 216:4,9,22 217:9 219:12 246:10,16 247:1 259:13,21 260:23 262:16 286:24
**sending** 60:22 64:18 71:2 77:8 96:10 128:22 145:2 246:13 260:6,25 293:25

**sends** 49:3,13,15 54:10 55:24 57:21 74:5,8 75:22,25 77:14 99:12 111:15 128:13,15 138:18 139:1 145:3 146:4
**senior** 19:5 43:7,9 43:14,17
**sense** 43:3 68:8,9 68:24 100:9 103:18 175:3 246:9
**sent** 48:20 49:10 54:14,16,17,22,23 57:8,10,13,14,19 58:23 59:16 60:25 61:3,5 67:21 73:14,17,24 74:15 75:5,10,12,13,15 75:16,19 77:15 86:6,13,18,24 87:12 88:20 89:19 96:13 97:14 99:19 100:18,25 102:16 102:20,21 103:2,3 114:3 122:1 123:25 132:19 139:4,24 144:16 154:16,19 175:11 175:16,17 178:11 178:16 183:19 184:12,22 185:1 185:11 186:17 187:5,6,7,17 189:7 189:11 190:1,12 218:1 243:9 251:9 259:23 260:15 261:2 262:11 264:3,8 265:15,20 266:9,12 268:10 278:24 285:3,7 286:1 289:3,14 291:10 292:12
**sentence** 176:11 176:12 182:17 186:20
**separate** 33:6,18 89:4,10 148:7 221:15 281:6
**september** 19:13
**sequence** 285:18
**series** 13:17
**service** 202:4
**services** 1:7,7 32:20 33:13 299:7 299:7
**session** 70:6
**set** 5:9,11,13 34:10 38:19 89:18 186:10 189:14 195:14 211:22 220:1 243:12 250:12 258:14 270:8 278:14 279:11
**seven** 26:19 95:17 116:25 177:20,22
**seventh** 285:18
**shake** 10:14
**shape** 92:14
**shared** 210:14 211:10,13
**sheet** 207:13 209:12
**short** 234:8 272:20
**shorthand** 2:1 299:20 300:24
**show** 27:20 31:17 48:9 58:16 68:5 112:12,12 117:6 123:24 125:17 129:19 142:17 149:25 151:3 163:5,12 172:22 178:10,13 188:20 224:20 225:12,14 233:6 234:18 235:1,2 264:20 285:1 289:16 290:25 293:24
**showed** 129:2 290:12 292:7
**showing** 48:8 58:16 121:10 130:7 142:17 215:20 216:17 222:21,23,24 233:13 234:11 246:9 293:10,14
**shown** 265:2 292:12 293:16,20
**shows** 67:4 124:23 176:14 220:20 293:18 294:15 295:7
**side** 35:10 167:24 168:25 170:9 176:8,9 179:16 180:3 182:19 193:3 210:13 233:18
**signals** 279:23
**signature** 4:8 297:9 300:3,8,23
**significance** 289:24
**signifies** 233:25 290:22
**signify** 54:25 57:10 63:15 106:23
**signifying** 21:24
**similar** 242:11 248:12 283:4 289:13
**similarly** 266:22
**simmons** 168:7,21 170:23 171:5,15
**simplicity's** 181:20
**simply** 22:1 117:12 188:19 204:12 217:15
**single** 113:9 142:9 142:10,11 145:22 146:1 147:14 158:11,12,14 265:16
**sir** 7:25 8:7,10,12 8:15,19,22 9:3,6 9:11,14,19 10:11 10:19 11:8,18,24 12:3,7,13,16,19 13:2,11 14:13 15:1,6,12,15,22 16:9 17:1 18:11 18:16 19:1,3,23 20:3,9 25:22 26:15,17,23 27:8 27:11,14 28:7,12 28:15,19 29:9 30:19 33:23 34:21 35:13,17,20,24 36:2,5,19 37:8,12 38:6,22 39:3,19 40:2,17,19 41:12 41:19,23 42:4 43:16 45:18 50:21 51:1 52:17,25 53:10,19 54:8 56:20,24 57:2 59:1 61:2,4,7 62:8

62:13,18,21,24
65:3 70:8,11,15,17
74:7,10,23 75:17
79:1,5 80:4 83:4,7
83:16 84:12,16
85:10 89:7 90:3
90:15 92:7,10,13
92:24 93:5,9,14
94:7 95:10 96:11
96:15,18 97:5,8,16
99:6,9 100:15
101:3,13,21 102:7
104:23 105:25
106:3 107:1,18,23
115:10 120:5
121:23 122:5,24
123:2 124:10,14
125:1 126:11
128:17 133:8,13
133:25 135:25
136:9 137:4,9,13
137:25 139:6
140:2,22 141:15
143:17,20 144:13
146:8,11 148:4
149:6,9,12,17
150:11 151:12,16
152:12,16 154:11
155:4,20 156:7
157:16,18,24
161:16 162:7
163:10 165:12
168:6,15,20
171:20 172:5,10
172:20 173:3,16
174:7,12,21
175:15 176:10,21
182:22 183:9,17
183:20,24 184:1,3
184:5,8 185:7,9
186:6,14 187:2,24
189:3,10,13
190:13 191:3
192:9,16 193:11
193:14 194:6
196:7,9,18 197:19
197:23 198:15,19
200:11 202:21
206:15 207:24
209:19 210:2,7,15
210:18 211:21
212:12,20,23
213:9,13 214:5
215:7 216:15
218:4,17,21 221:8
222:12 224:17,23
225:9,15 226:25
227:8,20 236:14
239:7 240:24
241:2,5 242:22
243:5,8,11 245:1
247:23 248:2,14
248:19 250:9,18
250:22 251:22
252:6 253:11
254:10,12,24
255:14,17 256:5,8
257:21 258:4,23
259:1 260:5,8,17
260:19 261:11,19
261:25 263:25
264:12,25 265:3
265:11 266:25
267:6 268:8,12
269:21 272:2
275:3,9,17,21
276:1,18,22 277:9
277:25 278:6
282:23,25 283:5
283:13 284:6,9,15
284:19,25 286:6,8
286:19 287:4,19
287:24 288:4,8,10
288:15,18,20,24
289:11,15 290:8
290:15 291:14,18
292:2,9,18,24
296:12,15 297:5

**sit** 84:5 88:19 257:1
**sites** 30:11
**sitting** 27:15 28:23 32:16 45:7,23 51:25 70:25 80:19 105:3 135:16 148:23 208:3 236:19 238:15 268:4,13
**situation** 58:14 68:1 88:2 114:10 179:23 215:23 247:7
**situations** 58:9 245:4,24
**six** 26:20 164:6 167:3 187:20,23 287:12
**sixth** 254:13
**skip** 197:16,20,22
**skipped** 292:20
**slightly** 71:19 123:19
**slow** 88:15
**small** 29:25 256:20,24
**smaller** 256:25
**smith** 155:5
**snippet** 21:9
**soft** 192:14 237:3 266:24
**software** 21:7 90:17,18
**sold** 119:21
**solutions** 1:8,12 33:1,5,12,17,22 299:8,14
**solve** 244:5
**somebody** 141:12 168:16 180:21 266:19 273:14
**somebody's** 198:16
**someone's** 203:24
**somewhat** 11:10
**soon** 101:7 189:15 195:1 244:16,20
**sooner** 167:4 245:12
**sorry** 46:20 47:1 56:11 64:12 66:13 86:25 88:13 92:18 97:23 108:13 126:1 128:2 150:8 150:22 153:2,4 160:25 168:25 169:25 173:18 183:3 189:15 193:24 210:8,12 214:7 223:18 225:18 231:15 236:23 239:11,13 244:15 249:21 255:2 279:4,24 280:20 284:3 293:18 294:20 295:2
**sort** 137:8 288:17 291:16
**sorted** 136:12 140:5,17
**sorter** 4:20 137:6
**sorting** 136:16

**sought** 16:7 61:9
**sound** 248:4
**sounds** 84:12 115:7 126:14 132:23 150:8
**source** 60:1 95:2 115:21 127:17 275:13
**sources** 127:8
**spaced** 158:12,14
**speak** 16:19,20 31:3 157:1
**speaking** 31:6,18 64:5,22 78:23
**special** 269:21
**specific** 13:24 18:15 24:10 26:2 57:5 69:2 157:12 166:12 186:23 206:8 228:21 229:22
**specifically** 24:10 37:17 89:11 109:17 121:6,7 177:24 178:5 186:18 251:7 296:19
**specifications** 273:16
**specifics** 27:23
**specified** 236:10 264:14
**specify** 13:10 73:19 184:6,9,12
**speculation** 23:15 24:17 26:9 29:5 32:4,25 55:15 63:3 65:19 76:25 86:15 88:10 97:12 101:20 102:12 103:7 104:4 105:18 106:15 109:25 114:22 126:23 128:24 156:12 232:12 244:1 262:25 265:9 266:14 267:11 268:19 269:19 273:18 274:20 291:5
**spell** 7:12
**spelled** 7:13
**split** 29:24
**spoke** 25:1 189:14
**spoken** 24:22 195:1
**spouse's** 290:1
**spreadsheet** 249:1 258:1
**stage** 48:16
**stamp** 253:3 255:12 257:6,13 257:19 285:19
**stand** 66:7,15 194:15
**standard** 62:22
**standards** 32:17
**standing** 83:22 271:20
**stands** 49:8 66:9 137:20 194:14 290:10
**start** 54:1 135:1,13 153:6,7,12 161:25 193:1 253:19 281:19
**started** 213:22
**starting** 6:11
**starts** 158:7 195:19 213:17,23 220:6,7 222:13 226:2 288:12
**state** 2:1 6:25 7:11 68:12 183:15 202:5 253:2 299:21 300:24
**stated** 17:4 123:22
**statement** 76:11 175:7,8 176:13 178:1,5,7,9,19,20 178:22 179:3,5,9 179:10,13,18,25 180:6,7,9,18,23 181:1,2,4,21 182:3 182:4 191:12 277:12 285:7,8 289:13
**statements** 178:4 178:10,23 183:5
**states** 1:1 66:20,22 67:20 68:2,23 69:2,6,15,15 125:10 187:21 215:22 219:1 278:23 299:1
**stating** 168:3 217:5
**statistics** 133:17
**status** 30:15 118:6 118:7,8,15 119:8 119:14 120:1 163:15,17,18,22 164:4 166:25 225:4,7,13 233:12 234:3,4,6,18 235:13 293:14
**statuses** 292:17
**statutory** 50:11
**stay** 119:1
**stayed** 130:24
**stays** 118:18
**stenographic** 9:16
**step** 37:6 147:3 179:24 181:6 286:15,17
**steps** 24:13,19 48:11 147:10 198:13 284:13,21 287:5
**stipulate** 221:16
**stipulation** 15:3
**stood** 137:21
**stop** 151:5,10 221:9
**stopped** 150:25 151:18 157:3
**stopping** 69:23
**stops** 162:11
**storage** 271:8
**store** 57:5,7 90:21 91:1,6,9 137:15
**stored** 32:1 90:25 91:2,19 92:5,8 95:5 96:16 97:5,7 256:10
**stores** 90:24 91:3,4 91:5,11,12,13,14 94:14 96:25
**storing** 90:5
**story** 179:17
**street** 3:11
**stretch** 269:22
**strike** 47:16 49:13 87:3 286:16
**structure** 55:5 71:11
**student** 125:21 219:22 293:23
**study** 158:24
**stuff** 194:25
**styled** 1:23
**subject** 65:8,14 136:17 146:19

**submission** 49:9
**submit** 286:12
**submits** 145:22
**submitted** 124:9 125:3 126:25 148:3 168:3,22 232:20 246:20 247:4 286:22 292:21 294:3
**subscribed** 199:4 300:18
**subscriber** 228:17 228:20,25
**subsequent** 178:24
**subsequently** 103:14 104:17
**subset** 43:15 211:13
**substance** 79:13 181:22
**substantive** 9:16 195:25
**successful** 286:2
**succinctly** 22:2
**sufficient** 22:2 125:6 129:3 265:24
**suggest** 69:24
**suggesting** 82:7 108:17
**suite** 2:2 3:4,7,11
**sulaiman** 3:7
**sulaimanlaw.com** 3:9
**sum** 124:8
**summaries** 91:13 175:6 182:1,1
**summarize** 229:17 284:21
**summary** 66:2 101:16 176:14
**supervisor** 135:1,3 135:6,10,12
**support** 19:9 125:22 219:23 293:22
**suppose** 139:1 239:21
**suppressed** 162:14 162:21
**suppressing** 172:25
**suppression** 160:11 173:6,7
**sure** 6:22 9:23 11:14 14:22 24:12 32:16 45:13 53:13 63:4,7,13,18,18,20 66:21 69:20 70:21 71:1,9 72:15 73:17 76:8 77:3 80:7 81:10 82:2,5 85:12,16,19 94:18 94:20 96:22,23 98:16 99:3,17 100:21 105:19 106:5,8 113:11 114:6 115:4 120:11 121:14 127:2 129:8 130:7 131:16 141:6,10 144:17 152:9 153:19 160:3 162:17 165:2 171:7 177:13 181:13 182:11 187:9 188:2 191:17 196:1 197:18 200:7 208:10,19,23,25 209:4 211:24 213:25 217:22,24 219:8 220:12 222:5 230:13,17 231:24 236:8,19 237:13 240:6 242:8 243:19 244:17 249:10,25 251:18 253:17 257:14 263:1 268:1,4,6 270:3 271:21,23 274:14 277:15 279:10 281:11,16 283:14 293:12
**surprise** 169:4 170:7,13,17 200:18,24
**surrounding** 171:4
**suspicious** 166:18
**swap** 221:14
**sworn** 1:23 7:7 299:24 300:18
**system** 23:7,12 24:7 38:13,16 45:20 92:22 93:1 93:16,22,24 101:8 137:11,15,21 138:1,3,5,5,9,12 138:17,18,20,22 138:23,25 139:2 139:14,22 165:24 166:17 247:20 248:1 256:9 272:9 272:12,14
**system's** 76:17 209:22
**systemic** 57:13 67:22 69:15 77:13 260:22
**systemically** 57:19
**systems** 20:18,24 20:25 21:1,22 22:25 23:3 46:12 55:4 67:25 92:9 93:18 94:2 138:8 234:15 270:12

**t**

**t** 7:14 155:14
**table** 213:16 229:14,16 290:13
**tadt** 236:15
**tag** 139:23
**take** 8:16 15:16 18:23 20:4 21:25 21:25 24:2 28:1 31:16 34:14 48:11 64:1 70:1 80:15 80:18 82:13,17 98:8 99:12,19 106:13 121:20 136:23 141:12 166:23 187:25 191:4 195:5 198:13 212:3 213:21 214:18 225:16,23 239:10 240:17 241:12,13 243:14 253:18 255:15 256:11,19
**taken** 1:23 12:10 24:13,19 28:17,21 84:13 119:18 300:15
**takes** 286:17
**talk** 6:23 44:16 83:10 87:22 88:6 153:1 154:8 156:14,25 158:20 241:25 273:14,20
**talked** 18:12 38:20 72:6 75:23 80:16

94:12 132:15,18 149:13,15 159:13 161:4,7 214:9 219:15 220:23 248:16 264:23 265:1,18 268:9 275:18 280:21 281:7,8 282:4,5 294:10
**talking** 9:25 37:22 53:17 62:2 64:25 81:23 82:3 99:5 105:21 121:6 170:4 172:13 189:5 213:12 215:21 227:18 236:8 251:23 295:2
**talks** 158:15 214:11 215:10,17 218:3,6,7 220:7,24 269:7 275:8
**tangent** 172:14
**tape** 96:20
**targets** 17:20 18:10
**tasked** 128:4
**tax** 125:22
**team** 43:7
**technical** 21:20 137:22 273:16
**technically** 143:11
**telephone** 3:10 30:10,12 252:15 256:4 257:3
**tell** 9:23 16:3,15 19:6 25:14 28:24 37:2 58:12,19 64:6 68:4 84:3 86:17,22 114:23 117:18 143:13 165:20 166:10 187:13 191:18 196:12 206:4 207:10 211:1 234:10 248:11 253:22 264:7 279:8 283:21 284:10 285:21
**telling** 68:10 86:22 157:22 166:9 248:6,10
**tells** 36:23 215:24 264:8 285:13,17 285:17,19,21,25
**ten** 133:18 142:19 142:22
**tens** 55:11
**term** 38:3,4,20 53:14 89:5 100:9 100:11 107:3,3 184:21
**terms** 51:21 199:12 201:24 209:14 218:15 249:23
**terrell** 1:25 299:20 300:23
**test** 11:2 31:4,16 31:19,24
**testified** 7:7 17:19 18:9 66:11 68:21 69:4 71:11 87:14 109:14 163:14 165:24 219:10,11 241:25 242:8,19 267:20 288:25
**testify** 8:13 11:15 16:12 17:5 18:24 23:21,24 24:3 27:16,22 33:21 46:5 51:16 67:13 79:3 105:4,11 158:23 159:3 168:12 273:22
**testifying** 8:24 23:17 76:10 81:1 134:4,7
**testimony** 9:5 12:12,15 17:25 18:3 27:19 34:4 44:23 70:22 80:8 80:22 82:23 84:19 84:25 102:2,12 104:13,22 105:9 107:12 108:24 146:17 147:1 148:5,12,13,13 152:10 155:25 158:19 159:2,8 170:20 171:2 214:3 242:6 262:20 293:4 299:25
**texas** 2:1,3 6:6 29:11,23 30:6,17 199:20 299:21 300:24
**text** 158:12,15
**thank** 7:15,19 10:20 12:8 13:12 14:8 28:5 47:6,11 66:14 69:21 81:12 83:17 94:24 95:4 105:14 133:5 160:8 174:22 175:2,24 176:17 177:14 209:13 211:22 221:20 239:8 243:12 251:15 257:24 258:14,20 278:7 282:3,12 283:7,10 297:6
**theoretically** 237:25
**thereabouts** 8:1
**therefor** 300:9
**thing** 11:4 53:17 63:15 99:5,9 106:24 107:16 131:11 146:2 147:9 169:6,6,20 245:13 249:2
**things** 22:15 29:19 43:8,13,20 46:5 49:22 50:5 53:8 55:21 82:14 91:4 111:5,14 114:7 120:21 122:23 147:3,21 159:10 159:11 161:14 169:5 170:1,9,14 170:18,21,25 179:19,21,25 211:18 219:17,23 229:17 240:1 244:20 261:5 270:18,18 297:4
**think** 9:9 24:24 26:4 28:7 32:22 37:14 43:11 44:8 44:9 46:10,11 48:22 50:10 53:5 53:14 58:21 66:9 66:10 77:1,11 81:1 85:5,13 91:15 92:1,10 95:22 96:23 103:8 105:11 107:1,5,9 107:13,17,22 110:22 112:21 114:5 116:19 122:22 126:17

128:12,12 129:2 133:4 134:9,10 136:10 137:13 147:18,21,25 148:4,14,23 153:17 161:6 165:4 167:17 168:1 169:9 170:17,24 171:7 171:23 173:9 180:14,14 191:15 199:11,13 203:5 218:20 221:22 222:16 232:17 241:23 242:9 244:2,8 245:6,23 246:11 247:7 249:11 250:20 252:17 253:20 266:4 270:17 277:21 279:23 281:1 283:6 284:20,21 286:9 290:12 292:19,20 292:20 293:6 295:2
**thinking** 281:9
**thinks** 167:22,23
**third** 5:8 35:1 77:8 98:23 99:7 176:19 182:19 186:11 189:12 198:24 250:11 254:11,12 255:9 261:8,13 262:16 263:14 267:13,24 268:11 279:10,21
**thorough** 244:17
**thought** 44:15 112:22 251:23
**thousand** 76:20
**thousands** 55:11 55:11 77:7
**three** 29:25 34:23 35:3 50:17,19,22 66:15 120:21 124:21,22 125:5 134:15 176:18 177:17,22,25 178:1,4,8 212:5 219:6,12 220:15 240:20,22,25 249:4 252:25 263:8 276:2 284:1 285:7
**thursday** 17:9
**tie** 33:20 281:15
**tier** 20:25 21:1,4 23:11,11
**tiffany** 153:14,16
**tilt** 170:2
**time** 6:2 9:8 11:9,9 11:19,19 15:2 17:7,12,14 19:14 28:2 50:16,25 52:6 53:24 54:3 55:25 56:2,7 57:6 68:10,12 70:7 74:4 76:15 81:20 84:14,14 100:18 100:20,24 102:8 102:22 113:8,10 116:18 118:20,23 125:3 126:9 132:12 133:16 139:11 140:18 144:12,19 145:21 147:4 148:10 149:2,19,20 150:3 150:9 151:3,7 161:23 166:1,3 173:6 179:3,20,22 180:3 184:14 186:1 213:1 228:19,23 235:10 235:13,15,17,22 235:25 236:2 237:10 241:17 245:8 260:24 261:11 263:10 276:25 277:5,14 280:15,22 283:9
**times** 8:1,3,3 18:13,17,21 52:8 54:5,9 55:8,19 64:11 67:3,6 72:7 76:21 77:4 89:19 132:19 264:17 269:11 288:14 293:7
**timing** 185:22
**tina** 1:25 28:4 299:20 300:23
**title** 19:4 44:11,13 44:14 78:8 134:24 153:19 156:6
**titled** 106:9
**today** 7:17 8:14 9:5 10:10 11:11 12:1,12,15 13:8 14:25 15:13,19 16:12 25:8 27:15 32:16 33:21 38:5 45:7,23 51:13,25 56:22 70:25 85:11 87:23 88:19 105:3 148:5 156:25 157:23 158:2,19 159:3 162:19,23 163:13 208:3 214:4,9 236:19 239:20 241:24 242:11 264:24 268:13 281:7 283:7
**today's** 12:21 26:12 163:1
**told** 72:14 165:19 166:14 171:22 182:3 238:9
**top** 82:25 83:11 193:4,6 210:13 280:25 285:15 291:20
**topic** 16:19,20,21 16:21 46:7,10,12 46:16,17,17,17 47:9,10,10,10,10 47:10 159:19 160:3,3,4,4,4,4,4,4 160:5,5,5,5,5,5,6,6 160:6,6
**topics** 14:1 15:14 15:17 16:7,10,11 16:15,23 17:3,14 46:14 47:7 51:12 88:6 159:22 160:2
**touched** 297:1
**tracing** 197:16,20 197:23
**trade** 53:25 54:4,7 54:21 58:10 59:12 61:19,21,22 75:1 95:14 96:9 111:21 116:9,13 123:3 131:22 144:25 145:22 146:16 147:14,24 162:5 162:21 164:15,18 180:10 183:3,12 188:18 191:5 197:14 213:4 214:24 215:5

225:8,10,24 228:24 231:15,16 231:19 232:19,23 233:2,6,10 234:21 235:3 236:12,17 236:25 237:2,3,4,6 237:11,12,17,17 237:19,21 238:3 250:20 259:15 267:19 277:15,19 278:2,25 280:4,16 286:22 290:25
**trades** 4:24 213:10 221:4 222:11 227:11 229:13 251:10
**train** 112:21
**trained** 30:19
**training** 31:6,12 31:14 153:20
**transaction** 89:10 149:3 285:16
**transactions** 77:7 197:14
**transcribed** 10:6,6 110:6
**transcript** 1:17 10:5 81:8 83:9,10 84:18 85:20 87:24 134:11 299:24 300:7
**transmission** 41:14 49:21 71:3 80:2 109:20 110:8 186:4 294:25 295:23 296:4
**transmissions** 52:4
**transmit** 52:8 76:14
**transmitted** 60:11 61:14 100:18 289:2
**transmitting** 52:23
**transunion** 50:20 240:6
**trdt** 236:13
**treated** 161:7
**trial** 134:4,11
**tried** 206:20
**trigger** 118:14
**triggered** 147:13
**triggers** 73:22
**trip** 294:6
**trouble** 46:21 64:13
**truck** 199:19,21 199:24
**true** 12:23 49:6 51:4 148:17 163:19 167:12,14 203:16 224:22 269:12 287:2 288:21 298:3 299:25
**truly** 114:14
**trust** 222:6 248:5
**truth** 84:3,4 248:6
**truthful** 9:4 12:12 12:15
**truthfully** 18:24 24:3 80:20
**try** 9:22 128:8 134:25 135:13 148:21 229:23 247:21 250:2 279:17
**trying** 31:7 60:19 94:19 142:1 198:6 198:10 202:18
209:2 216:24 245:5,7
**tuesday** 17:11
**turn** 176:4
**turns** 12:23
**two** 18:18,20 29:7 31:9 37:10 45:18 51:20 57:20 73:16 79:23 80:1,3,5,17 84:1,6,20,25 89:18 93:20 108:16 111:13 112:13 123:12 138:3,8,24 142:5 145:14 147:2,3,10,12,12 147:21 152:14 167:19 173:11 175:11,14,24 176:3 179:19,21 179:24,24 181:6 181:23 182:8 187:20,23 191:10 216:3,9,10,13,14 227:8 230:25 238:3 239:5 241:19,21 242:9 242:17 244:20 249:6 252:25 263:25 276:15 285:2 297:4
**type** 30:14,17 66:4 66:5 67:5 78:5 89:10 95:18,21 102:16 118:1 122:22 129:4 139:15 140:10 160:24 161:8 179:4 187:4 189:25 194:1,5,7,9 194:9,11 197:6,8 201:13 202:13
205:12 206:10 245:13 264:7,18 264:19 265:5,16 265:25 268:24 269:3,6 293:22
**types** 26:6 30:5,20 61:24 66:18 89:19 91:21,24 93:6 105:23 159:6 160:16 161:21 162:5 196:6 199:6 202:3 205:9 210:1 211:10 218:24 219:23 235:4 256:13 264:2 266:5 267:2,6
**typically** 96:20 125:22 131:19 164:6 167:2 179:4 246:7 286:10 293:23

**u**

**u.s.** 6:5 252:7 255:25 256:1
**uh** 10:15,15 226:11 262:4
**umbrella** 33:4
**unable** 185:13
**unauthentic** 114:12
**undated** 102:25
**underneath** 117:16
**understand** 9:2,4 9:7,17 10:23,25 11:7,12,14,23 12:2 12:4,25 13:10 15:10,13 23:10 29:1 30:4 38:4 46:4 55:23 64:23 67:9 81:25 82:8

[understand - vegas]


94:17,24 104:14 106:12 107:2,3 125:19 144:17 146:16 156:21 165:3 170:7 174:7 204:7 237:14 241:17 247:24,24 251:25 253:15 254:2 261:12 296:1
**understanding** 24:14 38:3 42:12 42:17 51:1,2 56:2 64:13 67:13,15 68:17 69:3,6 80:23 97:24 124:20,24 129:12 133:11 149:18 160:23 197:24 205:5 206:4 208:16 241:18 248:9 251:2 268:7 270:6 280:13 282:13 287:7,16 290:22 292:10
**understands** 204:6 209:25
**understood** 31:10
**unique** 254:22
**united** 1:1 299:1
**unpaid** 223:25
**unsecured** 161:22
**unspecified** 269:8 269:11
**update** 48:14 53:21,24,25 54:3 57:15,16,19 59:18 59:21 62:20 71:5 76:16 77:13,15 86:9,23 89:1 96:9 96:14 100:14,24 101:6,7 103:5 104:16 105:22,23 109:21 110:8 112:25 114:10,15 120:10,19 125:16 126:6 129:3 131:14 145:7,12 147:6,7 149:24 150:1 177:21 179:4 180:1,4,18 180:22 183:16,22 185:14,15 188:20 189:22 190:3,19 191:20 216:6,16 216:20 217:11 219:24 236:1,9,12 236:25 237:1,6,17 237:19,23 238:3,4 239:24 244:6 245:18 246:10 247:10,10 251:13 256:16 260:22,24 281:2,10,12 285:10,23 286:1,7 286:10,12,15 289:8,22 292:22 293:19,24 294:21 295:5
**updated** 48:14 54:22 59:3,6 62:15 86:19 101:6 103:21 110:13 145:1,10 160:10 163:4 174:2 175:9 178:13 180:1 183:8,10,12,23 185:2 190:6 216:21 217:10,21 217:23 220:16 229:5 235:13,18 235:23 237:11,12 237:12 239:25 245:9,11 246:12 247:13 251:10 278:25 280:5,19 280:20,25 284:25 291:7
**updates** 5:4,6 54:6 59:1 67:6 74:21 75:1 96:10 97:6 101:8 104:15 105:12,23 159:5 178:23 180:11 182:4 191:18 216:14 224:24 251:4 286:19
**updating** 54:15 144:7 145:16,16 172:22 177:16,19 180:15 220:10 238:5 289:15 290:24 293:7 296:2
**upload** 252:20 256:1
**uploads** 252:22 255:23,23
**upper** 176:8,9 290:5
**urban** 200:8
**urgent** 91:4
**use** 22:18,19 50:4 52:1,4,10,22 53:2 59:2 60:9 62:10 63:8,14,14,19 64:1 64:8,11,17,25 76:3 76:14 90:19 92:22 100:14 105:23 106:19,22 112:25 119:18 120:25 131:14 138:9 139:25 144:10 148:21 150:1,17 154:14 158:1,2 172:23 183:22 184:21 189:24 190:3,15 198:4 201:12,16,21 202:13,15 219:17 219:18 228:18,23 229:5,20 230:6,24 235:21 237:7,9 239:23 245:13 256:16 268:16 275:23 280:24 288:21
**user** 21:7
**uses** 53:1,5 60:15 60:22 64:10 75:25 76:20 146:7 197:22 286:10
**usually** 99:7 164:5 166:1,23 167:2 179:14 245:5

**v**

**v** 1:4 6:4 7:14 23:18 299:4
**vacillated** 118:12
**vague** 21:21,24 23:1,14 24:16 28:11 40:22 129:15,15 166:20 268:19 271:1,5
**vantagescore** 91:19,22 92:12,21 92:24
**varies** 200:3
**various** 30:3 115:19
**vary** 199:24
**veering** 81:14
**vegas** 3:4

**vendor** 60:3,5,16
**vendors** 60:10
**verb** 63:5,8,20,23 64:7,18
**verbal** 10:17
**verification** 48:7 49:9,10 60:1,10,11 72:9
**verified** 62:23 169:17 171:5 188:18
**verify** 62:10 72:10 72:20,25 111:4,8 111:11,23 112:8 113:7,12 128:20 129:5 131:17,20 167:10 188:8
**verifying** 113:16
**version** 221:19
**versus** 60:22 208:5
**vice** 78:8 153:9
**view** 81:16 287:17
**violates** 171:24
**viscara** 23:18
**visit** 29:12
**visual** 10:4
**voluntary** 125:5

**w**

**w** 3:4,16 7:5 282:2
**wacker** 3:16
**wait** 176:1
**waited** 178:14
**walk** 30:4 256:11 256:12,14,15
**walked** 294:7
**want** 11:13 37:21 46:6 58:16,18 73:4 82:19 83:8 121:8 152:6,8,25 158:23 164:8 165:2,4 172:14 179:9,16 180:18 180:22,23 183:15 186:9,10 187:25 191:4,11 192:10 192:11,17 196:2 208:23 209:14 210:9 213:21 218:11 221:14,15 221:16 222:4 225:17 226:1 243:14,15 245:8 249:1,24 253:15 259:5,8 273:21 283:6,12 285:10 287:11,11 288:11
**wanted** 31:9 103:5 127:6 132:10,11 157:14 175:8 181:2 198:16 236:7 244:15 268:13 275:4 278:20 295:21
**wanting** 114:18
**wants** 46:5 48:9 59:8,12 130:4 241:25 244:11
**warranted** 146:20 147:16
**washington** 3:11
**way** 15:18 19:15 26:11 43:13 47:22 54:13 56:22 66:1 76:7 79:23 80:1,2 80:3,5 84:1,20,25 86:11 87:7 92:14 98:14 99:6 105:20 107:14,22 113:5 119:6 128:6 129:5 132:4 139:7 142:24 155:8 164:5 180:23 182:25 191:3 217:17 234:11 235:2 241:19,21 242:9,17 257:11 258:10 265:24 268:6 269:3
**ways** 53:1 161:8 294:11
**we've** 24:11 31:20 38:20 50:4 111:13 113:24 149:23 158:1 169:16 213:11 253:2 284:20
**webbank** 1:6 73:7 73:8,14,24 86:6,7 86:11,25 87:3,12 88:21 122:4 124:18 125:7 126:21 131:20 143:22 146:16 164:14,18 183:6 190:12 191:5 222:20 224:3,7 225:24 235:22 236:5 259:13,15 259:22 260:7,15 285:11,15 289:14 291:9 292:12,13 293:8 294:13 296:17 299:6
**website** 64:6 209:6
**week** 133:20
**welcome** 47:12
**wells** 87:8
**went** 118:7,7 132:15 162:8 178:20 225:7 285:5
**west** 3:11
**white** 289:24 290:1,2,4,21
**willey** 1:5 299:5
**willing** 200:22 201:17
**wish** 64:7 214:2 233:8 248:11
**wished** 74:18 112:12
**withdraw** 69:18 249:9
**withdrawn** 14:7
**withheld** 152:13
**withholding** 171:18,20
**witness** 1:22 4:4 8:14 15:8 16:8 23:21 42:11,20 45:24 67:17 69:9 71:1 88:4,13 109:11 110:1 151:25 153:3 168:12 221:6,10 242:1 258:19 279:20 283:13 299:23 300:1
**witnesses** 168:2 219:10,11
**wondering** 253:12
**word** 22:18,19,20 22:22 59:2 62:4 63:1,8,14,20 64:2 64:17 106:12,13 106:16,22,23 107:2,17,19,20 108:9 117:20 140:3 182:23,25 185:23 211:17 242:3 258:24
**worded** 62:3 68:25

**wording** 132:21
**words** 39:12 99:2 108:14,16 209:8 209:10 221:24 233:22 234:10
**work** 20:23,24,25 23:7 27:1,2 44:2 50:22 55:10 78:13 96:6 98:17 133:2 138:16,24 139:11 140:6 145:15 171:12 197:17 199:16 274:15,22
**worked** 19:12 20:21 23:2,4 45:8
**worker** 156:5 168:10,12
**working** 23:6 51:3 155:15,18 202:5
**works** 33:10 47:22 105:1 153:17 155:12 169:22 187:9 197:25 198:3 275:9
**world** 243:21
**worries** 213:25
**worry** 236:7
**write** 21:14 256:23
**written** 102:9 129:15 136:17 145:23,23 171:10
**wrong** 12:23 104:24 130:3,14 170:25 173:19 188:15 212:15 278:13
**wrote** 108:11

**x**

**x** 282:2
**xxx** 300:4

**y**

**y** 38:17 282:2
**yeah** 126:14
**year** 23:18 45:18 52:8,19 76:21 77:4 84:7 89:20 133:17 193:23
**years** 18:18,20,22 20:22 23:3,8 29:7 31:23 72:7,15 80:17 84:6 95:17 114:23 116:25 187:20,23 227:8 242:8 263:25 282:19,20
**yesterday** 26:13 37:5 87:23,24 106:6 159:1 171:8 239:15,16,21 241:18 249:22 250:1 270:4
**younger** 134:5

**z**

**z** 282:2
**zarba** 87:9
**zero** 191:23 225:4 282:21
**zimmerman** 3:10
**zip** 253:3
**zorba** 18:4 70:23 80:8,22,24 81:7,24 82:11,24 83:23 85:1 87:5,14,19,22 88:4 109:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2016. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

Jennifer L. Braster
Nevada Bar No. 9982
Andrew J. Sharples
Nevada Bar No. 12866
NAYLOR & BRASTER
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(T) (702) 420-7000
(F) (702) 420-7001
jbraster@naylorandbrasterlaw.com
asharples@naylorandbrasterlaw.com

Adam W. Wiers (*pro hac vice*)
Christopher A. Hall (*pro hac vice*)
Jones Day
77 W. Wacker Ave.
Chicago, IL 60601

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

LOUIS A. CARDINALI,

Plaintiff,

v.

PLUSFOUR, INC; RC WILLEY HOME FURNISHINGS; WEBBANK/DELL FINANCIAL SERVICES; EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.,

Defendants.

Case No. 2:16-cv-02046-JAD-NJK

**ERRATA FROM JULY 19, 2018 DEPOSITION OF MARY A. METHVIN**

Pursuant to Federal Rule of Civil Procedure 30(e)(1), Mary A. Methvin submits the following corrections to her July 19, 2018 deposition testimony:

| Page:Line | Correction (Reason) |
|---|---|
| 23:18 | "Viscera" should be "Foskaris" (transcription error) |
| 95:13 | "Additionally" should be "Additional information" (witness misspoke or was misheard) |

| Page:Line | Correction (Reason) |
|---|---|
| 138:11, 138:13 | "CAPS" should be "CAP" (transcription error) |
| 140:7 | "it" should be "the agent" (witness misspoke) |
| 150:1 | "use" should be "used" (transcription error) |
| 154:1 | "instituting" should be "initiating" (witness misspoke or was misheard) |
| 233:13 | "CCI" should be "CII" (transcription error) |
| 234:5 | "CCI" should be "CII" (transcription error) |
| 251:5 | "CAPS" should be "CAP" (transcription error) |
| 264:24 | "PPM" should be "PPN" (transcription error) |

August 28, 2018

Mary Methvin

Mary Methvin



NAYLOR & BRASTER
ATTORNEYS AT LAW
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(702) 420-7000

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on this 28th day of August 2018, I caused the above document to be served via email addressed to:

David H. Krieger, Esq.
Haines & Krieger, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, NV 89123
dkrieger@hainesandkrieger.com

Matthew I Knepper
Miles N Clark
Knepper & Clark, LLC
10040 W. Cheyenne Ave. Suite 170-109
Las Vegas, NV 89129
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Sean N. Payne
Payne Law Firm, LLC
9550 S. Eastern Ave. Suite 253-A213
Las Vegas, NC 89123
Email: seanpayne@spaynelaw.com

Thomas A. Zimmerman , Jr.
Matt De Re
77 W. Washington St., Ste 1220
Chicago, IL 60602
(312) 440-0020
tom@attorneyzim.com
matt@attorneyzim.com

Mohammed Omar Badwan
Sulaiman Law Group, Ltd.
2500 S Highland Ave Ste 200
Lombard, IL 60148
(630) 575-8180
Fax: (630) 575-8181
mbadwan@sulaimanlaw.com

*Attorneys for Plaintiff*

/s/ Christopher A. Hall
*Attorney for Experian Information Solutions, Inc.*



NAYLOR & BRASTER
ATTORNEYS AT LAW
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(702) 420-7000

Jennifer L. Braster
Nevada Bar No. 9982
Andrew J. Sharples
Nevada Bar No. 12866
NAYLOR & BRASTER
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(T) (702) 420-7000
(F) (702) 420-7001
jbraster@naylorandbrasterlaw.com
asharples@naylorandbrasterlaw.com

Adam W. Wiers (*pro hac vice*)
Christopher A. Hall (*pro hac vice*)
Jones Day
77 W. Wacker Ave.
Chicago, IL 60601

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LOUIS A. CARDINALI,<br><br>Plaintiff,<br><br>v.<br><br>PLUSFOUR, INC; RC WILLEY HOME FURNISHINGS; WEBBANK/DELL FINANCIAL SERVICES; EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>Defendants. | Case No. 2:16-cv-02046-JAD-NJK<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.'S CONFIDENTIALITY DESIGNATIONS OF THE JULY 19, 2018 DEPOSITION OF MARY A. METHVIN** |

Pursuant to the January 4, 2017 confidentiality order entered in the above-captioned action, Experian Information Solutions, Inc. designates the following portions of the July 19, 2018 deposition of Mary A. Methvin confidential:

| | | | | |
|---|---|---|---|---|
| 66:17-69:20 | 73:3-74:4 | 90:21-91:16 | 95:8-96:23 | 192:21-196:24 |
| 207:15-209:5 | 209:20-211:21 | 214:6-220:24 | 222:10-223:5 | 226:1-230:6 |
| 231:5-239:7 | 247:19-250:1 | 251:2-258:13 | 264:23-265:11 | 281:6-282:11 |
| 284:3-286:13 | 295:7-20 | | | |

Dated August 28, 2018

By: */s/ Christopher A. Hall*
Adam W. Wiers (*pro hac vice*)
Christopher A. Hall (*pro hac vice*)
JONES DAY
77 W. Wacker Ave.
Chicago, IL 60601

Jennifer L. Braster
Nevada Bar No. 9982
Andrew J. Sharples
Nevada Bar No. 12866
NAYLOR & BRASTER
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145

*Attorneys for Defendant Experian Information Solutions, Inc.*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that on this 28th day of August 2018, I caused the above document to be served via email addressed to:

David H. Krieger, Esq.
Haines & Krieger, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, NV 89123
dkrieger@hainesandkrieger.com

Matthew I Knepper
Miles N Clark
Knepper & Clark, LLC
10040 W. Cheyenne Ave. Suite 170-109
Las Vegas, NV 89129
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

Sean N. Payne
Payne Law Firm, LLC
9550 S. Eastern Ave. Suite 253-A213
Las Vegas, NC 89123
Email: seanpayne@spaynelaw.com

Thomas A. Zimmerman , Jr.
Matt De Re
77 W. Washington St., Ste 1220
Chicago, IL 60602
(312) 440-0020
tom@attorneyzim.com
matt@attorneyzim.com

Mohammed Omar Badwan
Sulaiman Law Group, Ltd.
2500 S Highland Ave Ste 200
Lombard, IL 60148
(630) 575-8180
Fax: (630) 575-8181
mbadwan@sulaimanlaw.com

*Attorneys for Plaintiff*

/s/ Christopher A. Hall
*Attorney for Experian Information Solutions, Inc.*



NAYLOR & BRASTER
ATTORNEYS AT LAW
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(702) 420-7000