Jennifer L. Braster
Nevada Bar No. 9982
Andrew J. Sharples
Nevada Bar No. 12866
NAYLOR & BRASTER
1050 Indigo Drive, Suite 200
Las Vegas, NV 89145
(T) (702) 420-7000
(F) (702) 420-7001
jbraster@naylorandbrasterlaw.com
asharples@naylorandbrasterlaw.com

Adam W. Wiers (*pro hac vice*)
Christopher A. Hall (*pro hac vice*)
Jones Day
77 W. Wacker Ave.
Chicago, IL 60601

*Attorneys for Defendant*
*Experian Information Solutions, Inc.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LOUIS A. CARDINALI,<br><br>     Plaintiff,<br><br>v.<br><br>PLUSFOUR, INC; RC WILLEY HOME FURNISHINGS; WEBBANK/DELL FINANCIAL SERVICES; EQUIFAX INFORMATION SERVICES, LLC; EXPERIAN INFORMATION SOLUTIONS, INC.,<br><br>     Defendants. | Case No. 2:16-cv-02046-JAD-NJK<br><br>**EXPERIAN INFORMATION SOLUTIONS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56, Defendant Experian Information Solutions, Inc. ("Experian") hereby moves for summary judgment on all claims and submits the following Memorandum, declarations and exhibits in support thereof.

## INTRODUCTION

At issue in this case is the reporting of a single tradeline on Plaintiff Louis Cardinali's ("Plaintiff") Experian credit report. This account was charged-off by the lender after Plaintiff stopped making payments and later was discharged in a Chapter 7 bankruptcy. Experian always accurately reported the account, first as charged-off, then as charged-off and included in bankruptcy, and finally as charged-off and discharged in bankruptcy with a $0 balance. Despite the accurate reporting, Plaintiff's bankruptcy lawyers submitted a form dispute on his behalf three years after the discharge in the hopes of generating a Fair Credit Reporting Act ("FCRA") lawsuit. They then filed this case, alleging that Experian mishandled that dispute, with designs on a nationwide class action. The case and Plaintiff's claims have always been frivolous, driven by Plaintiff's lawyers, not inaccurate reporting or a faulty dispute investigation. For multiple dispositive reasons, it is time for this case to end.

## BACKGROUND

### I.   THE FAIR CREDIT REPORTING ACT.

The FCRA seeks "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007). The FCRA requires "consumer reporting agencies" ("CRAs") like Experian to have "reasonable procedures to assure maximum possible accuracy" of information in "consumer reports," *see* 15 U.S.C. § 1681e(b), and to conduct reasonable reinvestigations into consumer disputes if "the consumer notifies the agency directly." *Id.* § 1681i(a). In conducting a reinvestigation, a CRA must notify the data furnisher, providing them "all relevant information" about the consumer's dispute. *See id.* at § 1681i(a)(2). If a dispute does not resolve the issue, the FCRA allows the consumer to place a statement on the account explaining the consumer's position, which must be included with future consumer reports. *See id.* at § 1681i(b)-(c).

## II.   PROCEDURAL BACKGROUND

Plaintiff filed this case on August 29, 2016. (ECF No. 1.) The original complaint claimed Experian violated § 1681i of the FCRA and that the Webbank Account was inaccurately reporting that Webbank "'charged-off' the account "on multiple occasions" in every month from May 2011 through August 2011 and in every month from October 2012 to March 2012." (hereafter the "Multiple Charge-off Theory") (*Id.* at ¶ 83.) On April 19, 2017, Plaintiff filed his amended complaint, shifting his claim of inaccuracy to state that Webbank's reporting "was inaccurate in that it did not comply with the Consumer Data Industry Association's Metro 2 reporting standards . . . ." (ECF No. 57 at ¶ 23.) Specifically, Plaintiff claimed that for the two months after he filed his bankruptcy petition, Webbank should have reported a "D" which corresponds to "no data reported for this month" in the account history grid (hereafter the "Bankruptcy Filing Theory"). (*Id.* ¶ 26.) According to Plaintiff, this divergence from "the credit industry's own reporting standards . . . creates a materially misleading impression of Mr. Cardinali's creditworthiness . . . ." (*Id.* ¶ 27.) Both Theories are based on the information pictured below:



(ECF No. 34-5; Ex. A.)

The Amended Complaint also elaborated on the alleged deficiencies in Experian's reinvestigation, alleging that Experian did not notify Webbank of Plaintiff's dispute, and misrepresented the nature of the reinvestigation when Experian informed Plaintiff that it had "updated" the Webbank Account. (*See id.* ¶¶ 57-62.) Plaintiff claims that this purported failure violates not only § 1681i, but also §1681e(b) of the FCRA. (*See id.* at ¶ 61-62.)

III.    STATEMENT OF UNDISPTUED MATERIAL FACTS.

   A.    Experian's Tradeline Reporting Procedures.

Consumer reports created by Experian consist of numerous accounts, called tradelines. (Declaration of Mary Methvin ("Methvin") ¶¶ 6-7.) The tradeline data is reported to Experian by hundreds of different "data furnishers," under contract to report data to Experian accurately. (*Id.* ¶ 7.) Tradeline data is reported to Experian using what is known as the Metro-2 formatting language. (*Id.* ¶ 8.) This language is described generally in a guide published by the Consumer Data Industry Association, called the Credit Resource Reporting Guide (the "CRRG"). (*Id.*; Ex. B (2015 Credit Resource Reporting Guide.)) Metro-2 has specific fields that correspond to certain account information. (*See id.*) For example, furnishers will report to Experian the "current status" of an account using a particular code that corresponds to the relevant status. (Ex. B at 0084.) Relevant here, a status '97' is a charge-off. (*Id.* at 115.) For derogatory statuses like a charge-off, Experian uses the date the status was first reported as the "date of status," informing users when the event occurred. (Methvin. ¶ 9.) The furnisher will report additional information including balance amount and the account history. (*Id.* ¶ 8.) The account history (also called payment history) is a grid that provides a view into the historical status of the account for the current month and each of the prior 24 months (*e.g.*, OK, 30 days late, foreclosure started, charge-off, etc.). (Ex. B at 0085.) With regard to charge-off accounts, Metro 2 instructs that the furnisher is to report the account status as charge-off with code '97' and to report an 'L' in the account history for each month that the account was in charge-off status. (*See* Ex. B, 0137-0138, 0219.) While the account history grid is additional information about the account's status over time, Experian uses the "account status" and "date of status" to inform users of the report as to the account's current status and when that status took effect. (Methvin. ¶ 12.) In Metro-2, a specific account is coded as included in bankruptcy by adding a particular code in the "Consumer Information Indicator" ("CII") field. (*See* Ex. B at 0168.) The letter "A" in the CII field means the account was included in a Chapter 7 petition, while the letter "E" indicates that the account was discharged in a Chapter 7 bankruptcy. (*See id.*) In Experian's systems, any account coded with an "E" in the CII field, will report to third-parties as having been discharged in Chapter 7, with a $0 balance and no monthly payment

1     obligation. (Methvin ¶ 13.)

2          **B.**     **Experian's Bankruptcy-Related Reinvestigation Procedures.**

3          When a consumer disputes information in their credit file, Experian undertakes a

4 reinvestigation. (*Id.* ¶ 17.) While many disputes require Experian to contact the data furnisher

5 before updating the consumer's file, sending the furnisher an ACDV, which the furnisher will

6 review and return with any recommended changes. (*Id.*) Some disputes, however, Experian can

7 resolve internally, based on proof provided by the consumer or based on Experian's own policies.

8 (*Id.* ¶ 18.) In such an instance, Experian sends the furnisher notice of the dispute including all

9 relevant information by way of a Dispute Response Notification ("DRN" or "DR Notification")

10 which will notify the furnisher of the changes made, as well as provide a summary of why Experian

11 made the change, and in some cases transmit documents provided by the consumer. (*See id.*; Ex.

12 C at 0319-0320 (Excerpt of e-Oscar participant Guide); Ex. D (e-Oscar DRN Reference Card and

13 Sample).) Any time Experian internally updates tradeline data in response to a consumer dispute,

14 it automatically sends a DRN to the furnisher describing the changes. (Methvin ¶ 20.) The data

15 furnisher is instructed to review the DRN and contact Experian if they have questions or concerns.

16 (*See* Ex. D at 0323.) Both DRNs and ACDVs are transmitted to the data furnisher through an

17 online portal called e-Oscar and use Metro 2 to communicate the changes made. (Methvin ¶ 19.)

18          When a consumer contacts Experian and informs them that particular accounts were

19 discharged in their Chapter 7 bankruptcy, Experian will internally update those accounts if a)

20 Experian has record of a bankruptcy on the consumer's file, and b) the account was opened before

21 the bankruptcy was filed. (*Id.* ¶ 22.) This type of dispute results in a DRN being automatically sent

22 to the data furnisher indicating that Experian made the changes reflected based on its policies. (*Id.*)

23          **C.**     **Plaintiff's Webbank Account.**

24          In December 2007, a data furnisher called Webbank began reporting an account to

25 Experian for inclusion in Plaintiff's credit file, likely for the financing of a Dell personal computer

26 (the "Webbank Account"). (Ex. E at 0329 (Jan. 2012 Disclosure); Ex. F at 13:3-8; 31:23-32:11

27 (Deposition of L. Cardinali)). Beginning in July 2010, Webbank reported that Plaintiff was not

28

paying on the account. (Ex. E at 0329 (January 17, 2012 disclosure).) In November 2010, Webbank began reporting that the account was charged-off. (*Id.*) Webbank reported the charge-off consistent with the CRRG, reporting an 'L' in the payment history field, and an account status of '97,' or charge-off. (Methvin ¶ 24.) Webbank also reported that it had written off $991 dollars. (*Id.*; Ex. E at 0329.). When Experian prepares consumer disclosures, which are sent directly to consumers, it translates the 'L's in the payment history to 'CO's, an abbreviation for charge-off. (Methvin ¶ 11.) Webbank continued reporting the account with a current status of "charge-off," with the "date of status" as November 2010, and reflecting that Plaintiff stopped paying on the account in July 2010 and with either a 'CO' for "charge-off" or 'CLS' for "closed" for every month in the account history after November 2010 until the bankruptcy discharge.[1] (Ex. A at 0018; Ex E. at 2.) Any Experian reports issued during the time period after the charge-off but prior to the bankruptcy discharge would have reflected a "status" of charge-off, a "date of status" of November 2010, and the account history would show that Plaintiff first went delinquent in July 2010.  (Methvin. ¶ 24.)

In January 2012, Plaintiff filed a petition for Chapter 7 bankruptcy. *In re Cardinali*, Case No. 12-bk-10854, ECF No. 1 (Bankr. D. Nev. Jan. 26, 2012) (Plaintiff's bankruptcy petition, attached as Ex. G.) The Webbank Account was included in Plaintiff's bankruptcy as an unsecured claim for $991 to Dell Financial Services. (*See id.* at 27.) Experian's public records vendor, Lexis, reported Plaintiff's bankruptcy filing to Experian on January 27, 2012 and the Webbank Account was updated to report as included in Plaintiff's bankruptcy the same day. (Methvin ¶ 26.) On April 30, 2012, a discharge order was entered. (*See In re Cardinali*, ECF No. 22 (attached as Ex. H).) Lexis reported the discharge order to Experian on May 1, 2012. (Methvin ¶ 27.) Under Experian's policies, the Webbank Account was automatically updated to report as discharged on May 1, 2012. (*Id.*) Once added, a CII code will supplant any other status codes, like a '97' charge-off status code, for any consumer reports Experian furnishes. (*Id.* ¶ 28.) After May 1, 2012, anytime Experian furnished information regarding the Webbank Account to a third party, it indicated that the debt was discharged in Chapter 7 bankruptcy, with no balance or monthly payment obligations. (*Id.*)

---

[1] Save for September 2011, when Webbank reported no data. (Methvin ¶ 25.)

1    Once a discharge code is added to a tradeline, no account history will display which post-dates the
2    date of the discharge order. (*Id.* ¶ 29.)
3           During the months Plaintiff's bankruptcy was pending (February and March 2012), the
4    Webbank Account continued to report its charge-off status, though the account was updated to
5    reflect that it was included in bankruptcy. (*Id.* ¶ 30.) Webbank also continued to report the 'L'
6    notation in the account history for the two months of the bankruptcy, reflecting the fact that the
7    account status remained "charged-off" during each of those months. (*Id.* ¶ 29; Ex. A at 0018). The
8    CRRG instructs furnishers to continue to report the prior account status (here a '97,' for charge-
9    off) for accounts included in bankruptcy and recommends that furnishers report no additional
10   account history during a bankruptcy. (Ex. B at 0202.) Prior to December 2015, Experian did not
11   prevent a furnisher like Webbank from continuing to report account history status during the
12   pendency of the bankruptcy, especially where, as is the case for a charge-off, the history is simply
13   reiterating the same account status that is otherwise reporting.[2] (Methvin ¶ 30.) There is no record
14   of Experian furnishing any consumer reports between January 26, 2012 and April 30, 2012, and
15   thus no record of any consumer reports which included the account history reporting in February
16   and March 2012, that did not also report the Webbank Account as discharged in Plaintiff's
17   bankruptcy. (*Id.* ¶¶ 28, 31-32.) The last time Experian provided Plaintiff's consumer report to a
18   third party prior to Plaintiff's bankruptcy was August 9, 2011. (Methvin ¶ 35; Ex. E at 0330.)
19          **D.    H&K's Dispute**
20          Three years after Plaintiff's bankruptcy discharge, in August 2015, Haines & Krieger, LLC
21   ("H&K") wrote a letter to the Experian "Central Source" requesting Plaintiff's free annual credit
22   report. (Ex. F at 55:2-56:18; Methvin ¶ 36.) Plaintiff himself did not request this report and does
23   not know how this report was requested. (Ex. F at 55:2-56:18.) On August 25, 2015, Experian sent
24   Plaintiff a copy of his credit disclosure, where the Webbank Account was reporting as discharged
25   in bankruptcy with a $0 balance. (Methvin ¶ 37; Ex. I (Aug. 25, 2015 disclosure).)
26
27          [2] In December 2015, Experian revised its bankruptcy reporting policies such that no
     payment history (for example, late payments) will display after the date of bankruptcy filing.
28

1    Two months after receiving this report, H&K wrote and mailed a dispute letter to Experian,

2    disputing several accounts, including the Webbank Account. (Ex. F at 71:8-24; Ex. J (Oct. 6, 2015

3    dispute letter).) Plaintiff did not write, type, or mail the letter, but did review and sign it. (Ex. F at

4    72:10-74:2.) The letter was a form letter, copying letters that H&K mails to Experian and other

5    CRAs routinely, including boilerplate inappropriate demands. (*See* Methvin ¶ 39, Ex. K (Sample

6    H&K Dispute Letters).) The letter made no mention of the account history reporting prior to

7    bankruptcy (*i.e.*, the Multiple Charge Off Theory). (*See* Ex. J at 0491.) Instead it stated Plaintiff's

8    Webbank account had been discharged and claimed that "there should be no derogatory

9    information after the filing date." (*Id.*) H&K demanded that Experian "immediately delete the

10   account and the disputed information from [Plaintiff's] credit report" and that the debt "should be

11   reported with an account balance of $0 with a status of 'current.'" (*Id.*) H&K also demanded that

12   if Experian refused to delete the account that it add "a 100 word statement in [Plaintiff's] credit

13   report of all the disputed information contained in this letter regarding this account." (*Id.*) The

14   letter included a copy of the August 25, 2015 credit report, the first three pages from Plaintiff's

15   bankruptcy petition, and a copy of Plaintiff's driver's license. (Methvin ¶ 40.)

16       **E.       Experian Response to H&K's Dispute**

17   Experian received H&K's letter on October 12, 2015. (Methvin ¶ 38.) Based on a review

18   of the letter, Experian determined that because a) Plaintiff's bankruptcy was already included in

19   his credit file and b) this account was opened prior to the date his bankruptcy was filed, it could

20   resolve Plaintiff's dispute internally. (*Id.* ¶ 41.) On October 19, 2015, Experian made several

21   internal updates to the Webbank Account to confirm its accuracy. (*Id.* ¶ 42.) First, Experian

22   reapplied the "CII" code for a Chapter 7 discharge, and updated the "last report date" for this

23   information from August 31, 2015, to April 30, 2012, the date of Plaintiff's discharge order. (*Id.*)

24   These updates automatically generated a DRN which was sent to Webbank. (*Id.*) The DRN

25   informed Webbank of the dispute and showed them how the account was reporting before and

26   after Experian's updates, including all the data in the "account history" grid. (*Id.*) The DRN further

27   indicated that Experian had updated the account per its own policies in response to a dispute from

28

Plaintiff. (*Id.*) In addition, after Experian's systems had processed these initial changes, Experian added a consumer dispute statement to the account as Plaintiff had requested. (*Id.* ¶ 43.) These updates generated two disclosures to Plaintiff, one after the initial update, and the other showing that Plaintiff's requested statement had been added as well. (*Id.* ¶ 44.) Experian also included a paragraph explaining that it continues to report account history leading to the bankruptcy discharge as it "tells that account's history." (Ex. L. (Excerpt of Oct. 19, 2015 Dispute Results).) Following Plaintiff's dispute, Webbank ceased its monthly reporting of the account, and did not transmit new information to Experian until March 24, 2016, when it instructed Experian to entirely remove the account from Plaintiff's file. (*Id.* ¶ 45.) Experian did so, and the Webbank Account has not been included in any consumer report for Plaintiff since that time. (*Id.*)

### F.    Plaintiff's Purported Damages.

Plaintiff claimed that Experian's violations caused "out-of-pocket expenses," "damage to his creditworthiness" and "emotional distress." (Am. Comp. ¶ 68.) At deposition, Plaintiff testified that the out-of-pocket expenses referred to the costs of gas and time off work involved in traveling to H&K's offices incurred before Plaintiff disputed the Webbank Account. (Ex. F at 108:15-110:13) Plaintiff has not produced any documentary evidence related to these expenses.  (*See* Declaration of C. Hall ("Hall") ¶ 20) Plaintiff further testified did not know if the Webbank Account impacted his credit score. (Ex. F *at* 15:6-22; 110:14-111:3.) Describing his emotional distress, Plaintiff stated "[b]asically knowing if I could purchase new things or not" but admitted that he had never been denied credit due to the Webbank Account. (*Id.* at 14:14-15:5; 112:2-18.)

### G.    The Testimony of Plaintiff's Expert Dean Binder

Plaintiff disclosed an expert named Dean Binder. (*See* Ex. N (Excerpt from Plaintiff's Expert Disclosures).) Mr. Binder opined that "Experian did not adhere to industry standards regarding Plaintiff's post-bankruptcy delinquency reporting," and that "the reporting of multiple charge-offs in the payment history field can be misleading for consumer and current or prospective creditors." (*Id.* at 6, 10.) At deposition, Mr. Binder conceded that the account history reporting that he takes issue with did not negatively impact Plaintiff's credit score at all. (*See* Ex. M at 77:3-11;

82:10-13). (Deposition of D. Binder).) He also testified that the reporting was always accurate. (*Id.* 54:7-55:17; 82:14-83:3.) Mr. Binder testified that his opinion that Experian's reporting could be misleading is based entirely on his own speculation, for he, like Experian, has never encountered or heard of any user actually being misled in any of the ways he hypothesizes could conceivably be possible. (*Id.* at 85:3-16.)

### 1.    The Multiple Charge-off Theory

Under the Multiple Charge-off Theory, Webbank should have reported a 'CO' in the account history *only* for the month of November 2010, the month the charge-off actually occurred, and should not have reported the fact that the account remained in charge-off status in the account history in subsequent months. Plaintiff posits this despite Mr. Binder admitting that this is precisely how Metro 2 recommends reporting charge-offs. (*Id.* at 88:12-24.) Plaintiff claims this could leave a reader with the mistaken impression that the account was charged-off multiple times. (*See* Am. Compl. ¶ 28b.) Mr. Binder then theorized that by reporting month after month that the account status remained "charged off," a hypothetical user of the report could wrongly think that the account was charged-off more recently than it was. (Ex. M at 84:21-85:9.)

Mr. Binder conceded that an account cannot be charged-off more than once. (Ex. M at 40:15-20.) Moreover, Mr. Binder acknowledged that anyone actually misled by the reporting would be *mis*reading it, and would likely not be properly trained. (*Id.* 30:7-18; 84:21-85:2.) Mr. Binder also admitted that if someone were to engage in any due diligence, it would be clear when the account was in fact charged-off. (*Id.* at 85:10-20.) By his own admission, Mr. Binder's theory is speculative, as he conceded that despite his years of experience, he has never seen or heard of anyone actually misreading the report as he speculates might be possible (*Id.* at 84:3-16).[3] Experian, for its part, would never expect any user to misread a report in the way theorized, and

---

[3] Mr. Binder provided this same opinion in *Barakat v. Equifax Info. Servs., LLC et al.*, No. 16-cv-10718 (E.D. Mich.). There, the court struck Mr. Binder's opinion since it was based on nothing more than speculation, as he admitted in his deposition. *Barakat v. Equifax Info. Servs., LLC*, No. 16-CV-10718, 2017 WL 3278202, at *5 (E.D. Mich. Aug. 2, 2017). Mr. Binder concedes that his opinion in this case is not based on anything different than it was in *Barakat*. (Ex. M at 9:24-10:5; 83:3-9.) In other words, it is pure speculation that the court need give no weight.

1   indeed is not aware of it ever happening. (Methvin ¶¶ 46-48.)

2   ### 2.      The Bankruptcy Filing Theory

3   According to the Bankruptcy Filing Theory, it was misleading to report a status of

4   "charged-off" and account history of 'CO' for the account during the pendency of Plaintiff's

5   bankruptcy, according to Mr. Binder, as doing so might potentially mislead a user into thinking

6   the account was actively being collected. (Ex. M at 46:23-47:5; 57:16-58:13; Am. Compl ¶ 28a.)

7   Mr. Binder testified that Plaintiff's bankruptcy filing did not change the fact of the charge-

8   off, and that the reporting remained accurate. (*Id.* at 54:22-55:17.) He further acknowledged that

9   charge-off accounts by definition are not subject to active collections, since they have been written

10  off by the lender, and that this fact is "rudimentary knowledge." (*Id.* at 39:16-21, 56:1-6.) He also

11  conceded that the automatic stay makes collection illegal during a bankruptcy. (*Id.* at 42:5-17.)

12  This, he admitted, is "fairly basic" knowledge as well. (*Id.* at 44:3-8; 55:22-25.) Thus, he conceded

13  it would be incorrect for a third-party viewing the February and March 2012 reporting to mean

14  that Webbank was trying to collect the debt in violation of the automatic stay. (*Id.* at 57:6-17.)

15  Asked if someone with even "remedial understanding of credit terminology" and the effects of the

16  automatic stay would understand that Webbank was *not* trying to collect on the debt, Mr. Binder

17  responded: "I would hope so." (*Id.* at 65:9-25.) Mr. Binder also testified that, again, the CRRG

18  would instruct Webbank to continue to report the charged-off status of the Webbank Account

19  while Plaintiff's bankruptcy was pending. (*Id.* at 73:13-76:7.) Moreover, as with the Multiple

20  Charge-off Theory, Mr. Binder has never actually seen or heard of anyone who was actually misled

21  by this reporting. (Tr. at 58:7-18.). Neither has Experian.  (Methvin ¶¶ 46-48.)

22  ### 3.      The End Date of Even Mr. Binder's Theories

23  Mr. Binder conceded that no user, even the unsophisticated ones that are the subject of his

24  theories, could be misled regarding the status of the account after the reporting of the discharge

25  and the $0 balance in May 2012. In particular, Mr. Binder conceded that Experian accurately

26  reported the Webbank Account as discharged in Plaintiff's bankruptcy, and, when asked if it was

27  right that "nobody in their right mind is going to think that there is a possibility of collection" after

28

April 2012, Mr. Binder agreed, responding: "That is correct. And there is no charge-off reporting after that either." (Ex. M at 50:8-51:6.) Accordingly, Mr. Binder agreed that his Bankruptcy Filing concern was limited to the two months in February and March 2012, as anyone viewing the Webbank Account after April 2012 would "unambiguously know that there's a zero-dollar balance and it's been discharged in bankruptcy." (*Id.* at 51:7-52:1.) Likewise, after April 2012, the Multiple Charge Off Theory was no longer of concern as "there is no charge-off reporting after that either." (*Id.* at 50:8-51:6.)

## LEGAL STANDARD

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). A "genuine" issue exists where there is sufficient evidence that a reasonable jury could return a verdict for either party. *See id.* Mere arguments or allegations are insufficient to defeat a properly supported motion for summary judgment; the nonmovant must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial. *See* Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

## ARGUMENT

### I.   THERE IS NO EVIDENCE OF INACCURATE INFORMATION IN PLAINTIFF'S CONSUMER REPORT.

"[T]o sustain either a § 1681e or a § 1681i claim, a consumer must first 'make a prima facie showing of inaccurate reporting' by the CRA." *Shaw v. Experian Info. Sols., Inc.*, 891 F.3d 749, 756 (9th Cir. 2018) (quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890 (9th Cir. 2010)). "[I]nformation is inaccurate for purposes of [the FCRA] where it either is 'patently incorrect' or is 'misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" *Id.* (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)). When a plaintiff cannot carry his burden of showing inaccurate reporting, the defendant is entitled to judgment as a matter of law. *See, e.g., Shaw*, 891 F.3d 749 (affirming summary judgment where the plaintiff had not introduced evidence of inaccurate reporting);

1   *Carvalho*, 629 F.3d at 884 (same); *Alexander v. Equifax Info. Servs., LLC*, No. 2:17-CV-00139,

2   2018 WL 3025939, at *3 (D. Nev. June 15, 2018) (granting summary judgment on § 1681e(b) and

3   § 1681i claims where the Plaintiff had not shown that the reporting was materially misleading);

4   *see also Bilderback v. Ocwen Loan Servicing, LLC*, No. 2:16-CV-01954, 2017 WL 4079262, at

5   *3 (D. Nev. Sept. 14, 2017) (J. Dorsey) (dismissing claim under § 1681s-2 for failing to plausibly

6   plead inaccurate information).

7        The "materially misleading" standard is objective: credit reporting must be "misleading in

8   such a way and to such an extent that it can be expected to adversely affect credit decisions."

9   *Banneck v. HSBC Bank USA, N.A.*, No. 15-CV-02250-HSG, 2016 WL 3383960, at *7 (N.D. Cal.

10  June 20, 2016) (granting summary judgment for Experian where reporting was being misread by

11  a user, but in a way that it would have been unreasonable for Experian to expect). Thus, the

12  question is whether the CRA should have reasonably expected a user of its credit reports to be

13  misled by the reporting in question. *See Shaw*, 891 F.3d at 759 (explaining that the mere fact that

14  one of 15,000 users was misreading Experian's reporting did not make Experian liable); *Toliver v.*

15  *Experian Info. Solutions, Inc.*, 973 F. Supp. 2d 707, 717-18 (S.D. Tex. 2013) (holding that the

16  possibility of a third party misreading Experian's clearly defined codes "does not make the code

17  itself . . . inaccurate or misleading"); *Reyes v. Experian Info. Sols., Inc.*, No. 16-cv-0563, 2017 WL

18  4712075, at *4 (C.D. Cal. Oct. 13, 2017) (granting summary judgment for Experian and holding

19  that "[e]ven if Defendant's reporting was somehow 'selective' or 'incomplete,' it provided an

20  indisputably accurate impression of Plaintiff's credit history for purposes of making 'credit

21  decisions'") (citations omitted).

22       The question, then, is has Plaintiff met his *prima facie* burden of demonstrating that

23  Experian ever issued a consumer report that was either patently inaccurate or materially misleading

24  such that Experian should have reasonably expected it to mislead users of its data into making

25  adverse credit decisions. The answer, of course, is no.

26  **A.    There Was No Inaccurate Reporting During the Relevant Time.**

27       As described below, all of Plaintiff's theories of inaccuracy fail to meet the Ninth Circuit's

28

tests for inaccurate or misleading information. But Plaintiff's claims fail for a more fundamental reason: there is no evidence Experian ever issued an inaccurate consumer report. Under either § 1681e(b) or § 1681i, Plaintiff has a *prima facie* burden of showing that inaccurate information was included in a consumer report. *See e.g.*, *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("In order to make out a prima facie violation under § 1681e(b), a consumer must present evidence tending to show that a credit reporting agency prepared a report containing inaccurate information."); *Hogue v. Allied Collection Serv., Inc.*, No. 2:16-CV-1620, 2018 WL 771321, at *6 (granting summary judgment in part based on the fact that there was no evidence that disputed information was ever included in a consumer report); *Hannon v. Ne. Credit & Collections*, No. 2:16-CV-01814, 2018 WL 577216, at *1 (D. Nev. Jan. 26, 2018), ("a CRA must 'conduct a reasonable reinvestigation' upon receiving a dispute notice from a consumer concerning the accuracy of information in a consumer report"); *Wantz v. Experian Info. Sols.*, 386 F.3d 829, 833–34 (7th Cir. 2004), *abrogated on other grounds by Safeco*, 551 U.S. 47 ("There is no consumer report unless there is a 'communication ... for the purpose of serving as a factor in establishing the consumer's eligibility for' credit or other statutorily enumerated purposes, *i.e.*, there cannot be a consumer report without disclosure to a third party") (citing 15 U.S.C. § 1681a(d)(1)).

According to Plaintiff's own expert, it is indisputable that Webbank Account was reporting accurately after May 1, 2012, when it was updated to report as discharged in Plaintiff's bankruptcy. *Supra* at 11. Asked to confirm that "nobody in their right mind is going to think that there is a possibility of collection" after April 2012, Mr. Binder unequivocally agreed, responding: "That is correct. And there is no charge-off reporting after that either." (Ex. M at 50:8-51:6.) Mr. Binder confirmed that his Bankruptcy Filing concern was limited to *only* the two months in February and March 2012, as anyone viewing the Webbank Account after April 2012 would "unambiguously know that there's a zero-dollar balance and it's been discharged in bankruptcy." (*Id.* at 51:7-52:1.) The concerns raised about the Multiple Charge Off Theory were similarly no longer of concern as "there is no charge-off reporting after that [date of discharge] either." (*Id.* at 50:8-51:6.).) Of

1    course, Mr. Binder is correct. Once the account was reporting as "discharged in bankruptcy" with

2    a $0 balance, no user of an Experian credit report could possibly think it was subject to collections

3    or care when the account was first charged-off or whether it was charged-off multiple times (if that

4    were even possible). An account is "misleading" only when it might "materially alter how the

5    reported debt is understood" by creditors. *Gorman,* 584 F.3d at 1163. Because even Mr. Binder's

6    uneducated users of credit reports would understand that "discharged in bankruptcy" and $0

7    balance means that Webbank can no longer collect anything from Plaintiff, any theories regarding

8    misleading reporting unquestionably cease as of May 2012. This creates multiple incurable

9    problems for Plaintiff.

10        *First*, because all allegedly inaccurate reporting ceased in May 2012, only reports issued

11   before then could serve as a basis for liability. But the most recent report Experian issued prior to

12   the discharge was on August 9, 2011. (Methvin ¶ 35.) Plaintiff, however, waited until August 26,

13   2016 to file his case, and thus cannot rely on any consumer reports issued before August 26, 2011,

14   as such reports would be barred under the FCRA's five year statute of repose. *See* 15 U.S.C. §

15   1681p(2); *Drew v. Equifax Info. Servs.*, LLC, 690 F.3d 1100, 1109 (9th Cir. 2012) ([The FCRA]

16   provides that all claims arising from the alleged violation will repose "5 years after the date on

17   which the violation that is the basis for such liability occurs.") (quoting 15 U.S.C. § 1681p(2).)

18   All of Plaintiff's claims fail as there are no inaccurate consumer reports to support them.

19        *Second*, because there is no evidence to show that any reports *at all* were issued during

20   February-April, 2012, the only time that matters for the Bankruptcy Filing Theory, that theory fails

21   as a matter of law and cannot support a claim even without consideration of the statute of repose.

22        *Third*, Plaintiff's § 1681i claim fails for the additional reason that there was no inaccuracy

23   reporting at the time of H&K's dispute. The Ninth Circuit has held repeatedly that the Plaintiff has

24   the *prima facie* burden of demonstrating an inaccuracy in the reporting if he is to challenge a

25   CRA's investigation. The inaccuracy in question must exist in the disputed item *at the time of the*

26   *dispute. See Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir.2008) (§ 1681i creates no duty

27   to reinvestigate where "the credit report accurately reflect[s] the status of the information"

28

disputed.); *Carvalho*, 629 F.3d at 890 ("[W]e conclude that unless [Plaintiff] has raised a genuine issue as to whether the disputed item was inaccurate," her claims fail.); *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 67 (1st Cir. 2008) ("[I]f there is no genuine issue as to whether the [disputed] debt reported by [the CRA] was inaccurate, [the plaintiff's] claim fails as a matter of law."); *Hannon*, 2018 WL 577216, at *1 ("[t]o state a claim for liability under the reinvestigation provision, a plaintiff must establish that "1) his credit files contained inaccurate or incomplete information; 2) he directly notified [the CRA] of the inaccuracy . . .";).[4] Here, H&K sent in the dispute in 2015, more than three years *after* any allegedly misleading reporting identified by Mr. Binder. As Mr. Binder agrees, "nobody in their right mind" would be misled about the status of that account after that point. (Ex. M at 51:1-6.)  Because the item H&K disputed in 2015 was no longer reporting in the way Mr. Binder claimed was misleading, Plaintiff cannot demonstrate that Experian issued an inaccurate report after the dispute, and the § 1681i claim therefore fails.

### B.   Experian's Reporting of the Webbank Account Was Factually Accurate.

The Amended Complaint does not take issue with the factual accuracy of Experian's reporting of the Webbank Account, nor does Mr. Binder. (Ex. M at 46:23-47:5.) And the record in this case makes clear that any such attempt would fail. Plaintiff opened an account with Dell/Webbank, paid that account for some time, then stopped paying. (Ex. F at 32:13-34:6.) After Plaintiff stopped making payments, Webbank charged-off the account, writing off a loss of $991, a fact which Plaintiff has offered no evidence to contest. (Ex. F at 66:20-69:7.) The account remained in charge-off status each month until the bankruptcy discharge. Plaintiff then filed for Chapter 7 bankruptcy, and after two months, his personal liability on the account was discharged through that bankruptcy. All of these facts were clearly and unambiguously included on Plaintiff's credit report *three years* before H&K obtained Plaintiff's free credit report. As many other courts have explained, Experian's reporting of a consumer's bankruptcy discharge is accurate when it

---

[4] The dispute here did not mention the Multiple Charge Off Theory and it therefore cannot form the basis of liability under 1681i in any event. *See, e.g.*, *Peterson v. Am. Express*, No. CV-14-02056-PHX-GMS, 2016 WL 1158881, at *4 (D. Ariz. Mar. 23, 2016) (letter that does not refer specifically to inaccurate information insufficient to provide the notice required by § 1681i.)

makes clear that the debt is discharged and that the consumer is thus no longer personally liable, which is precisely what was reported here. *See, e.g.*, *Florence v. Cenlar Fed. Sav. & Loan*, No. 2:16-CV-0587-GMN-NJK, 2018 WL 1145804, at *6 (D. Nev. Mar. 1, 2018) ("[H]istorically accurate debts may be reported even after discharge, so long as the credit report indicates that the debts were discharged in bankruptcy.") (quoting *Harris v. Experian Info. Sols., Inc.*, No. 16–cv–02162–BLF, 2017 WL 1354778, at *6 (N.D. Cal. Apr. 13, 2017)); *Hupfauer v. Citibank, N.A.*, No. 16-C-0475, 2016 WL 4506798, at *2 (N.D. Ill. Aug. 19, 2016) (dismissing claims where credit report showed that bankruptcy was discharged and disputed account reported as foreclosed with a $0 balance). Experian's reporting has always had the facts of the Webbank Account exactly right.

### C. Experian's Reporting Was Not Materially Misleading.

Plaintiff, by way of Mr. Binder, puts forward two theories of misleading reporting. Neither meets the Ninth Circuit's test.

### 1. The Multiple Charge-Off Theory Fails.

Plaintiff's claim that the accurate monthly reporting of 'CO' notations in the account history implies that Webbank charged-off the account on multiple occasions or that the account was charged-off more recently than it actually was is wholly unsupported by the record in this case, and runs contrary to applicable case law. Initially, this *precise theory* has been considered and rejected by numerous courts. It fares no better here. *See Barakat*, 2017 WL 3720439 at *2-3, (E.D. Mich. 2017) (granting summary judgment to Experian on claims regarding the exact same reporting, finding that there was no basis to find monthly 'CO' reporting misleading); *Shaw v. Equifax Info. Sols., Inc.*, 204 F. Supp. 3d 956, 960 (E.D. Mich. 2016) (granting summary judgment to defendant based on identical reporting in which plaintiff alleged that the reporting indicated "that the account was charged-off on multiple occasions"); *Dominguez v. Macy's Retail Holdings Inc.*, No. CV-16-03242, 2016 WL 7440791, at *3 (D. Ariz. Dec. 27, 2016) (dismissing claim alleging the Multiple Charge Off Theory for lack of Article III standing as failing to plausibly allege misleading reporting causing injury).

Those decisions, of course, make perfect sense, since the reporting is not only not

"materially" misleading, it is not misleading at all. Here, Mr. Binder, retained to bolster this theory, provided testimony that demonstrates its failings. Mr. Binder testified it is impossible for a creditor to charge-off an account more than once. (Ex. M at 40:15-20.) He also testified that the tradeline clearly reported the date of the charge-off and any confusion would be a result of a misread by an improperly trained user. (*Id.* 30:7-18; 84:21-85:2.) And he recognized the CRRG instructs a creditor to report an 'L' in the payment history every month that the creditor reports the account, and a creditor can continue reporting charged-off accounts until the consumer pays off the balance or, as happened here, until the debt is discharged in bankruptcy. (*Id.* at 40:2-14; 53:9-54:6.) Unsurprisingly, Mr. Binder admitted that he had never known an instance where someone had in fact misunderstood this type of reporting, meaning that his opinion is the kind of unsupported conjecture that is insufficient at summary judgment. (*Id.* at 58:7-18.)

There is simply nothing inaccurate or possibly misleading about reporting the accurate account status for each month in the account history field. Indeed, that is the precise purpose of that field. It is especially not misleading when that account history is presented alongside the "account status" and "date of status," which left no doubt that the charge-off event happened in November 2010. It is thus utterly unsurprising that Mr. Binder has never seen nor heard of anyone being misled in the way he hypothesizes is possible for a user who lacks even a rudimentary understanding of basic credit terminology.

### 2.     The Bankruptcy Filing Theory Fails.

The Bankruptcy Filing Theory (that reporting the charge-off status during the pendency of the bankruptcy might somehow mislead someone into thinking the account was being actively collected) has also already been considered and rejected by numerous courts. Indeed, some courts found similar theories insufficient to even state a claim, let alone to survive summary judgment. *See, e.g. Doster v. Experian Info. Sols., Inc.*, No. 16-CV-04629-LHK, 2017 WL 264401, at *4 (N.D. Cal. Jan. 20, 2017) ("[A]s a matter of law, it is not misleading or inaccurate to report delinquent debts during the pendency of a bankruptcy proceeding prior to the discharge of the debts.") (collecting cases dismissing post-petition, pre-discharge claims of inaccuracy). These

1    decisions make sense as it is not the mere filing of a bankruptcy petition that changes the legal

2    status of a debt, but rather the discharge order itself that operates as a permanent injunction of the

3    debtor's personal liability. *See, e.g. Abeyta v. Bank of Am.*, No. 215CV02320RCJNJK, 2016 WL

4    1298109, at *2 (D. Nev. Mar. 31, 2016) ("[T]he Bankruptcy Code prevents certain collection

5    activities, but it does not alter the fact of delinquency . . . Congress explicitly declined via the

6    FCRA to prevent the reporting of delinquencies as to discharged debts for seven years and

7    bankruptcies themselves for ten."); *Hogue*, 2018 WL 771321, at *4 (D. Nev. Feb. 7, 2018)

8    ("Bankruptcy does not serve to rewrite history . . .[t]he indicators in plaintiff's payment history

9    section that the Silver State auto account was once delinquent does not change the fact the account

10   was discharged by the bankruptcy.") (citation omitted). Courts in this district have held "as a matter

11   of law, it is not misleading or inaccurate to report a delinquent debt during the pendency of a

12   bankruptcy, and that the industry guidelines—such as Metro 2—do not establish the standards for

13   accuracy under the FCRA." *Florence v. Cenlar Fed. Sav. & Loan*, No. 2:16-CV-0587-GMN-NJK,

14   2018 WL 1145804, at *7 (D. Nev. Mar. 1, 2018); *see also Doster v. Experian Info. Sols., Inc*., No.

15   16-CV-04629-LHK, 2017 WL 264401, at *5 (N.D. Cal. Jan. 20, 2017) (collecting cases and

16   finding that "courts in this district have repeatedly held that accurately reporting a delinquent debt

17   during the pendency of a bankruptcy is not rendered unlawful simply because a plaintiff alleges

18   that the reporting, though accurate, was inconsistent with industry standards").

19           In any event, as with the Multiple Charge-Off Theory, Plaintiff's Bankruptcy Filing Theory

20   is belied by the testimony of Plaintiff's own expert. Mr. Binder acknowledged that Plaintiff's

21   bankruptcy filing did not change the fact that Webbank had charged-off the account. (*Id.* at 54:22-

22   55:17.) Instead, he testified that his concern with the 'CO' reporting in February and March 2012

23   (the months during which Plaintiff's bankruptcy was pending) was based on the idea that this

24   reporting could somehow imply that Webbank was trying to actively collect on a charged-off debt

25   that was included in a bankruptcy. (*Id.* at 57:6-13.) To do so, Mr. Binder conceded that the reader

26   would have to assume that Webbank was violating the automatic stay in Plaintiff's bankruptcy.

27   (*Id.* at 44:3-8; 52:10-15; 55:22-25.) They would also, of course, have to assume that Webbank was

28

attempting to collect a charged-off debt, something that Mr. Binder admits is well known to be a debt that is *not* in active collections. (*Id.* 39:5-21.) Any user confused into thinking Webbank was both violating the automatic stay and trying to collect a debt they had written off is making a series of illogical and grievously wrong assumptions that are simply not the type of assumptions Experian can or should reasonably expect any user of its reports to make. It is thus, again, totally unsurprising that Mr. Binder testified that he was not aware of even a single instance where a creditor actually was misled by the kind of reporting at issue here. (*Id.* at 84:13-20.)

Finally, while Mr. Binder opined that Webbank's two months of account history reporting veered from the CRRG's Metro-2 guidelines with regard to account history, he agreed that those guidelines do not bind Experian. (*Id.* at 66:1-17.) Regardless, those same guidelines would have required that Webbank continue to report the "account status" field with a "charged-off" status until the discharge of his bankruptcy in May 2012, and there is no suggestion, much less any evidence, that reporting the charge-off status in two places (in both "account status" *and* in the account history) instead of just in "account status," while leaving account history blank, as Mr. Binder urges, would cause any additional confusion to a user of Experian's consumer reports. Indeed, any hypothetical, unsophisticated user who would have mistakenly interpreted the allegedly improper 'CO' notation in the account history as reflecting that Webbank was both violating the automatic stay and trying to collect a debt it had written off, would have been equally misled by the "charged off" notation in the account status field, which is indisputably consistent with Metro-2. Put simply, eliminating the reporting of the 'CO' notation in the account history grid would not make a difference to Mr. Binder's hypothetical, unsophisticated user who would still see that the account was charged off and reached the same illogical conclusions. Thus, any attempt to tether liability to Experian's purported non-compliance with Metro 2, must also fail.[5]

*      *      *      *

---

[5] Notably, Mr. Binder, revealing that this is not a case about whether Experian complied with Metro 2, testified at deposition that, despite Metro 2's guidance that furnishers should continue to report a "charge off" status in the account status field during the pendency of a bankruptcy, he does not believe such an approach is appropriate as it would still confuse his hypothetical, unsophisticated user. (Ex. M, at 75:16-76:13.)

1    For both the Multiple Charge-off and Bankruptcy Filing Theories, the Ninth Circuit's

2    recent decision in *Shaw* is instructive. There, unlike the hypothetical scenarios presented here,

3    there was an *actual* user of Experian's data who was, in fact, *actually* misreading the data which

4    was having an *actual* real world impact on consumers trying to secure mortgages. Fannie Mae, a

5    huge user of credit reports, was misreading Experian's reporting of a short sale and interpreting it

6    as a foreclosure. *See Shaw*, 891 F.3d at 753-54. In particular, Fannie Mae misinterpreted

7    Experian's account history code "9", which encompasses numerous types of statuses, not just short

8    sales. *Id.* at 752-54. The Court found that even though Fannie was actually misreading reports,

9    Experian should not have reasonably expected Fannie Mae to misread the reporting, since (like

10   this case) the precise status was reported in "account status," which should have made clear to any

11   reader of the report that the status was a short sale and not something else. Because Experian's

12   reporting itself was accurate, it could not be liable for Fannie Mae's refusal to properly read that

13   reporting. *See id.* at 759 ("The FCRA does not suggest that Experian should be liable for the

14   misconduct of one of those 15,000 subscribers . . . Nor should Experian necessarily be required to

15   amend its coding to curb a single subscriber's misconduct when all 14,999 other subscribers are

16   apparently accurately reading its manuals.")

17   Here, as in *Shaw*, there is no dispute that the reporting was accurate. Yet, unlike *Shaw*,

18   there is no real life example of a user misreading the reporting, only Mr. Binder's speculations.

19   And unlike *Shaw*, there is not even an arguable ambiguity in the reporting. Instead, Mr. Binder

20   points to hypothetical users who know nothing about credit reporting, the nature of charge-offs, or

21   the effects of filing bankruptcy, and who nevertheless blindly review credit reports and jump to

22   wrong conclusions not supported by the actual reporting. Of course, such a user could,

23   hypothetically, be misled by all kinds of otherwise accurate reporting. But such an unprepared user

24   should not be reading reports and making decisions based on them in the first place. Nor should

25   Experian be required to adapt its reporting to accommodate the hypothetical unprepared user.

26   Instead, Experian reasonably expects users of its reports to familiarize themselves with how the

27   reports read and what the reports mean and provides the means to do so.

28

Under guiding Ninth Circuit law, there is no dispute of fact regarding the nature of the reporting—it is not materially misleading because Experian could not, did not, and should not reasonably expect any user of its reports to be misled in the manner suggested by Plaintiff.

## II.   THERE IS NO EVIDENCE TO SHOW THAT EXPERIAN'S PURPORTED VIOLATIONS WERE WILLFUL.

Plaintiff claims that by handling H&K's dispute internally, rather than sending it to Webbank and asking its opinion, Experian violated § 1681i. Because Plaintiff seeks to certify a nationwide class, he bases his claims primarily on claims for willful violations of the FCRA that would entitle him to statutory damages. Willful violations of the FCRA may be either knowing or reckless, but "a company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Safeco*, 551 U.S. at 69. This is an objective standard, which must be supported by evidence at summary judgment. *See Shaw*, 891 F.3d at 760-61 (affirming summary judgment where the plaintiff-appellant "fail[ed] to show that any violation by Experian was willful").

Plaintiff claims that Experian willfully violated the FCRA by the "continued inaccurate and negative reporting of the discharged [Webbank Account] in light of its knowledge of the actual error" (Am. Compl. ¶ 46) and by "fail[ing] to timely notify Webbank" of Plaintiff's dispute. Neither claim survives scrutiny.

### A.   Experian's Reporting of the Webbank Account Cannot Amount to a Willful Violation.

Plaintiff's claims for a willful violation of § 1681e(b) essentially amount to a claim that reporting the Webbank account history with charge-off indicators in multiple months, including during the bankruptcy, amounts to a failure to use reasonable procedures when creating credit reports, in willful violation of the FCRA. (*See* Am. Compl. ¶ 44.) As explained above, Experian's reporting of the Webbank Account was entirely accurate, and indisputably so after it was discharged, which is a complete defense to claims under § 1681e(b). However, even if the reporting had been inaccurate, and even if inaccurate reports had been issued during the relevant time period,

the mere reporting of inaccurate information cannot support a finding of a willful violation of the FCRA because "[t]he FCRA does not impose strict liability." *Guimond*, 45 F.3d at 1333. Instead, "an agency can escape liability if it establishes that an inaccurate report was generated despite the agency's following reasonable procedures." *Id.* Indeed, where Experian's reporting has been upheld by a court, there can be no finding of willfulness. *See Safeco*, 551 U.S. at 70, n. 20 (explaining that a defendant cannot have willfully violated the FCRA where it "followed an interpretation that could reasonably have found support in the courts"). As described above, the Multiple Charge Off Theory and the Bankruptcy Filing Theory have both been considered and rejected by numerous courts. Thus, as Experian's reporting of the Webbank Account not only "could reasonably have found support in the courts," but actually has found support in the courts, time and time again, there is no argument that the reporting was willfully in violation of the FCRA.

### B. Experian's Notification of Plaintiff's Dispute to Webbank Did Not Violate the FCRA.

The heart of Plaintiff's case, and the impetus for his efforts to turn this case into a class action, arise from his misguided notion that Experian did not notify Webbank of his dispute because Experian did not send Webbank a communication known as an ACDV. But here, because Experian was able to resolve the dispute internally, it sent Webbank a different communication known as a DRN. The DRN informed Webbank that Experian had updated the account internally, based on a dispute received from Plaintiff, and showed Webbank how the account was reporting both before and after Experian resolved Plaintiff's dispute. Likewise, it seems as though Webbank received and acted on the DRN, as Webbank ceased its monthly reporting the same month Experian sent the DRN.

Plaintiff's theory comes into focus by considering his opposition to Experian's Motion to transfer venue, where he wrote:

> . . . the e-OSCAR platform is set up to route ACDVs and DRNs to different "queues" in eOSCAR, and that while data furnishers have set deadlines to respond to ACDVs, there is no required response in e-OSCAR for DRNs. Thus, to the degree Experian has a substantial, if not controlling, role in designing the communications platform through which furnishers are notified of and respond to consumer credit disputes, it may have set up that communications system to effectively extinguish a data furnisher's ability to

respond to a number of consumer disputes . . . In so doing, Experian minimized its own reinvestigation expenses by divesting itself of its obligation to consider and apply a substantial number of ACDV responses.

(ECF No. 51 at 10.)

Plaintiff's theory is not that Experian did not notify Webbank, but rather that Experian surreptitiously designed e-Oscar so that it could somehow save money by sending DRNs instead of ACDVs. Unsurprisingly, none of this tin-foil-hat conspiracy theory is borne out by the facts in this case. As an initial matter, it is no secret that the CRAs resolve many consumer disputes internally, sending DRNs to notify the furnisher after the updates are made. E-Oscar publishes documents which detail this process. (*See* Exs. C, D.) Regulatory authorities have long known of this practice. *See, e.g.,* Consumer Financial Protection Bureau, KEY DIMENSIONS AND PROCESSES IN THE U.S. CREDIT REPORTING SYSTEM, 4 (Dec. 2012) (noting that "The NCRAs resolve an average of 15% of trade line disputes internally (without furnisher involvement)") (attached as Ex. O). And even Mr. Binder agrees that the process is not only reasonable, but also frequently more consumer friendly than the sending of an ACDV. (Ex. M at 21:12-22:7.) Indeed, the Bureau of Consumer Financial Protection ("CFPB") recently created its own summary graphic of the consumer dispute process which explains that CRAs first resolve disputes internally if possible, providing notice after the update is made. *See* Consumer Financial Protection Bureau, SUPERVISORY HIGHLIGHTS CONSUMER REPORTING SPECIAL EDITION, Iss. 14, at 10 (March 2017) (attached as Ex. P).

This practice also aligns with the FCRA's reinvestigation requirements. When a consumer submits a dispute, the CRA must conduct a reinvestigation and notify the furnisher of the dispute within five business days. The FCRA is entirely silent as to whether the CRA's reinvestigation *must* involve requesting verification from the furnisher and waiting for the furnisher to respond (*i.e.* the ACDV process). In many cases, the furnisher is in a better position than the CRA to verify the accuracy of the disputed information. In others, there is no reason to ask the furnisher to verify information as proof submitted by the consumer or reasonable policies can allow for the update.

Moreover, in every case where Experian's use of DRNs to notify furnishers of a

1      consumer's dispute has been litigated (including numerous brought by Plaintiff's own lawyers

2      from Illinois), Experian has been granted summary judgment. *See, e.g., Pappas v. Experian Info.*

3      *Sols., Inc.*, No. 15-C-8115, 2017 WL 635145, at *4 (N.D. Ill. Feb. 16, 2017) (granting summary

4      judgment where Experian notified the data furnisher via a DRN and stating "the Court would be

5      hard-pressed to conclude that Experian knowingly or with reckless disregard violated the

6      FCRA");[6] *Banno v. Experian Info. Sols., Inc.*, No. 15 C 8291, 2017 WL 3087726, at *8 (N.D. Ill.

7      July 20, 2017) (same); *Webb v. Experian Info. Servs., Inc.*, No. 15 C 10355, 2017 WL 1022012,

8      at *5 (N.D. Ill. Mar. 16, 2017) (holding that "because Experian does send DRNs to data furnishers

9      whenever a consumer dispute causes Experian to update account information" it did not willfully

10     violate the FCRA by merely overlooking a single account in a consumer's dispute); *Jackson v.*

11     *Experian Info. Sols., Inc.*, 236 F. Supp. 3d 1058, 1061 (N.D. Ill. 2017) (granting summary

12     judgment to Experian in a case challenging the use of DRNs).[7]

13          Moreover, the very nature of DRNs, which typically are used when Experian makes the

14     updates requested by the consumer, suggests that they would not lead most consumers to complain,

15     for most consumers do not have the gall to sue *after getting what they asked for.* Indeed, plaintiffs

16     suing under the FCRA often argue the precise opposite:  that CRAs cannot conduct reasonable

17     reinvestigations by sending ACDVs. *See, e.g., Abernathy v. Cont'l Serv. Grp., Inc.*, No. 2:17-CV-

18     00636, 2018 WL 3370524, at *4 (D. Nev. July 9, 2018), *appeal dismissed*, No. 18-16499, 2018

19     WL 5880583 (9th Cir. Sept. 12, 2018) (summarizing plaintiff's argument that "reliance on the

20     ACDV process is deficient as a matter of law to establish a reasonable reinvestigation"). At bottom,

21     the complaint about DRNs is not one that originates with consumers, but rather with attorneys

22     looking to find fault even with consumer friendly processes work in their clients' favor.

23

24          [6] The *Pappas* court went further and issued sweeping sanctions against the lawyers who
brought the case, some of who represent Plaintiff here, finding filed in bad faith. *See Pappas v.*

25     *Experian Info. Sols.*, No. 15 C 8115, 2017 WL 3052978, at *2 (N.D. Ill. July 13, 2017).

         [7] The *Jackson* case was decided by Judge Kennelly, who also presided over the *Boren* class

26     action that was the subject of Experian's Motion to Transfer since it was materially identical to
this one. (*See* ECF No. 47.) After Judge Kennelly issued his opinion in *Jackson*, the *Boren* lawyers

27     had a change of heart, dropped that case, and joined up with the Nevada lawyers here, with hopes
this Court might disagree with Judge Kennelly and a slew of other judges.

28

There is no evidence to support a conclusion that Experian's reinvestigation and notice of dispute violated the FCRA at all, let alone willfully. Plaintiff's dispute was borderline if not actually frivolous, disputing an account that was already reporting as discharged with no post-discharge reporting, yet brazenly asking Experian to delete the account entirely or to wrongly update it to "current." There is no reason to think that Experian should have disputed this account externally by sending an ACDV, rather than taking the more efficient route and resolving it internally. Experian already knew that Plaintiff had filed a Chapter 7 bankruptcy and had been given a discharge order. Experian knew that this account was an unsecured account opened years before the petition was filed. In other words, Experian already had the information it needed to know that this debt was discharged as Plaintiff claimed, which is why the Webbank Account had been reporting as discharged *for three years* before the dispute. Even supposing that something would have been gained by disputing the Webbank Account through the ACDV process, the failure to do so was certainly not willfully or recklessly in violation of the FCRA. Experian is accordingly entitled to summary judgment that its reinvestigation willfully violated § 1681i.

## III. PLAINTIFF'S DISPUTE DID NOT IMPLICATE THE FCRA'S REINVESTIGATION PROVISIONS.

### A. The Dispute Was Not Made By Plaintiff Directly To Experian.

The FCRA does not require Experian to conduct a reinvestigation of items that are disputed by a third party, such as a credit repair organization. The statute provides:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed *by the consumer* and the consumer *notifies the agency directly*, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate . . . .

15 U.S.C. § 1681i(a)(1)(A) (emphasis added). Thus, two prerequisites are necessary to trigger a CRA's reinvestigation duty: a dispute must be made "by the consumer" who must convey it "directly" to the CRA. Neither prerequisite was satisfied here.

Initially, there is no dispute that Plaintiff did not write his dispute letter, nor did he mail it. (Ex. F at 72:10-74:2.) Instead, the dispute was written and mailed by H&K. Plaintiff's role was

limited to reviewing and signing the letter. As made evident by his deposition, Plaintiff could not have understood the content of his dispute as he does not understand what it means to say that Webbank charged-off the account, nor does he have any understanding of what his discharge means, or even if there is a difference between a debt being charged-off by a creditor and discharged in bankruptcy. (Ex. F at 62:17-63:3) When asked directly if he had any independent understanding, apart from his lawyers at H&K, as to the meaning of his dispute letter, he confirmed that he did not. (*Id.* at 75:7-76:6.) Hence, when the dispute letter stated "this account was discharged in my Bankruptcy . . . there should be no derogatory reporting after the filing date," that "the date of last activity on this account should pre-date my bankruptcy filing date," or otherwise described the effects of Plaintiff's bankruptcy, these statements originated with H&K, not Plaintiff. In short, this was not Plaintiff's dispute, but that of his lawyers at H&K. Obviously, H&K is not a consumer under the FCRA, see 15 U.S.C. § 1681a(c), thus the dispute was not made "by the consumer."

Likewise Plaintiff did not communicate the dispute directly to Experian. To the extent Plaintiff had any dispute of his own (a notion unsupported by the record in this case), he told it to H&K, not directly to Experian. *See In re Experian Info. Sols., Inc.*, No. CV-15-01212-PHX-GMS, 2017 WL 3559007, at *4 (D. Ariz. Aug. 17, 2017) ("The contrast between 'directly' and 'indirectly' is the contrast between the consumer doing something alone and the consumer doing something with the assistance of a third party.").

**B.    The FCRA Does Not Require Experian To Reinvestigate Disputes From Credit Repair Organizations Like H&K.**

Given that § 1681i applies only to disputes which come directly from the consumer, numerous cases have held that CRAs like Experian have no duty to reinvestigate disputes which come from credit repair organizations ("CRO"s) like H&K. *See, e.g.*, *In re Experian Info. Sols., Inc.*, 2017 WL 3559007, (D. Ariz. Aug. 17, 2017) (granting summary judgment to Experian on § 1681i claims where disputes originated with CRO); *Turner v. Experian Info. Sols., Inc.*, No. 3:16 CV 630, 2017 WL 2832738, at *8 (N.D. Ohio June 30, 2017), *aff'd*, No. 17-3795, 2018 WL 3648282 (6th Cir. Mar. 1, 2018) (same); *Klotz v. Trans Union, LLC*, No. CIV. A. 05-4580, 2008

WL 2758445, at *4 (E.D. Pa. July 16, 2008) (granting summary judgment to CRA under § 1681i where a CRO wrote the disputes, but the consumer signed and mailed them); *A-1 Credit & Assur. Co. v. Trans Union Credit Info. Co.*, 678 F. Supp. 1147, 1151 (E.D. Pa. 1988) (granting summary judgment on § 1681i claims, and stating that the CRA "was under no duty to recognize [the CRO] as the agent for any consumer"). Likewise, the Federal Trade Commission has explicitly stated that "[a] CRA need not investigate a dispute about a consumer's file raised by a third party - such as a 'credit repair organization' defined in 15 U.S.C. § 1679a(3) - because the obligation under this section arises only where file information is disputed 'by the consumer' who notifies the agency 'directly' of such dispute." Fed'l Trade Comm'n, 40 YEARS OF EXPERIENCE WITH THE FAIR CREDIT REPORTING ACT, 2011 WL 3020575, at *70.

To be sure, H&K is a credit repair organization. The Credit Repair Organizations Act ("CROA") defines "credit repair organization" as:

> . . . any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of--
>
> (i) improving any consumer's credit record, credit history, or credit rating; or
>
> (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)

15 U.S.C. § 1679a(3).

The record in this case makes clear that H&K meets both these tests.[8] There has never been a serious question that H&K advertises services aimed at improving a consumer's creditworthiness. H&K has long advertised that they can help consumers improve their creditworthiness, telling consumers that after a bankruptcy "it is vitally important to know how to effectively work on your credit score," that "Haines and Krieger Can Help," and that H&K will "guide you every step of the way from helping you dispute items in your credit report to filing a

---

[8] Experian sought discovery on this topic in May 2018, nearly a year ago, and H&K has vigorously opposed, no doubt because it recognizes the result. H&K sanctionably stonewalled at deposition, and Experian's motion to compel production of documents remains outstanding. (ECF No. 130.) Those documents may further supplement this argument.

1    lawsuit on your behalf." (Ex. Q at 0753 (compiled H&K websites).) There is certainly no dispute

2    that H&K uses the mail to provide its services, mailing form disputes to CRAs like Experian as

3    they did in this case.

4           Nor has there ever been a genuine dispute that H&K offers these services for monetary

5    compensation and other valuable consideration. H&K makes it explicit that the reason why it offers

6    its credit repair services for "free" to the consumer is *because* H&K's fees are paid by defendants

7    in the FCRA cases that result. (*Id.*) H&K has never contested that it has filed hundreds of such

8    cases, and has been paid handsomely for its credit repair services. The mere fact that H&K collects

9    its fees from defendants, rather than directly from consumers, makes no difference, as it does not

10   change the fundamental fact that H&K offers credit repair services because it gets paid to do so.

11   Nor does the mere fact that H&K also happens to be a law firm exempt them from the CROA, as

12   the Ninth Circuit has explained that "attorneys are credit repair organizations if they qualify under

13   the CROA." *Rannis v. Recchia*, 380 F. App'x 646, 649 (9th Cir. 2010); *see also FTC v. Gill*, 265

14   F.3d 944, 952 (9th Cir. 2001) (upholding summary judgment against a law firm for CROA

15   violations).

16          All of this precedent makes perfect sense. The purpose of § 1681i is to allow consumers to

17   dispute inaccurate information in their credit files. It was not intended as a means to legitimize

18   credit repair operations which manufacture baseless disputes in the hopes of having accurate, but

19   derogatory information removed from a consumer's file. Nor was it intended as a door to civil

20   litigation, allowing lawyers to manufacture cases by sending waves of form disputes, knowing that

21   in the overwhelming majority of those cases, defendants will make the pragmatic decision to settle,

22   rather than suffer the costs required to vindicate their rights. Indeed, in this case, Mr. Binder,

23   Plaintiff's own expert, agreed that CROs often file frivolous disputes, which can rightfully be

24   ignored. (Ex. M at 115:5-12.) Mr. Binder also agreed that the request in H&K's dispute letter to

25   entirely "delete" the Webbank Account was improper, as was the request to update the reporting

26   to "current." (*Id.* at 115:13-116:25.) These types of frivolous demands are, according to Mr.

27   Binder, hallmarks of CRO disputes. (*Id.* at 115:5-12.)

28

While it is true that in some cases it can be helpful for the consumer to consult an attorney in articulating their dispute, but that is not what happened here. In this case, there is no indication that, left to his own devices, Plaintiff would have filed any credit disputes at all. And, if he had not, nothing would have changed regarding his credit report. The Webbank Account still would have reported accurately, clearly showing that Plaintiff's liability was discharged in his bankruptcy. The only difference would have been that H&K would not have been able to extract meritless settlements from defendants who chose to pay H&K's ransom.

Enriching CROs like H&K was not the purpose of § 1681i and Experian cannot be liable under that section of the FCRA under the facts in this case.

## IV.     THERE IS NO EVIDENCE THAT EXPERIAN CAUSED ANY OF PLAINTIFF'S ALLEGED DAMAGES.

"The FCRA does not presume actual damages for a negligent or willful failure to comply with any of its requirements. Plaintiff bears the burden of proving that his damages were, in fact, *caused* by Defendant's violation." *Johnson v. Wells Fargo Home Mortg., Inc.*, 558 F. Supp. 2d 1114, 1122 (D. Nev. 2008) (emphasis added). Where a plaintiff fails to provide evidence that his damages were caused by the alleged violation, summary judgment is appropriate. *See, e.g.*, *Abernathy*, 2018 WL 3370524, at \*4 (D. Nev. July 9, 2018) (granting summary judgment on negligence claims under the FCRA where the plaintiff had "not produced evidence showing he suffered actual damages from any alleged Experian FCRA violation").

Here there is no evidence at all that any of the damages claimed by Plaintiff were caused by Experian, presuming those damages exist at all. First, there is no evidence that Experian's conduct caused any credit denials or even impacted Plaintiff's credit score, as even Mr. Binder concedes. Second, the alleged "out of pocket expenses" incurred for visiting his lawyers are unsupported and occurred before H&K even submitted the dispute, and are thus not recoverable. *See, e.g.*, *Johnson*, 558 F. Supp. 2d at 1136 (relying on cases holding that "liability arises under 1681i thirty days after the consumer reporting agency receives notice of the disputed item from the consumer" to interpret parallel provision in § 1681s-2) (quoting *Lawrence v. Trans Union LLC*, 296 F. Supp. 2d 582, 587 (E.D. Pa. 2003); *Acton v. Bank One Corp.*, 293 F. Supp. 2d 1092, 1100

(D. Ariz. 2003) ("Plaintiff could not have been damaged by Equifax's failure to comply with §

1681i until the 30–day reinvestigation period expired."). Finally, Plaintiff's testimony as to his

emotional distress shows that his concern was that he might not be able to make certain purchases

after his bankruptcy. As Experian's reporting after Plaintiff's bankruptcy was indisputably

accurate (as reflected in the deposition testimony of Plaintiff's expert), any concern Plaintiff had

was caused, not by Experian, but by Plaintiff's own misunderstanding about how the Webbank

Account could have impacted his ability to make new purchases.  Thus there is no competent

evidence to create a triable issue on whether Experian caused Plaintiff any damages.

## CONCLUSION.

For the above-stated reasons, Experian respectfully requests that this Court enter an order

granting Experian judgment as a matter of law and dismissing all of Plaintiff's claims with

prejudice.

DATED this 19th day of February 2019.

NAYLOR & BRASTER

By: /s/ Andrew J. Sharples
    Jennifer L. Braster
    Nevada Bar No. 9982
    Andrew J. Sharples
    Nevada Bar No. 12866
    1050 Indigo Drive, Suite 200
    Las Vegas, NV 89145

    Adam W. Wiers (*pro hac vice*)
    Christopher A. Hall (*pro hac vice*)
    JONES DAY
    77 W. Wacker Ave.
    Chicago, IL 60601

    *Attorneys for Defendant Experian Information Solutions, Inc.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Federal Rule of Civil Procedure 5(b), I hereby certify that I am an employee of NAYLOR & BRASTER and that on this <u>19th</u> day of February 2019, I caused the document **EXPERIAN INFORMATION SOLUTIONS, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be served through the Court's CM/ECF system addressed to the following counsel:

Matthew I Knepper
Miles N Clark
Knepper & Clark, LLC
10040 W. Cheyenne Ave. Suite 170-109
Las Vegas, NV 89129
Email: matthew.knepper@knepperclark.com
Email: miles.clark@knepperclark.com

David H. Krieger
Haines & Krieger, LLC
8985 S. Eastern Avenue, Suite 350
Henderson, NV 89123
Email: dkrieger@hainesandkrieger.com

Mohammed Omar Badwan
Sulaiman Law Group, Ltd.
2500 S Highland Ave Ste 200
Lombard, IL 60148
Email: mbadwan@sulaimanlaw.com

Thomas A. Zimmerman , Jr.
Matthew C. De Re
77 W. Washington St., Ste 1220
Chicago, IL 60602
Email: tom@attorneyzim.com
Email: matt@attorneyzim.com

Sean N. Payne
PAYNE LAW FIRM LLC
9550 S. Eastern Ave. Suite 253-A213
Las Vegas, NV 89123
Email: seanpayne@spaynelaw.com

*Attorneys for Plaintiff*

/s/ Andrew J. Sharples
An Employee of NAYLOR & BRASTER